# United States Court of Appeals
# for the District of Columbia Circuit

## No. 25-3041

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

DAN EDWIN WILSON, also known as Daniel Edwin Wilson,

*Defendant-Appellant.*

*On Appeal from the United States District Court for the District of Columbia in No. 1:23-cr-00427-DLF-1, Honorable Dabney L. Friedrich, U.S. District Judge*

# JOINT APPENDIX

\* George T. Pallas
GEORGE T. PALLAS, P.A.
2420 Coral Way
Miami, Florida
(305) 856-8580
george@pallaslaw.com

Carolyn A. Stewart
STEWART COUNTRY LAW PA
1204 Swilley Road
Plant City, Florida 33567
(813) 659-5178
carolstewart_esq@protonmail.com

*Counsel for Defendant-Appellant*

Chrisellen R. Kolb
Daniel J. Lenerz
Nicholas P. Coleman
  *Assistant U.S. Attorneys*
U.S. ATTORNEY'S OFFICE
601 D Street, NW, Room 8104
Washington, D.C. 20530
(202) 252-6833
chrisellen.r.kolb@usdoj.gov
daniel.lenerz@usdoj.gov
nicholas.coleman@usdoj.gov

*Counsel for Plaintiff-Appellee*

NOVEMBER 5, 2025

# TABLE OF CONTENTS

**Page**

District Court Docket Sheet for the District of Columbia
(Case No. 1:23-cr-00427) ...................................................................A1

Rule 20 Transfer Notice
(Case No. 1:24-cr-00238) ...............................................................A16

    Indictment dated January 18, 2023..........................................A17

    Notice of Designation of Pending Related Criminal Case .........................A22

    District Court Docket Sheet for the Western District of Kentucky
    (Case No. 3:23-cr-00003)...............................................................A23

Criminal Complaint
    filed May 17, 2023 .......................................................................A28

Indictment
    filed December 6, 2023..................................................................A29

Superseding Indictment
    filed April 17, 2024......................................................................A32

Second Superseding Information
    filed May 16, 2024 ........................................................................A47

Plea Agreement
(Case No. 1:24-cr-00238)
    filed May 20, 2024 .......................................................................A51

Statement of Offense
(Case No. 1:24-cr-00238)
    filed May 20, 2024 .......................................................................A65

Plea Agreement
(Case No. 1:23-cr-00427)
    filed May 20, 2024 .......................................................................A77

Statement of Offense
(Case No. 1:23-cr-00427)
    filed May 20, 2024 .......................................................................A91

Defendant's Sentencing Memorandum
    filed August 9, 2024 .......................................................................A103

Defendant's Reply Sentencing Memorandum
    filed August 15, 2024 .....................................................................A114

Judgment in a Criminal Case
(Case No. 1:24-cr-00238)
    filed September 17, 2024...............................................................A120

Judgment in a Criminal Case
(Case No. 1:23-cr-00427)
    filed September 17, 2024...............................................................A128

Transcript of May 17, 2024 Plea Hearing before
The Honorable Dabney L. Friedrich
    filed January 23, 2025 ..................................................................A135

Transcript of August 28, 2024 Plea Hearing before
The Honorable Dabney L. Friedrich
    filed January 23, 2025 ..................................................................A160

Defendant's Motion for Stay of Order Pertaining to Release from Custody
    filed January 26, 2025 ..................................................................A231

Government's Response to Court's Minute Order Dated February 3, 2025
    filed February 6, 2025 ..................................................................A235

Defendant's Reply to Government's Memorandum Regarding Scope of
Presidential Pardon
    filed February 7, 2025 ..................................................................A238

Minute Order
    filed February 7, 2025 ..................................................................A244

Defendant's Unopposed Motion to Vacate, Set Aside, or Correct Sentence
Pursuant to 28 U.S.C. § 2255
    filed February 24, 2025 ................................................................A245

Government's Response to Court's February 24, 2025 Order Regarding
Defendant's Motion for Relief Pursuant to 28 U.S.C. § 2255
    filed February 25, 2025 ................................................................A252

Minute Order
    filed February 26, 2025 .............................................................A256

Government's Response to Court's Minute Order Regarding Interpretation
of the Presidential Pardon
    filed February 26, 2025 .............................................................A257

Order Denying Motion to Vacate, Set Aside, or Correct Sentence
Pursuant to 28 U.S.C. § 2255
    filed March 13, 2025................................................................A261

Memorandum Opinion
    filed March 13, 2025................................................................A263

Transcript of February 26, 2025 Motions Hearing before
The Honorable Dabney L. Friedrich
    filed April 30, 2025.................................................................A282

District Court Docket Sheet for the District of Columbia
(Case No. 1:24-cr-00238) ...................................................................A344

**Query**    **Reports**    **Utilities**    **Help**    **Log Out**

APPEAL,CAT B,CLOSED

# U.S. District Court
## District of Columbia (Washington, DC)
## CRIMINAL DOCKET FOR CASE #: 1:23-cr-00427-DLF-1

Case title: USA v. WILSON                                    Date Filed: 12/06/2023

Related  Case: 1:25-cv-00545-DLF
Magistrate judge case number: 1:23-mj-00103-ZMF

---

Assigned to: Judge Dabney L. Friedrich

Appeals court case number: 25-3041

**Defendant (1)**

**DAN EDWIN WILSON**
*also known as*
DANIEL EDWIN WILSON

represented by   **George T. Pallas**
GEORGE T. PALLAS, P.A.
2420 Coral Way
Miami, FL 33145
305-856-8580
Fax: 305-860-4828
Email: george@pallaslaw.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Designation: Retained*

**Norman A Pattis**
PATTIS & PAZ, LLC
383 Orange Street
1st Floor
New Haven, CT 06511
203-393-3017
Fax: 203-393-9745
Email: npattis@pattispazlaw.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Designation: Retained*

**Scott T. Wendelsdorf**
WESTERN KY FEDERAL COMMUNITY
DEFENDER
629 S. 4th Street
Suite 200
Louisville, KY 40202
502-584-0525
Email: scott_wendelsdorf@fd.org
*TERMINATED: 03/20/2024*

A1

*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

| **Pending Counts** | **Disposition** |
|---|---|
| 18:1512(c)(2) and 2; TAMPERING WITH A WITNESS, VICTIM OR INFORMANT; Obstruction of an Official Proceeding and Aiding and Abetting. (1) | DISMISSED ON GOVERNMENT'S MOTION. |
| 18:1512(k); TAMPERING WITH WITNESS, VICTIM, OR AN INFORMANT; Conspiracy To Obstruct of an Official Proceeding (1s) | DISMISSED ON GOVERNMENT'S MOTION. |
| 18:372; CONSPIRE TO IMPEDE OR INJURE OFFICER; Conspiracy To Impede or Injure Officer (1ss) | Sixty (60) months incarceration to run concurrent to Count 1 and Count 2 in 24cr238. Three (3) years Supervised Release to run concurrent to Count 1 and Count 2 in 24cr238. $100 Special Assessment. $2,000 Restitution. |
| 18:1752(a)(1); TEMPORARY RESIDENCE OF THE PRESIDENT; Entering and Remaining in a Restricted Building or Grounds. (2) | DISMISSED ON GOVERNMENT'S MOTION. |
| 18:1512(c)(2) and 2; TAMPERING WITH A WITNESS, VICTIM OR INFORMANT; Obstruction of an Official Proceeding and Aiding and Abetting (2s) | DISMISSED ON GOVERNMENT'S MOTION. |
| 18:1512(k); TAMPERING WITH WITNESS, VICTIM, OR AN INFORMANT; Conspiracy To Obstruct of an Official Proceeding (2ss) | DISMISSED ON GOVERNMENT'S MOTION. |
| 18:1752(a)(2); TEMPORARY RESIDENCE OF THE PRESIDENT; Disorderly and Disruptive Conduct in a Restricted Building or Grounds. (3) | DISMISSED ON GOVERNMENT'S MOTION. |
| 18:1752(a)(1); TEMPORARY RESIDENCE OF THE PRESIDENT; Entering and Remaining in a Restricted Building or Grounds (3s) | DISMISSED ON GOVERNMENT'S MOTION. |
| 18:1512(c)(2) and 2; TAMPERING WITH A WITNESS, VICTIM OR INFORMANT; Obstruction of an Official Proceeding and Aiding and Abetting (3ss) | DISMISSED ON GOVERNMENT'S MOTION. |

A2

| | |
|---|---|
| 40:5104(e)(2)(D); VIOLENT ENTRY AND DISORDERLY CONDUCT ON CAPITOL GROUNDS; Disorderly Conduct in a Capitol Building. (4) | DISMISSED ON GOVERNMENT'S MOTION. |
| 18:1752(a)(2); TEMPORARY RESIDENCE OF THE PRESIDENT; Disorderly and Disruptive Conduct in a Restricted Building or Grounds (4s) | DISMISSED ON GOVERNMENT'S MOTION. |
| 18:1752(a)(1); TEMPORARY RESIDENCE OF THE PRESIDENT; Entering and Remaining in a Restricted Building or Grounds (4ss) | DISMISSED ON GOVERNMENT'S MOTION. |
| 40:5104(e)(2)(G); VIOLENT ENTRY AND DISORDERLY CONDUCT ON CAPITOL GROUNDS; Parading, Demonstrating, or Picketing in a Capitol Building. (5) | DISMISSED ON GOVERNMENT'S MOTION. |
| 40:5104(e)(2)(D); VIOLENT ENTRY AND DISORDERLY CONDUCT ON CAPITOL GROUNDS; Disorderly Conduct in a Capitol Building (5s) | DISMISSED ON GOVERNMENT'S MOTION. |
| 18:1752(a)(2); TEMPORARY RESIDENCE OF THE PRESIDENT; Disorderly and Disruptive Conduct in a Restricted Building or Grounds (5ss) | DISMISSED ON GOVERNMENT'S MOTION. |
| 40:5104(e)(2)(G); VIOLENT ENTRY AND DISORDERLY CONDUCT ON CAPITOL GROUNDS; Parading, Demonstrating, or Picketing in a Capitol Building (6s) | DISMISSED ON GOVERNMENT'S MOTION. |
| 40:5104(e)(2)(D); VIOLENT ENTRY AND DISORDERLY CONDUCT ON CAPITOL GROUNDS; Disorderly Conduct in a Capitol Building (6ss) | DISMISSED ON GOVERNMENT'S MOTION. |
| 40:5104(e)(2)(G); VIOLENT ENTRY AND DISORDERLY CONDUCT ON CAPITOL GROUNDS; Parading, Demonstrating, or Picketing in a Capitol Building (7ss) | DISMISSED ON GOVERNMENT'S MOTION. |

**Highest Offense Level (Opening)**

Felony

| **Terminated Counts** | **Disposition** |
|---|---|

A3

None

**Highest Offense Level (Terminated)**

None

| Complaints | Disposition |
|---|---|
| COMPLAINT in VIOLATION of 18 U.S.C. § 1512(c)(2); 18 U.S.C. § 1752(a)(1); 18 U.S.C. § 1752(a)(2); 40 U.S.C. § 5104(e)(2)(D); 40 U.S.C. § 5104(e)(2)(G) | |

---

**Plaintiff**

**USA**                                            represented by **Jennifer Leigh Blackwell**
                                                   US ATTORNEY GENERAL'S OFFICE/DC
                                                   555 4th Street, N.W.
                                                   Washington, DC 20530
                                                   (202) 803-1590
                                                   Email: jennifer.blackwell3@usdoj.gov
                                                   *LEAD ATTORNEY*
                                                   *ATTORNEY TO BE NOTICED*

                                                   **Taylor Fontan**
                                                   DOJ-USAO
                                                   601 D Street, N.W.
                                                   Washington, DC 20530
                                                   202-815-8597
                                                   Email: taylor.fontan@usdoj.gov
                                                   *LEAD ATTORNEY*
                                                   *ATTORNEY TO BE NOTICED*
                                                   *Designation: Assistant U.S. Attorney*

                                                   **Anthony William Mariano**
                                                   U.S. ATTORNEY'S OFFICE FOR THE
                                                   DISTRICT OF COLUMBIA
                                                   601 D Street, NW
                                                   Washington, DC 20530
                                                   (202) 476-0319
                                                   Email: anthony.mariano2@usdoj.gov
                                                   *TERMINATED: 09/04/2024*
                                                   *Designation: Assistant U.S. Attorney*

                                                   **Mindy L Deranek**
                                                   U.S. ATTORNEY'S OFFICE FOR THE
                                                   DISTRICT OF COLUMBIA
                                                   555 4th Street, NW
                                                   Washington, DC 20001
                                                   202-252-7776
                                                   Email: mindy.deranek@usdoj.gov
                                                   *ATTORNEY TO BE NOTICED*
                                                   *Designation: Assistant U.S. Attorney*

A4

| Date Filed | # | Docket Text |
|---|---|---|
| 05/17/2023 | 1 | COMPLAINT as to DANIEL EDWIN WILSON (1). (Attachments: # 1 Statement of Facts) (zltp) (Main Document 1 replaced on 5/25/2023) (zltp). (Attachment 1 replaced on 5/25/2023) (zltp). [1:23-mj-00103-ZMF] (Entered: 05/25/2023) |
| 05/17/2023 | 3 | MOTION to Seal Case by USA as to DANIEL EDWIN WILSON. (Attachments: # 1 Text of Proposed Order)(zltp) [1:23-mj-00103-ZMF] (Entered: 05/25/2023) |
| 05/17/2023 | 4 | ORDER granting 3 Motion to Seal Case as to DANIEL EDWIN WILSON (1). Signed by Magistrate Judge Zia M. Faruqui on 5/17/2023. (zltp) [1:23-mj-00103-ZMF] (Entered: 05/25/2023) |
| 05/25/2023 | 5 | Arrest Warrant, dated 5/17/2023, Returned Executed on 5/25/2023 as to DANIEL EDWIN WILSON. (zltp) [1:23-mj-00103-ZMF] (Entered: 05/25/2023) |
| 05/25/2023 | | Arrest of DANIEL EDWIN WILSON in Kentucky. (zltp) [1:23-mj-00103-ZMF] (Entered: 05/25/2023) |
| 05/25/2023 | | Case unsealed as to DANIEL EDWIN WILSON (zltp) [1:23-mj-00103-ZMF] (Entered: 05/25/2023) |
| 05/25/2023 | | MINUTE ORDER as to DANIEL EDWIN WILSON: It is hereby ORDERED that Defendant appear for an initial appearance on 6/8/2023 at 1:00 p.m. before Magistrate Judge Moxila A. Upadhyaya. The hearing will be conducted by video teleconference; call-in instructions will be provided to counsel prior to the hearing. Counsel for the United States is directed to ensure that counsel for Defendant has received this Order and will provide the information to Defendant. If Defendant does not have counsel, counsel for the United States is directed to contact the Office of the Federal Public Defender for the District of Columbia and provide their office with the information contained in this Order. If the parties have questions about this Order or the scheduled hearing, please contact the Courtroom Deputy at 202-354-3165. Signed by Magistrate Judge Robin M. Meriweather on 5/25/2023. (znjb) [1:23-mj-00103-ZMF] (Entered: 05/30/2023) |
| 06/08/2023 | 7 | NOTICE OF ATTORNEY APPEARANCE: Scott T. Wendelsdorf appearing for DANIEL EDWIN WILSON (Wendelsdorf, Scott) (Main Document 7 replaced on 6/8/2023) (zhsj). [1:23-mj-00103-ZMF] (Entered: 06/08/2023) |
| 06/08/2023 | | ORAL MOTION to Appoint Counsel by DANIEL EDWIN WILSON (1). (bb) [1:23-mj-00103-ZMF] (Entered: 06/08/2023) |
| 06/08/2023 | | ORAL MOTION for Speedy Trial by USA as to DANIEL EDWIN WILSON (1). (bb) [1:23-mj-00103-ZMF] (Entered: 06/08/2023) |
| 06/08/2023 | | Minute Entry for proceedings held before Magistrate Judge Moxila A. Upadhyaya: First Appearance in the District as to DANIEL EDWIN WILSON (1) held on 6/8/2023. Defendant was present by video and consented to proceed by video. Oral Motion to Appoint Counsel by DANIEL EDWIN WILSON (1); heard and granted. FPD, Scott Wendelsdorf was appointed for DANIEL EDWIN WILSON (1). The Court advised the Government of its due process obligations under Rule 5(f). Conditions of release were imposed. Defendant waived the right to have a Preliminary Hearing. Oral Motion by the Government for Speedy Trial Waiver as to DANIEL EDWIN WILSON (1); heard and granted. Time between 6/8/2023, and 8/1/2023, shall be excluded from calculation of time in the interest of justice (XT) under the Speedy Trial Act. Status Hearing set for 8/1/2023 at 1:00 PM by Telephonic/VTC before Magistrate Judge Moxila A. Upadhyaya. Bond Status of Defendant: Placed on Personal Recognizance Bond; Court Reporter: FTR Gold; FTR Time Frame: CTRM 5 [1:22:00-1:36:26], [1:46:29-1:55:02]; Defense Attorney: |

A5

|            |     | Scott Wendelsdorf; U.S. Attorney: Emory Cole and Anthony Mariano; Pretrial Officer: Katrina Stanford. (bb) [1:23-mj-00103-ZMF] (Entered: 06/08/2023) |
|------------|-----|---|
| 06/08/2023 |     | MINUTE ORDER as to DANIEL EDWIN WILSON (1): As required by Rule 5(f), the United States is ordered to produce all exculpatory evidence to the defendant pursuant to Brady v. Maryland and its progeny. Not doing so in a timely manner may result in sanctions, including exclusion of evidence, adverse jury instructions, dismissal of charges and contempt proceedings. Signed by Magistrate Judge Moxila A. Upadhyaya on 6/8/2023. (bb) [1:23-mj-00103-ZMF] (Entered: 06/08/2023) |
| 06/08/2023 | 9   | ORDER Setting Conditions of Release as to DANIEL EDWIN WILSON (1) Personal Recognizance Bond. Signed by Magistrate Judge Moxila A. Upadhyaya on 6/8/2023. (Attachments: # 1 Appearance Bond) (bb) [1:23-mj-00103-ZMF] (Entered: 06/08/2023) |
| 06/09/2023 | 10  | Unopposed MOTION for Protective Order by USA as to DANIEL EDWIN WILSON. (Attachments: # 1 Exhibit)(Mariano, Anthony) [1:23-mj-00103-ZMF] (Entered: 06/09/2023) |
| 06/09/2023 | 11  | Unopposed MOTION for Disclosure *of Materials Protected by Fed. R. Crim. P. 6(e)* by USA as to DANIEL EDWIN WILSON. (Mariano, Anthony) [1:23-mj-00103-ZMF] (Entered: 06/09/2023) |
| 06/14/2023 | 12  | PROTECTIVE ORDER setting forth procedures for handling confidential material; allowing designated material to be filed under seal as to DANIEL EDWIN WILSON. Signed by Magistrate Judge Moxila A. Upadhyaya on 6/14/2023. (zcll) [1:23-mj-00103-ZMF] (Entered: 06/14/2023) |
| 06/14/2023 |     | MINUTE ORDER as to DANIEL EDWIN WILSON, GRANTING the government's unopposed 11 Motion for an Order to Disclose Items Protected by Federal Rule of Criminal Procedure 6(e) and Sealed Materials and AUTHORIZING the government, pursuant to Federal Rule of Criminal Procedure 6(e)(3)(E)(i) and the previously entered 12 Protective Order governing discovery in this case, to provide to defendant, and any co-defendants who may later be joined, materials protected by Federal Rule of Criminal Procedure 6(e), insofar as such disclosure is necessary for the government to comply with its discovery and disclosure obligations. granting 11 Motion for Disclosure as to DANIEL EDWIN WILSON (1). So ORDERED, by Chief Judge James E. Boasberg on 6/14/2023. (nbn) [1:23-mj-00103-ZMF] (Entered: 06/14/2023) |
| 07/28/2023 | 14  | Joint MOTION to Continue *Status Hearing and Exclude Time Under the Speedy Trial Act* by USA as to DANIEL EDWIN WILSON. (Attachments: # 1 Text of Proposed Order) (Mariano, Anthony) [1:23-mj-00103-ZMF] (Entered: 07/28/2023) |
| 07/28/2023 | 15  | MOTION to Exclude Time Under the Speedy Trial Act by USA as to DANIEL EDWIN WILSON. (See Docket Entry 14 to View Document). (zhsj) [1:23-mj-00103-ZMF] (Entered: 07/31/2023) |
| 07/31/2023 | 16  | ORDER granting 14 Motion to Continue Status Hearing and Exclude Time as to DANIEL EDWIN WILSON (1). Status hearing continued to 10/3/2023 at 1:00 PM by Telephonic/VTC before Magistrate Judge Moxila A. Upadhyaya. Signed by Magistrate Judge Robin M. Meriweather on 7/31/2023. (zcll) [1:23-mj-00103-ZMF] (Entered: 08/03/2023) |
| 10/02/2023 | 18  | Joint MOTION to Continue *Status Hearing and Exclude Time Under the Speedy Trial Act* by USA as to DANIEL EDWIN WILSON. (Attachments: # 1 Text of Proposed Order) (Mariano, Anthony) [1:23-mj-00103-ZMF] (Entered: 10/02/2023) |
| 10/02/2023 | 19  | MOTION to Exclude Time Under the Speedy Trial Act by USA as to DANIEL EDWIN WILSON. (See Docket Entry 18 to View Document). (zhsj) [1:23-mj-00103-ZMF] |

A6

| | | (Entered: 10/02/2023) |
|---|---|---|
| 10/03/2023 | 20 | ORDER granting 18 Motion to Continue Status Hearing and Exclude Time as to DANIEL EDWIN WILSON. Status Hearing continued to 11/2/2023 at 1:00 PM by Telephonic/VTC before Magistrate Judge Zia M. Faruqui. Signed by Magistrate Judge Moxila A. Upadhyaya on 10/3/2023. (znjb) [1:23-mj-00103-ZMF] (Entered: 10/03/2023) |
| 10/31/2023 | 21 | Joint MOTION to Continue *Status Hearing and Exclude Time Under the Speedy Trial Act* by USA as to DANIEL EDWIN WILSON. (Attachments: # 1 Text of Proposed Order) (Mariano, Anthony) [1:23-mj-00103-ZMF] (Entered: 10/31/2023) |
| 10/31/2023 | 22 | MOTION to Exclude Time Under the Speedy Tria Act by USA as to DANIEL EDWIN WILSON. (See Docket Entry 21 to View Document). (zhsj) [1:23-mj-00103-ZMF] (Entered: 10/31/2023) |
| 11/01/2023 | 24 | ORDER granting 21 Motion to Continue Status Hearing and Exclude Time as to DANIEL EDWIN WILSON. Status Hearing continued to 12/7/2023 at 1:00 PM by Telephonic/VTC before Magistrate Judge Robin M. Meriweather. Signed by Magistrate Judge Zia M. Faruqui on 11/1/2023. (znjb) [1:23-mj-00103-ZMF] (Entered: 11/01/2023) |
| 12/06/2023 | 26 | INDICTMENT as to DAN EDWIN WILSON (1) count(s) 1, 2, 3, 4, 5. (zhsj) (Entered: 12/07/2023) |
| 12/06/2023 | | MINUTE ORDER: The hearing currently scheduled for 12/7/2023 before Magistrate Judge Robin M. Meriweather is hereby VACATED, as DANIEL EDWIN WILSON: has had an initial appearance in this jurisdiction and has been charged Indictment. As such, there are no pending matters necessitating action by a magistrate judge. The parties are directed to contact the assigned District Judge to schedule a status hearing and arraignment, if one has not yet been set. The parties are instructed to address any requests to toll the Speedy Trial Act to the assigned District Judge. Signed by Magistrate Judge G. Michael Harvey on 12/6/2023. (znjb) (Entered: 12/07/2023) |
| 12/06/2023 | | Terminate Deadlines and Hearings as to DAN EDWIN WILSON: Status Hearing continued to 12/7/2023 at 1:00 PM by Telephonic/VTC before Magistrate Judge Robin M. Meriweather is hereby VACATED. (znjb) (Entered: 12/07/2023) |
| 12/07/2023 | | MINUTE ORDER. Pursuant to the Due Process Protections Act, the Court ORDERS that all government counsel shall review their disclosure obligations under Brady v. Maryland, 373 U.S. 83 (1963), and its progeny, as set forth in Local Criminal Rule 5.1, and comply with those provisions. The failure to comply could result in dismissal of the indictment or information, dismissal of individual charges, exclusion of government evidence or witnesses, continuances, Bar discipline, or any other remedy that is just under the circumstances. Further, the parties are directed to submit any requests to toll under the Speedy Trial Act to the Court by filing a motion on the public docket. So Ordered by Judge Dabney L. Friedrich on December 7, 2023. (lcdlf3) (Entered: 12/07/2023) |
| 12/11/2023 | | Set/Reset Hearings as to DAN EDWIN WILSON: Arraignment set for 12/12/2023 at 9:30 AM via video before Judge Dabney L. Friedrich. (zjch, ) (Entered: 12/11/2023) |
| 12/11/2023 | | NOTICE OF HEARING as to DAN EDWIN WILSON. Arraignment set for 12/12/2023 at 9:00 AM via video before Judge Dabney L. Friedrich. (zjch, ) (Entered: 12/11/2023) |
| 12/12/2023 | | Minute Entry for Arraignment and Status Conference as to DAN EDWIN WILSON on Counts 1,2,3,4,5 held on 12/12/2023 before Judge Dabney L. Friedrich. Not Guilty Plea entered as to DAN EDWIN WILSON on all counts. Speedy Trial Excludable (XT) started 12/12/2023 through 2/7/2024 in the interest of justice as to DAN EDWIN WILSON. Status Report due by 2/5/2024. Status Conference set for 2/7/2024 at 9:00 AM via video before Judge Dabney L. Friedrich. Bond Status of Defendant: Personal Recognizance; |

A7

| | | Court Reporter: Sara Wick; Defense Attorney: Scott Wendelsdorf; US Attorney: Anthony Mariano. (zjch, ) (Entered: 12/12/2023) |
|---|---|---|
| 02/02/2024 | 28 | MOTION to Dismiss Count *Count 1 of Indictment*, MOTION to Stay *Proceedings* by DAN EDWIN WILSON. (Attachments: # 1 Text of Proposed Order, # 2 Text of Proposed Order)(Wendelsdorf, Scott) (Entered: 02/02/2024) |
| 02/02/2024 | 29 | Joint STATUS REPORT by USA as to DAN EDWIN WILSON (Attachments: # 1 Text of Proposed Order)(Mariano, Anthony) (Entered: 02/02/2024) |
| 02/05/2024 | 31 | Memorandum in Opposition by USA as to DAN EDWIN WILSON re 28 Motion to dismiss count(s), Motion to Stay (Mariano, Anthony) (Entered: 02/05/2024) |
| 02/07/2024 | | Minute Entry for Status Conference as to DAN EDWIN WILSON held on 2/7/2024 before Judge Dabney L. Friedrich. Speedy Trial Excludable (XT) started 2/7/2024 through 7/22/2024 in the interest of justice as to DAN EDWIN WILSON. Jury Trial set for 7/22/2024 at 9:00 AM in Courtroom 14- In Person before Judge Dabney L. Friedrich. Status Conference set for 5/3/2024 at 9:00 AM via video before Judge Dabney L. Friedrich. Bond Status of Defendant: Personal Recognizance; Court Reporter: Sara Wick; Defense Attorney: Scott Wendelsdorf; US Attorney: Anthony Mariano. (zjch, ) (Entered: 02/07/2024) |
| 02/07/2024 | | MINUTE ORDER. For the reasons stated from the bench during today's hearing, the defendant's 28 Motion to Dismiss Count One and Motion to Stay Proceedings is DENIED. The parties shall appear on May 3, 2024 at 9:00 a.m. by video for another status conference. Further, as stated during today's hearing, the Court finds that the "ends of justice outweigh the best interest of the public and the defendant in a speedy trial." 18 U.S.C. § 3161(h)(7)(A). Accordingly, pursuant to the Speedy Trial Act and with the consent of the defendants, the time from February 7, 2024 to July 22, 2024 shall be excluded in computing the date for a speedy trial in this case. So Ordered by Judge Dabney L. Friedrich on February 7, 2024. (lcdlf3) (Entered: 02/07/2024) |
| 03/12/2024 | 40 | NOTICE OF ATTORNEY APPEARANCE: Norman A Pattis appearing for DAN EDWIN WILSON (Pattis, Norman) (Entered: 03/12/2024) |
| 03/13/2024 | 41 | MOTION to Withdraw as Attorney by Scott T. Wendelsdorf. by DAN EDWIN WILSON. (Attachments: # 1 Text of Proposed Order)(Wendelsdorf, Scott) (Entered: 03/13/2024) |
| 03/20/2024 | | MINUTE ORDER as to DAN EDWIN WILSON granting 34 Motion to Withdraw as Attorney. Scott T. Wendelsdorf is withdrawn from the case. So ordered by Judge Dabney L. Friedrich on March 20, 2024. (lcdlf3) (Entered: 03/20/2024) |
| 04/17/2024 | 47 | SUPERSEDING INDICTMENT as to DAN EDWIN WILSON (1) count(s) 1s, 2s, 3s, 4s, 5s, 6s, DAVID SCOTT KUNTZ (2) count(s) 1s, 2s, 3s, 4s, 5s. (zljn) (Entered: 04/18/2024) |
| 04/19/2024 | 49 | NOTICE OF ATTORNEY APPEARANCE Mindy L Deranek appearing for USA. (Deranek, Mindy) (Entered: 04/19/2024) |
| 04/24/2024 | | NOTICE OF HEARING as to DAN EDWIN WILSON Arraignment set for 5/3/2024 at 9:00 AM via video before Judge Dabney L. Friedrich. (zjch, ) (Entered: 04/24/2024) |
| 04/30/2024 | 50 | MOTION for Hearing *to be Adjourned* by DAN EDWIN WILSON. (Pattis, Norman) (Entered: 04/30/2024) |
| 04/30/2024 | | MINUTE ORDER. In light of the defendant's 50 Consent Motion for Hearing to be Adjourned, on or before May 1, 2024, defense counsel shall supplement his consent motion with the parties' positions on whether the Court should exclude time under the |

A8

| | | |
|---|---|---|
| | | Speedy Trial Act. Counsel shall also include grounds for any such extension. So ordered by Judge Dabney L. Friedrich on April 30, 2024. (lcdlf3) (Entered: 04/30/2024) |
| 05/01/2024 | 51 | MOTION to Exclude *Time From Speedy Trial Requirements* by DAN EDWIN WILSON. (Pattis, Norman) (Entered: 05/01/2024) |
| 05/01/2024 | | MINUTE ORDER as to DAN EDWIN WILSON. Based upon the representations in the defendant's 50 Consent Motion for Hearing to be Adjourned, the May 3, 2024 hearing is vacated. Despite the Court's April 30, 2024 order, the Court had previously excluded time through July 22, 2024, and will deny therefore deny the parties' 51 motion as moot. So ordered by Judge Dabney L. Friedrich on May 1, 2024. (lcdlf3) (Entered: 05/01/2024) |
| 05/01/2024 | | Terminate Deadlines and Hearings as to DAN EDWIN WILSON (1). (zjch, ) (Entered: 05/02/2024) |
| 05/02/2024 | | NOTICE OF HEARING as to DAN EDWIN WILSON (1), DAVID SCOTT KUNTZ (2). Arraignment set for 5/7/2024 at 9:30 AM via video before Judge Dabney L. Friedrich. (zjch, ) (Entered: 05/02/2024) |
| 05/07/2024 | | Minute Entry for status and Arraignment as to DAN EDWIN WILSON (1) on Counts 1s,2s,3s,4s,5s,6s held on 5/7/2024 before Judge Dabney L. Friedrich. Speedy Trial Excludable (XT) started 5/7/2024 through 6/12/2024 in the interest of justice as to DAN EDWIN WILSON (1). Motions due by 7/30/2024. Responses due by 8/13/2024. Replies due by 8/20/2024. Jury Trial set for 10/15/2024 at 9:00 AM in Courtroom 14- In Person before Judge Dabney L. Friedrich. Plea Agreement Hearing set for 5/17/2024 at 2:30 PM in Courtroom 14- In Person before Judge Dabney L. Friedrich. Bond Status of Defendant: Personal Recognizance; Court Reporter: Sara Wick. Defense Attorney: Norman Pattis; US Attorney: Anthony Mariano and Mindy Deranek. (zjch, ) (Entered: 05/07/2024) |
| 05/16/2024 | 54 | SECOND SUPERSEDING INFORMATION as to DAN EDWIN WILSON (1) count(s) 1ss, 2ss, 3ss, 4ss, 5ss, 6ss, 7ss. (zljn) Modified on 5/17/2024 (ztnr). (Entered: 05/17/2024) |
| 05/17/2024 | | Minute Entry for Arraignment and Plea Agreement as to DAN EDWIN WILSON (1) as to Count 1ss held on 5/17/2024 before Judge Dabney L. Friedrich. Guilty Plea entered by DAN EDWIN WILSON (1) as to Count 1ss. REFERRAL TO PROBATION OFFICE for Presentence Investigation. Responses to Sentencing due by 8/15/2024. Sentencing Memorandum due by 8/9/2024. Sentencing set for 8/22/2024 at 11:00 AM in Courtroom 14- In Person before Judge Dabney L. Friedrich. Bond Status of Defendant: Personal Recognizance; Court Reporter: Sara Wick; Defense Attorney: Norman Pattis; US Attorney: Anthony Mariano and Mindy Deranek. (zjch, ) (Entered: 05/20/2024) |
| 05/20/2024 | 56 | PLEA AGREEMENT as to DAN EDWIN WILSON (1) (zjch, ) (Entered: 05/20/2024) |
| 05/20/2024 | 57 | WAIVER of Trial by Jury as to DAN EDWIN WILSON (1). Approved by Judge Dabney L. Friedrich on 5/17/2024. (zjch, ) (Entered: 05/20/2024) |
| 05/20/2024 | 58 | WAIVER OF INDICTMENT by DAN EDWIN WILSON (1). Signed by Judge Dabney L. Friedrich on 5/17/2024. (zjch, ) (Entered: 05/20/2024) |
| 05/20/2024 | 59 | STATEMENT OF OFFENSE by DAN EDWIN WILSON (1). (zjch, ) (Entered: 05/20/2024) |
| 07/30/2024 | 61 | NOTICE OF ATTORNEY APPEARANCE Taylor Fontan appearing for USA. (Fontan, Taylor) (Entered: 07/30/2024) |
| 07/30/2024 | 62 | MOTION in Limine by USA as to DAN EDWIN WILSON, DAVID SCOTT KUNTZ. (Attachments: # 1 Exhibit A-Fitzsimons Transcript, # 2 Exhibit B-Badalian Transcript) (Fontan, Taylor) (Entered: 07/30/2024) |

A9

| 07/31/2024 | | MINUTE ORDER as to DAVID SCOTT KUNTZ (2). On May 7, 2024, the Court ordered the parties to file any pretrial motions on or before July 30, 2024. The Court set dates for a motions hearing (August 26, 2024) and trial (October 15, 2024). As of today, the defendant has filed no pretrial motions. Accordingly, the defendant shall promptly, and no later than August 5, 2024, file any pretrial motions. In addition, the parties shall file a joint status report on or before August 5 stating whether (1) the August 26, 2024 motions hearing can be vacated and/or converted to a status hearing and (2) whether a trial in this case is anticipated. So ordered by Judge Dabney L. Friedrich on July 31, 2024. (lcdlf3) (Entered: 07/31/2024) |
| 08/08/2024 | | Set/Reset Deadlines/Hearings as to DAN EDWIN WILSON: Motions due by 7/30/2024. Motion in Limine due by 9/16/2024. Responses due by 8/13/2024 Replies due by 8/20/2024. Witness List due by 10/8/2024. Jury Trial set for 10/15/2024 at 10:00 AM in Courtroom 12- In Person before Judge Dabney L. Friedrich. Pretrial Conference set for 10/8/2024 at 10:00 AM in Courtroom 12- In Person before Judge Dabney L. Friedrich. (zjch, ) (Entered: 08/08/2024) |
| 08/09/2024 | 66 | SENTENCING MEMORANDUM by DAN EDWIN WILSON (Pattis, Norman) (Entered: 08/09/2024) |
| 08/09/2024 | 67 | SENTENCING MEMORANDUM by USA as to DAN EDWIN WILSON (Attachments: # 1 Exhibit 1-21)(Mariano, Anthony) (Entered: 08/09/2024) |
| 08/15/2024 | 68 | SENTENCING MEMORANDUM by DAN EDWIN WILSON (Pattis, Norman) (Entered: 08/15/2024) |
| 08/20/2024 | | NOTICE OF HEARING as to DAN EDWIN WILSON (1). Sentencing set for 8/28/2024 at 10:00 AM in Courtroom 14- In Person before Judge Dabney L. Friedrich. (zjch, ) (Entered: 08/20/2024) |
| 08/28/2024 | | Minute Entry for Sentencing held on 8/28/2024 before Judge Dabney L. Friedrich as to DAN EDWIN WILSON (1): It is the judgment of the Court, the Defendant is hereby committed to the custody of the Bureau of Prisons for Sixty (60) months as to Count 1ss, to run concurrently to Count 1 and Count 2 in 24cr238. The Defendant is further sentenced to serve a Three (3) year term of Supervised Release as to Count 1ss, to run concurrently to Count 1 and Count 2 in 24cr238. It is further ordered that the Defendant pay a $100 Special Assessment and Restitution in the amount of $2,000. Oral Government Motion to dismiss all remaining counts, heard and GRANTED. Oral Government Motion for remand (pursuant to the plea agreement) heard and GRANTED. Bond Status of Defendant: Remanded/Commitment Issued. US Attorneys: Anthony Mariano and Mindy Deranek. Defense Attorney: Norman Pattis. Probation Officer: Sherry Baker. Court Reporter: Sara Wick. (smc) (Entered: 08/28/2024) |
| 09/04/2024 | 75 | NOTICE OF WITHDRAWAL OF APPEARANCE *by Anthony Mariano* by USA as to DAN EDWIN WILSON, DAVID SCOTT KUNTZ (Mariano, Anthony) (Entered: 09/04/2024) |
| 09/17/2024 | 79 | JUDGMENT as to DAN EDWIN WILSON. Statement of Reasons Not Included. Signed by Judge Dabney L. Friedrich on 09/17/2024. (zljn) (Entered: 09/18/2024) |
| 09/17/2024 | 80 | STATEMENT OF REASONS as to DAN EDWIN WILSON re 79 Judgment Access to the PDF Document is restricted per Judicial Conference Policy. Access is limited to Counsel of Record and the Court. Signed by Judge Dabney L. Friedrich on 09/17/2024. (zljn) (Entered: 09/18/2024) |
| 01/23/2025 | 98 | TRANSCRIPT OF PLEA HEARING in case as to DAN EDWIN WILSON before Judge Dabney L. Friedrich held on 05/17/2024. Page Numbers: 1-44. Date of Issuance: |

A10

| | | |
|---|---|---|
| | | 01/23/2025. Court Reporter: Sara Wick, telephone number 202-354-3284. Transcripts may be ordered by submitting the Transcript Order Form<br><br>For the first 90 days after this filing date, the transcript may be viewed at the courthouse at a public terminal or purchased from the court reporter referenced above. After 90 days, the transcript may be accessed via PACER. Other transcript formats, (multi-page, condensed, CD or ASCII) may be purchased from the court reporter.<br><br>**NOTICE RE REDACTION OF TRANSCRIPTS:** The parties have twenty-one days to file with the court and the court reporter any request to redact personal identifiers from this transcript. If no such requests are filed, the transcript will be made available to the public via PACER without redaction after 90 days. The policy, which includes the five personal identifiers specifically covered, is located on our website at www.dcd.uscourts.gov.<br><br>Redaction Request due 2/13/2025. Redacted Transcript Deadline set for 2/23/2025. Release of Transcript Restriction set for 4/23/2025.(Wick, Sara) (Entered: 01/23/2025) |
| 01/23/2025 | 99 | TRANSCRIPT OF SENTENCING HEARING in case as to DAN EDWIN WILSON before Judge Dabney L. Friedrich held on 08/28/2024. Page Numbers: 1-71. Date of Issuance: 01/23/2025. Court Reporter: Sara Wick, telephone number 202-354-3284. Transcripts may be ordered by submitting the Transcript Order Form<br><br>For the first 90 days after this filing date, the transcript may be viewed at the courthouse at a public terminal or purchased from the court reporter referenced above. After 90 days, the transcript may be accessed via PACER. Other transcript formats, (multi-page, condensed, CD or ASCII) may be purchased from the court reporter.<br><br>**NOTICE RE REDACTION OF TRANSCRIPTS:** The parties have twenty-one days to file with the court and the court reporter any request to redact personal identifiers from this transcript. If no such requests are filed, the transcript will be made available to the public via PACER without redaction after 90 days. The policy, which includes the five personal identifiers specifically covered, is located on our website at www.dcd.uscourts.gov.<br><br>Redaction Request due 2/13/2025. Redacted Transcript Deadline set for 2/23/2025. Release of Transcript Restriction set for 4/23/2025.(Wick, Sara) (Entered: 01/23/2025) |
| 01/26/2025 | 100 | MOTION for Order Stay of order to return to prison by DAN EDWIN WILSON as to DAN EDWIN WILSON, DAVID SCOTT KUNTZ. (Pattis, Norman) (Entered: 01/26/2025) |
| 01/27/2025 | | VACATED PURSUANT TO ORDER ENTERED 2/13/2025.....MINUTE ORDER as to DAN EDWIN WILSON (1). The government shall file its response to the defendant's 100 Motion for Order of Stay of Order to Return to Prison on or before January 28, 2025. So Ordered by Judge Dabney L. Friedrich on January 27, 2025. (lcdlf2) Modified on 2/13/2025 (zjch, ). (Entered: 01/27/2025) |
| 01/28/2025 | 101 | RESPONSE TO ORDER OF THE COURT by USA as to DAN EDWIN WILSON re Order,, Set Deadlines, (Blackwell, Jennifer) (Entered: 01/28/2025) |
| 01/28/2025 | | MINUTE ORDER as to DAN EDWIN WILSON (1) granting the defendant's unopposed 100 Motion for Order of Stay. Accordingly, at least at this time, the defendant is not required to surrender to the Bureau of Prisons. So Ordered by Judge Dabney L. Friedrich on January 28, 2025. (lcdlf2) (Entered: 01/28/2025) |

A11

| 01/30/2025 | [102](#) | MOTION to Withdraw as Attorney by Mindy Deranek. by USA as to DAN EDWIN WILSON. (Deranek, Mindy) (Entered: 01/30/2025) |
|---|---|---|
| 02/03/2025 | | MINUTE ORDER as to DAN EDWIN WILSON (1). On May 17, 2024, Mr. Wilson pled guilty to Counts 1 and 2 of the Indictment in No. 3:23-cr-3 (W.D. Ky.), which charged him with Possession of a Firearm by a Prohibited Person, in violation of 18 U.S.C. §§ 922(g)(1) & 924(a)(2), and Possession of an Unregistered Firearm, in violation of 26 U.S.C. §§ 5841, 5861(d), & 5871. *See* [56](#) Plea Agreement. Mr. Wilson also pled guilty to Count 1 of the [54](#) Second Superseding Information, which charged him with Conspiracy to Impede or Injure an Officer, in violation of 18 U.S.C. § 372. *See* [56](#) Plea Agreement. On August 28, 2024, the Court sentenced Mr. Wilson to a term of imprisonment of 5 years (60 months) on Count 1 of the Second Superseding Information, to run concurrently with Counts 1 and 2 of the Indictment in No. 3-23-cr-3 (W.D. Ky.). *See* [79](#) Judgment.<br><br>Subsequently, on January 20, 2025, the President issued "a full, complete and unconditional pardon to... individuals convicted of offenses related to events that occurred at or near the United States Capitol on January 6, 2021." *See* Granting Pardons And Commutation Of Sentences For Certain Offenses Relating To The Events At Or Near The United States Capitol On January 6, 2021 (Jan. 20, 2025), https://www.whitehouse.gov/presidential-actions/2025/01/granting-pardons-and-commutation-of-sentences-for-certain-offenses-relating-to-the-events-at-ornear-the-united-states-capitol-on-january-6-2021/ (last visited Feb. 3, 2025). Thereafter, Mr. Wilson was released from custody by the Bureau of Prisons.<br><br>On or before February 6, 2025, the government shall file a brief, with supporting legal authority, that sets forth its position as to why the Court should not order the defendant to self-report to the Federal Bureau of Prisons to serve the remainder of his sentence on the firearms offenses, which are unrelated to the defendant's criminal conduct on January 6, 2021. The defendant shall file any response on or before February 10, 2025. So Ordered by Judge Dabney L. Friedrich on February 3, 2025. (lcdlf2)<br><br>(Entered: 02/03/2025) |
| 02/06/2025 | [103](#) | RESPONSE TO ORDER OF THE COURT by USA as to DAN EDWIN WILSON re Order,,,,,,,,, Set Deadlines,,,,,,,, (Blackwell, Jennifer) (Entered: 02/06/2025) |
| 02/07/2025 | [104](#) | REPLY by DAN EDWIN WILSON *Reply To Government's Memorandum Regarding Scope of Presidential Pardon* re [103](#) Response to Order of the Court (Pattis, Norman) Modified to add link on 2/10/2025 (znmw). (Entered: 02/07/2025) |
| 02/07/2025 | | MINUTE ORDER as to DAN EDWIN WILSON (1). Upon consideration of the government's [103](#) Response to the Court's Minute Order Dated February 3, 2025 and the defendant's [104](#) Reply, the Court finds that the plain language of the President's January 20, 2025 pardon does not extend to the defendant's Western District of Kentucky firearm convictions: Possession of a Firearm by a Prohibited Person, in violation of 18 U.S.C. §§ 922(g)(1) & 924(a)(2), and Possession of an Unregistered Firearm, in violation of 26 U.S.C. §§ 5841, 5861(d), & 5871. *See* Judgment at 2, Dkt. 79. The defendant does not appear to contest the scope of the pardon; rather, he argues, without citing to any legal authority, that the Court cannot take further action in this case because it lacks subject matter jurisdiction or personal jurisdiction over Mr. Wilson. *See* Def. Reply at 2, Dkt. 104. Given that the Court's judgment remains operative with regards to the defendant's firearms convictions, and the defendant has remaining time left to serve on his five-year (60 month) sentence, the Court cannot discern any reason that it would be deprived of jurisdiction over the defendant nor why his erroneous release would bar the government from reincarcerating him, as it apparently intends to do, *see* Gov't Response at 3, Dkt. 105. *See, e.g.*, *Vega v. United States*, 493 F.3d 310, 316 (3d Cir. 2007) ("[A] mistaken |

A12

release does not prevent a government from reincarcerating a prisoner who has time to serve."). At the time of his plea, the defendant waived trial in the Western District of Kentucky on the firearms offenses and consented to a transfer to this Court under Rule 20 of the Federal Rules of Criminal Procedure. *See* Plea at 10, Dkt. 56. Far from being a "tortured anomaly," as the defendant argues, *see* Def. Reply at 5, among January 6 defendants, he stands in a class of his own: he was convicted of ***three*** separate felony offenses--a conspiracy to impede or injure an officer at the U.S. Capitol on January 6, 2021 ***and*** two unrelated Western District of Kentucky firearm offenses. *See* Judgment at 2; Gov't Response at 2.

Accordingly, it is ORDERED that the Court's Minute Order of January 27, 2025 is VACATED. It is further ORDERED that the defendant shall self-surrender to the Bureau of Prisons, as directed by the United States Probation Office, to serve the remainder of the five-year (60 month) concurrent sentence the Court imposed for his Western District of Kentucky firearm convictions, *see* Judgment at 2. So Ordered by Judge Dabney L. Friedrich on February 7, 2025. (lcdlf2)

(Entered: 02/07/2025)

| 02/07/2025 | | RESOLVED.....NOTICE of Provisional/Government Not Certified Status re 100 MOTION for Order Stay of order to return to prison by DAN EDWIN WILSON as to DAN EDWIN WILSON, DAVID SCOTT KUNTZ. (Pattis, Norman). |
| | | |
| | | Your attorney renewal/government certification has not been received. As a result, your membership with the U.S. District & Bankruptcy Courts for the District of Columbia is not in good standing, and you are not permitted to file. Pursuant to Local Criminal Rule 57.21.1, you must immediately correct your membership status by following the appropriate instructions on this page of our website: https://www.dcd.uscourts.gov/attorney-renewal. |
| | | |
| | | Please be advised that the presiding judge in this case has been notified that you are currently not in good standing to file in this court. Renewal Due by 2/14/2025. (zhcn) Modified on 2/12/2025 (zhcn). (Entered: 02/10/2025) |
| 02/19/2025 | 105 | NOTICE OF ATTORNEY APPEARANCE: George T. Pallas appearing for DAN EDWIN WILSON (Pallas, George) (Entered: 02/19/2025) |
| 02/20/2025 | 106 | Unopposed MOTION for Extension of Time to *Surrender* by DAN EDWIN WILSON. (Pallas, George) (Entered: 02/20/2025) |
| 02/20/2025 | | MINUTE ORDER as to DAN EDWIN WILSON (1). Upon consideration of the defendant's unopposed 106 Motion for an Extension of Time to Surrender, the motion is DENIED for the reasons stated in the Court's February 7, 2025 Minute Order. Accordingly, the defendant shall surrender to the Federal Bureau of Prisons as ordered. So Ordered by Judge Dabney L. Friedrich on February 20, 2025. (lcdlf2) (Entered: 02/20/2025) |
| 02/24/2025 | 107 | Emergency MOTION to Vacate under 28 U.S.C. 2255. NO DOCUMENTS ARE TO BE FILED IN THE CIVIL 2255 ACTION. ALL DOCUMENTS ARE TO BE FILED IN THIS CRIMINAL CASE by DAN EDWIN WILSON. (Attachments: # 1 Appendix) (Pallas, George) Civil case 1:25-cv-00545-DLF opened. (Entered: 02/24/2025) |
| 02/24/2025 | | MINUTE ORDER as to DAN EDWIN WILSON (1). Before the Court is the defendant's unopposed 107 Motion to Vacate Under 28 U.S.C. § 2255 The defendant is scheduled to report to the Bureau of Prisons on February 27, 2025. Accordingly, the government shall file any response to the defendant's 107 Motion on or before 12:00 p.m. on February 25, |

A13

| | | |
|---|---|---|
| | | 2025. So Ordered by Judge Dabney L. Friedrich on February 24, 2025. (lcdlf2) (Entered: 02/24/2025) |
| 02/25/2025 | 108 | RESPONSE TO ORDER OF THE COURT by USA as to DAN EDWIN WILSON re 02/24/2025 MINUTE Order, Set Deadlines, (Blackwell, Jennifer) Modified text on 2/27/2025 (zljn). (Entered: 02/25/2025) |
| 02/25/2025 | | MINUTE ORDER as to DAN EDWIN WILSON (1). The defendant is currently scheduled to report to the Bureau of Prisons on February 27, 2025. Before the Court is the defendant's 107 Emergency Motion to Vacate. Accordingly, the parties are directed to file, on or before 9:00 a.m. on February 26, 2025, a notice that states the times on February 26, 2025 that they are available for a hearing on the emergency motion. So Ordered by Judge Dabney L. Friedrich on February 25, 2025. (lcdlf2) (Entered: 02/25/2025) |
| 02/26/2025 | 109 | RESPONSE TO ORDER OF THE COURT by USA as to DAN EDWIN WILSON re 02/25/2025 MINUTE Order, (Blackwell, Jennifer) Modified text on 2/27/2025 (zljn). (Entered: 02/26/2025) |
| 02/26/2025 | | NOTICE OF HEARING as to DAN EDWIN WILSON (1): Emergency Motion Hearing set for 2/26/2025 at 11:30 AM via Zoom before Judge Dabney L. Friedrich. (smc) (Entered: 02/26/2025) |
| 02/26/2025 | 110 | NOTICE *of Certificate of Pardon* by DAN EDWIN WILSON (Pallas, George) (Entered: 02/26/2025) |
| 02/26/2025 | | Minute Entry for Hybrid Motion Hearing held before Judge Dabney L. Friedrich as to DAN EDWIN WILSON (1): re 107 Emergency MOTION to Vacate under 28 U.S.C. 2255. Oral arguments heard and TAKEN UNDER ADVISEMENT. Government's supplemental brief, if any, due by 5:00 PM today. Bond Status of Defendant: Continued on Personal Recognizance. US Attorney: Jennifer Blackwell. Defense Attorney: George Pallas. Court Reporter: Christine Asif. (smc) (Entered: 02/26/2025) |
| 02/26/2025 | | MINUTE ORDER as to DAN EDWIN WILSON (1). As the Court stated during today's hearing on the defendants 107 Emergency Motion to Vacate, the government shall clarify or modify, on or before 5:00 pm on February 26, 2025, the representations counsel made during the hearing regarding the meaning of the Pardon that the President issued on January 20, 2025. Further, the Courts February 7, 2025 order directing the defendant to surrender to the Bureau of Prisons on February 27, 2025, is STAYED pending any future order of the Court. So Ordered by Judge Dabney L. Friedrich on February 26, 2025. (lcdlf2) (Entered: 02/26/2025) |
| 02/26/2025 | 111 | RESPONSE TO ORDER OF THE COURT by USA as to DAN EDWIN WILSON re 02/26/2025 MINUTE Order (Blackwell, Jennifer) Modified text on 2/27/2025 (zljn). (Entered: 02/26/2025) |
| 03/13/2025 | 112 | ORDER as to DAN EDWIN WILSON (1) denying the defendant's unopposed 107 Motion to Vacate, Set Aside, or Correct Sentence Pursuant to 28 U.S.C. § 2255. See text for details. Signed by Judge Dabney L. Friedrich on March 13, 2025. (lcdlf2) (Entered: 03/13/2025) |
| 03/13/2025 | 113 | MEMORANDUM OPINION as to DAN EDWIN WILSON (1) regarding the defendant's 107 Motion to Vacate, Set Aside, or Correct Sentence Pursuant to 28 U.S.C. § 2255. See text for details. Signed by Judge Dabney L. Friedrich on March 13, 2025. (lcdlf2) (Entered: 03/13/2025) |
| 03/28/2025 | 114 | NOTICE OF APPEAL - Final Judgment by DAN EDWIN WILSON Filing fee $ 605, receipt number ADCDC-11573699. Fee Status: Fee Paid. Parties have been notified. (Pallas, George) (Entered: 03/28/2025) |

A14

| 03/28/2025 | 115 | Transmission of the Notice of Appeal, Order Appealed, and Docket Sheet to US Court of Appeals. The Court of Appeals fee was paid as to DAN EDWIN WILSON (1) re 114 Notice of Appeal - Final Judgment. (zstd) (Main Document 115 replaced on 3/28/2025) (zstd). (Entered: 03/28/2025) |
|---|---|---|
| 03/28/2025 | | USCA Case Number as to DAN EDWIN WILSON 25-3041 for 114 Notice of Appeal - Final Judgment filed by DAN EDWIN WILSON (1). (zstd) (Entered: 03/28/2025) |
| 04/02/2025 | 116 | ORDER of USCA as to DAN EDWIN WILSON (1) re 114 Notice of Appeal - Final Judgment. In accordance with the Order filed on April 2, 2025, Upon consideration of the emergency motion for release pending appeal, and the notice of supplemental authority, it is ORDERED that the motion be denied. USCA Case Number 25-3041. (zstd) (Entered: 04/03/2025) |
| 04/30/2025 | 117 | TRANSCRIPT OF PROCEEDINGS in case as to DAN EDWIN WILSON before Judge Dabney L. Friedrich held on 2/26/2025; Page Numbers: 1-77. Date of Issuance:4/30/2025. Court Reporter Christine T. Asif, Telephone number 202-354-3247, Transcripts may be ordered by submitting the Transcript Order Form<br><br>For the first 90 days after this filing date, the transcript may be viewed at the courthouse at a public terminal or purchased from the court reporter referenced above. After 90 days, the transcript may be accessed via PACER. Other transcript formats, (multi-page, condensed, CD or ASCII) may be purchased from the court reporter.<br><br>**NOTICE RE REDACTION OF TRANSCRIPTS:** The parties have twenty-one days to file with the court and the court reporter any request to redact personal identifiers from this transcript. If no such requests are filed, the transcript will be made available to the public via PACER without redaction after 90 days. The policy, which includes the five personal identifiers specifically covered, is located on our website at www.dcd.uscourts.gov.<br><br>Redaction Request due 5/21/2025. Redacted Transcript Deadline set for 5/31/2025. Release of Transcript Restriction set for 7/29/2025.(Asif, Christine) (Entered: 04/30/2025) |

| **PACER Service Center** | | |
|---|---|---|
| **Transaction Receipt** | | |
| 10/30/2025 16:19:11 | | |
| **PACER Login:** | cplosangeles16 | **Client Code:** | |
| **Description:** | Docket Report | **Search Criteria:** | 1:23-cr-00427-DLF |
| **Billable Pages:** | 16 | **Cost:** | 1.60 |

A15

**U.S. Department of Justice**             **Rule 20 – Transfer Notice**

| To | District | Date |
|---|---|---|
| **Christopher C. Tieke**<br>**Assistant United States Attorney** | **Western District of Kentucky** | **May 7, 2024** |

| Name of Subject | Statute Violated | File Data *(Initials and #)* |
|---|---|---|
| **Dan Edwin Wilson** | **18 U.S.C. §§ 922(g)(1) and 924(a)(2) 26 U.S.C §§ 5841, 5861(d), and 5871** | **3:23-CR-003-CHB** |

### Part A - District of Arrest

**[ X ]**    **The above-named subject has been apprehended in this jurisdiction and indicates amenability to Rule 20 disposition of the charges pending against him in your district.  Kindly indicate whether you are agreeable to Rule 20 disposition and forward two certified copies of indictment or information if any.**

[ ]    Enclosed is certified copy of waiver of indictment executed by defendant.  Kindly file criminal information and forward two certified copies thereof.

**[ X ]**    **Enclosed is Consent to Transfer form executed in duplicate (one copy for your files) by defendant and the United States Attorney in the district of arrest.  Kindly add your consent and have the Clerk of your district transmit the papers in the proceedings or certified copies thereof to the Clerk of the Court in this district in accordance with Rule 20.**

[ ]    Other (*Specify*):

[ ]    The above-named defendant entered a plea of guilty under Rule 20.

    **Date of Plea        Date of Sentence        Sentence**

> FILED
> JAMES J. VILT JR., CLERK
> U.S. DISTRICT COURT
> W/D OF KENTUCKY
>
> Date:   May 16, 2024

| From (*Signature and Title*) | Address |
|---|---|
| */s/ Matthew Graves*<br>**United States Attorney**<br>**District of Columbia** | **601 D. Street, NW**<br>**Washington, DC 20579** |

### Part B - District of Offense

**[X]**    **I am agreeable to Rule 20 disposition.**

[ ]    I am not agreeable to Rule 20 disposition.  Defendant's appearance is desired at       on      at      o'clock
    (*Kindly notify me of any anticipated delay.*)

**[X]**    **Enclosed are two certified copies of indictment of information.  Docket No. 3:23-CR-003-CHB**

[ ]    Please have defendant execute waiver of indictment.

**[X]**    Other (*Specify*): **Please forward copy of Judgment/Commitment order after sentencing**.

| Signature (*Name and Title*) | District | Date |
|---|---|---|
| **Christopher C. Tieke**<br>**Assistant United States Attorney** | **Western District of Kentucky** | **5/15/24** |

A16

**FILED**
JAMES J. VILT, JR. - CLERK

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
AT LOUISVILLE

JAN 18 2023

U.S. DISTRICT COURT
WEST'N. DIST. KENTUCKY

UNITED STATES OF AMERICA

v.

**DAN EDWIN WILSON**

<u>INDICTMENT</u>

NO.   3.23.CR - 3 - CHB
18 U.S.C. § 922(g)(1)
18 U.S.C. § 924(a)(2)
18 U.S.C. § 924(d)
26 U.S.C. § 5841
26 U.S.C. § 5861(d)
26 U.S.C. § 5871
26 U.S.C. § 5872
28 U.S.C. § 2461

The Grand Jury charges:

<u>COUNT 1</u>
(*Possession of a Firearm by a Prohibited Person*)

On or about June 3, 2022, in the Western District of Kentucky, Jefferson County, Kentucky, the defendant, **DAN EDWIN WILSON**, knowingly possessed, in and affecting commerce, a firearm, that is a Rock Island Armory, Model M1911-A1, .45 caliber pistol, bearing serial number RIA1547427, a Smith & Wesson, Model M&P Shield, 9 millimeter pistol, bearing serial number HUH1149, and a Rock Island Armory, Model M1911-A1, .45 caliber pistol, bearing serial number RIA2266246, and ammunition with knowledge that he had previously been convicted in a court of a crime punishable by imprisonment for a term exceeding one year, to wit:

On or about July 11, 1994, in Breckenridge Circuit Court, Breckenridge County, Kentucky, in Case Number 94-CR-019, **DAN EDWIN WILSON**, was convicted of Burglary in the Second Degree (2 counts) and Unlawful Transaction with a Minor, each a felony;

On or about December 19, 1995 in Jefferson Circuit Court, Jefferson County, Kentucky, in Case Number 95-CR-2600, **DAN EDWIN WILSON**, was convicted of Theft By Unlawful Taking over $300 (2 counts), a felony;

A17

On or about December 10, 1997, in Fayette Circuit Court, Fayette County, Kentucky, in Case Number 97-CR-977, **DAN EDWIN WILSON**, was convicted of Escape in the Second Degree, a felony.

In violation of Title 18, United States Code, Sections 922(g)(1), and 924(a)(2).

The Grand Jury further charges:

COUNT 2
(*Possession of an Unregistered Firearm*)

On or about June 3, 2022, in the Western District of Kentucky, Jefferson County, Kentucky, the defendant, **DAN EDWIN WILSON**, knowingly received and possessed a firearm, to wit: an Anderson Manufacturing, Model AM-15, multi-caliber rifle bearing serial number 19347295, with a 28 inch overall length and a 14 inch barrel, not registered to him in the National Firearms Registration and Transfer Record.

In violation of Title 26, United States Code, Sections 5841, 5861(d), and 5871.

NOTICE OF FORFEITURE

As a result of committing an offense in violation of Title 18, United States Code, Section 922(g)(1), as alleged in Count 1 of this Indictment, a felony punishable by imprisonment for more than one year, the defendant, **DAN EDWIN WILSON**, shall forfeit to the United States, pursuant to Title 18, United States Code, Section 924(d), and Title 28, United States Code, Section 2461, all firearms and ammunition involved in the commission of the offense, including, but not limited to: a Rock Island Armory, Model M1911-A1, .45 caliber pistol, bearing serial number

2

A18

RIA1547427, a Smith & Wesson, Model M&P Shield, 9mm pistol, bearing serial number HUH1149, and a Rock Island Armory, Model M1911-A1, .45 caliber pistol, bearing serial number RIA2266246, and ammunition.

Furthermore, as a result of committing an offenses in violation of Title 26, United States Code, Section 5861(d) as specifically charged in Count 2 of this Indictment, the defendant, **DAN EDWIN WILSON**, shall forfeit to the United States, pursuant to Title 26, United States Code, Section 5872, all National Firearms Act firearms, including, but not limited to: an Anderson Manufacturing, Model AM-15, multi-caliber rifle bearing serial number 19347295, with a 28 inch overall length and a 14 inch barrel.

A TRUE BILL.

Redacted

FOREPERSON

MICHAEL A. BENNETT
UNITED STATES ATTORNEY

MAB:CCT:1.10.2023

3

A19

UNITED STATES OF AMERICA v. DAN EDWIN WILSON

## P E N A L T I E S

Count 1:  NM 10 yrs./$250,000/both/NM 3 yrs. Supervised Release
Count 2:  NM 10 yrs./$250,000/both/NM 3 yrs. Supervised Release
Forfeiture

## N O T I C E

## ANY PERSON CONVICTED OF AN OFFENSE AGAINST THE UNITED STATES SHALL BE SUBJECT TO SPECIAL ASSESSMENTS, FINES, RESTITUTION & COSTS.

SPECIAL ASSESSMENTS

18 U.S.C. § 3013 requires that a special assessment shall be imposed for each count of a conviction of offenses committed after November 11, 1984, as follows:

| Misdemeanor: | $ 25 per count/individual | Felony: | $100 per count/individual |
| | $125 per count/other | | $400 per count/other |

FINES

In addition to any of the above assessments, you may also be sentenced to pay a fine. Such fine is due immediately unless the court issues an order requiring payment by a date certain or sets out an installment schedule.  You shall provide the United States Attorney's Office with a current mailing address for the entire period that any part of the fine remains unpaid, or you may be held in contempt of court.  18 U.S.C. § 3571, 3572, 3611, 3612

**Failure to pay fine as ordered may subject you to the following:**

1.   INTEREST and PENALTIES as applicable by law according to last date of offense.

For offenses occurring after December 12, 1987:

No INTEREST will accrue on fines under $2,500.00.

INTEREST will accrue according to the Federal Civil Post-Judgment Interest Rate in effect at the time of sentencing.  This rate changes monthly.  Interest accrues from the first business day following the two week period after the date a fine is imposed.

PENALTIES of:

10% of fine balance if payment more than 30 days late.

15% of fine balance if payment more than 90 days late.

2.   Recordation of a LIEN shall have the same force and effect as a tax lien.

3.   Continuous GARNISHMENT may apply until your fine is paid.

18 U.S.C. §§ 3612, 3613

If you WILLFULLY refuse to pay your fine, you shall be subject to an ADDITIONAL FINE of not more than the greater of $10,000 or twice the unpaid balance of the fine; or IMPRISONMENT for not more than 1 year or both.  18 U.S.C. § 3615

RESTITUTION

If you are convicted of an offense under Title 18, U.S.C., or under certain air piracy offenses, you may also be ordered to make restitution to any victim of the offense, in addition to, or in lieu of any other penalty authorized by law.  18 U.S.C. § 3663

APPEAL

If you appeal your conviction and the sentence to pay your fine is stayed pending appeal, the court shall require:

A20

1.   That you deposit the entire fine amount (or the amount due under an installment schedule during the time of your appeal) in an escrow account with the U.S. District Court Clerk, or

2.   Give bond for payment thereof.

18 U.S.C. § 3572(g)

PAYMENTS

If you are ordered to make payments to the U.S. District Court Clerk's Office, certified checks or money orders should be made payable to the Clerk, U.S. District Court and delivered to the appropriate division office listed below:

| | |
|---|---|
| LOUISVILLE: | Clerk, U.S. District Court |
| | 106 Gene Snyder U.S. Courthouse |
| | 601 West Broadway |
| | Louisville, KY  40202 |
| | 502/625-3500 |
| BOWLING GREEN: | Clerk, U.S. District Court |
| | 120 Federal Building |
| | 241 East Main Street |
| | Bowling Green, KY  42101 |
| | 270/393-2500 |
| OWENSBORO: | Clerk, U.S. District Court |
| | 126 Federal Building |
| | 423 Frederica |
| | Owensboro, KY  42301 |
| | 270/689-4400 |
| PADUCAH: | Clerk, U.S. District Court |
| | 127 Federal Building |
| | 501 Broadway |
| | Paducah, KY  42001 |
| | 270/415-6400 |

If the court finds that you have the present ability to pay, an order may direct imprisonment until payment is made.

A21

**CLERK'S OFFICE**                                                  CO-931
**UNITED STATES DISTRICT COURT**                         New 3/78

**NOTICE OF DESIGNATION OF PENDING\* RELATED CRIMINAL
CASE PURSUANT TO RULE 3-4, UNITED STATES DISTRICT
COURT FOR THE DISTRICT OF COLUMBIA**

Criminal Number: _____
(To be supplied by the Clerk)

NOTICE TO PROSECUTOR:

  Pursuant to LCrR 57.12(a)(1) of this Court's Rules, you should prepare this form and submit it to the Clerk's Office along with the indictments in any related cases.  One copy is needed for the Clerk's records, once for the Judge to whom the case is assigned, and one additional copy for each defendant.  Therefore, in a one defendant case you should submit 3 copies, for a two defendant case you should submit 4 copies, etc.  The Clerk will mail copies of this form to all defense counsel along with the arraignment notice.

NOTICE TO DEFENDANT:

  Rule LCrR 57.12(b)(1) of this Court's Rules requires that any objection by the defendant to the related case designation shall be served on the U. S. Attorney and filed with the Clerk within 10 days after arraignment.

NOTICE TO ALL COUNSEL:

  Rule LCrR 57.12(b)(3) requires, in part, that as soon as an attorney for a party becomes aware of the existence of a related case or cases, such attorney shall immediately notify in writing, the Judges on whose calendars the cases appear and shall serve such notice on counsel for all other parties.

_____

The prosecutor will please complete the following:

1. Name of defendant: Dan Edwin Wilson

2. Number of related case: 23-cr-427-1

3. Name of Judge assigned to related case: Dabney L. Friedrich

4. Name of United States Court in which the related case is pending (if other than this Court:)
  Western District of Kentucky (prior to transfer)

5. Relationship of new case to related case:

  [Check appropriate box(es)]

   ☐ (a) New case is a superseding INDICTMENT/INFORMATION.

   ☑ (b) More than one indictment is filed or pending against defendant.

   ☐ (c) Prosecution against different defendant(s) arises from:

     ☐ a common wiretap

     ☐ a common search warrant

     ☐ activities which are a part of the same alleged criminal event or transaction

  (\*) A case is considered pending until a defendant has been sentenced. [Rule 3-4(a)(1)]

A22

CASREF,CLOSED

# U.S. District Court
## Western District of Kentucky (Louisville)
## CRIMINAL DOCKET FOR CASE #: <u>3:23−cr−00003−CHB−RSE</u> All Defendants
### *Internal Use Only*

Case title: USA v. Wilson

Date Filed: 01/18/2023

Date Terminated: 05/16/2024

Assigned to: Judge Claria Horn Boom
Referred to: Magistrate Judge Regina S. Edwards

**Defendant (1)**

| | | |
|---|---|---|
| **Dan Edwin Wilson** | represented by | **Nicholas D. Mudd** |
| *TERMINATED: 05/16/2024* | | Mudd Legal Group |
| | | 600 W. Main Street, Suite 500 |
| | | Louisville, KY 40202 |
| | | 502−855−7591 |
| | | Email: nicholasmudd@gmail.com |
| | | *LEAD ATTORNEY* |
| | | *ATTORNEY TO BE NOTICED* |

| **Pending Counts** | **Disposition** |
|---|---|
| None | |

**Highest Offense Level (Opening)**

None

| **Terminated Counts** | **Disposition** |
|---|---|
| 18:922(g)(1) and 924(a)(2) POSSESSION OF A FIREARM BY A PROHIBITED PERSON (1) | Rule 20 to the District of Columbia |
| 26:5841,5861(d), and 5871 POSSESSION OF AN UNREGISTERED FIREARM (2) | Rule 20 to the District of Columbia |

**Highest Offense Level (Terminated)**

Felony

A23

**Complaints**                                                    **Disposition**

None

---

**Plaintiff**

**USA**                                    represented by   **Christopher C. Tieke (USA)**
                                                            U.S. Attorney Office – Louisville
                                                            717 W. Broadway
                                                            Louisville, KY 40202
                                                            502–625–7079
                                                            Email: christopher.tieke@usdoj.gov
                                                            *LEAD ATTORNEY*
                                                            *ATTORNEY TO BE NOTICED*
                                                            *Designation: Retained*

| Date Filed | # | Docket Text |
|---|---|---|
| 01/18/2023 | 1 | INDICTMENT as to Seal 1 (1) count(s) 1, 2. (DJT) (Entered: 01/18/2023) |
| 01/18/2023 | 2 | Case Assignment (Random Selection): Case Assigned to Judge Claria Horn Boom. (DJT) (Entered: 01/18/2023) |
| 01/18/2023 | 3 | *SEALED* SEALED DOCUMENT:NON–REDACTED INDICTMENT re 1 Indictment (DJT) (Entered: 01/18/2023) |
| 01/18/2023 | 4 | NOTICE OF ATTORNEY APPEARANCE Christopher C. Tieke (USA) appearing for USA. (DJT) (Entered: 01/18/2023) |
| 01/18/2023 | 6 | MOTION to Seal Case by USA as to Seal 1. (DJT) (Entered: 01/18/2023) |
| 01/18/2023 | 7 | ORDER signed by Magistrate Judge Colin H. Lindsay on 1/18/23; granting 6 Motion to Seal Case as to Seal 1 (1) cc: AUSA (DJT) (Entered: 01/18/2023) |
| 01/18/2023 | 8 | *SEALED* Sealed Document (DJT) (Entered: 01/18/2023) |
| 01/19/2023 | 9 | STANDING REFERRAL ORDER by Judge Claria Horn Boom signed on 02/18/2022. Matter REFERRED to the Magistrate Judge selected by random draw for the reasons set forth. (Magistrate Judge Regina S. Edwards) cc: Counsel (RLK) (Entered: 01/19/2023) |
| 02/01/2023 | | Proceedings held before Magistrate Judge Regina S. Edwards; Initial Appearance as to Dan Edwin Wilson held on 2/1/2023. (Court Reporter Digitally Recorded.) (DJT) (Entered: 02/02/2023) |
| 02/01/2023 | 11 | APPEARANCE BOND AND ORDER SETTING CONDITIONS OF RELEASE Unsecured Bond Entered as to Dan Edwin Wilson in amount of $ 10,000.00, (DJT) (Entered: 02/02/2023) |
| 02/02/2023 | | Case unsealed as to Seal 1 (DJT) (Entered: 02/02/2023) |
| 02/02/2023 | 10 | ORDER ON INITIAL APPEARANCE (EBOC) by Magistrate Judge Regina S. Edwards on 2/2/23 as to Dan Edwin Wilson : IT IS HEREBY ORDERED that the Indictment is UNSEALED. IT IS FURTHER ORDERED that the defendant is released |

2

A24

| | | |
|---|---|---|
| | | on an unsecured bond in the amount of $10,000.00 with conditions pending further order of the Court. IT IS FURTHER ORDERED that this case is scheduled for arraignment proceedings on 2/6/2023 at 1:30 p.m., before the Honorable Regina S. Edwards, United States Magistrate Judge. cc: Counsel, USP, Counsel for Deft(none listed) (DJT) (Entered: 02/02/2023) |
| 02/03/2023 | 12 | NOTICE OF ATTORNEY APPEARANCE: Nicholas D. Mudd appearing for Dan Edwin Wilson (Mudd, Nicholas) (Entered: 02/03/2023) |
| 02/06/2023 | 13 | ORDER FOLLOWING ARRAIGNMENT AND SCHEDULING ORDER (EBOC) from proceedings held before Magistrate Judge Regina S. Edwards; Arraignment as to Dan Edwin Wilson (1) Count 1,2 held on 2/6/2023: Counsel, on behalf of defendant, waived formal reading of the Indictment and entered a plea of NOT GUILTY to the charges contained therein. Jury Trial set for 4/11/2023 at 9:00 AM in Louisville Courtroom before Judge Claria Horn Boom. See ORDER for specific deadlines. The defendant remains under the terms and conditions of his current bond pending further order of the Court. (Court Reporter Digitally Recorded.) cc: Counsel, CM–CHB, Jury Clerk (DJT) (Entered: 02/06/2023) |
| 02/06/2023 | 14 | ORDER Pursuant to Due Process Protections Act by Magistrate Judge Regina S. Edwards on 2/6/23 as to Dan Edwin Wilson. cc: Counsel (DJT) (Entered: 02/06/2023) |
| 03/14/2023 | 15 | MOTION to Continue by Dan Edwin Wilson. (Attachments: # 1 Proposed Order) (Mudd, Nicholas) (Entered: 03/14/2023) |
| 03/17/2023 | 16 | ORDER GRANTING MOTION TO CONTINUE TRIAL AND TO CONTINUE PRE–TRIAL DEADLINES signed by Judge Claria Horn Boom on 3/16/23; granting 15 Motion to Continue as to Dan Edwin Wilson (1): The Jury Trial currently set for 4/11/2023, is REMANDED from the Courts docket. The Jury Trial is RESCHEDULED for Tuesday, 6/13/2023, at the hour of 9:00 a.m., before the Honorable Claria Horn Boom, United States District Judge, at the Gene Snyder U.S. Courthouse in Louisville, Kentucky. Counsel shall be present in the courtroom at 8:30 a.m. All pretrial filings and deadlines as set forth in the Court's Order Following Arraignment and Scheduling Order [R. 13 ] shall be relative to this new trial date. cc: Counsel, Jury Clerk (DJT) (Entered: 03/17/2023) |
| 05/17/2023 | 17 | Second MOTION to Continue by Dan Edwin Wilson. (Attachments: # 1 Proposed Order) (Mudd, Nicholas) (Entered: 05/17/2023) |
| 05/18/2023 | 18 | ORDER GRANTING MOTION TO CONTINUE TRIAL AND TO CONTINUE PRE–TRIAL DEADLINES signed by Judge Claria Horn Boom on 5/18/23 ; granting 17 Motion to Continue as to Dan Edwin Wilson (1): The Jury Trial currently set for 6/13/2023, is REMANDED from the Courts docket. Jury Trial reset for 8/8/2023 at 9:00 AM in Louisville Courtroom before Judge Claria Horn Boom. All pretrial filings and deadlines as set forth in the Courts Order Following Arraignment and Scheduling Order [R. 13] shall be relative to this new trial date. cc: Counsel, Jury Clerk(DJT) (Entered: 05/18/2023) |
| 05/24/2023 | 19 | NOTICE *Bill of Particulars for Forfeiture of Property* by USA (Tieke (USA), Christopher) (Entered: 05/24/2023) |
| 07/11/2023 | 20 | MOTION to Continue by Dan Edwin Wilson. (Attachments: # 1 Proposed Order) (Mudd, Nicholas) (Entered: 07/11/2023) |
| 07/12/2023 | 21 | |

A25

| | | |
|---|---|---|
| | | ORDER GRANTING MOTION TO RESCHEDULE TRIAL signed by Judge Claria Horn Boom on 7/12/23; granting 20 Motion to Continue as to Dan Edwin Wilson (1): The Jury Trial currently set for August 8, 2023, is REMANDED from the Court's docket. The Jury Trial is RESCHEDULED for Tuesday, 9/12/2023, at the hour of 9:00 a.m., before the Honorable Claria Horn Boom, United States District Judge, at the Gene Snyder U.S. Courthouse in Louisville, Kentucky. Counsel shall be present in the courtroom at 8:30 a.m.. All pretrial filings and deadlines as set forth in the Courts Order Following Arraignment and Scheduling Order [R. 13 ] shall be relative to this new trial date. cc: Counsel, USP, Jury Clerk(DJT) (Entered: 07/12/2023) |
| 08/21/2023 | 22 | MOTION to Continue by Dan Edwin Wilson. (Attachments: # 1 Proposed Order) (Mudd, Nicholas) (Entered: 08/21/2023) |
| 08/22/2023 | 23 | ORDER GRANTING MOTION TO CONTINUE TRIAL signed by Judge Claria Horn Boom on 8/22/23; granting 22 Motion to Continue as to Dan Edwin Wilson (1): The Jury Trial currently set for 9/12/2023, is REMANDED from the Court's docket, and RESCHEDULED to Tuesday, 11/7/2023, at 9:00 a.m., before the Honorable Claria Horn Boom, United States District Judge, at the Gene Snyder U.S. Courthouse in Louisville, Kentucky. Counsel shall be present in the courtroom at 8:30 a.m.. All pretrial filings and deadlines as set forth in the Courts Order Following Arraignment and Scheduling Order [R. 13 ] shall be relative to this new trial date. cc: Counsel, Jury Clerk, USP (DJT) (Entered: 08/22/2023) |
| 10/11/2023 | 24 | MOTION to Continue by Dan Edwin Wilson. (Attachments: # 1 Proposed Order) (Mudd, Nicholas) (Entered: 10/11/2023) |
| 10/16/2023 | 25 | ORDER GRANTING MOTION TO CONTINUE TRIAL signed by Judge Claria Horn Boom on 10/13/23; granting 24 Motion to Continue as to Dan Edwin Wilson (1): The Jury Trial currently set for 11/7/2023, is REMANDED from the Court's docket. Jury Trial reset for 1/9/2024 at 9:00 AM in Louisville Courtroom before Judge Claria Horn Boom. All pretrial filings and deadlines as set forth in the Court's Order Following Arraignment and Scheduling Order [R. 13 ] shall be relative to this new trial date. cc: Counsel, USP, Jury Clerk(DJT) (Entered: 10/16/2023) |
| 12/05/2023 | 26 | MOTION to Continue by Dan Edwin Wilson. (Attachments: # 1 Proposed Order) (Mudd, Nicholas) (Entered: 12/05/2023) |
| 12/06/2023 | 27 | ORDER GRANTING MOTION TO CONTINUE TRIAL signed by Judge Claria Horn Boom on 12/6/23; granting 26 Motion to Continue as to Dan Edwin Wilson (1): The Jury Trial currently set for 1/9/2024, is REMANDED from the Courts docket, and RESCHEDULED to Tuesday, 3/12/2024, at 9:00 a.m., before the Honorable Claria Horn Boom, United States District Judge, at the Gene Snyder U.S. Courthouse in Louisville, Kentucky. Counsel shall be present in the courtroom at 8:30 a.m. cc: Counsel, Jury Clerk, USP(DJT) (Entered: 12/06/2023) |
| 01/09/2024 | 28 | USP Status – No Action as to Dan Edwin Wilson Counsel shall refer to the Court's website:http://www.kywd.uscourts.gov/e–filing Re:How Do I View Restricted Documents. (sg) (Entered: 01/09/2024) |
| 02/08/2024 | 29 | MOTION to Continue by Dan Edwin Wilson. (Attachments: # 1 Proposed Order) (Mudd, Nicholas) (Entered: 02/08/2024) |
| 02/09/2024 | 30 | ORDER GRANTING MOTION TO CONTINUE TRIAL signed by Judge Claria Horn Boom on 2/9/24; granting 29 Motion to Continue as to Dan Edwin Wilson (1): The Jury Trial currently set for March 12, 2024, is REMANDED from the Court's docket, |

4

A26

| | | |
|---|---|---|
| | | and RESCHEDULED to Tuesday, May 14, 2024, at 9:00 a.m., before the Honorable Claria Horn Boom, United States District Judge, at the Gene Snyder U.S. Courthouse in Louisville, Kentucky. Counsel shall be present in the courtroom at 8:30 a.m. All pretrial filings and deadlines as set forth in the Courts Order Following Arraignment and Scheduling Order [R. 13] shall be relative to this new trial date. cc: Counsel, USP, Jury Clerk(DJT) (Entered: 02/09/2024) |
| 03/06/2024 | 31 | USP Status – No Action as to Dan Edwin Wilson Counsel shall refer to the Court's website:http://www.kywd.uscourts.gov/e–filing Re:How Do I View Restricted Documents. (cdc) (Entered: 03/06/2024) |
| 04/18/2024 | 32 | ORDER SETTING TELEPHONIC STATUS CONFERENCE by Judge Claria Horn Boom on 4/18/24 as to Dan Edwin Wilson: IT IS HEREBY ORDERED a Telephonic Status Conference for counsel only is SET for Monday, 4/29/2024, at the hour of 10:15 a.m., before the Honorable Claria Horn Boom, United States District Judge. Counsel for the parties SHALL connect to the Telephonic Status Conference by dialing the toll–free number 888–363–4735 and entering access code 9522526#. Parties shall dial into the conference five (5) minutes prior to the Conference. cc:counsel (DJT) (Entered: 04/18/2024) |
| 04/29/2024 | | Proceedings held before Judge Claria Horn Boom; Telephonic Status Conference as to Dan Edwin Wilson held on 4/29/2024. (Court Reporter Rebecca Boyd.) (DJT) (Entered: 04/29/2024) |
| 04/29/2024 | 33 | MEMORANDUM FOLLOWING TELEPHONIC STATUS CONFERENCE by Judge Claria Horn Boom on 4/29/24 as to Dan Edwin Wilson: The parties' oral joint motion to continue trial is GRANTED. The Jury Trial currently set for 5/14/2024, is REMANDED from the Courts docket, and RESCHEDULED to Tuesday, 6/18/2024, at 9:00 a.m., before the Honorable Claria Horn Boom, United States District Judge, at the Gene Snyder U.S. Courthouse in Louisville, Kentucky. Counsel shall be present in the courtroom at 8:30 a.m. cc: Counsel, USP, Jury Admin (DJT) (Entered: 04/29/2024) |
| 05/16/2024 | 34 | CONSENT TO TRANSFER JURISDICTION (Rule 20) to the District of Columbia Counts closed as to Dan Edwin Wilson (1) Count 1,2. (Attachments: # 1 Transfer Notice) (JM) (Entered: 05/16/2024) |
| 05/16/2024 | 35 | Notice to the District of Columbia of a Rule 20 Consent as to Dan Edwin Wilson. Docket sheet and documents attached. Restricted documents will sent by separate email to Court. Request for certified copies of documents should be sent to kywdml_CRAssignment@kywd.uscourts.gov cc: District of Columbia (sent electronically) (JM) (Entered: 05/16/2024) |

A27

AO 91 (Rev. 11/11)   Criminal Complaint

# UNITED STATES DISTRICT COURT
for the

District of Columbia

| United States of America | ) | |
| v. | ) | Case: 1:23-mj-103 |
| | ) | Assigned To: Magistrate Judge Zia M. Faruqui |
| Daniel Edwin Wilson | ) | Assigned Date: 5/17/2023 |
| DOB: XXXXXX | ) | Description: COMPLAINT WITH ARREST WARRANT |
| | ) | |
| | ) | |

*Defendant(s)*

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of ___January 6, 2021___ in the county of _____ in the

_____ in the District of ___Columbia___ , the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 1512(c)(2) - Obstruction of Justice/Congress; | |
| 18 U.S.C. § 1752(a)(1) - Knowingly Entering or Remaining in any Restricted Building or Grounds; | |
| 18 U.S.C. § 1752(a)(2) - Disorderly and Disruptive Conduct in any Restricted Building or Grounds; | |
| 40 U.S.C. § 5104(e)(2)(D) -  Disorderly and Disruptive Conduct on Capitol Grounds; | |
| 40 U.S.C. § 5104(e)(2)(G) - Parade, Demonstrate, or Picket on any Capitol Grounds. | |

This criminal complaint is based on these facts:

See attached statement of facts.

☒ Continued on the attached sheet.

_____
*Complainant's signature*

Special Agent
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1
by telephone.

2023.05.1
7 15:25:26
-04'00'

Date:  ___May 17, 2023___

_____
*Judge's signature*

City and state:         ___Washington, D.C.___          ___Zia M. Faruqui, U.S. Magistrate Judge___
*Printed name and title*

A28

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

**Holding a Criminal Term**

**Grand Jury Sworn in on September 15, 2023**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | CRIMINAL NO. |
| | : | |
| v. | : | MAGISTRATE NO. 23-MJ-103 |
| | : | |
| DAN EDWIN WILSON, | : | VIOLATIONS: |
| | : | 18 U.S.C. §§ 1512(c)(2), 2 |
| Defendant. | : | (Obstruction of an Official Proceeding and |
| | : | Aiding and Abetting) |
| | : | 18 U.S.C. § 1752(a)( 1) |
| | : | (Entering and Remaining in a Restricted |
| | : | Building or Grounds) |
| | : | 18 U.S.C. § 1752(a)(2) |
| | : | (Disorderly and Disruptive Conduct in a |
| | : | Restricted Building or Grounds) |
| | : | 40 U.S.C. § 5104(e)(2)(D) |
| | : | (Disorderly Conduct in a Capitol Building) |
| | : | 40 U.S.C. § 5104(e)(2)(G) |
| | : | (Parading, Demonstrating, or Picketing in |
| | : | a Capitol Building) |

**I N D I C T M E N T**

The Grand Jury charges that:

**COUNT ONE**

On or about January 6, 2021, within the District of Columbia and elsewhere, **DAN EDWIN WILSON** attempted to, and did, corruptly obstruct, influence, and impede an official proceeding, that is, a proceeding before Congress, specifically, Congress's certification of the Electoral College vote as set out in the Twelfth Amendment of the Constitution of the United States and 3 U.S.C. §§ 15-18.

> (**Obstruction of an Official Proceeding and Aiding and Abetting**, in violation of Title 18, United States Code, Sections 1512(c)(2) and 2)

A29

### COUNT TWO

On or about January 6, 2021, in the District of Columbia, **DAN EDWIN WILSON** did knowingly enter and remain in a restricted building and grounds, that is, any posted, cordoned-off, and otherwise restricted area within the United States Capitol and its grounds, where the Vice President was and would be temporarily visiting, without lawful authority to do so.

(**Entering and Remaining in a Restricted Building or Grounds**, in violation of Title 18, United States Code, Section 1752(a)(1))

### COUNT THREE

On or about January 6, 2021, in the District of Columbia, **DAN EDWIN WILSON** did knowingly, and with intent to impede and disrupt the orderly conduct of Government business and official functions, engage in disorderly and disruptive conduct in and within such proximity to, a restricted building and grounds, that is, any posted, cordoned-off, and otherwise restricted area within the United States Capitol and its grounds, where the Vice President was and would be temporarily visiting, when and so that such conduct did in fact impede and disrupt the orderly conduct of Government business and official functions.

(**Disorderly and Disruptive Conduct in a Restricted Building or Grounds**, in violation of Title 18, United States Code, Section 1752(a)(2))

### COUNT FOUR

On or about January 6, 2021, in the District of Columbia, **DAN EDWIN WILSON** willfully and knowingly engaged in disorderly and disruptive conduct within the United States Capitol Grounds and in any of the Capitol Buildings with the intent to impede, disrupt, and disturb the orderly conduct of a session of Congress and either House of Congress, and the orderly conduct in that building of a hearing before or any deliberation of, a committee of Congress or either House of Congress.

A30

(**Disorderly Conduct in a Capitol Building**, in violation of Title 40, United States Code, Section 5104(e)(2)(D))

## COUNT FIVE

On or about January 6, 2021, in the District of Columbia, **DAN EDWIN WILSON** willfully and knowingly paraded, demonstrated, and picketed in any United States Capitol Building.

(**Parading, Demonstrating, or Picketing in a Capitol Building**, in violation of Title 40, United States Code, Section 5104(e)(2)(G))

A TRUE BILL:

FOREPERSON.

Attorney of the United States in
and for the District of Columbia.

3

A31

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

**Holding a Criminal Term**

**Grand Jury Sworn in on September 15, 2023**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | CRIMINAL NO. 23-CR-427 |
| | : | |
| v. | : | VIOLATIONS: |
| | : | 18 U.S.C. § 1512(k) |
| DAN EDWIN WILSON, and | : | (Conspiracy To Obstruct an Official |
| (Counts 1, 2, 3, 4, 5, 6) | : | Proceeding) |
| | : | 18 U.S.C. §§ 1512(c)(2), 2 |
| DAVID SCOTT KUNTZ, | : | (Obstruction of an Official Proceeding) |
| (Counts 1, 2, 3, 4, 5) | : | 18 U.S.C. § 1752(a)(1) |
| | : | (Entering and Remaining in a Restricted |
| Defendants. | : | Building or Grounds) |
| | : | 18 U.S.C. § 1752(a)(2) |
| | : | (Disorderly and Disruptive Conduct in a |
| | : | Restricted Building or Grounds) |
| | : | 40 U.S.C. § 5104(e)(2)(D) |
| | : | (Disorderly Conduct in a Capitol Building) |
| | : | 40 U.S.C. § 5104(e)(2)(G) |
| | : | (Parading, Demonstrating, or Picketing in |
| | : | a Capitol Building) |
| | : | |

**SUPERSEDING INDICTMENT**

The Grand Jury charges that, at all times material to this Superseding Indictment, on or about the dates stated below:

**Introduction**

***The 2020 United States Presidential Election and the Official Proceeding on January 6, 2021***

1.    The 2020 United States Presidential Election occurred on November 3, 2020.

2.    The United States Electoral College ("Electoral College") is a group required by the Constitution to form every four years for the sole purpose of electing the president and vice president, with each state appointing its own electors in a number equal to the size of that state's Congressional delegation.

A32

3.      On December 14, 2020, the presidential electors of the Electoral College met in the state capital of each state and in the District of Columbia and formalized the result of the 2020 U.S. Presidential Election: Joseph R. Biden Jr. and Kamala D. Harris were declared to have won sufficient votes to be elected the next president and vice president of the United States.

4.      On January 6, 2021, a Joint Session of the United States House of Representatives and the United States Senate ("the Joint Session") convened in the United States Capitol ("the Capitol") building.  The purpose of the Joint Session was to open, count, and resolve any objections to the Electoral College vote of the 2020 U.S. Presidential Election, and to certify the results of the Electoral College vote ("Certification of the Electoral College vote") as set out in the Twelfth Amendment of the Constitution of the United States and 3 U.S.C. §§ 15–18.

### The Attack at the U.S. Capitol on January 6, 2021

5.      The Capitol is secured 24 hours a day by United States Capitol Police ("Capitol Police").  The Capitol Police maintain permanent and temporary barriers to restrict access to the Capitol exterior, and only authorized individuals with appropriate identification are allowed inside the Capitol building.

6.      On January 6,2021, the exterior plaza of the U.S. Capitol was closed to members of the public.

7.      On January 6, 2021, at approximately 1:00 p.m., the Joint Session convened in the Capitol building for the Certification of the Electoral College vote.  Vice President Michael R. Pence presided, first in the Joint Session and then in the Senate chamber.

8.      A large crowd began to gather outside the Capitol perimeter as the Joint Session got underway.  Crowd members eventually forced their way through, up, and over Capitol Police barricades onto the Capitol grounds and advanced to the building's exterior facade.  Capitol Police

A33

officers attempted to maintain order and stop the crowd from entering the Capitol building, to which the doors and windows were locked or otherwise secured. Nonetheless, shortly after 2:00 p.m., crowd members forced entry into the Capitol building by breaking windows, ramming open doors, and assaulting Capitol Police officers. Other crowd members encouraged and otherwise assisted the forced entry. The crowd was not lawfully authorized to enter or remain inside the Capitol building or grounds, and no crowd member submitted to security screenings or weapons checks by Capitol Police or other security officials.

9.      Shortly thereafter, at approximately 2:20 p.m., members of the House and Senate (including Vice President Pence) were evacuated from their respective chambers. The Joint Session was halted while Capitol Police and other law-enforcement officers worked to restore order and clear the Capitol building and grounds of the unlawful occupants.

10.     Later that night, law enforcement regained control of the Capitol building and grounds. At approximately 8:00 p.m., the Joint Session reconvened, presided over by Vice President Pence, who had remained hidden within the Capitol building throughout these events.

11.     In the course of these events, over 100 law enforcement officers were injured. The Capitol suffered millions of dollars in damage—including broken windows and doors, graffiti, and residue from pepper spray, tear gas, and fire extinguishers deployed both by crowd members who stormed the Capitol and by Capitol Police officers trying to restore order. Additionally, many media members were assaulted and had cameras and other news-gathering equipment destroyed.

### *"Three Percenters"*

12.     A group of individuals, some of whom associate with militias, identify as "Three Percenters" (also called "III%" or "3%" or "Threepers"), based on their view that only three percent of American colonists took up arms against the British during the American Revolution.

3

Some Three Percenters liken the present-day U.S. Government to British authorities that infringed on civil liberties in the period leading up to and during the American Revolution.   Many independent or multi-state militia groups incorporate "III%" in their unit names.

### *Conspirators*

13.     DAN EDWIN WILSON is a 48-year-old resident of Louisville, Kentucky.

14.     DAVID SCOTT KUNTZ is a 53-year-old resident of Elizabeth, Indiana.

15.     As described herein, WILSON and KUNTZ conspired with each other, and with others known and unknown, to corruptly obstruct, influence, and impede the Congressional proceeding at the U.S. Capitol on January 6, 2021.

16.     WILSON and KUNTZ both identify as Three Percenters and members of the Gray Ghost Partisan Kentucky Rangers, a Three Percenter militia.

### **COUNT ONE**

17.     The allegations in paragraphs 1 through 16 are realleged and incorporated as if fully set forth in this paragraph.

18.     Between on or about December 19, 2020 and January 6, 2021, within the District of Columbia and elsewhere, the defendants,

**DAN EDWIN WILSON, and**
**DAVID SCOTT KUNTZ**

together and with others, did conspire to corruptly obstruct, influence, and impede an official proceeding, that is, a proceeding before Congress, specifically, Congress's certification of the Electoral College vote as set out in the Twelfth Amendment of the Constitution of the United States and 3 U.S.C. §§ 15–18.

A35

### Acts in Furtherance of the Conspiracy

#### *Preparing for January 6, 2021*

19.    WILSON, KUNTZ, and others used Telegram, an encrypted messaging app that can send messages, photos, videos, and files, to share information regarding the 2020 presidential election, to coordinate travel and plans for January 6, 2021.  For example, with the assistance of another individual, KUNTZ created the "Coalition of the Unknown" Telegram group, where participants discussed plans to travel to Washington, D.C. in December 2020 and January 2021, among other things.  WILSON and KUNTZ, among others, participated in this Telegram chat, which ran from at least November 24, 2020 through at least December 22, 2020.

20.    On December 1, 2020, a member of the Coalition of the Unknown group shared a YouTube video titled, "Trump Lawyers Push Call for MARTIAL LAW As More Evidence Of FRAUD Emerges, DEMAND New Election."  Two minutes later, KUNTZ responded, "This is Reaper.  You must choose is it war or do we allow marshall law.  The decision must be made." "Reaper" was a moniker used by KUNTZ.

21.    In early December 2020, KUNTZ and others in the Coalition of the Unknown group discussed traveling to Washington, D.C. for January 20, 2021—the date for President Joe Biden's inauguration.  On December 6, 2020, KUNTZ wrote, "[L]ets go train and remove the Democratic party it is a must."

22.    On December 14, 2020, in the Coalition of the Unknown group, KUNTZ wrote, "This is Reaper. January the 20th in Washington D.C. is our day they will see we are not playing anymore we are going fully armed.  No more fucken games guy's you are in this 100% or your out and be a couch keyboard patriot we go in numbers they will not be able to do shit to us you must not be scared and be ready to not go home if something goes down you must start making a

5

A36

big stand no more rules this is our country no there's if you are in then say you are in and mean it no i will be there and not show up tell all groups you no to be thete in force.  Tell all guy's no fucken around on this time to do what we have been training for."  WILSON—who used the username and moniker "Live Wire" in the Coalition of the Unknown group—responded, "Everyone needs to start reaching out to everybody you know every state you know this is not gonna be an easy task to organize but we have to organize and go in together come out together or none of us come the fuck out."  KUNTZ responded, "Tell and bring all on this we go in numbers they won't do shit guy's but watch.  Dan3% is right on this one we go together."  Later that day, KUNTZ added, "The 20th is are date period."

      23.     In his Facebook account, KUNTZ also tried to rally others to travel to Washington, D.C. for January 20, 2021.  On December 14, 2020, KUNTZ posted a Facebook status update: "This is Reaper.  This is to all groups January the 20th we go to Washington. D.C. armed no matter what they say we go in for the million milita march we go in numbers they wont be able to do shit. Its time to show them we have had enough this is our time guy's we got this no more games.  We only want true patriots.  We are tired of the games they will no who owns this country.  You groups must start standing up this is what we all have been training for."  An individual responded, "Hate to say this, but you need permits in DC to carry.  Not saying it is a bad idea, but adds some problems."  KUNTZ responded, "No more playing we go in numbers we do not care about there gun laws thats why we go in numbers they won't be able to do shit."

      24.     On December 19, 2020, then-President Trump tweeted, "Peter Navarro releases 36-page report alleging election fraud 'more than sufficient' to swing victory to Trump https://washex.am/3nwaBCe.  A great report by Peter.  Statistically impossible to have lost the 2020 Election.  Big protest in D.C. on January 6th.  Be there, will be wild!"  Following this Tweet,

WILSON and KUNTZ redirected their organizing efforts to January 6, 2021.

25.     On December 20, 2020, on Facebook, KUNTZ posted a screenshot of the Tweet from then-President Trump with a red line under the words "Be there, will be wild!"  To that image, KUNTZ added the following message: "This is Reaper.  Washington D.C. is listing to us we have there attention for the 6th and the 20th that the militia groups are coming.  They have evacuated all none essential personnel out of D.C."

26.     On December 22, 2020, KUNTZ made the following statement in the Coalition of the Unknown group: "January the 6th will be the target date for D.C. this goes to all groups that can help to defend those that can not defend themselves."  WILSON responded to KUNTZ by stating, "Ooh Rah. Curb stomp crew all in!!!"  KUNTZ responded, "Hell ta D.C. here we come."

27.     On December 22, 2020, WILSON posted to the Coalition of the Unknown group, "For the new members in case you are not aware DC on the sixth here we come."  About one minute later, another individual in the Coalition of the Unknown group posted an image of the U.S. Capitol building, with the following language: "Occupy Congress.  #OccupyCongress.  If they won't hear us they will fear us.  The great betrayal is over.  Election fraud is treason. January 6, 2021."  About a minute later, WILSON responded, "Some of us in here are extremely active patriots so if you want to start getting boots on the ground reach out we do the damn thing."  A few minutes later, WILSON replied to a question from another individual: "What's the current thoughts on Battle rattle?  WILSON responded, "Everyone has differing opinions my personal opinion is if we're going to go in and take over the world Guns up.  if we're just trying to put on a show leave them at home."  Another individual responded, "I would always carry it with me at least a vest and plates under clothing."  WILSON responded, "Absolutely you can wear your attire I will have my plates on I was just talking about firearms."  Another individual responded, "I

7

wouldn't do firearms. Looks bad firing in a crowd. Knives and batons." WILSON replied, "That's my opinion you can ask people here that know me I'm a hands-on kind a guy." Later that same day, WILSON added, "I have to admit I have carried my expandable baton both times I've been there I understand it's against the rules but I haven't had a problem yet hard knuckle gloves are a must." Later that same day, WILSON wrote, "It is an easy choice but it's not an easy choice I stand with you all I will go down swinging." Later that same day, WILSON posted, "They might set up a perimeter as usual this line was pushed out even further I expect the sixth and the 20th to continue with that trend but they cannot stop us from walking in." WILSON continued, "We've already been up there twice so we are starting to understand the lay of the land and how to get around and what to expect if anybody has any questions feel free to ask."

28.     WILSON and KUNTZ also planned for January 6, 2021, in another Telegram group organized by KUNTZ, called "United Front." For example, on December 23, 2020, in the United Front group, another individual asked, "What is the goal of this group or chat? What are we trying to accomplish?" KUNTZ responded, "Getting groups in here to fig shit out what are next move will be when shit goes crazy." KUNTZ asked that person, "are you still going on the 6th to D.C." The individual responded, "Groups over here are talking about it now. The 6th is when they count the electoral votes. Republican Senators and Congressmen will be objecting to the votes, this is where things can change." KUNTZ responded, "Yes but i do believe thats when shit will get crazy what you think." The other individual replied, "It will get nuts if the vote is sent to the House to vote and the People's vote is considered null and void." He added, "That's where Trump will win, but it's a long shot." KUNTZ responded, "I think eaither way its not gonna be good."

29.     On December 22, 2020, on Facebook, KUNTZ updated his status to read, "This is Reaper. Spread the fast January 6th in D.C. A must show for all groups that are willing to help."

Along with this status, KUNTZ posted an image that included the following language: "Fight For America.  Patriot Party.  Jan. 6th Washington D.C. Capitol.  Join The Official Patriot Party Inc. to March on the Capital to fight corruption, fight for our rights and demand election integrity."

30.     On December 22, 2020, on Facebook, KUNTZ updated his status to read, "This is Reaper.  This is to all groups going to D.C. on the 6th because i do believe after that we must defend our states.  I believe after this date antifa and blm will start there shit big time.  So this is how i see it i would not show up on the 20th they will have the city shute down were we can not get in unless we fight our way in.  Im almost shure you will be defending your states after the 6th so to all groups you must be on high alert if i am wrong pls let me no i am only human this is my appinion only.  But i do believe from the 6th on we all will be very busy.  So pls let me no what you all think on this.  Thank you all for your time on this matter."  WILSON responded, "Everything is definitely fluid at this time we continue to try to plan and prepare as best we can we just have to play it by ear."  KUNTZ replied, "dan we are going to D.C. on the 6th and ready to fight no more games."

31.     On December 23, 2020, in the United Front group, WILSON posted a link to an open letter from the website oathkeepers.org, entitled, "Open Letter to President Trump: You Must Use Insurrection Act to 'Stop the Steal' and Defeat the Coup."

32.     On December 24, 2020, WILSON discussed in the United Front group his plan to travel to Washington D.C. on January 6, 2021.  Among other messages, another individual messaged the group, "Yes a lot is happening legally and a lot can happen on the 6th.  The most important thing is for the Electoral College results to get contested and that Patriotic Militias set differences aside and gather together."  WILSON responded, "In my opinion I don't think it's time to gun up for the sixth we have to play this out but if they seat biden on the 20th all bets are off

9

it's gonna happen even if Trump wins we have to get this government under control it's been crossing my mind if we go to a Civil War do we try to take Washington DC first or do we try to take state capitals first." Another individual said, "I'm in DC the 6th with others." WILSON responded, "Our team is going. I have had a lot of people reaching out to me about going on the sixth it's going to be the biggest one yet."

33.   On December 27, 2020, in the United Front group, an individual shared an image of a building labeled "BIDEN HARRIS" being blown up, with the message, "Betrayed by nearly everyone in Congress…WE MUST FIGHT. He's the only chance anyone has got. DONALD J. TRUMP. FIGHT HARD." WILSON responded, "I am ready to lay my life on the line. It is time for good men to do bad things." KUNTZ responded later that morning, "Ok guy's lets get this clear once and for all thete will be no talking about taking over nothing or blowing up shit period on here if you do you are out. So stop that shit now keep it to yourself act like the law is right beside you. Reaper out."

34.   On December 27, 2020, in the United Front group, another individual asked WILSON, "Is Reaper going to DC?" WILSON responded, "We will be there." The other individual asked, "Yall in the same Squad trip Wire? Or same Militia Group." WILSON responded, "Yes." WILSON added, "The time is now." KUNTZ replied, "The 6th will tell it all im ready." Later that day, WILSON wrote, "I ain't nobody but when it comes down to it follow me and I'll show you a symphony of destruction." KUNTZ responded, "Come on the 6th lets do this shit."

35.   On December 27, 2020, in the United Front group, KUNTZ shared a tweet from then-President Trump, "See you in Washington, DC, on January 6th. Don't miss it. Information to follow!" KUNTZ added, "He is asking us to be there." WILSON added, "Y'all wanna do it.

10

A41

Ask your self.  Are you really ready.  This is not for the faint of heart."  KUNTZ responded, "Good

he does need us im going armed period."  He added, "alot of groups are going in hot."

### *January 6, 2021: Participation in the Riot at the U.S. Capitol*

36.    WILSON and KUNTZ, who had both previously traveled to Washington, D.C. for

rallies in November and December 2020, drove together to Washington, D.C. for January 6, 2021.

37.    In the early morning of January 6, 2021, WILSON and KUNTZ gathered with

others in the area of the Lincoln Memorial.  Later that morning, WILSON and KUNTZ gathered

with other individuals in the area of the Ellipse and the Washington Monument, during the time

when then-President Donald Trump, among others, addressed the crowd.

38.    After listening to speeches in the area of the Ellipse, KUNTZ and WILSON walked

together to the U.S. Capitol building.

39.    At approximately 1:44 p.m., over Zello—a live voice push-to-talk communication

platform available on cell phones—WILSON received a message from another individual.  The

individual asked, "How many patriots do we have pushing through at the Capitol, Live Wire?"

WILSON responded a few seconds later, "Hey, pass the word, Badlands, as fast as you can, the

people are pushing on the Capitol.  We need hands on deck."  The individual responded, seconds

later, "Heard, Live Wire.  Will send."  Later, at 1:55 p.m., that same individual sent a message to

WILSON, "Live Wire, when your team touches down in the Capitol, I need a sit rep, please."

40.    At approximately 1:44 p.m., over Zello, WILSON shared a message to a group

called, "Oath Keepers general chat."  In that message, WILSON said, "Hey, whoever's got ears

on, even if you ain't in D.C., pass the word, the people are pushing on the Capitol.  We need all

hands on deck."

41.    At approximately 1:45 p.m., over Zello, WILSON shared an audio message to a

A42

group called, "Stop the Steal J6." WILSON said, "The people are trying to push through the barricade at the Capitol building. We're headed that way."

42.    At the U.S. Capitol building, WILSON wore a pair of blue jeans, tan boots, and a blue hooded sweatshirt, and carried a red backpack and an olive-green fabric pouch. At times, he also wore a gas mask.

43.    After he arrived at the U.S. Capitol building, WILSON climbed to an area above the Inaugural Stage and stood on a set of bleachers that had been constructed on the Upper West Terrace, overlooking the Inaugural Stage and West Plaza. Wilson triumphantly raised his fist in the air, as he observed the crowd below, before turning back and walking up the bleachers—toward the U.S. Capitol building.

44.    WILSON entered the U.S. Capitol building through the Upper West Terrace Door at approximately 2:37 p.m., while wearing his gas mask. After entering the building, WILSON walked into the Rotunda, where he remained for several minutes. While in the Rotunda, WILSON removed his gas mask and placed it in the olive-green fabric pouch he was wearing in front. From the Rotunda, WILSON walked through Statuary Hall, before returning to the Rotunda.

45.    WILSON ultimately exited the U.S. Capitol building at 2:49 p.m., through the East Rotunda Doors.

46.    At the U.S. Capitol building, KUNTZ wore a black tactical vest, with a red and white reaper image on the back. At times, he also wore a dark-colored hat, sunglasses, and dark-colored gloves.

47.    KUNTZ entered the Upper West Terrace by approximately 2:22 p.m., from the northeast side of the U.S. Capitol building. From there, KUNTZ walked toward the area of the Parliamentarian Door and Senate Wing Door, on the Upper West Terrace.

12

A43

48.     At approximately, 2:42 p.m., rioters breached the Parliamentarian Door on the Upper West Terrace of the U.S. Capitol building.  KUNTZ was present in the area at the time of this breach.  As rioters swarmed the Parliamentarian Door, KUNTZ called out, "Fuck the police!"

49.     While on the Upper West Terrace, KUNTZ held up a radio to his mouth and can be heard referring to "Live Wire"—the moniker used by WILSON.

(**Conspiracy To Obstruct of an Official Proceeding**, in violation of Title 18, United States Code, Sections 1512(k))

## COUNT TWO

50.     The allegations in paragraphs 1 through 16 and paragraphs 19 through 49 are realleged and incorporated as if fully set forth in this paragraph.

51.     On or about January 6, 2021, within the District of Columbia, the defendants,

**DAN EDWIN WILSON, and
DAVID SCOTT KUNTZ**

attempted to, and did, corruptly obstruct, influence, and impede an official proceeding, that is, a proceeding before Congress, specifically, Congress's certification of the Electoral College vote as set out in the Twelfth Amendment of the Constitution of the United States and 3 U.S.C. §§ 15–18.

(**Obstruction of an Official Proceeding and Aiding and Abetting**, in violation of Title 18, United States Code, Sections 1512(c)(2) and 2)

## COUNT THREE

52.     The allegations in paragraphs 1 through 16 and paragraphs 19 through 49 are realleged and incorporated as if fully set forth in this paragraph.

53.     On or about January 6, 2021, in the District of Columbia, the defendants

**DAN EDWIN WILSON, and
DAVID SCOTT KUNTZ**

13

A44

did knowingly enter and remain in a restricted building and grounds, that is, any posted, cordoned-off, and otherwise restricted area within the United States Capitol and its grounds, where the Vice President was and would be temporarily visiting, without lawful authority to do so.

(**Entering and Remaining in a Restricted Building or Grounds**, in violation of Title 18, United States Code, Section 1752(a)(1))

## COUNT FOUR

54.     The allegations in paragraphs 1 through 16 and paragraphs 19 through 49 are realleged and incorporated as if fully set forth in this paragraph.

55.     On or about January 6, 2021, in the District of Columbia, the defendants,

**DAN EDWIN WILSON, and**
**DAVID SCOTT KUNTZ**

did knowingly, and with intent to impede and disrupt the orderly conduct of Government business and official functions, engage in disorderly and disruptive conduct in and within such proximity to, a restricted building and grounds, that is, any posted, cordoned-off, and otherwise restricted area within the United States Capitol and its grounds, where the Vice President was and would be temporarily visiting, when and so that such conduct did in fact impede and disrupt the orderly conduct of Government business and official functions.

(**Disorderly and Disruptive Conduct in a Restricted Building or Grounds**, in violation of Title 18, United States Code, Section 1752(a)(2))

## COUNT FIVE

56.     The allegations in paragraphs 1 through 16 and paragraphs 19 through 49 are realleged and incorporated as if fully set forth in this paragraph.

57.     On or about January 6, 2021, in the District of Columbia, the defendants,

A45

**DAN EDWIN WILSON, and**
**DAVID SCOTT KUNTZ**

willfully and knowingly engaged in disorderly and disruptive conduct within the United States

Capitol Grounds and in any of the Capitol Buildings with the intent to impede, disrupt, and

disturb the orderly conduct of a session of Congress and either House of Congress, and the

orderly conduct in that building of a hearing before or any deliberation of, a committee of

Congress or either House of Congress.

> (**Disorderly Conduct in a Capitol Building**, in violation of Title 40, United States Code,
> Section 5104(e)(2)(D))

## COUNT SIX

58.     The allegations in paragraphs 1 through 16 and paragraphs 19 through 49 are

realleged and incorporated as if fully set forth in this paragraph.

59.     On or about January 6, 2021, in the District of Columbia, **DAN EDWIN WILSON**

willfully and knowingly paraded, demonstrated, and picketed in any United States Capitol

Building.

> (**Parading, Demonstrating, or Picketing in a Capitol Building**, in violation of Title 40,
> United States Code, Section 5104(e)(2)(G))

A TRUE BILL:

FOREPERSON.

*Mathew M. Graves / nj̃*

Attorney of the United States in
and for the District of Columbia.

15

A46

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | **CRIMINAL NO. 23-cr-427** |
| | : | |
| **v.** | : | **VIOLATION:** |
| | : | **18 U.S.C. § 372 (Conspiracy To Obstruct** |
| **DAN EDWIN WILSON,** | : | **or Impede Officers)** |
| | : | **18 U.S.C. § 1512(k)** |
| **Defendant.** | : | **(Conspiracy To Obstruct an Official** |
| | : | **Proceeding)** |
| | : | **18 U.S.C. §§ 1512(c)(2), 2** |
| | : | **(Obstruction of an Official Proceeding)** |
| | : | **18 U.S.C. § 1752(a)(1)** |
| | : | **(Entering and Remaining in a Restricted** |
| | : | **Building or Grounds)** |
| | : | **18 U.S.C. § 1752(a)(2)** |
| | : | **(Disorderly and Disruptive Conduct in a** |
| | : | **Restricted Building or Grounds)** |
| | : | **40 U.S.C. § 5104(e)(2)(D)** |
| | : | **(Disorderly Conduct in a Capitol Building)** |
| | : | **40 U.S.C. § 5104(e)(2)(G)** |
| | : | **(Parading, Demonstrating, or Picketing in** |
| | : | **a Capitol Building)** |

## <u>INFORMATION</u>

The United States Attorney charges that at all relevant times:

## <u>COUNT ONE</u>

Between on or about December 22, 2020 and January 6, 2021, within the District of Columbia and elsewhere, DAN EDWIN WILSON, with others, did conspire to prevent, by force, intimidation, or threat, any person, that is, Members of the United States Congress and law enforcement officers, from discharging any duties of any office, trust, or place of confidence under the United States, and to induce by force, intimidation, and threat, any officer of the United States, that is Members of the United States Congress and law enforcement officers, to leave the place, where their duties as officers were required to be performed.

A47

(**Conspiracy To Impede or Injure Officer**, in violation of Title 18, United States Code, Section 372)

## COUNT TWO

Between on or about December 22, 2020 and January 6, 2021, within the District of Columbia and elsewhere, DAN EDWIN WILSON, with others, did conspire to corruptly obstruct, influence, and impede an official proceeding, that is, a proceeding before Congress, specifically, Congress's certification of the Electoral College vote as set out in the Twelfth Amendment of the Constitution of the United States and 3 U.S.C. §§ 15–18.

(**Conspiracy To Obstruct of an Official Proceeding**, in violation of Title 18, United States Code, Section 1512(k))

## COUNT THREE

On or about January 6, 2021, within the District of Columbia, DAN EDWIN WILSON attempted to, and did, corruptly obstruct, influence, and impede an official proceeding, that is, a proceeding before Congress, specifically, Congress's certification of the Electoral College vote as set out in the Twelfth Amendment of the Constitution of the United States and 3 U.S.C. §§ 15–18.

(**Obstruction of an Official Proceeding and Aiding and Abetting**, in violation of Title 18, United States Code, Sections 1512(c)(2) and 2)

## COUNT FOUR

On or about January 6, 2021, in the District of Columbia, DAN EDWIN WILSON did knowingly enter and remain in a restricted building and grounds, that is, any posted, cordoned-off, and otherwise restricted area within the United States Capitol and its grounds, where the Vice President was and would be temporarily visiting, without lawful authority to do so.

2

A48

(**Entering and Remaining in a Restricted Building or Grounds**, in violation of Title 18, United States Code, Section 1752(a)(1))

## COUNT FIVE

On or about January 6, 2021, in the District of Columbia, DAN EDWIN WILSON did knowingly, and with intent to impede and disrupt the orderly conduct of Government business and official functions, engage in disorderly and disruptive conduct in and within such proximity to, a restricted building and grounds, that is, any posted, cordoned-off, and otherwise restricted area within the United States Capitol and its grounds, where the Vice President was and would be temporarily visiting, when and so that such conduct did in fact impede and disrupt the orderly conduct of Government business and official functions.

(**Disorderly and Disruptive Conduct in a Restricted Building or Grounds**, in violation of Title 18, United States Code, Section 1752(a)(2))

## COUNT SIX

On or about January 6, 2021, in the District of Columbia, DAN EDWIN WILSON willfully and knowingly engaged in disorderly and disruptive conduct within the United States Capitol Grounds and in any of the Capitol Buildings with the intent to impede, disrupt, and disturb the orderly conduct of a session of Congress and either House of Congress, and the orderly conduct in that building of a hearing before or any deliberation of, a committee of Congress or either House of Congress.

(**Disorderly Conduct in a Capitol Building**, in violation of Title 40, United States Code, Section 5104(e)(2)(D))

## COUNT SEVEN

On or about January 6, 2021, in the District of Columbia, DAN EDWIN WILSON

3

A49

willfully and knowingly paraded, demonstrated, and picketed in any United States Capitol

Building.

      (**Parading, Demonstrating, or Picketing in a Capitol Building**, in violation of Title 40, United States Code, Section 5104(e)(2)(G))

                                  MATTHEW M. GRAVES
                                  United States Attorney
                                  D.C. Bar No. 481052

By:      */s/ Anthony W. Mariano*
                                  Anthony W. Mariano, MA Bar No. 688559
                                  Trial Attorney, Detailee
                                  United States Attorney's Office
                                  for the District of Columbia
                                  601 D Street NW
                                  Washington, D.C. 20530
                                  (202) 476-0319
                                  Anthony.Mariano2@usdoj.gov

A50



U.S. Department of Justice

Matthew M. Graves
United States Attorney

*District of Columbia*

---

*Patrick Henry Building*
*601 D St., N.W.*
*Washington, D.C. 20530*

May 6, 2024

Norman A. Pattis
Counsel for Dan Edwin Wilson

     Re:   *United States v. Dan Edwin Wilson*
        Criminal Case No. 23-cr-427 (DLF)

Dear Counsel:

   This letter sets forth the full and complete plea offer to your client, Dan Edwin Wilson (hereinafter referred to as "your client" or "defendant"), from the Office of the United States Attorney for the District of Columbia (hereinafter also referred to as "the Government" or "this Office"). This plea offer expires on May 24, 2024. If your client accepts the terms and conditions of this offer, please have your client execute this document in the space provided below. Upon receipt of the executed document, this letter will become the Plea Agreement (hereinafter referred to as "this Agreement"). The terms of the offer are as follows:

1.   **Charges and Statutory Penalties**

   Your client agrees to plead guilty to Count One of a criminal Information, a copy of which is attached, charging your client with Conspiracy To Impede or Injure Officer, in violation of 18 U.S.C. § 372. Your client further agrees, pursuant to Rule 20 of the Federal Rules of Criminal Procedure, to plead guilty to Counts 1 and 2 of the Indictment in case 3:23-cr-3 (CHB) from the United States District Court for the Western District of Kentucky, charging your client with Possession of a Firearm by a Prohibited Person, in violation of 18 U.S.C. §§ 922(g)(1) & 924(a)(2), and Possession of an Unregistered Firearm, in violation of 26 U.S.C. §§ 5841, 5861(d), & 5871.

   Your client understands that a violation of 18 U.S.C. § 372 carries a maximum sentence of 6 years of imprisonment; a fine of $250,000, pursuant to 18 U.S.C. § 3571(b)(3); a term of supervised release of not more than 3 years, pursuant to 18 U.S.C. § 3583(b)(2); and an obligation to pay any applicable interest or penalties on fines and restitution not timely made.

A51

Your client understands that a violation of 18 U.S.C. §§ 922(g)(1) & 924(a)(2) carries a maximum sentence of 20 years of imprisonment; a fine of $250,000, pursuant to 18 U.S.C. § 3571(b)(3); a term of supervised release of not more than 3 years, pursuant to 18 U.S.C. § 3583(b)(2); and an obligation to pay any applicable interest or penalties on fines and restitution not timely made.

Your client understands that a violation of 26 U.S.C. §§ 5841, 5861(d), & 5871 carries a maximum sentence of 10 years of imprisonment; a fine of $10,000, pursuant to 18 U.S.C. § 5871; a term of supervised release of not more than 3 years, pursuant to 18 U.S.C. § 3583(b)(2); and an obligation to pay any applicable interest or penalties on fines and restitution not timely made.

In addition, your client agrees to pay a special assessment of $100 per felony conviction to the Clerk of the United States District Court for the District of Columbia.  Your client also understands that, pursuant to 18 U.S.C. § 3572 and § 5E1.2 of the United States Sentencing Commission, *Guidelines Manual* (2021) (hereinafter "Sentencing Guidelines," "Guidelines," or "U.S.S.G."), the Court may also impose a fine that is sufficient to pay the federal government the costs of any imprisonment, term of supervised release, and period of probation.  Further, your client understands that, if your client has two or more convictions for a crime of violence or felony drug offense, your client may be subject to the substantially higher penalties provided for in the career-offender statutes and provisions of the Sentencing Guidelines.

## 2.   **Cooperation with Additional Investigation**

Your client agrees to allow law enforcement agents to review any social media accounts operated by your client for statements and postings in and around January 6, 2021, and conduct an interview of your client regarding the events in and around January 6, 2021 prior to sentencing.

## 3.   **Factual Stipulations**

Your client agrees that the attached "Statement of Offense" fairly and accurately describes your client's actions and involvement in the offenses to which your client is pleading guilty.  Please have your client sign and return the Statement of Offense as a written proffer of evidence, along with this Agreement.

## 4.   **Additional Charges**

In consideration of your client's guilty plea to the above offenses, your client will not be further prosecuted criminally by this Office for the conduct set forth in the attached Statement of Offense.  The United States will request that the Court dismiss at the time of sentencing the following charges in the information: Count 2, 18 U.S.C. § 1512(k); Count 3, 18 U.S.C. §§ 1512(c)(2); Count 4, 18 U.S.C. § 1752(a)(1); Count 5, 18 U.S.C. § 1752(a)(2); Count 6, 40 U.S.C. § 5104(e)(2)(D); and Count 7, 40 U.S.C. § 5104(e)(2)(G).

A52

After the entry of your client's plea of guilty to the offenses identified in paragraph 1 above, your client will not be charged with any non-violent criminal offense in violation of Federal or District of Columbia law which was committed within the District of Columbia by your client prior to the execution of this Agreement and about which this Office was made aware by your client prior to the execution of this Agreement. However, the United States expressly reserves its right to prosecute your client for any crime of violence, as defined in 18 U.S.C. § 16 and/or 22 D.C. Code § 4501, if in fact your client committed or commits such a crime of violence prior to or after the execution of this Agreement.

The U.S. Attorney's Office for District of Columbia represents that it has contacted the U.S. Attorney's Office for the Western District of Kentucky, and that jurisdiction has agreed to abide by the terms of this agreement, i.e., not to criminally prosecute the defendant in the Western District of Kentucky for the specific conduct described in the Information or Statement of Facts.

**5.     Sentencing Guidelines Analysis**

Your client understands that the sentence in this case will be determined by the Court, pursuant to the factors set forth in 18 U.S.C. § 3553(a), including a consideration of the Sentencing Guidelines. Pursuant to Federal Rule of Criminal Procedure 11(c)(1)(B), and to assist the Court in determining the appropriate sentence, the parties agree to the following:

**A.     Estimated Offense Level Under the Guidelines**

The parties agree that the following Sentencing Guidelines sections apply:

**Information Count 1 (18 U.S.C. § 372)**

| | | |
|---|---|---|
| U.S.S.G. § 2J1.2 | Obstruction of Justice Base Offense Level | **14** |
| U.S.S.G. § 2J1.2(b)(3)(C) | Extensive Scope, Planning, or Preparation | **+2** |
| | Total | **16** |

**W.D.K.Y. Count 1 (18 U.S.C. §§  922(g)(1), 924(a)(2))**

| | | |
|---|---|---|
| U.S.S.G. § 2K2.1(a)(4) | Unlawful Possession of Firearms Base Offense Level | **20** |
| U.S.S.G. § 2K2.1(b)(1)(A) | Possession of 3-7 Firearms | **+2** |
| | Total | **22** |

**W.D.K.Y. Count 2 (26 U.S.C. §§ 5841, 5861(d), & 5871)**

| | | |
|---|---|---|
| U.S.S.G. § 2K2.1(a)(4) | Unlawful Possession of Firearms Base Offense Level | **20** |
| | Total | **20** |

Your client understands that, with respect to the 18 U.S.C. § 372 charge, the government maintains that, pursuant to U.S.S.G. § 3B1.1, an enhancement of two or more points may apply. Your client agrees to the facts as stated in the Statement of Offense, but reserves the right to challenge the application of U.S.S.G. § 3B1.1.

A53

### Grouping

Count 1 from the Information does not group with the either count from the Western District of Kentucky Indictment. Count 1 from the Information, therefore, constitutes Group One. The base offense level for Group One is at least 16. If the Government requests and the Court applies an enhancement of two of more points under U.S.S.G. § 3B1.1, the base offense level for Group One would be as high as 20.

Pursuant to U.S.S.G. § 3D1.2(c), Count 1 and Count 2 from the Western District of Kentucky Indictment group. Count 1 and Count 2 from the Western District of Kentucky Indictment constitute Group Two. The base offense level for Group Two is the offense level for the most serious count, per U.S.S.G. § 3D1.3, which is Count 1 from the Western District of Kentucky Indictment. Therefore, the base offense level for Group Two is 22.

Group Two constitutes the "Group with the highest offense level," and, represents 1 unit. If the offense level for Group One is 16, it would be "5 to 8 levels less serious than the Group with the highest offense level," and, accordingly, one-half unit would be added. The number of units is therefore at least 1 ½, which increases the offense level of Group Two by one level.

If the offense level for Group One is 18–20, it would be "1 to 4 levels less serious" than the Group with the highest offense level, and, accordingly, one unit would be added. The number of units would therefore be 2, which increases the offense level of Group Two by two levels.

Accordingly, the combined offense level is at least 23. If an enhancement under under U.S.S.G. § 3B1.1 is applied, the combined offense level would be 24.

### Acceptance of Responsibility

The Government agrees that a 2-level reduction will be appropriate, pursuant to U.S.S.G. § 3E1.1, provided that your client clearly demonstrates acceptance of responsibility, to the satisfaction of the Government, through your client's allocution, adherence to every provision of this Agreement, and conduct between entry of the plea and imposition of sentence. Furthermore, assuming your client has accepted responsibility as described in the previous sentence, the Government agrees that an additional 1-level reduction will be appropriate, pursuant to U.S.S.G. § 3E1.1(b), because your client has assisted authorities by providing timely notice of your client's intention to enter a plea of guilty, thereby permitting the Government to avoid preparing for trial and permitting the Court to allocate its resources efficiently.

Nothing in this Agreement limits the right of the Government to seek denial of the adjustment for acceptance of responsibility, pursuant to U.S.S.G. § 3E1.1, and/or imposition of an adjustment for obstruction of justice, pursuant to U.S.S.G. § 3C1.1, regardless of any agreement set forth above, should your client move to withdraw your client's guilty plea after it is entered, or should it be determined by the Government that your client has either (a) engaged in conduct, unknown to the Government at the time of the signing of this Agreement, that

constitutes obstruction of justice, or (b) engaged in additional criminal conduct after signing this Agreement.

In accordance with the above, the Estimated Offense Level will be at least 20, depending upon the application of any contested enhancement under U.S.S.G. § 3B1.1.

### B.     Estimated Criminal History Category

Based upon the information now available to this Office, your client has no applicable criminal convictions.

Accordingly, your client is estimated to have 0 criminal history points and your client's Criminal History Category is estimated to be I (the "Estimated Criminal History Category"). Your client acknowledges that after the pre-sentence investigation by the United States Probation Office, a different conclusion regarding your client's criminal convictions and/or criminal history points may be reached and your client's criminal history points may increase or decrease.

### C.     Adjustment Based on U.S.S.G. § 4C1.1

The parties agree that your client is not eligible for an adjustment pursuant to U.S.S.G. § 4C1.1 because U.S.S.G. §§ 4C1.1(a)(3) and (7) apply. Specifically, the parties agree that the defendant used violence or credible threats of violence in connection with the offense, and possessed, received, purchased, transported, transferred, sold, or otherwise dispose of a firearm or other dangerous weapon in connection with the offense; and therefore that the defendant is ineligible to receive the adjustment pursuant to U.S.S.G. §§ 4C1.1(a)(3) and (7).

### D.     Estimated Guidelines Range

Based upon the Estimated Offense Level and the Estimated Criminal History Category set forth above, your client's estimated Sentencing Guidelines range is **33 months to 41 months** (the "Estimated Guidelines Range"). In addition, the parties agree that, pursuant to U.S.S.G. § 5E1.2, should the Court impose a fine, at Guidelines level **20**, the estimated applicable fine range is **$15,000 to $150,000**. Your client reserves the right to ask the Court not to impose any applicable fine.

The parties agree that, solely for the purposes of calculating the applicable range under the Sentencing Guidelines, neither a downward nor upward departure from the Estimated Guidelines Range set forth above is warranted, except the Government reserves the right to request an upward departure pursuant to U.S.S.G. § 3A1.4, n. 4, U.S.S.G. § 5K2.7 (Disruption of Governmental Function), and/or 5K2.14 (Public Welfare). Except as provided for in the "Reservation of Allocution" section below, the parties also agree that neither party will seek any offense-level calculation different from the Estimated Offense Level calculated above in subsection A. However, the parties are free to argue for a Criminal History Category different from that estimated above in subsection B.

A55

Your client understands and acknowledges that the Estimated Guidelines Range calculated above is not binding on the Probation Office or the Court. Should the Court or Probation Office determine that a guidelines range different from the Estimated Guidelines Range is applicable, that will not be a basis for withdrawal or recission of this Agreement by either party.

Your client understands and acknowledges that the terms of this section apply only to conduct that occurred before the execution of this Agreement. Should your client commit any conduct after the execution of this Agreement that would form the basis for an increase in your client's base offense level or justify an upward departure (examples of which include, but are not limited to, obstruction of justice, failure to appear for a court proceeding, criminal conduct while pending sentencing, and false statements to law enforcement agents, the probation officer, or the Court), the Government is free under this Agreement to seek an increase in the base offense level based on that post-agreement conduct.

**6.    Agreement as to Sentencing Allocution**

The parties further agree that a sentence within the Estimated Guidelines Range would constitute a reasonable sentence in light of all of the factors set forth in 18 U.S.C. § 3553(a), should such a sentence be subject to appellate review notwithstanding the appeal waiver provided below. However, the parties agree that either party may seek a variance and suggest that the Court consider a sentence outside of the applicable Guidelines Range, based upon the factors to be considered in imposing a sentence pursuant to 18 U.S.C. § 3553(a).

**7.    Reservation of Allocution**

The Government and your client reserve the right to describe fully, both orally and in writing, to the sentencing judge, the nature and seriousness of your client's misconduct, including any misconduct not described in the charges to which your client is pleading guilty, to inform the presentence report writer and the Court of any relevant facts, to dispute any factual inaccuracies in the presentence report, and to contest any matters not provided for in this Agreement. The parties also reserve the right to address the correctness of any Sentencing Guidelines calculations determined by the presentence report writer or the court, even if those calculations differ from the Estimated Guidelines Range calculated herein.   In the event that the Court or the presentence report writer considers any Sentencing Guidelines adjustments, departures, or calculations different from those agreed to and/or estimated in this Agreement, or contemplates a sentence outside the Guidelines range based upon the general sentencing factors listed in 18 U.S.C. § 3553(a), the parties reserve the right to answer any related inquiries from the Court or the presentence report writer and to allocute for a sentence within the Guidelines range, as ultimately determined by the Court, even if the Guidelines range ultimately determined by the Court is different from the Estimated Guidelines Range calculated herein.

In addition, if in this Agreement the parties have agreed to recommend or refrain from recommending to the Court a particular resolution of any sentencing issue, the parties reserve the right to full allocution in any post-sentence litigation. The parties retain the full right of allocution in connection with any post-sentence motion which may be filed in this matter and/or

any proceeding(s) before the Bureau of Prisons. In addition, your client acknowledges that the Government is not obligated and does not intend to file any post-sentence downward departure motion in this case pursuant to Rule 35(b) of the Federal Rules of Criminal Procedure.

**8.** <u>**Court Not Bound by this Agreement or the Sentencing Guidelines**</u>

Your client understands that the sentence in this case will be imposed in accordance with 18 U.S.C. § 3553(a), upon consideration of the Sentencing Guidelines. Your client further understands that the sentence to be imposed is a matter solely within the discretion of the Court. Your client acknowledges that the Court is not obligated to follow any recommendation of the Government at the time of sentencing. Your client understands that neither the Government's recommendation nor the Sentencing Guidelines are binding on the Court.

Your client acknowledges that your client's entry of a guilty plea to the charged offense(s) authorizes the Court to impose any sentence, up to and including the statutory maximum sentence, which may be greater than the applicable Guidelines range. The Government cannot, and does not, make any promise or representation as to what sentence your client will receive. Moreover, it is understood that your client will have no right to withdraw your client's plea of guilty should the Court impose a sentence that is outside the Guidelines range or if the Court does not follow the Government's sentencing recommendation. The Government and your client will be bound by this Agreement, regardless of the sentence imposed by the Court. Any effort by your client to withdraw the guilty plea because of the length of the sentence shall constitute a breach of this Agreement.

**9.** <u>**Conditions of Release**</u>

Your client acknowledges that, although the Government will not seek a change in your client's release conditions pending sentencing, the final decision regarding your client's bond status or detention will be made by the Court at the time of your client's plea of guilty. The Government may move to change your client's conditions of release, including requesting that your client be detained pending sentencing, if your client engages in further criminal conduct prior to sentencing or if the Government obtains information that it did not possess at the time of your client's plea of guilty and that is relevant to whether your client is likely to flee or pose a danger to any person or the community. Your client also agrees that any violation of your client's release conditions or any misconduct by your client may result in the Government filing an <u>ex parte</u> motion with the Court requesting that a bench warrant be issued for your client's arrest and that your client be detained without bond while pending sentencing in your client's case.

Your client agrees not to object to the Government's recommendation to the Court at the time of sentencing in this case that your client be detained, pursuant to 18 U.S.C. § 3143.

10.    <u>Waivers</u>

    A.    **Venue**

Your client waives any challenge to venue in the District of Columbia.

    B.    **Statute of Limitations**

Your client agrees that, should the conviction following your client's plea of guilty pursuant to this Agreement be vacated for any reason, any prosecution, based on the conduct set forth in the attached Statement of Offense, that is not time-barred by the applicable statute of limitations on the date of the signing of this Agreement (including any counts that the Government has agreed not to prosecute or to dismiss at sentencing pursuant to this Agreement) may be commenced or reinstated against your client, notwithstanding the expiration of the statute of limitations between the signing of this Agreement and the commencement or reinstatement of such prosecution. It is the intent of this Agreement to waive all defenses based on the statute of limitations with respect to any prosecution of conduct set forth in the attached Statement of Offense that is not time-barred on the date that this Agreement is signed.

    C.    **Trial Rights**

Your client understands that by pleading guilty in this case your client agrees to waive certain rights afforded by the Constitution of the United States and/or by statute or rule. Your client agrees to forego the right to any further discovery or disclosures of information not already provided at the time of the entry of your client's guilty plea. Your client also agrees to waive, among other rights, the right to be indicted by a Grand Jury, the right to plead not guilty, and the right to a jury trial. If there were a jury trial, your client would have the right to be represented by counsel, to confront and cross-examine witnesses against your client, to challenge the admissibility of evidence offered against your client, to compel witnesses to appear for the purpose of testifying and presenting other evidence on your client's behalf, and to choose whether to testify. If there were a jury trial and your client chose not to testify at that trial, your client would have the right to have the jury instructed that your client's failure to testify could not be held against your client. Your client would further have the right to have the jury instructed that your client is presumed innocent until proven guilty, and that the burden would be on the United States to prove your client's guilt beyond a reasonable doubt. If your client were found guilty after a trial, your client would have the right to appeal your client's conviction. Your client understands that the Fifth Amendment to the Constitution of the United States protects your client from the use of self-incriminating statements in a criminal prosecution. By entering a plea of guilty, your client knowingly and voluntarily waives or gives up your client's right against self-incrimination.

Your client acknowledges discussing with you Rule 11(f) of the Federal Rules of Criminal Procedure and Rule 410 of the Federal Rules of Evidence, which ordinarily limit the admissibility of statements made by a defendant in the course of plea discussions or plea proceedings if a guilty plea is later withdrawn. Your client knowingly and voluntarily waives the

rights that arise under these rules in the event your client withdraws your client's guilty plea or withdraws from this Agreement after signing it.

Your client also agrees to waive all constitutional and statutory rights to a speedy sentence and agrees that the plea of guilty pursuant to this Agreement will be entered at a time decided upon by the parties with the concurrence of the Court. Your client understands that the date for sentencing will be set by the Court.

### D.    Appeal Rights

Your client agrees to waive, insofar as such waiver is permitted by law, the right to appeal the conviction in this case on any basis, including but not limited to claim(s) that (1) the statute(s) to which your client is pleading guilty is unconstitutional, and (2) the admitted conduct does not fall within the scope of the statute(s). Your client understands that federal law, specifically 18 U.S.C. § 3742, affords defendants the right to appeal their sentences in certain circumstances. Your client also agrees to waive the right to appeal the sentence in this case, including but not limited to any term of imprisonment, fine, forfeiture, award of restitution, term or condition of supervised release, authority of the Court to set conditions of release, and the manner in which the sentence was determined, except to the extent the Court sentences your client above the statutory maximum or guidelines range determined by the Court. In agreeing to this waiver, your client is aware that your client's sentence has yet to be determined by the Court. Realizing the uncertainty in estimating what sentence the Court ultimately will impose, your client knowingly and willingly waives your client's right to appeal the sentence, to the extent noted above, in exchange for the concessions made by the Government in this Agreement. Notwithstanding the above agreement to waive the right to appeal the conviction and sentence, your client retains the right to appeal on the basis of ineffective assistance of counsel, but not to raise on appeal other issues regarding the conviction or sentence.

### E.    Collateral Attack

Your client also waives any right to challenge the conviction entered or sentence imposed under this Agreement or otherwise attempt to modify or change the sentence or the manner in which it was determined in any collateral attack, including, but not limited to, a motion brought under 28 U.S.C. § 2255 or Federal Rule of Civil Procedure 60(b), except to the extent such a motion is based on newly discovered evidence or on a claim that your client received ineffective assistance of counsel. Your client reserves the right to file a motion brought under 18 U.S.C. § 3582(c)(2).

### F.    Hearings by Video Teleconference and/or Teleconference

Your client agrees to consent, under the Federal Rules of Criminal Procedure, to hold any proceedings in this matter – specifically including but not limited to presentment, initial appearance, and status hearings – by video teleconference and/or by teleconference and to waive any rights to demand an in-person/in-Court hearing. Your client further agrees to not challenge or contest any findings by the Court that it may properly proceed by video teleconferencing and/or telephone conferencing in this case. Your client understands, however, that pursuant to

the expiration of the CARES Act, as well as the Chief Judge's Standing Order No. 23-26 (JEB) (May 5, 2023), felony plea and sentencing hearings must be conducted in-person.

### G.    Transfer of Case from the Western District of Kentucky

In light of your client's wish to plead guilty, pursuant to Rule 20(a) of Federal Rule of Criminal Procedure, your client agrees that he wishes to waive trial in the Western District of Kentucky and consents to the United States District Court for the District of Columbia disposing of *United States v. Dan Edwin Wilson*, 3:23-cr-3 (CHB) (W.D. Ky.).

### 11.    Use of Self-Incriminating Information

The Government and your client agree, in accordance with U.S.S.G. § 1B1.8, that the Government will be free to use against your client for any purpose at the sentencing in this case or in any related criminal or civil proceedings, any self-incriminating information provided by your client pursuant to this Agreement or during the course of debriefings conducted in anticipation of this Agreement, regardless of whether those debriefings were previously covered by an "off the record" agreement by the parties.

Your client understands if your client fails to plead guilty in accordance with this agreement or withdraws the plea of guilty, any statements your client makes (including this plea agreement, and admission of guilt) during or in preparation for any guilty plea hearing, sentencing hearing, or other hearing and any statements your client makes or has made to law enforcement agents, in any setting (including during a proffer), may be used against your client in this or any other proceeding. Your client knowingly waives any right your client may have under the Constitution, any statute, rule or other source of law to have such statements, or evidence derived from such statements, suppressed or excluded from being admitted into evidence and stipulate that such statements can be admitted into evidence.

### 12.    Restitution

Your client understands that the Court has an obligation to determine whether, and in what amount restitution applies in this case. Your client agrees to pay restitution pursuant to 18 U.S.C. § 3663(a)(3).

Your client acknowledges that the riot that occurred on January 6, 2021, caused as of July 7, 2023, approximately $2,923,080.05 in damage to the United States Capitol, as well as additional losses to the Metropolitan Police Department. Your client agrees as part of the plea in this matter to pay restitution to the Architect of the Capitol in the amount of $2,000.

Payments of restitution shall be made to the Clerk of the Court. In order to facilitate the collection of financial obligations to be imposed in connection with this prosecution, your client agrees to disclose fully all assets in which your client has any interest or over which your client exercises control, directly or indirectly, including those held by a spouse, nominee or other third party. Your client agrees to submit a completed financial statement on a standard financial disclosure form which has been provided to you with this Agreement to the Financial Litigation

A60

Unit of the United States Attorney's Office, as it directs. If you do not receive the disclosure form, your client agrees to request one from usadc.ecfflu@usa.doj.gov. Your client will complete and electronically provide the standard financial disclosure form to usadc.ecfflu@usa.doj.gov within 30 days of entry of your client's guilty plea. Your client agrees to be contacted by the Financial Litigation Unit of the United States Attorney's Office, through defense counsel, to complete a financial statement. Upon review, if there are any follow-up questions, your client agrees to cooperate with the Financial Litigation Unit. Your client promises that the financial statement and disclosures will be complete, accurate and truthful, and understands that any willful falsehood on the financial statement could be prosecuted as a separate crime punishable under 18 U.S.C. § 1001, which carries an additional five years' incarceration and a fine.

Your client expressly authorizes the United States Attorney's Office to obtain a credit report on your client in order to evaluate your client's ability to satisfy any financial obligations imposed by the Court or agreed to herein.

Your client understands and agrees that the restitution or fines imposed by the Court will be due and payable immediately and subject to immediate enforcement by the United States. If the Court imposes a schedule of payments, your client understands that the schedule of payments is merely a minimum schedule of payments and will not be the only method, nor a limitation on the methods, available to the United States to enforce the criminal judgment, including without limitation by administrative offset. If your client is sentenced to a term of imprisonment by the Court, your client agrees to participate in the Bureau of Prisons' Inmate Financial Responsibility Program, regardless of whether the Court specifically imposes a schedule of payments.

Your client certifies that your client has made no transfer of assets in contemplation of this prosecution for the purpose of evading or defeating financial obligations that are created by this Agreement and/or that may be imposed by the Court. In addition, your client promises to make no such transfers in the future until your client has fulfilled the financial obligations under this Agreement.

13.    **Forfeiture**

Your client understands and agrees to forfeiture, pursuant to Title 18, United States Code, Section 924(d), Title 28, United States Code, Section 2461, and Title 26, United States Code, Section 5872, all firearms and ammunition, including, but not limited to:

- A Rock Island Armory, Model M1911-A1, .45 caliber pistol, bearing serial number RIA1547427.
- A Smith & Wesson, Model M&P Shield, 9 millimeter pistol bearing serial number HUH1149.
- A Rock Island Armory, Model M1911-A1, .45 caliber pistol, bearing serial number RIA2266246.
- An Anderson Manufacturing, Model AM-15, multi-caliber rifle bearing serial number 19347295, with a 28-inch overall length and a 14-inch barrel.
- A 5.56 caliber long barrel M-4 style rifle with "M" logo, with no visible serial number.

A61

- A 5.56 caliber short barrel M-4 style rifle, with Anderson butt-stock, with no visible serial number.

### 14.    Breach of Agreement

Your client understands and agrees that, if after entering this Agreement, your client fails specifically to perform or to fulfill completely each and every one of your client's obligations under this Agreement, or engages in any criminal activity prior to sentencing, your client will have breached this Agreement. In the event of such a breach: (a) the Government will be free from its obligations under this Agreement; (b) your client will not have the right to withdraw the guilty plea; (c) your client will be fully subject to criminal prosecution for any other crimes, including perjury and obstruction of justice; and (d) the Government will be free to use against your client, directly and indirectly, in any criminal or civil proceeding, all statements made by your client and any of the information or materials provided by your client, including such statements, information and materials provided pursuant to this Agreement or during the course of any debriefings conducted in anticipation of, or after entry of, this Agreement, whether or not the debriefings were previously characterized as "off-the-record" debriefings, and including your client's statements made during proceedings before the Court pursuant to Rule 11 of the Federal Rules of Criminal Procedure.

Your client understands and agrees that the Government shall be required to prove a breach of this Agreement only by a preponderance of the evidence, except where such breach is based on a violation of federal, state, or local criminal law, which the Government need prove only by probable cause in order to establish a breach of this Agreement.

Nothing in this Agreement shall be construed to permit your client to commit perjury, to make false statements or declarations, to obstruct justice, or to protect your client from prosecution for any crimes not included within this Agreement or committed by your client after the execution of this Agreement. Your client understands and agrees that the Government reserves the right to prosecute your client for any such offenses. Your client further understands that any perjury, false statements or declarations, or obstruction of justice relating to your client's obligations under this Agreement shall constitute a breach of this Agreement. In the event of such a breach, your client will not be allowed to withdraw your client's guilty plea.

### 15.    Complete Agreement

No agreements, promises, understandings, or representations have been made by the parties or their counsel other than those contained in writing herein, nor will any such agreements, promises, understandings, or representations be made unless committed to writing and signed by your client, defense counsel, and an Assistant United States Attorney for the District of Columbia.

Your client further understands that this Agreement is binding only upon the Criminal and Superior Court Divisions of the United States Attorney's Office for the District of Columbia. This Agreement does not bind the Civil Division of this Office or any other United States Attorney's Office, nor does it bind any other state, local, or federal prosecutor. It also does not

A62

bar or compromise any civil, tax, or administrative claim pending or that may be made against your client.

       If the foregoing terms and conditions are satisfactory, your client may so indicate by signing this Agreement and the Statement of Offense, and returning both to me no later than May 24, 2024.

Sincerely yours,

Matthew M. Graves
United States Attorney

By:      /s/ Anthony W. Mariano
Anthony W. Mariano
Trial Attorney, Detailee
United States Attorney's Office

DEFENDANT'S ACCEPTANCE

I have read every page of this Agreement and have discussed it with my attorney, Norman A. Pattis. I fully understand this Agreement and agree to it without reservation. I do this voluntarily and of my own free will, intending to be legally bound. No threats have been made to me nor am I under the influence of anything that could impede my ability to understand this Agreement fully. I am pleading guilty because I am in fact guilty of the offense(s) identified in this Agreement.

I reaffirm that absolutely no promises, agreements, understandings, or conditions have been made or entered into in connection with my decision to plead guilty except those set forth in this Agreement. I am satisfied with the legal services provided by my attorney in connection with this Agreement and matters related to it.


Date: 5-15-24

Dan Edwin Wilson
Defendant


ATTORNEY'S ACKNOWLEDGMENT

I have read every page of this Agreement, reviewed this Agreement with my client, Dan Edwin Wilson, and fully discussed the provisions of this Agreement with my client. These pages accurately and completely set forth the entire Agreement. I concur in my client's desire to plead guilty as set forth in this Agreement.


Date: 5/15/24

Norman A. Pattis
Attorney for Defendant

A64

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | Case No.: 23-CR-427 (DLF) |
| | : | |
| v. | : | |
| | : | |
| DAN EDWIN WILSON, | : | |
| | : | |
| Defendant. | : | |
| | : | |

### STATEMENT OF OFFENSE

Pursuant to Fed. R. Crim. P. 11, the United States of America, by and through its attorney, the United States Attorney for the District of Columbia, and the defendant, Dan Edwin Wilson, with the concurrence of the defendant's attorney, agree and stipulate to the below factual basis for the defendant's guilty plea—that is, if this case were to proceed to trial, the parties stipulate that the United States could prove the below facts beyond a reasonable doubt:

#### *The Attack at the U.S. Capitol on January 6, 2021*

1.      The U.S. Capitol, which is located at First Street, SE, in Washington, D.C., is secured twenty-four hours a day by U.S. Capitol Police (USCP). Restrictions around the Capitol include permanent and temporary security barriers and posts manned by USCP. Only authorized people with appropriate identification are allowed access inside the Capitol.

2.      On January 6, 2021, the exterior plaza of the Capitol was closed to members of the public. The grounds around the Capitol were posted and cordoned off, and the entire area as well as the Capitol building itself were restricted as that term is used in Title 18, United States Code, Section 1752 due to the fact that the Vice President and the immediate family of the Vice President, among others, would be visiting the Capitol complex that day.

A65

3.     On January 6, 2021, a joint session of the United States Congress convened at the Capitol. During the joint session, elected members of the United States House of Representatives and the United States Senate were meeting in separate chambers of the Capitol to certify the vote count of the Electoral College of the 2020 Presidential Election, which had taken place on Tuesday, November 3, 2020. This joint session of Congress was an official proceeding as that term is used in Title 18, United States Code, Section 1512. The joint session began at approximately 1:00 PM. Shortly thereafter, by approximately 1:30 PM, the House and Senate adjourned to separate chambers to resolve a particular objection. Vice President Mike Pence was present and presiding, first in the joint session, and then in the Senate chamber.

4.     As the proceedings continued in both the House and the Senate, and with Vice President Pence present and presiding over the Senate, a large crowd gathered outside the Capitol. Temporary and permanent barricades, as noted above, were in place around the exterior of the Capitol, and USCP officers were present and attempting to keep the crowd away from the Capitol and the proceedings underway inside.

5.     At approximately 2:00 PM, certain individuals in the crowd forced their way through, up, and over the barricades. Officers of the USCP were forced to retreat and the crowd advanced to the exterior façade of the building. Officers with the D.C. Metropolitan Police Department were called to assist officers of the USCP who were then engaged in the performance of their official duties. The crowd was not lawfully authorized to enter or remain in the building and, prior to entering the building, no members of the crowd submitted to security screenings or weapons checks as required by USCP officers or other authorized security officials.

6.     At such time, the certification proceedings were still underway, and the exterior doors and windows of the Capitol were locked or otherwise secured. Members of the USCP

attempted to maintain order and keep the crowd from entering the Capitol; however, shortly after 2:00 PM, individuals in the crowd forced entry into the Capitol, including by breaking windows and by assaulting members of law enforcement, as others in the crowd encouraged and assisted those acts. The riot resulted in substantial damage to the Capitol, requiring the expenditure of more than $2.9 million dollars for repairs.

7.      Shortly thereafter, at approximately 2:20 PM, members of the House of Representatives and of the Senate, including the President of the Senate, Vice President Pence, were instructed to—and did—evacuate the chambers. Accordingly, all proceedings of the United States Congress, including the joint session, were effectively suspended until shortly after 8:00 PM on January 6, 2021. In light of the dangerous circumstances caused by the unlawful entry to the Capitol—including the danger posed by individuals who had entered the Capitol without any security screening or weapons check—Congressional proceedings could not resume until after every unauthorized occupant had been removed from or left the Capitol, and USCP confirmed that the building was secured. The proceedings resumed at approximately 8:00 PM after the building had been secured. Vice President Pence remained in the Capitol from the time he was evacuated from the Senate Chamber until the session resumed.

***Dan Edwin Wilson's Participation in the January 6, 2021, Capitol Riot***

8.      As early as November 24, 2020, the defendant, Dan Edwin Wilson, was the member of an encrypted Telegram Messenger chat, organized by other individuals, including David Scott Kuntz, called the "Coalition of the Unknown."

9.      On or about December 19, 2020, then-President Trump tweeted, "Peter Navarro releases 36-page report alleging election fraud 'more than sufficient' to swing victory to Trump https://washex.am/3nwaBCe. A great report by Peter. Statistically impossible to have lost the 2020

Election. Big protest in D.C. on January 6th. Be there, will be wild!" On or about December 22, 2020, Kuntz made the following statement in the Coalition of the Unknown Telegram group: "January the 6th will be the target date for D.C. this goes to all groups that can help to defend those that can not defend themselves." The defendant, using the Telegram moniker "Live Wire," responded by stating, "Ooh Rah. Curb stomp crew all in!!!" Kuntz responded, "Hell ta D.C. here we come." Later that same day, the defendant wrote, "We are willing to work and coordinate with others but I am a gray ghost ranger." "Gray ghost ranger" refers to the defendant's affiliation with a Three Percenter militia known as the "Gray Ghost Militia."

10.    On or about December 22, 2020, the defendant posted to the Coalition of the Unknown Telegram group, "For new members in case you are not aware DC on the sixth here we come." That same day, the defendant wrote, "Some of us in here are extremely active patriots so if you want to start getting boots on the ground reach out we do the damn thing."

11.    On or about December 22, 2020, in the Coalition of the Unknown Telegram group, another individual wrote, "What's the current thoughts on Battle rattle?" The defendant responded, "Everyone has differing opinions my personal opinion is if we're going to go in and take over the world Guns up. if we're just trying to put on a show leave them at home." Another individual responded, "I would always carry it with me at least a vest and plates under clothing." The defendant replied, "Absolutely you can wear your attire I will have my plates on I was just talking about firearms." Another individual responded, "I wouldn't do firearms. Looks bad firing in a crowd. Knives and batons." The defendant replied, "That's my opinion you can ask people here that know me I'm a hands-on kind a guy." Later that same day, the defendant added, "I have to admit I have carried my expandable baton both times I've been there I understand it's against the rules but I haven't had a problem yet hard knuckle gloves are a must." Later that same day, the

defendant wrote, "It is an easy choice but it's not an easy choice I stand with you all I will go down swinging." Later that same day, the defendant posted, "They might set up a perimeter as usual this line was pushed out even further I expect the sixth and the 20th to continue with that trend but they cannot stop us from walking in We've already been up there twice so we are starting to understand the lay of the land and how to get around and what to expect if anybody has any questions feel free to ask."

12.    On or about December 23, 2020, in another Telegram group, titled "United Front," the defendant posted a link to an open letter from the website oathkeepers.org, entitled "Open Letter to President Trump: You Must Use Insurrection Act to 'Stop the Steal' and Defeat the Coup."

13.    On or about December 24, 2020, the defendant discussed in the United Front Telegram group, including with another individual, his plan to travel to Washington D.C. on January 6th. Among other messages, another individual messaged the group, "Yes a lot is happening legally and a lot can happen on the 6th. The most important thing is for the Electoral College results to get contested and that Patriotic Militias set differences aside and gather together." The defendant responded, "In my opinion I don't think it's time to gun up for the sixth we have to play this out but if they seat biden on the 20th all bets are off it's gonna happen even if Trump wins we have to get this government under control it's been crossing my mind if we go to a Civil War do we try to take Washington DC first or do we try to take state capitals first."

14.    Also on or about December 24, 2020, the defendant wrote in the United Front Telegram group, "Our team is going. I have had a lot of people reaching out to me about going on the sixth it's going to be the biggest one yet."

15.     Also on or about December 24, 2020, in the United Front Telegram group, another individual wrote, "No the intention on the 6th is for Congress to reject the Electoral College vote and to get the Supreme Court to hear We The People and examine the evidence of Voter Fraud." The defendant responded, "We have more and more every day citizens starting to stand up we have to have these people behind us in order to support the movement and make this work."

16.     On December 27, 2020, in the United Front Telegram group, an individual shared an image of a building labeled "BIDEN HARRIS" being blown up, with the message, "Betrayed by nearly everyone in Congress…WE MUST FIGHT. He's the only chance anyone has got. DONALD J. TRUMP. FIGHT HARD." The defendant responded, "I am ready to lay my life on the line. It is time for good men to do bad things." Kuntz responded later that morning, "Ok guy's lets get this clear once and for all thete will be no talking about taking over nothing or blowing up shit period on here if you do you are out. So stop that shit now keep it to yourself act like the law is right beside you. Reaper out."

17.     On or about December 27, 2020, in the United Front Telegram group, another individual asked, "Is Reaper going to DC?" "Reaper" was a reference to Kuntz, who frequently used the moniker "Reaper" to identify himself. The defendant responded, "We will be there." The other individual responded, "Yall in the same Squad trip Wire?" The defendant responded, "Yes." Later that day, the defendant posted, "The time is now." The other individual responded, "Yup." Kuntz responded, "The 6th will tell it all im ready."

18.     On or about December 27, 2020, in the United Front Telegram group, the defendant wrote, "I ain't nobody but when it comes down to it follow me and I'll show you a symphony of destruction." Kuntz responded, "Come on the 6th lets do this shit."

19.    On or about December 27, 2020, in the United Front Telegram group, Kuntz shared an image of a tweet from then-President trump, which stated, "See you in Washington, D.C. on January 6th. Don't miss it. Information to follow!" Kuntz wrote, "He is asking us to be there." The defendant responded, "Y'all wanna do it. Ask your self. Are you really ready. This is not for the faint of heart." Kuntz responded, "Good he does need us im going armed period."

20.    The defendant agreed with Kuntz and others to travel to Washington, D.C. for the events of January 6, 2021. The defendant and Kuntz traveled to Washington, D.C. together in the defendant's vehicle on January 5, 2021. Their intent was to corruptly obstruct or impede Congress, including through their unlawful presence at the U.S. Capitol building, with respect to the certification of the 2020 electoral college vote. In order to accomplish this goal, the defendant and others, including Kuntz, agreed to work together and to coordinate their actions.

21.    In the early morning of January 6, 2021, the defendant and Kuntz gathered with others in the area of the Lincoln Memorial.  Later that morning, the defendant and Kuntz gathered with other individuals in the area of the Ellipse and the Washington Monument, during the time when then-President Donald Trump, among others, addressed the crowd.

22.    From the Ellipse, the defendant walked with others, including Kuntz, toward the U.S. Capitol building, where they passed fencing and barricades and joined with thousands of other rioters on the grounds of the U.S. Capitol.

23.    At approximately 1:43 p.m., over Zello—a live voice push-to-talk communication platform available on cell phones—the defendant shared an audio message to a group called, "Stop the Steal J6."  The defendant said, "The people are trying to push through the barricade at the Capitol building.  We're headed that way."

24.    At approximately 1:44 p.m., over Zello, the defendant received a message from

another individual. The individual asked, "How many patriots do we have pushing through at the Capitol, Live Wire?" the defendant responded a few seconds later, "Hey, pass the word, Badlands, as fast as you can, the people are pushing on the Capitol. We need hands on deck." The individual responded, seconds later, "Heard, Live Wire. Will send."

25.     At approximately 1:45 p.m., over Zello, the defendant shared a message to a group called, "Oath Keepers general chat." In that message, the defendant said, "Hey, whoever's got ears on, even if you ain't in D.C., pass the word, the people are pushing on the Capitol. We need all hands on deck."

26.     At the U.S. Capitol building, the defendant ascended to the Upper West Terrace. The defendant stood on a set of bleachers that had been constructed on the Upper West Terrace, and which overlooked the inaugural stage and West Plaza. As he watched the crowd below, the defendant triumphantly raised his first in the air, before turning back and walking up the bleachers—toward the U.S. Capitol building.

27.     At approximately 2:37 PM EST, the defendant entered the U.S. Capitol building through the Upper West Terrace Door, wearing a gas mask.

28.     After entering the building, the defendant walked into the Rotunda, where he remained for several minutes. While in the Rotunda, the defendant removed his gas mask and placed it in the olive-green fabric pouch he was wearing in front. From the Rotunda, the defendant walked through Statuary Hall, before returning to the Rotunda.

29.     The defendant ultimately exited through the East Rotunda Doors at approximately 2:49 PM EST.

30.     On or about March 9, 2021, the defendant was voluntarily interviewed by the FBI. In this interview, the defendant claimed that he traveled to Washington, D.C. with Kuntz on

January 5, 2021, in the defendant's vehicle. The defendant stated that he and Kuntz attended the speech by then-President Donald Trump on the morning of January 6, 2021, and that he and Kuntz then went to the U.S. Capitol building, where they passed an area where fencing was originally set up. However, the defendant repeatedly falsely denied having entered the U.S. Capitol building and claimed he did not know anyone that entered the building.

### *Dan Edwin Wilson's Conduct in the Western District of Kentucky*

31.     On June 3, 2022, during the execution of a lawfully issued search warrant for the defendant's home, law enforcement recovered a number of firearms and ammunition, among other items.

32.     The defendant knowingly possessed, in and affecting commerce, a firearm, that is a Rock Island Armory, Model M1911-A1, .45 caliber pistol, bearing serial number RIA1547427; a Smith & Wesson, Model M&P Shield, 9 millimeter pistol bearing serial number HUH1149; a Rock Island Armory, Model M1911-A1, .45 caliber pistol, bearing serial number RIA2266246; an Anderson Manufacturing, Model AM-15, multi-caliber rifle bearing serial number 19347295, with a 28-inch overall length and a 14-inch barrel; a 5.56 caliber long barrel M-4 style rifle with "M" logo, with no visible serial number; a 5.56 caliber short barrel M-4 style rifle, with Anderson butt-stock, with no visible serial number; and ammunition, with knowledge that he had previously been convicted in a court of a crime punishable by imprisonment for a term exceeding one year, specifically:

a.     On or about July 11, 1994, in Breckenridge Circuit Court, Breckenridge County, Kentucky, in Case Number 94-CR-019, Dan Edwin Wilson, was convicted of Burglary in the Secondary Degree (2 counts) and Unlawful Transaction with a Minor, each a felony;

b. On or about December 19, 1995, in Jefferson Circuit Court, Jefferson County, Kentucky, in Case Number 95-CR-2600, Dan Edwin Wilson, was convicted of Theft by Unlawful Taking over $300 (2 counts), a felony; and

c. On or about December 10, 1997, in Fayette Circuit Court, Fayette County, Kentucky, in Case Number 97-CR-977, Dan Edwin Wilson, was convicted of Escape in the Second Degree, a felony.

33.     On June 3, 2022, the defendant knowingly received and possessed a firearm, specifically: an Anderson Manufacturing, Model AM-15, multi-caliber rifle bearing serial number 19347295, with a 28-inch overall length and a 14-inch barrel, not registered to him in the National Firearms Registration and Transfer Record.

34.     The rifle that the officers recovered from the defendant's home is a firearm, as that term is defined by the United States Code, is not an antique and, further, was transported in interstate commerce from one state to another.

### *Elements of the Offenses*

35.     Dan Edwin Wilson knowingly and voluntarily admits to all the elements of Conspiracy To Impede or Injure Officer. Specifically, the defendant admits that on or about January 6, 2021, the defendant willfully and knowingly, did conspire with one or more other persons to prevent, by force, intimidation, or threat, any person, that is, Members of the United States Congress and law enforcement officers, from discharging any duties of any office, trust, or place of confidence under the United States, and to induce by force, intimidation, and threat, any

officer of the United States, that is Members of the United States Congress and law enforcement officers, to leave the place, where their duties as officers were required to be performed.

36.     Dan Edwin Wilson knowingly and voluntarily admits to all the elements of Possession of a Firearm by a Prohibited Person. Specifically, the defendant admits that the defendant knowingly possessed at least three firearms, with knowledge that he had previously been convicted in a court of a crime punishable by imprisonment for a term exceeding one year.

37.     Dan Edwin Wilson knowingly and voluntarily admits to all the elements of Possession of an Unregistered Firearm. Specifically, the defendant admits that the defendant knowingly received and possessed a firearm, specifically a rifle with a 28-inch overall length and a 14-inch barrel, not registered to him in the National Firearms Registration and Transfer Record.

Respectfully submitted,

MATTHEW M. GRAVES
United States Attorney
D.C. Bar No. 481052

By:     */s/ Anthony W. Mariano*
_____
Anthony W. Mariano, MA Bar No. 688559
Trial Attorney, Detailee
United States Attorney's Office
for the District of Columbia
601 D Street NW
Washington, D.C. 20530
(202) 476-0319
Anthony.Mariano2@usdoj.gov

A75

## DEFENDANT'S ACKNOWLEDGMENT

I, Dan Edwin Wilson, have read this Statement of the Offense and have discussed it with my attorney. I fully understand this Statement of the Offense. I agree and acknowledge by my signature that this Statement of the Offense is true and accurate. I do this voluntarily and of my own free will. No threats have been made to me nor am I under the influence of anything that could impede my ability to understand this Statement of the Offense fully.

Date: MAy 15, 2024

Dan Edwin Wilson
Defendant

## ATTORNEY'S ACKNOWLEDGMENT

I have read this Statement of the Offense and have reviewed it with my client fully. I concur in my client's desire to adopt this Statement of the Offense as true and accurate.

Date: 5/15/24

Norman A. Pattis
Attorney for Defendant

A76



U.S. Department of Justice

Matthew M. Graves
United States Attorney

*District of Columbia*

*Patrick Henry Building*
*601 D St., N.W.*
*Washington, D.C. 20530*

May 6, 2024

Norman A. Pattis
Counsel for Dan Edwin Wilson

      Re:   *United States v. Dan Edwin Wilson*
            Criminal Case No. 23-cr-427 (DLF)

Dear Counsel:

      This letter sets forth the full and complete plea offer to your client, Dan Edwin Wilson (hereinafter referred to as "your client" or "defendant"), from the Office of the United States Attorney for the District of Columbia (hereinafter also referred to as "the Government" or "this Office"). This plea offer expires on May 24, 2024. If your client accepts the terms and conditions of this offer, please have your client execute this document in the space provided below. Upon receipt of the executed document, this letter will become the Plea Agreement (hereinafter referred to as "this Agreement"). The terms of the offer are as follows:

1.    **Charges and Statutory Penalties**

      Your client agrees to plead guilty to Count One of a criminal Information, a copy of which is attached, charging your client with Conspiracy To Impede or Injure Officer, in violation of 18 U.S.C. § 372. Your client further agrees, pursuant to Rule 20 of the Federal Rules of Criminal Procedure, to plead guilty to Counts 1 and 2 of the Indictment in case 3:23-cr-3 (CHB) from the United States District Court for the Western District of Kentucky, charging your client with Possession of a Firearm by a Prohibited Person, in violation of 18 U.S.C. §§ 922(g)(1) & 924(a)(2), and Possession of an Unregistered Firearm, in violation of 26 U.S.C. §§ 5841, 5861(d), & 5871.

      Your client understands that a violation of 18 U.S.C. § 372 carries a maximum sentence of 6 years of imprisonment; a fine of $250,000, pursuant to 18 U.S.C. § 3571(b)(3); a term of supervised release of not more than 3 years, pursuant to 18 U.S.C. § 3583(b)(2); and an obligation to pay any applicable interest or penalties on fines and restitution not timely made.

A77

Your client understands that a violation of 18 U.S.C. §§ 922(g)(1) & 924(a)(2) carries a maximum sentence of 20 years of imprisonment; a fine of $250,000, pursuant to 18 U.S.C. § 3571(b)(3); a term of supervised release of not more than 3 years, pursuant to 18 U.S.C. § 3583(b)(2); and an obligation to pay any applicable interest or penalties on fines and restitution not timely made.

Your client understands that a violation of 26 U.S.C. §§ 5841, 5861(d), & 5871 carries a maximum sentence of 10 years of imprisonment; a fine of $10,000, pursuant to 18 U.S.C. § 5871; a term of supervised release of not more than 3 years, pursuant to 18 U.S.C. § 3583(b)(2); and an obligation to pay any applicable interest or penalties on fines and restitution not timely made.

In addition, your client agrees to pay a special assessment of $100 per felony conviction to the Clerk of the United States District Court for the District of Columbia. Your client also understands that, pursuant to 18 U.S.C. § 3572 and § 5E1.2 of the United States Sentencing Commission, *Guidelines Manual* (2021) (hereinafter "Sentencing Guidelines," "Guidelines," or "U.S.S.G."), the Court may also impose a fine that is sufficient to pay the federal government the costs of any imprisonment, term of supervised release, and period of probation. Further, your client understands that, if your client has two or more convictions for a crime of violence or felony drug offense, your client may be subject to the substantially higher penalties provided for in the career-offender statutes and provisions of the Sentencing Guidelines.

2.   **Cooperation with Additional Investigation**

Your client agrees to allow law enforcement agents to review any social media accounts operated by your client for statements and postings in and around January 6, 2021, and conduct an interview of your client regarding the events in and around January 6, 2021 prior to sentencing.

3.   **Factual Stipulations**

Your client agrees that the attached "Statement of Offense" fairly and accurately describes your client's actions and involvement in the offenses to which your client is pleading guilty. Please have your client sign and return the Statement of Offense as a written proffer of evidence, along with this Agreement.

4.   **Additional Charges**

In consideration of your client's guilty plea to the above offenses, your client will not be further prosecuted criminally by this Office for the conduct set forth in the attached Statement of Offense. The United States will request that the Court dismiss at the time of sentencing the following charges in the information: Count 2, 18 U.S.C. § 1512(k); Count 3, 18 U.S.C. §§ 1512(c)(2); Count 4, 18 U.S.C. § 1752(a)(1); Count 5, 18 U.S.C. § 1752(a)(2); Count 6, 40 U.S.C. § 5104(e)(2)(D); and Count 7, 40 U.S.C. § 5104(e)(2)(G).

After the entry of your client's plea of guilty to the offenses identified in paragraph 1 above, your client will not be charged with any non-violent criminal offense in violation of Federal or District of Columbia law which was committed within the District of Columbia by your client prior to the execution of this Agreement and about which this Office was made aware by your client prior to the execution of this Agreement. However, the United States expressly reserves its right to prosecute your client for any crime of violence, as defined in 18 U.S.C. § 16 and/or 22 D.C. Code § 4501, if in fact your client committed or commits such a crime of violence prior to or after the execution of this Agreement.

The U.S. Attorney's Office for District of Columbia represents that it has contacted the U.S. Attorney's Office for the Western District of Kentucky, and that jurisdiction has agreed to abide by the terms of this agreement, i.e., not to criminally prosecute the defendant in the Western District of Kentucky for the specific conduct described in the Information or Statement of Facts.

5.    **Sentencing Guidelines Analysis**

Your client understands that the sentence in this case will be determined by the Court, pursuant to the factors set forth in 18 U.S.C. § 3553(a), including a consideration of the Sentencing Guidelines. Pursuant to Federal Rule of Criminal Procedure 11(c)(1)(B), and to assist the Court in determining the appropriate sentence, the parties agree to the following:

A.    **Estimated Offense Level Under the Guidelines**

The parties agree that the following Sentencing Guidelines sections apply:

**Information Count 1 (18 U.S.C. § 372)**

| | | |
|---|---|---|
| U.S.S.G. § 2J1.2 | Obstruction of Justice Base Offense Level | **14** |
| U.S.S.G. § 2J1.2(b)(3)(C) | Extensive Scope, Planning, or Preparation | **+2** |
| | Total | **16** |

**W.D.K.Y. Count 1 (18 U.S.C. §§ 922(g)(1), 924(a)(2))**

| | | |
|---|---|---|
| U.S.S.G. § 2K2.1(a)(4) | Unlawful Possession of Firearms Base Offense Level | **20** |
| U.S.S.G. § 2K2.1(b)(1)(A) | Possession of 3-7 Firearms | **+2** |
| | Total | **22** |

**W.D.K.Y. Count 2 (26 U.S.C. §§ 5841, 5861(d), & 5871)**

| | | |
|---|---|---|
| U.S.S.G. § 2K2.1(a)(4) | Unlawful Possession of Firearms Base Offense Level | **20** |
| | Total | **20** |

Your client understands that, with respect to the 18 U.S.C. § 372 charge, the government maintains that, pursuant to U.S.S.G. § 3B1.1, an enhancement of two or more points may apply. Your client agrees to the facts as stated in the Statement of Offense, but reserves the right to challenge the application of U.S.S.G. § 3B1.1.

A79

**Grouping**

Count 1 from the Information does not group with the either count from the Western District of Kentucky Indictment. Count 1 from the Information, therefore, constitutes Group One. The base offense level for Group One is at least 16. If the Government requests and the Court applies an enhancement of two of more points under U.S.S.G. § 3B1.1, the base offense level for Group One would be as high as 20.

Pursuant to U.S.S.G. § 3D1.2(c), Count 1 and Count 2 from the Western District of Kentucky Indictment group. Count 1 and Count 2 from the Western District of Kentucky Indictment constitute Group Two. The base offense level for Group Two is the offense level for the most serious count, per U.S.S.G. § 3D1.3, which is Count 1 from the Western District of Kentucky Indictment. Therefore, the base offense level for Group Two is 22.

Group Two constitutes the "Group with the highest offense level," and, represents 1 unit. If the offense level for Group One is 16, it would be "5 to 8 levels less serious than the Group with the highest offense level," and, accordingly, one-half unit would be added. The number of units is therefore at least 1 ½, which increases the offense level of Group Two by one level.

If the offense level for Group One is 18–20, it would be "1 to 4 levels less serious" than the Group with the highest offense level, and, accordingly, one unit would be added. The number of units would therefore be 2, which increases the offense level of Group Two by two levels.

Accordingly, the combined offense level is at least 23. If an enhancement under under U.S.S.G. § 3B1.1 is applied, the combined offense level would be 24.

**Acceptance of Responsibility**

The Government agrees that a 2-level reduction will be appropriate, pursuant to U.S.S.G. § 3E1.1, provided that your client clearly demonstrates acceptance of responsibility, to the satisfaction of the Government, through your client's allocution, adherence to every provision of this Agreement, and conduct between entry of the plea and imposition of sentence. Furthermore, assuming your client has accepted responsibility as described in the previous sentence, the Government agrees that an additional 1-level reduction will be appropriate, pursuant to U.S.S.G. § 3E1.1(b), because your client has assisted authorities by providing timely notice of your client's intention to enter a plea of guilty, thereby permitting the Government to avoid preparing for trial and permitting the Court to allocate its resources efficiently.

Nothing in this Agreement limits the right of the Government to seek denial of the adjustment for acceptance of responsibility, pursuant to U.S.S.G. § 3E1.1, and/or imposition of an adjustment for obstruction of justice, pursuant to U.S.S.G. § 3C1.1, regardless of any agreement set forth above, should your client move to withdraw your client's guilty plea after it is entered, or should it be determined by the Government that your client has either (a) engaged in conduct, unknown to the Government at the time of the signing of this Agreement, that

A80

constitutes obstruction of justice, or (b) engaged in additional criminal conduct after signing this Agreement.

In accordance with the above, the Estimated Offense Level will be at least 20, depending upon the application of any contested enhancement under U.S.S.G. § 3B1.1.

### B.    Estimated Criminal History Category

Based upon the information now available to this Office, your client has no applicable criminal convictions.

Accordingly, your client is estimated to have 0 criminal history points and your client's Criminal History Category is estimated to be I (the "Estimated Criminal History Category"). Your client acknowledges that after the pre-sentence investigation by the United States Probation Office, a different conclusion regarding your client's criminal convictions and/or criminal history points may be reached and your client's criminal history points may increase or decrease.

### C.    Adjustment Based on U.S.S.G. § 4C1.1

The parties agree that your client is not eligible for an adjustment pursuant to U.S.S.G. § 4C1.1 because U.S.S.G. §§ 4C1.1(a)(3) and (7) apply. Specifically, the parties agree that the defendant used violence or credible threats of violence in connection with the offense, and possessed, received, purchased, transported, transferred, sold, or otherwise dispose of a firearm or other dangerous weapon in connection with the offense; and therefore that the defendant is ineligible to receive the adjustment pursuant to U.S.S.G. §§ 4C1.1(a)(3) and (7).

### D.    Estimated Guidelines Range

Based upon the Estimated Offense Level and the Estimated Criminal History Category set forth above, your client's estimated Sentencing Guidelines range is **33 months to 41 months** (the "Estimated Guidelines Range"). In addition, the parties agree that, pursuant to U.S.S.G. § 5E1.2, should the Court impose a fine, at Guidelines level **20**, the estimated applicable fine range is **$15,000 to $150,000**. Your client reserves the right to ask the Court not to impose any applicable fine.

The parties agree that, solely for the purposes of calculating the applicable range under the Sentencing Guidelines, neither a downward nor upward departure from the Estimated Guidelines Range set forth above is warranted, except the Government reserves the right to request an upward departure pursuant to U.S.S.G. § 3A1.4, n. 4, U.S.S.G. § 5K2.7 (Disruption of Governmental Function), and/or 5K2.14 (Public Welfare). Except as provided for in the "Reservation of Allocution" section below, the parties also agree that neither party will seek any offense-level calculation different from the Estimated Offense Level calculated above in subsection A. However, the parties are free to argue for a Criminal History Category different from that estimated above in subsection B.

A81

Your client understands and acknowledges that the Estimated Guidelines Range calculated above is not binding on the Probation Office or the Court. Should the Court or Probation Office determine that a guidelines range different from the Estimated Guidelines Range is applicable, that will not be a basis for withdrawal or recission of this Agreement by either party.

Your client understands and acknowledges that the terms of this section apply only to conduct that occurred before the execution of this Agreement. Should your client commit any conduct after the execution of this Agreement that would form the basis for an increase in your client's base offense level or justify an upward departure (examples of which include, but are not limited to, obstruction of justice, failure to appear for a court proceeding, criminal conduct while pending sentencing, and false statements to law enforcement agents, the probation officer, or the Court), the Government is free under this Agreement to seek an increase in the base offense level based on that post-agreement conduct.

6.    **Agreement as to Sentencing Allocution**

The parties further agree that a sentence within the Estimated Guidelines Range would constitute a reasonable sentence in light of all of the factors set forth in 18 U.S.C. § 3553(a), should such a sentence be subject to appellate review notwithstanding the appeal waiver provided below. However, the parties agree that either party may seek a variance and suggest that the Court consider a sentence outside of the applicable Guidelines Range, based upon the factors to be considered in imposing a sentence pursuant to 18 U.S.C. § 3553(a).

7.    **Reservation of Allocution**

The Government and your client reserve the right to describe fully, both orally and in writing, to the sentencing judge, the nature and seriousness of your client's misconduct, including any misconduct not described in the charges to which your client is pleading guilty, to inform the presentence report writer and the Court of any relevant facts, to dispute any factual inaccuracies in the presentence report, and to contest any matters not provided for in this Agreement. The parties also reserve the right to address the correctness of any Sentencing Guidelines calculations determined by the presentence report writer or the court, even if those calculations differ from the Estimated Guidelines Range calculated herein. In the event that the Court or the presentence report writer considers any Sentencing Guidelines adjustments, departures, or calculations different from those agreed to and/or estimated in this Agreement, or contemplates a sentence outside the Guidelines range based upon the general sentencing factors listed in 18 U.S.C. § 3553(a), the parties reserve the right to answer any related inquiries from the Court or the presentence report writer and to allocute for a sentence within the Guidelines range, as ultimately determined by the Court, even if the Guidelines range ultimately determined by the Court is different from the Estimated Guidelines Range calculated herein.

In addition, if in this Agreement the parties have agreed to recommend or refrain from recommending to the Court a particular resolution of any sentencing issue, the parties reserve the right to full allocution in any post-sentence litigation. The parties retain the full right of allocution in connection with any post-sentence motion which may be filed in this matter and/or

A82

any proceeding(s) before the Bureau of Prisons. In addition, your client acknowledges that the Government is not obligated and does not intend to file any post-sentence downward departure motion in this case pursuant to Rule 35(b) of the Federal Rules of Criminal Procedure.

### 8.   Court Not Bound by this Agreement or the Sentencing Guidelines

Your client understands that the sentence in this case will be imposed in accordance with 18 U.S.C. § 3553(a), upon consideration of the Sentencing Guidelines. Your client further understands that the sentence to be imposed is a matter solely within the discretion of the Court. Your client acknowledges that the Court is not obligated to follow any recommendation of the Government at the time of sentencing. Your client understands that neither the Government's recommendation nor the Sentencing Guidelines are binding on the Court.

Your client acknowledges that your client's entry of a guilty plea to the charged offense(s) authorizes the Court to impose any sentence, up to and including the statutory maximum sentence, which may be greater than the applicable Guidelines range. The Government cannot, and does not, make any promise or representation as to what sentence your client will receive. Moreover, it is understood that your client will have no right to withdraw your client's plea of guilty should the Court impose a sentence that is outside the Guidelines range or if the Court does not follow the Government's sentencing recommendation. The Government and your client will be bound by this Agreement, regardless of the sentence imposed by the Court. Any effort by your client to withdraw the guilty plea because of the length of the sentence shall constitute a breach of this Agreement.

### 9.   Conditions of Release

Your client acknowledges that, although the Government will not seek a change in your client's release conditions pending sentencing, the final decision regarding your client's bond status or detention will be made by the Court at the time of your client's plea of guilty. The Government may move to change your client's conditions of release, including requesting that your client be detained pending sentencing, if your client engages in further criminal conduct prior to sentencing or if the Government obtains information that it did not possess at the time of your client's plea of guilty and that is relevant to whether your client is likely to flee or pose a danger to any person or the community. Your client also agrees that any violation of your client's release conditions or any misconduct by your client may result in the Government filing an ex parte motion with the Court requesting that a bench warrant be issued for your client's arrest and that your client be detained without bond while pending sentencing in your client's case.

Your client agrees not to object to the Government's recommendation to the Court at the time of sentencing in this case that your client be detained, pursuant to 18 U.S.C. § 3143.

10.   <u>Waivers</u>

A.   **Venue**

Your client waives any challenge to venue in the District of Columbia.

B.   **Statute of Limitations**

Your client agrees that, should the conviction following your client's plea of guilty pursuant to this Agreement be vacated for any reason, any prosecution, based on the conduct set forth in the attached Statement of Offense, that is not time-barred by the applicable statute of limitations on the date of the signing of this Agreement (including any counts that the Government has agreed not to prosecute or to dismiss at sentencing pursuant to this Agreement) may be commenced or reinstated against your client, notwithstanding the expiration of the statute of limitations between the signing of this Agreement and the commencement or reinstatement of such prosecution. It is the intent of this Agreement to waive all defenses based on the statute of limitations with respect to any prosecution of conduct set forth in the attached Statement of Offense that is not time-barred on the date that this Agreement is signed.

C.   **Trial Rights**

Your client understands that by pleading guilty in this case your client agrees to waive certain rights afforded by the Constitution of the United States and/or by statute or rule. Your client agrees to forego the right to any further discovery or disclosures of information not already provided at the time of the entry of your client's guilty plea. Your client also agrees to waive, among other rights, the right to be indicted by a Grand Jury, the right to plead not guilty, and the right to a jury trial. If there were a jury trial, your client would have the right to be represented by counsel, to confront and cross-examine witnesses against your client, to challenge the admissibility of evidence offered against your client, to compel witnesses to appear for the purpose of testifying and presenting other evidence on your client's behalf, and to choose whether to testify. If there were a jury trial and your client chose not to testify at that trial, your client would have the right to have the jury instructed that your client's failure to testify could not be held against your client. Your client would further have the right to have the jury instructed that your client is presumed innocent until proven guilty, and that the burden would be on the United States to prove your client's guilt beyond a reasonable doubt. If your client were found guilty after a trial, your client would have the right to appeal your client's conviction. Your client understands that the Fifth Amendment to the Constitution of the United States protects your client from the use of self-incriminating statements in a criminal prosecution. By entering a plea of guilty, your client knowingly and voluntarily waives or gives up your client's right against self-incrimination.

Your client acknowledges discussing with you Rule 11(f) of the Federal Rules of Criminal Procedure and Rule 410 of the Federal Rules of Evidence, which ordinarily limit the admissibility of statements made by a defendant in the course of plea discussions or plea proceedings if a guilty plea is later withdrawn. Your client knowingly and voluntarily waives the

rights that arise under these rules in the event your client withdraws your client's guilty plea or withdraws from this Agreement after signing it.

Your client also agrees to waive all constitutional and statutory rights to a speedy sentence and agrees that the plea of guilty pursuant to this Agreement will be entered at a time decided upon by the parties with the concurrence of the Court. Your client understands that the date for sentencing will be set by the Court.

### D.    Appeal Rights

Your client agrees to waive, insofar as such waiver is permitted by law, the right to appeal the conviction in this case on any basis, including but not limited to claim(s) that (1) the statute(s) to which your client is pleading guilty is unconstitutional, and (2) the admitted conduct does not fall within the scope of the statute(s). Your client understands that federal law, specifically 18 U.S.C. § 3742, affords defendants the right to appeal their sentences in certain circumstances. Your client also agrees to waive the right to appeal the sentence in this case, including but not limited to any term of imprisonment, fine, forfeiture, award of restitution, term or condition of supervised release, authority of the Court to set conditions of release, and the manner in which the sentence was determined, except to the extent the Court sentences your client above the statutory maximum or guidelines range determined by the Court. In agreeing to this waiver, your client is aware that your client's sentence has yet to be determined by the Court. Realizing the uncertainty in estimating what sentence the Court ultimately will impose, your client knowingly and willingly waives your client's right to appeal the sentence, to the extent noted above, in exchange for the concessions made by the Government in this Agreement. Notwithstanding the above agreement to waive the right to appeal the conviction and sentence, your client retains the right to appeal on the basis of ineffective assistance of counsel, but not to raise on appeal other issues regarding the conviction or sentence.

### E.    Collateral Attack

Your client also waives any right to challenge the conviction entered or sentence imposed under this Agreement or otherwise attempt to modify or change the sentence or the manner in which it was determined in any collateral attack, including, but not limited to, a motion brought under 28 U.S.C. § 2255 or Federal Rule of Civil Procedure 60(b), except to the extent such a motion is based on newly discovered evidence or on a claim that your client received ineffective assistance of counsel. Your client reserves the right to file a motion brought under 18 U.S.C. § 3582(c)(2).

### F.    Hearings by Video Teleconference and/or Teleconference

Your client agrees to consent, under the Federal Rules of Criminal Procedure, to hold any proceedings in this matter – specifically including but not limited to presentment, initial appearance, and status hearings – by video teleconference and/or by teleconference and to waive any rights to demand an in-person/in-Court hearing. Your client further agrees to not challenge or contest any findings by the Court that it may properly proceed by video teleconferencing and/or telephone conferencing in this case. Your client understands, however, that pursuant to

A85

the expiration of the CARES Act, as well as the Chief Judge's Standing Order No. 23-26 (JEB) (May 5, 2023), felony plea and sentencing hearings must be conducted in-person.

      **G.**    **Transfer of Case from the Western District of Kentucky**

In light of your client's wish to plead guilty, pursuant to Rule 20(a) of Federal Rule of Criminal Procedure, your client agrees that he wishes to waive trial in the Western District of Kentucky and consents to the United States District Court for the District of Columbia disposing of *United States v. Dan Edwin Wilson*, 3:23-cr-3 (CHB) (W.D. Ky.).

      **11.**    <u>Use of Self-Incriminating Information</u>

The Government and your client agree, in accordance with U.S.S.G. § 1B1.8, that the Government will be free to use against your client for any purpose at the sentencing in this case or in any related criminal or civil proceedings, any self-incriminating information provided by your client pursuant to this Agreement or during the course of debriefings conducted in anticipation of this Agreement, regardless of whether those debriefings were previously covered by an "off the record" agreement by the parties.

Your client understands if your client fails to plead guilty in accordance with this agreement or withdraws the plea of guilty, any statements your client makes (including this plea agreement, and admission of guilt) during or in preparation for any guilty plea hearing, sentencing hearing, or other hearing and any statements your client makes or has made to law enforcement agents, in any setting (including during a proffer), may be used against your client in this or any other proceeding. Your client knowingly waives any right your client may have under the Constitution, any statute, rule or other source of law to have such statements, or evidence derived from such statements, suppressed or excluded from being admitted into evidence and stipulate that such statements can be admitted into evidence.

      **12.**    <u>Restitution</u>

Your client understands that the Court has an obligation to determine whether, and in what amount restitution applies in this case. Your client agrees to pay restitution pursuant to 18 U.S.C. § 3663(a)(3).

Your client acknowledges that the riot that occurred on January 6, 2021, caused as of July 7, 2023, approximately $2,923,080.05 in damage to the United States Capitol, as well as additional losses to the Metropolitan Police Department. Your client agrees as part of the plea in this matter to pay restitution to the Architect of the Capitol in the amount of $2,000.

Payments of restitution shall be made to the Clerk of the Court. In order to facilitate the collection of financial obligations to be imposed in connection with this prosecution, your client agrees to disclose fully all assets in which your client has any interest or over which your client exercises control, directly or indirectly, including those held by a spouse, nominee or other third party. Your client agrees to submit a completed financial statement on a standard financial disclosure form which has been provided to you with this Agreement to the Financial Litigation

A86

Unit of the United States Attorney's Office, as it directs. If you do not receive the disclosure form, your client agrees to request one from usadc.ecfflu@usa.doj.gov. Your client will complete and electronically provide the standard financial disclosure form to usadc.ecfflu@usa.doj.gov within 30 days of entry of your client's guilty plea. Your client agrees to be contacted by the Financial Litigation Unit of the United States Attorney's Office, through defense counsel, to complete a financial statement. Upon review, if there are any follow-up questions, your client agrees to cooperate with the Financial Litigation Unit. Your client promises that the financial statement and disclosures will be complete, accurate and truthful, and understands that any willful falsehood on the financial statement could be prosecuted as a separate crime punishable under 18 U.S.C. § 1001, which carries an additional five years' incarceration and a fine.

Your client expressly authorizes the United States Attorney's Office to obtain a credit report on your client in order to evaluate your client's ability to satisfy any financial obligations imposed by the Court or agreed to herein.

Your client understands and agrees that the restitution or fines imposed by the Court will be due and payable immediately and subject to immediate enforcement by the United States. If the Court imposes a schedule of payments, your client understands that the schedule of payments is merely a minimum schedule of payments and will not be the only method, nor a limitation on the methods, available to the United States to enforce the criminal judgment, including without limitation by administrative offset. If your client is sentenced to a term of imprisonment by the Court, your client agrees to participate in the Bureau of Prisons' Inmate Financial Responsibility Program, regardless of whether the Court specifically imposes a schedule of payments.

Your client certifies that your client has made no transfer of assets in contemplation of this prosecution for the purpose of evading or defeating financial obligations that are created by this Agreement and/or that may be imposed by the Court. In addition, your client promises to make no such transfers in the future until your client has fulfilled the financial obligations under this Agreement.

13.   **Forfeiture**

Your client understands and agrees to forfeiture, pursuant to Title 18, United States Code, Section 924(d), Title 28, United States Code, Section 2461, and Title 26, United States Code, Section 5872, all firearms and ammuninition, including, but not limited to:

- A Rock Island Armory, Model M1911-A1, .45 caliber pistol, bearing serial number RIA1547427.
- A Smith & Wesson, Model M&P Shield, 9 millimeter pistol bearing serial number HUH1149.
- A Rock Island Armory, Model M1911-A1, .45 caliber pistol, bearing serial number RIA2266246.
- An Anderson Manufacturing, Model AM-15, multi-caliber rifle bearing serial number 19347295, with a 28-inch overall length and a 14-inch barrel.
- A 5.56 caliber long barrel M-4 style rifle with "M" logo, with no visible serial number.

- A 5.56 caliber short barrel M-4 style rifle, with Anderson butt-stock, with no visible serial number.

### 14.   **Breach of Agreement**

Your client understands and agrees that, if after entering this Agreement, your client fails specifically to perform or to fulfill completely each and every one of your client's obligations under this Agreement, or engages in any criminal activity prior to sentencing, your client will have breached this Agreement. In the event of such a breach: (a) the Government will be free from its obligations under this Agreement; (b) your client will not have the right to withdraw the guilty plea; (c) your client will be fully subject to criminal prosecution for any other crimes, including perjury and obstruction of justice; and (d) the Government will be free to use against your client, directly and indirectly, in any criminal or civil proceeding, all statements made by your client and any of the information or materials provided by your client, including such statements, information and materials provided pursuant to this Agreement or during the course of any debriefings conducted in anticipation of, or after entry of, this Agreement, whether or not the debriefings were previously characterized as "off-the-record" debriefings, and including your client's statements made during proceedings before the Court pursuant to Rule 11 of the Federal Rules of Criminal Procedure.

Your client understands and agrees that the Government shall be required to prove a breach of this Agreement only by a preponderance of the evidence, except where such breach is based on a violation of federal, state, or local criminal law, which the Government need prove only by probable cause in order to establish a breach of this Agreement.

Nothing in this Agreement shall be construed to permit your client to commit perjury, to make false statements or declarations, to obstruct justice, or to protect your client from prosecution for any crimes not included within this Agreement or committed by your client after the execution of this Agreement. Your client understands and agrees that the Government reserves the right to prosecute your client for any such offenses. Your client further understands that any perjury, false statements or declarations, or obstruction of justice relating to your client's obligations under this Agreement shall constitute a breach of this Agreement. In the event of such a breach, your client will not be allowed to withdraw your client's guilty plea.

### 15.   **Complete Agreement**

No agreements, promises, understandings, or representations have been made by the parties or their counsel other than those contained in writing herein, nor will any such agreements, promises, understandings, or representations be made unless committed to writing and signed by your client, defense counsel, and an Assistant United States Attorney for the District of Columbia.

Your client further understands that this Agreement is binding only upon the Criminal and Superior Court Divisions of the United States Attorney's Office for the District of Columbia. This Agreement does not bind the Civil Division of this Office or any other United States Attorney's Office, nor does it bind any other state, local, or federal prosecutor. It also does not

A88

bar or compromise any civil, tax, or administrative claim pending or that may be made against your client.

If the foregoing terms and conditions are satisfactory, your client may so indicate by signing this Agreement and the Statement of Offense, and returning both to me no later than May 24, 2024.

Sincerely yours,

Matthew M. Graves
United States Attorney

By: /s/ Anthony W. Mariano
Anthony W. Mariano
Trial Attorney, Detailee
United States Attorney's Office

<u>DEFENDANT'S ACCEPTANCE</u>

I have read every page of this Agreement and have discussed it with my attorney, Norman A. Pattis. I fully understand this Agreement and agree to it without reservation. I do this voluntarily and of my own free will, intending to be legally bound. No threats have been made to me nor am I under the influence of anything that could impede my ability to understand this Agreement fully. I am pleading guilty because I am in fact guilty of the offense(s) identified in this Agreement.

I reaffirm that absolutely no promises, agreements, understandings, or conditions have been made or entered into in connection with my decision to plead guilty except those set forth in this Agreement. I am satisfied with the legal services provided by my attorney in connection with this Agreement and matters related to it.

Date: 5-15-24

Dan Edwin Wilson
Defendant

<u>ATTORNEY'S ACKNOWLEDGMENT</u>

I have read every page of this Agreement, reviewed this Agreement with my client, Dan Edwin Wilson, and fully discussed the provisions of this Agreement with my client. These pages accurately and completely set forth the entire Agreement. I concur in my client's desire to plead guilty as set forth in this Agreement.

Date: 5/15/24

Norman A. Pattis
Attorney for Defendant

A90

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | Case No.: 23-CR-427 (DLF) |
| | : | |
| v. | : | |
| | : | |
| DAN EDWIN WILSON, | : | |
| | : | |
| Defendant. | : | |
| | : | |

## STATEMENT OF OFFENSE

Pursuant to Fed. R. Crim. P. 11, the United States of America, by and through its attorney, the United States Attorney for the District of Columbia, and the defendant, Dan Edwin Wilson, with the concurrence of the defendant's attorney, agree and stipulate to the below factual basis for the defendant's guilty plea—that is, if this case were to proceed to trial, the parties stipulate that the United States could prove the below facts beyond a reasonable doubt:

### *The Attack at the U.S. Capitol on January 6, 2021*

1.    The U.S. Capitol, which is located at First Street, SE, in Washington, D.C., is secured twenty-four hours a day by U.S. Capitol Police (USCP). Restrictions around the Capitol include permanent and temporary security barriers and posts manned by USCP. Only authorized people with appropriate identification are allowed access inside the Capitol.

2.    On January 6, 2021, the exterior plaza of the Capitol was closed to members of the public. The grounds around the Capitol were posted and cordoned off, and the entire area as well as the Capitol building itself were restricted as that term is used in Title 18, United States Code, Section 1752 due to the fact that the Vice President and the immediate family of the Vice President, among others, would be visiting the Capitol complex that day.

A91

3.      On January 6, 2021, a joint session of the United States Congress convened at the Capitol. During the joint session, elected members of the United States House of Representatives and the United States Senate were meeting in separate chambers of the Capitol to certify the vote count of the Electoral College of the 2020 Presidential Election, which had taken place on Tuesday, November 3, 2020. This joint session of Congress was an official proceeding as that term is used in Title 18, United States Code, Section 1512. The joint session began at approximately 1:00 PM. Shortly thereafter, by approximately 1:30 PM, the House and Senate adjourned to separate chambers to resolve a particular objection. Vice President Mike Pence was present and presiding, first in the joint session, and then in the Senate chamber.

4.      As the proceedings continued in both the House and the Senate, and with Vice President Pence present and presiding over the Senate, a large crowd gathered outside the Capitol. Temporary and permanent barricades, as noted above, were in place around the exterior of the Capitol, and USCP officers were present and attempting to keep the crowd away from the Capitol and the proceedings underway inside.

5.      At approximately 2:00 PM, certain individuals in the crowd forced their way through, up, and over the barricades. Officers of the USCP were forced to retreat and the crowd advanced to the exterior façade of the building. Officers with the D.C. Metropolitan Police Department were called to assist officers of the USCP who were then engaged in the performance of their official duties. The crowd was not lawfully authorized to enter or remain in the building and, prior to entering the building, no members of the crowd submitted to security screenings or weapons checks as required by USCP officers or other authorized security officials.

6.      At such time, the certification proceedings were still underway, and the exterior doors and windows of the Capitol were locked or otherwise secured. Members of the USCP

attempted to maintain order and keep the crowd from entering the Capitol; however, shortly after 2:00 PM, individuals in the crowd forced entry into the Capitol, including by breaking windows and by assaulting members of law enforcement, as others in the crowd encouraged and assisted those acts. The riot resulted in substantial damage to the Capitol, requiring the expenditure of more than $2.9 million dollars for repairs.

7.      Shortly thereafter, at approximately 2:20 PM, members of the House of Representatives and of the Senate, including the President of the Senate, Vice President Pence, were instructed to—and did—evacuate the chambers. Accordingly, all proceedings of the United States Congress, including the joint session, were effectively suspended until shortly after 8:00 PM on January 6, 2021. In light of the dangerous circumstances caused by the unlawful entry to the Capitol—including the danger posed by individuals who had entered the Capitol without any security screening or weapons check—Congressional proceedings could not resume until after every unauthorized occupant had been removed from or left the Capitol, and USCP confirmed that the building was secured. The proceedings resumed at approximately 8:00 PM after the building had been secured. Vice President Pence remained in the Capitol from the time he was evacuated from the Senate Chamber until the session resumed.

### Dan Edwin Wilson's Participation in the January 6, 2021, Capitol Riot

8.      As early as November 24, 2020, the defendant, Dan Edwin Wilson, was the member of an encrypted Telegram Messenger chat, organized by other individuals, including David Scott Kuntz, called the "Coalition of the Unknown."

9.      On or about December 19, 2020, then-President Trump tweeted, "Peter Navarro releases 36-page report alleging election fraud 'more than sufficient' to swing victory to Trump https://washex.am/3nwaBCe. A great report by Peter. Statistically impossible to have lost the 2020

Election. Big protest in D.C. on January 6th. Be there, will be wild!" On or about December 22, 2020, Kuntz made the following statement in the Coalition of the Unknown Telegram group: "January the 6th will be the target date for D.C. this goes to all groups that can help to defend those that can not defend themselves." The defendant, using the Telegram moniker "Live Wire," responded by stating, "Ooh Rah. Curb stomp crew all in!!!" Kuntz responded, "Hell ta D.C. here we come." Later that same day, the defendant wrote, "We are willing to work and coordinate with others but I am a gray ghost ranger." "Gray ghost ranger" refers to the defendant's affiliation with a Three Percenter militia known as the "Gray Ghost Militia."

10.     On or about December 22, 2020, the defendant posted to the Coalition of the Unknown Telegram group, "For new members in case you are not aware DC on the sixth here we come." That same day, the defendant wrote, "Some of us in here are extremely active patriots so if you want to start getting boots on the ground reach out we do the damn thing."

11.     On or about December 22, 2020, in the Coalition of the Unknown Telegram group, another individual wrote, "What's the current thoughts on Battle rattle?" The defendant responded, "Everyone has differing opinions my personal opinion is if we're going to go in and take over the world Guns up. if we're just trying to put on a show leave them at home." Another individual responded, "I would always carry it with me at least a vest and plates under clothing." The defendant replied, "Absolutely you can wear your attire I will have my plates on I was just talking about firearms." Another individual responded, "I wouldn't do firearms. Looks bad firing in a crowd. Knives and batons." The defendant replied, "That's my opinion you can ask people here that know me I'm a hands-on kind a guy." Later that same day, the defendant added, "I have to admit I have carried my expandable baton both times I've been there I understand it's against the rules but I haven't had a problem yet hard knuckle gloves are a must." Later that same day, the

defendant wrote, "It is an easy choice but it's not an easy choice I stand with you all I will go down swinging." Later that same day, the defendant posted, "They might set up a perimeter as usual this line was pushed out even further I expect the sixth and the 20th to continue with that trend but they cannot stop us from walking in We've already been up there twice so we are starting to understand the lay of the land and how to get around and what to expect if anybody has any questions feel free to ask."

12.    On or about December 23, 2020, in another Telegram group, titled "United Front," the defendant posted a link to an open letter from the website oathkeepers.org, entitled "Open Letter to President Trump: You Must Use Insurrection Act to 'Stop the Steal' and Defeat the Coup."

13.    On or about December 24, 2020, the defendant discussed in the United Front Telegram group, including with another individual, his plan to travel to Washington D.C. on January 6th. Among other messages, another individual messaged the group, "Yes a lot is happening legally and a lot can happen on the 6th. The most important thing is for the Electoral College results to get contested and that Patriotic Militias set differences aside and gather together." The defendant responded, "In my opinion I don't think it's time to gun up for the sixth we have to play this out but if they seat biden on the 20th all bets are off it's gonna happen even if Trump wins we have to get this government under control it's been crossing my mind if we go to a Civil War do we try to take Washington DC first or do we try to take state capitals first."

14.    Also on or about December 24, 2020, the defendant wrote in the United Front Telegram group, "Our team is going. I have had a lot of people reaching out to me about going on the sixth it's going to be the biggest one yet."

15.     Also on or about December 24, 2020, in the United Front Telegram group, another individual wrote, "No the intention on the 6th is for Congress to reject the Electoral College vote and to get the Supreme Court to hear We The People and examine the evidence of Voter Fraud." The defendant responded, "We have more and more every day citizens starting to stand up we have to have these people behind us in order to support the movement and make this work."

16.     On December 27, 2020, in the United Front Telegram group, an individual shared an image of a building labeled "BIDEN HARRIS" being blown up, with the message, "Betrayed by nearly everyone in Congress…WE MUST FIGHT. He's the only chance anyone has got. DONALD J. TRUMP. FIGHT HARD." The defendant responded, "I am ready to lay my life on the line. It is time for good men to do bad things." Kuntz responded later that morning, "Ok guy's lets get this clear once and for all thete will be no talking about taking over nothing or blowing up shit period on here if you do you are out. So stop that shit now keep it to yourself act like the law is right beside you. Reaper out."

17.     On or about December 27, 2020, in the United Front Telegram group, another individual asked, "Is Reaper going to DC?" "Reaper" was a reference to Kuntz, who frequently used the moniker "Reaper" to identify himself. The defendant responded, "We will be there." The other individual responded, "Yall in the same Squad trip Wire?" The defendant responded, "Yes." Later that day, the defendant posted, "The time is now." The other individual responded, "Yup." Kuntz responded, "The 6th will tell it all im ready."

18.     On or about December 27, 2020, in the United Front Telegram group, the defendant wrote, "I ain't nobody but when it comes down to it follow me and I'll show you a symphony of destruction." Kuntz responded, "Come on the 6th lets do this shit."

A96

19.     On or about December 27, 2020, in the United Front Telegram group, Kuntz shared an image of a tweet from then-President trump, which stated, "See you in Washington, D.C. on January 6th. Don't miss it. Information to follow!" Kuntz wrote, "He is asking us to be there." The defendant responded, "Y'all wanna do it. Ask your self. Are you really ready. This is not for the faint of heart." Kuntz responded, "Good he does need us im going armed period."

20.     The defendant agreed with Kuntz and others to travel to Washington, D.C. for the events of January 6, 2021. The defendant and Kuntz traveled to Washington, D.C. together in the defendant's vehicle on January 5, 2021. Their intent was to corruptly obstruct or impede Congress, including through their unlawful presence at the U.S. Capitol building, with respect to the certification of the 2020 electoral college vote. In order to accomplish this goal, the defendant and others, including Kuntz, agreed to work together and to coordinate their actions.

21.     In the early morning of January 6, 2021, the defendant and Kuntz gathered with others in the area of the Lincoln Memorial.  Later that morning, the defendant and Kuntz gathered with other individuals in the area of the Ellipse and the Washington Monument, during the time when then-President Donald Trump, among others, addressed the crowd.

22.     From the Ellipse, the defendant walked with others, including Kuntz, toward the U.S. Capitol building, where they passed fencing and barricades and joined with thousands of other rioters on the grounds of the U.S. Capitol.

23.     At approximately 1:43 p.m., over Zello—a live voice push-to-talk communication platform available on cell phones—the defendant shared an audio message to a group called, "Stop the Steal J6."  The defendant said, "The people are trying to push through the barricade at the Capitol building.  We're headed that way."

24.     At approximately 1:44 p.m., over Zello, the defendant received a message from

another individual. The individual asked, "How many patriots do we have pushing through at the Capitol, Live Wire?" the defendant responded a few seconds later, "Hey, pass the word, Badlands, as fast as you can, the people are pushing on the Capitol. We need hands on deck." The individual responded, seconds later, "Heard, Live Wire. Will send."

25.     At approximately 1:45 p.m., over Zello, the defendant shared a message to a group called, "Oath Keepers general chat." In that message, the defendant said, "Hey, whoever's got ears on, even if you ain't in D.C., pass the word, the people are pushing on the Capitol. We need all hands on deck."

26.     At the U.S. Capitol building, the defendant ascended to the Upper West Terrace. The defendant stood on a set of bleachers that had been constructed on the Upper West Terrace, and which overlooked the inaugural stage and West Plaza. As he watched the crowd below, the defendant triumphantly raised his first in the air, before turning back and walking up the bleachers—toward the U.S. Capitol building.

27.     At approximately 2:37 PM EST, the defendant entered the U.S. Capitol building through the Upper West Terrace Door, wearing a gas mask.

28.     After entering the building, the defendant walked into the Rotunda, where he remained for several minutes. While in the Rotunda, the defendant removed his gas mask and placed it in the olive-green fabric pouch he was wearing in front. From the Rotunda, the defendant walked through Statuary Hall, before returning to the Rotunda.

29.     The defendant ultimately exited through the East Rotunda Doors at approximately 2:49 PM EST.

30.     On or about March 9, 2021, the defendant was voluntarily interviewed by the FBI. In this interview, the defendant claimed that he traveled to Washington, D.C. with Kuntz on

January 5, 2021, in the defendant's vehicle. The defendant stated that he and Kuntz attended the speech by then-President Donald Trump on the morning of January 6, 2021, and that he and Kuntz then went to the U.S. Capitol building, where they passed an area where fencing was originally set up. However, the defendant repeatedly falsely denied having entered the U.S. Capitol building and claimed he did not know anyone that entered the building.

*Dan Edwin Wilson's Conduct in the Western District of Kentucky*

31.    On June 3, 2022, during the execution of a lawfully issued search warrant for the defendant's home, law enforcement recovered a number of firearms and ammunition, among other items.

32.    The defendant knowingly possessed, in and affecting commerce, a firearm, that is a Rock Island Armory, Model M1911-A1, .45 caliber pistol, bearing serial number RIA1547427; a Smith & Wesson, Model M&P Shield, 9 millimeter pistol bearing serial number HUH1149; a Rock Island Armory, Model M1911-A1, .45 caliber pistol, bearing serial number RIA2266246; an Anderson Manufacturing, Model AM-15, multi-caliber rifle bearing serial number 19347295, with a 28-inch overall length and a 14-inch barrel; a 5.56 caliber long barrel M-4 style rifle with "M" logo, with no visible serial number; a 5.56 caliber short barrel M-4 style rifle, with Anderson butt-stock, with no visible serial number; and ammunition, with knowledge that he had previously been convicted in a court of a crime punishable by imprisonment for a term exceeding one year, specifically:

  a.  On or about July 11, 1994, in Breckenridge Circuit Court, Breckenridge County, Kentucky, in Case Number 94-CR-019, Dan Edwin Wilson, was convicted of Burglary in the Secondary Degree (2 counts) and Unlawful Transaction with a Minor, each a felony;

A99

b.  On or about December 19, 1995, in Jefferson Circuit Court, Jefferson County, Kentucky, in Case Number 95-CR-2600, Dan Edwin Wilson, was convicted of Theft by Unlawful Taking over $300 (2 counts), a felony; and

c.  On or about December 10, 1997, in Fayette Circuit Court, Fayette County, Kentucky, in Case Number 97-CR-977, Dan Edwin Wilson, was convicted of Escape in the Second Degree, a felony.

33.  On June 3, 2022, the defendant knowingly received and possessed a firearm, specifically: an Anderson Manufacturing, Model AM-15, multi-caliber rifle bearing serial number 19347295, with a 28-inch overall length and a 14-inch barrel, not registered to him in the National Firearms Registration and Transfer Record.

34.  The rifle that the officers recovered from the defendant's home is a firearm, as that term is defined by the United States Code, is not an antique and, further, was transported in interstate commerce from one state to another.

### *Elements of the Offenses*

35.  Dan Edwin Wilson knowingly and voluntarily admits to all the elements of Conspiracy To Impede or Injure Officer. Specifically, the defendant admits that on or about January 6, 2021, the defendant willfully and knowingly, did conspire with one or more other persons to prevent, by force, intimidation, or threat, any person, that is, Members of the United States Congress and law enforcement officers, from discharging any duties of any office, trust, or place of confidence under the United States, and to induce by force, intimidation, and threat, any

A100

officer of the United States, that is Members of the United States Congress and law enforcement officers, to leave the place, where their duties as officers were required to be performed.

36.     Dan Edwin Wilson knowingly and voluntarily admits to all the elements of Possession of a Firearm by a Prohibited Person. Specifically, the defendant admits that the defendant knowingly possessed at least three firearms, with knowledge that he had previously been convicted in a court of a crime punishable by imprisonment for a term exceeding one year.

37.     Dan Edwin Wilson knowingly and voluntarily admits to all the elements of Possession of an Unregistered Firearm. Specifically, the defendant admits that the defendant knowingly received and possessed a firearm, specifically a rifle with a 28-inch overall length and a 14-inch barrel, not registered to him in the National Firearms Registration and Transfer Record.

Respectfully submitted,

MATTHEW M. GRAVES
United States Attorney
D.C. Bar No. 481052

By:      */s/ Anthony W. Mariano*
_____
Anthony W. Mariano, MA Bar No. 688559
Trial Attorney, Detailee
United States Attorney's Office
for the District of Columbia
601 D Street NW
Washington, D.C. 20530
(202) 476-0319
Anthony.Mariano2@usdoj.gov

## DEFENDANT'S ACKNOWLEDGMENT

I, Dan Edwin Wilson, have read this Statement of the Offense and have discussed it with my attorney. I fully understand this Statement of the Offense. I agree and acknowledge by my signature that this Statement of the Offense is true and accurate. I do this voluntarily and of my own free will. No threats have been made to me nor am I under the influence of anything that could impede my ability to understand this Statement of the Offense fully.

Date: _MAy 15, 2024_      _Dan Wilson_____

Dan Edwin Wilson
Defendant

## ATTORNEY'S ACKNOWLEDGMENT

I have read this Statement of the Offense and have reviewed it with my client fully. I concur in my client's desire to adopt this Statement of the Offense as true and accurate.

Date: _____5/15/24____      _____

Norman A. Pattis
Attorney for Defendant

Page **12** of **12**

A102

UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | 1:23-cr-00427-DLF-1 |
| Plaintiff | : | |
| V. | : | |
| | : | |
| | : | |
| DAN EDWIN WILSON | : | AUGUST 9, 2024 |
| Defendant | : | |

**<u>DEFENDANT'S SENTENCING MEMORANDUM</u>**

Mr. Wilson is now before the Court as a result of guilty pleas to two sets of offenses: Firearms offenses arising from the Western District of Kentucky: specifically, one count of possession of a firearm by a prohibited person, in violation of 18 U.S.C. Sections 922(g)(1) and 924(a)(2), and one count of possession of an unregistered firearm, in violation of 26 U.S. Sections 5841, 5861(d) and 5871. PSR, paras, 1, 13. He also entered a plea in an indictment returned in the District of Columbia, specifically, one count of conspiracy to impede or injure an officer, in violation of 18 U.S.C. Section 372. PSR, paras 10, 13. The matters were consolidated for disposition in the District of Columbia. The convictions arise from his participation in a demonstration-turned-riot at the United States Capitol on January 6, 2021, and a search related to an investigation of his participation in that event.

Mr. Wilson harbored a belief, fostered by no less a person than the president of the United States, Donald J. Trump, that the results of the presidential election in November 2020 were fraudulent, in effect that an election had been stolen. He appeared to protest, in the hope that members of Congress would not count the Electoral College votes until a further investigation could take place. He participated in extensive social media chatter prior to the event, communications referring to potential civil war and resistance to the

1

A103

government, communicating with groups well known to the Court, the Oath Keepers and Three Percenters.

He was arrested first in Kentucky on the firearms charges on February 1, 2023, and released on a $10,000 unsecured bond with conditions; he was then arrested on the District of Columbia charges on May 25, 2023 and released on personal recognizance with conditions. PSR, paras, 28, 29. He has been generally compliant with the conditions of his release, but for two positive tests for the use of marijuana. PSR, para. 30.

The United States Probation Office calculates a Total Offense Level of 20 and a criminal history of one, PSR, paras 103, 114, resulting in an estimated guidelines range of 33 months to 41 months. PSR, para 177. The probation office also recommends against imposition of a fine. PSR, para. 164. Mr. Wilson's plea agreement requires that he pay $2,000 in restitution to the Architect of the Capitol. PSR, para. 206.

Mr. Wilson has reviewed the PSR and notes no material errors or omissions.

## I.    Guidelines

The United States Sentencing Guidelines are no longer mandatory, they are advisory in nature, and the Court must consider them in imposing a sentence. *United States v. Booker*, 543 U.S. 2220, 245-246 (2005.) The sentencing Court is required to consider the guidelines range, and then consider the factors laid out in I8 United States Code Section 3553(a). It is the Court's responsibility to impose a sentence sufficient, but not greater than necessary, to accomplish the goals of Section 3553(a). *Rita v. United States*, 551 U.S. 338, 347 (2007).

## II.    Sentencing Factors

Section 3553(a) requires consideration of the following factors:

- The nature and circumstances of the offense and the history and characteristics of the defendant (subsection (a)(1));

2

- ■ The need for the sentence to reflect the seriousness of the offense, promote respect for the law and to provide just punishment (subsection (a)(2)(A));

- ■ The need for adequate deterrence to criminal conduct (subsection(a)(2)(B));

- ■ The need to protect the public from further crimes by the defendant (subsection (a)(2)(C));

- ■ The effort to assure rehabilitation of the defendant by such services as the Bureau of Prisons may provide (subsection (a)(2)(D)).

### III.    Guidelines Calculation

The sentencing calculation in this case is, by contrast to many, if not most, January 6 sentences, anomalous. That is because the firearms charges in Kentucky drive the sentence to be imposed, PSR, paras 172-177. The offense carrying the highest guideline calculation, a firearms offense, has a Total Offense Level of 22; the January 6 count has a level of 16.

Although the possessory offense regarding firearms drives the sentence, the Government is expected to seek an enhancement of the sentence under USSG Section 3B1.1 and potential upward departures based on USSG Sections 3A1,4, comment 4, USSG Section 5K2.7 (disruption of governmental function), and/or Section 5k2.14.   PSR, para. 178.

Mr. Wilson has yet to see the Government's argument in support of the enhancement or upward departures and cannot respond to an argument he has not seen. He questions the propriety of seeking enhancements for a non-controlling offense, and therefore, by definition, a less serious offense, when the Guidelines calculation are driven by the most serious offense.

In the event the Court considers 3B1.1 and 3B1.2 as to the defendant's conduct on January 6 itself, the defendant urges the Court to reject the Government's expected request for a finding of aggravating factors under 3B1.1, and urges the Court to find mitigation under

3B1.2.

There is no dispute that Mr. Wilson used vitriolic speech in the run up to January 6. By virtue of his plea of guilty to the count of conspiring to injure an officer, he has waived any claim that such speech was a mere abstract call for violence at some future date and was therefore protected speech at the time the utterances were made.

Unlike other defendants who engaged in such speech prior to the events of January 6, 2021, he was not charged with seditious conspiracy. Indeed, he was not assessed any points in the Guidelines calculation for being a leader or manager. PSR, para 86. Neither was he assessed additional points for specific offense characteristics related to the conspiracy. PSR, para. 84. (He was assessed an additional six points for offense characteristics on the firearms charge, because he possessed six firearms. (PSR, para 90)

Mr. Wilson contends that application of Section 3B1.1 as an aggravating factor is inappropriate because he was not an organizer, *United States v. Bolden*, 596 F.3d 976 (8th Cir 2010), manager, *United States v. Fuller*, 897 F.2d 1217, 1220 (1st Cir. 1990), or leader, *United States v. Solario*, 337 F.3d. 580 (6th Cir. 2003), in any criminal activity. He was a participant and a vocal one in vitriolic speech about what could, and perhaps should, happen on January 6, 2021. Yet for all that hyperbole, he was not charged with committing an act of violence against any law enforcement officer. Absent from the three indictments of Mr. Wilson arising out of the District of Columbia is the charge that would have lodged had his speech ripened into actual conduct: 18 U.S.C. Section 111, which supports a 6-point enhancement for an "official victim, under Section 3A1.2. (see, generally, Aggravating and *Mitigating Role Adjustments Primer Sections 3B1.1 and 3 B1.2*, US Sentencing Commission),

(https://www.ussc.gov/sites/default/files/pdf/training/primers/Primer_Role_Adjustmen

4

A106

t.pdf#:~:text=Section%203B1.1%20provides%20for%202-%2C%203-%2C%20and%204-level,or%20was%20otherwise%20extensive%2C%20increase%20by%204%20levels),  last accessed August 8, 2024).

On the other hand, Mr. Wilson urges the Court to find mitigation under 3B1.2. He contends that while he was present at the riot and that he did enter the Capitol, he neither engaged in direct destruction of property nor actual violent confrontation with law enforcement agents. These latter factors – destruction of property and actual physical violence – distinguish Mr. Wilson from more active participants and make him substantially less culpable. This is consistent with the approach taken in *United States v. Santos*, 357 F.3d. 136, 142 (1st Cir. 2004) ("less culpable than his coparticipants and to the conspiracy's other participants").

**IV.    Offense Characteristics**

There is no question that the protest on January 6, 2021 became a riot with violent features, but to suggest, as the Government has repeatedly in an extraordinarily ambitious campaign of prosecutions, that the events were a threat to democracy itself requiring harsh, even draconian, consequences is overdone. Attempts to castigate Mr. Wilson by repeated reference to the crowd and what other rioters did obscures a fundamental point: people had every right to appear at the Capitol to petition for redress of grievances, even if those grievances were more imagined than real in hindsight. Mr. Wilson did not plan an insurrection. He appeared at a protest and was swept up in events that turned violent. The sentence in this case should reflect the seriousness of Mr. Wilson's offense, not the Government's determination to send a message to the public at large based on the behavior of the group as a whole.

A107

## V.    Mr. Wilson's Characteristics

Mr. Wilson has had more than his fair share of trouble as a young adult and child. Abused as a child, he spent his early adulthood in and out of the criminal justice system. Yet now, at age 48, he has largely turned his life around. He is a licensed master electrician and gainfully employed. He manages his modest financial affairs responsibly, and is a productive member of society.

Clearly, he ought not to have possessed firearms, and warrants punishment for unlawfully possessing firearms. And his conduct at the Capitol on January 6, 2021 is culpable. It would take a sociologist or more learned scholar than this writer to comprehend just how so many Americans allowed themselves to become persuaded that the 2020 election was stolen, even after scores of attempts to litigate the issue failed in courts across the land. This belief, couple with a long history of resistance to public authority by dissenting groups in the United States – starting with the founders themselves – has created a combustible political culture. Mr. Wilson succumbed to that rhetoric of theft and the romance of popular sovereignty reclaimed. The consequences were a riot that delayed counting of electoral votes one day in January, 2021. The republic itself was not at risk; the day was the sort of day Aristotle warned against when he wrote about the dangers of democracy leading to mob rule and autocracy – entirely foreseeable and, in the end, manageable, in a republic with stable institutions. Our institutions held firm. They remain solid.

Whether Mr. Wilson's dependence on alcohol fueled a particular vulnerability is candidly unknown. PSR, para 143  (consumption of eight to 12 beers per day). One suspects his level of disaffection with mainstream institutions of American political life is best explained by the sense of alienation and estrangement among many working class Americans, as is written about by J.D. Vance, the current Republican vice presidential nominee,  in *Hillbilly*

*Elegy*.

## VI.    General Deterrence

The scope and extent of the Government's prosecution of rioters at the Capitol on January 6, 2021, militates against any need for general deterrence as a factor in this sentencing. Press accounts relay that more than 1200 persons have thus far been charged with offenses arising from the hours-long disturbance that day. Indeed, the United States Attorney for the District of Columbia not long ago held a conference at which he proclaimed that there are still more prosecutions to come. Apparently, the investigation of the event is ongoing. If there is an American alive who today believes that a similar riot will be tolerated in the future, that person does not read or listen to the news. Mr. Wilson received the message.

## VII.    Specific Deterrence

Although Mr. Wilson has zero criminal history points, he does have an extensive history of involvement with the criminal justice system. PSR, para. 105-120. He has served time in prison. Returning after more than a decade of participation in the economy and gaining a foothold in society will be a serious setback for Mr. Wilson.

Despite the lengthy record as a young adult, it is unlikely that he presents a risk of recidivism. He was caught up in the moment. He has been informed of the nature and operation of the sentencing guidelines and has been stoic in contemplation of the likely consequences of this conviction. Throughout the proceedings, he has been generally compliant with his conditions of release.

Mr. Wilson appreciates the seriousness of the charges. He will address the Court in his own words at the time of sentencing so that the Court can assess for itself his remorse and contrition.

A109

**VIII.    Rehabilitation**

A candid reading of the PSR in this case reflects a deep sense of personal tragedy – Mr. Wilson was abused by multiple father figures; his own father forced him to endure games of Russian Roulette; he spent a considerable period of in his youth in group homes, foster care and other residential and outpatient programs. PSR, Para. 127. The PSR author recommends the following programs for Mr. Wilson during his period of incarceration: the Federal Prisons Industries Program, the Drug Abuse Education Program, and both the Nonresidential Drug Abuse Program and the Residential Drug Abuse Program. Mr. Wilson would benefit from those programs.

There is every reason to believe that Mr. Wilson will again, and hopefully soon, regain his place as a productive member of society. The obstacles he has overcome in his life thus far are already significant. With assistance, he can overcome the current obstacles and emerge from prison chastened and prepared to live as a law-abiding citizen.

**IX.    Reasons for a Non-Guidelines Sentence**

No victim has stepped forth to say he or she was injured or otherwise affected by Mr. Wilson's conduct.

The restitution to the Architect of the Capitol in the amount of $2,000 is a more or less routine assessment on January 6 defendants in general. It reflects an overall assessment of damage to the Capitol building in the amount of approximately $2.9 million, a significant sum, but far less than what one would expect from an attack described by some as a insurrection intended to undermine the pillars of our Government. Replacement costs of things like windows and perimeter fences are significant at the Capitol.

8

The guidelines require a sentence sufficient to reflect the seriousness of the conduct, but no greater than necessary to accomplish that task. Mr. Wilson contends that the guidelines sentence overstates the significance of the conduct for which Mr. Wilson was actually convicted. To a dangerous extent the Government's sentencing papers in this and related cases seek to impose something like guilt by association. Yes, Mr. Wilson was part of a much larger crowd. But the crowd is not being sentenced here; Mr. Wilson is.

**X.    A Sentence of Two Years**

Mr. Wilson requests a sentence of no more than two years imprisonment and no imposition of a fine.

THE DEFENDANT

By /s/ Norman Pattis /s/
NORMAN PATTIS
Pattis & Paz,LLC
383 Orange Street
New Haven, CT 06511 Tel:
Tel:  203-393-3017
Fax: 203-393-9745
npattis@pattispazlaw.com

9

A111

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on the foregoing date, a copy of the foregoing Motion was filed electronically and served by mail on anyone unable to accept electronic filing. Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing. Parties may access this filing through the Court's CM/ECF system.

_____ /s/ NORMAN PATTIS _____

A112

11

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | 1:23-cr-00427-DLF-1 |
| PLAINTIFF | : | |
| | : | |
| Vs. | : | |
| | : | |
| DAN EDWIN WILSON | : | |
| DEFENDANT | : | AUGUST 15, 2024 |

**DEFENDANT'S REPLY SENTENCING MEMORANDUM**

Notwithstanding the recommendation of the Presentence Report writer, the Government seeks an upward departure or variance of the recommended sentence of 33 to 41 months, requesting that the Court impose a 60-month sentence. Mr. Wilson, by contrast seeks a downward departure or variance and a sentence of two years together with a recommendation that he be required to participate in certain rehabilitative programs.  In this memo, the defendant urges to reject the Government's requested sentence of 60 months.

The undersigned represented Joseph Biggs, a leader of the Proud Boys, in an extended trial before Kelly, J., in this courthouse, and now represents both Mr. Biggs and Zachary Rehl, a co-defendant in the Proud Boys trial, in the United States Court of Appeals for the District of Columbia. He represented both Mssrs. Biggs and Rehl in their sentencings before Kelly,

1

J.  What is striking about the Government's sentencing memoranda in this case and in the Proud Boys cases is the same urgent sense of outrage, despite the fact that in the Proud Boys cases the charges of conviction included seditious conspiracy and other counts carrying a maximum of 20 years. The Government there sought terrorism enhancements based on the destruction of Government property by the defendants and their co-conspirators, a fence valued at approximately $34,000. As in Mr. Wilson's case, the Government relied heavily on incendiary speech uttered by the defendants in the days and weeks before January 6, 2021. But unlike the case at bar, the Government attempted in the Proud Boys case to prove an elaborate plan to disrupt the Government, a plan including creation of a Ministry of Defense and related groups. In the absence of direct proof of such a plan, the Government urged the jury in closing argument to convict on the basis of a so-called "implicit conspiracy" formed at the moment the first barricade was breached. The cases differ in scope, but have somehow become identical in rhetoric. Mr. Wilson exhorted others to attend a rally in Washington, D.C., on January 6, and once there, he entered the Capitol in violation of the law. But he was not part of a larger conspiracy whose plans ripened into alleged planned and coordinated activity on January 6, 2021, and he should not be treated as such. Mr. Wilson was never charged with

2

seditious conspiracy and the Government, wisely in light of the ultimate decision in *Fischer v. United States* decision (6/28/2024), did not seek a plea on the 1512 charges it lodged.

The Government seeks an upward variance because Mr. Wilson's conduct, together with that or hundreds, if not thousands of others, "was a serious offense that attacked the fundamentals of American democracy." Govt's Memo., p. 36. As such, the Government urges this Court to conclude this was the functional equivalent of an act of terrorism and asks for a variance on grounds of 3A1.4, n. 4, because the defendant's conduct was "calculated to" … "affect the conduct of government." *Id.*, p. 38. This reasoning comes perilously close to calling anyone who protests, assembles and petitions for redress of grievances a terrorist. Although the Government scorns the notion that Mr. Wilson had any "legitimate evidence" to support his belief that the election was stolen, it bears remembering that no less a personage than the President of the United States continued to assert, even on January 6, and thereafter, that the election was stolen. Millions of his supporters would find it unsettling to realize that it is a crime to believe the commander in chief and leader of the free world. A stolen election is a far more dire threat to American democracy than a protest designed to delay counting of electoral votes on a given day.

A116

There is a reason that 18 U.S.C. Section 2332b(g)(5) enumerated nearly 50 federal crimes that would support application of the terrorism enhancement. It is to provide the Court with guidance on the level of severity of the conduct required to support such a finding. The Government's sentencing memorandum here is written for another case. Mr. Wilson was not charged with seditious conspiracy in the form of planning to use force to oppose the authority of the Government. Yet that is the accusation in the Government's memorandum used to support the claim that a terrorism enhancement applied. Govt's Sentencing Memo., p. 39. Lest there be any doubt that this is what the Government has done, consider its reliance on the sentences imposed and the use of terrorism enhancements in the Oath Keepers case. Id., pp. 41-42, a case in which seditious conspiracy was charged. The Government then compares the sentences imposed on Proud Boys, another group charged with seditious conspiracy. Id., pp. 55-56. If the comparisons are apt, then Mr. Wilson should have been charged with seditious conspiracy. He was not because, presumably, the evidence of which the Government is aware did not support the charge. The Proud Boys and Oath Keepers cases are not meaningful comparators.

Paradoxically, the Government already has what it wants with respect to the January 6 conduct. Even if the Court applies the two-point

A117

enhancement under 2J1.2(b)(3)(C), the total offense level for the Section 372 offense is 16. The combined offense level is 23. The difference in sentencing consequences roughly two years according to the sentencing table. "Adding back" points to basically eliminate the credit Mr. Wilson gets for acceptance of responsibility and leveraging enhancements on the less serious offense to enhance the penalty for the more serious firearms offenses is, to say the least, inequitable.

So, too, is the Government's refusal to accept that Mr. Wilson falls within Criminal History I.  It asks this Court to use its sentencing discretion to undermine one of the fundamental goals of the criminal sanction – rehabilitation.   The reason Mr. Wilson's extensive criminal history nonetheless results in his being in Criminal History I is that the convictions are by now ancient. He has largely overcome the roadblocks of a difficult childhood and become a productive member of society. In other words, rehabilitation worked. The fact that he was caught up in the drama of January 6 and whatever it says about the partisan divide In this country does not transform him Into a career criminal.  Dredging up ancient ghosts to populate the Government's January 6 House of Horrors refuses to recognize the hard work Mr. Wilson did to overcome his earlier challenge. As noted in our earlier brief, he is now a licensed electrician and a productive member of society.

A118

The Court should reject the Government's invitation to look back 30 years as it imposes sentence.

THE DEFENDANT,


**By    /s/    Norman A. Pattis, Esq.**
Norman A. Pattis, Esq.
PATTIS & PAZ, LLC
383 Orange St.
New Haven, CT  06511
Tel:    203-393-3017
Fax:   203-393-9745
npattis@pattispazlaw.com


**CERTIFICATE OF SERVICE**

I hereby certify that on the foregoing date, a copy of the foregoing was filed electronically and served by mail on anyone unable to accept electronic filing. Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing. Parties may access this filing through the Court's CM/ECF system.

_____**/s/    Norman A. Pattis, Esq.**_____

6

A119

AO 245B (Rev. 09/19)    Judgment in a Criminal Case
Sheet 1

# UNITED STATES DISTRICT COURT

District of Columbia

| | |
|---|---|
| UNITED STATES OF AMERICA | **JUDGMENT IN A CRIMINAL CASE** |
| v. | |
| DAN EDWIN WILSON | Case Number:  24cr238 (DLF) |
| | USM Number:  42452-510 |
| | Norman A Pattis |
| | Defendant's Attorney |

## THE DEFENDANT:

☑ pleaded guilty to count(s)    1 and 2 of the Indictment

☐ pleaded nolo contendere to count(s)
   which was accepted by the court.

☐ was found guilty on count(s)
   after a plea of not guilty.

The defendant is adjudicated guilty of these offenses:

| Title & Section [?] | Nature of Offense | Offense Ended | Count |
|---|---|---|---|
| 18 USC §§ 922(g)(1), | Possession of a Firearm by a Prohibited Person | 6/3/2022 | 1 |
| § 924(a)(2) | | | |

The defendant is sentenced as provided in pages 2 through ___8___ of this judgment.  The sentence is imposed pursuant to the Sentencing Reform Act of 1984.

☐ The defendant has been found not guilty on count(s)

☐ Count(s)  _____ ☐ is    ☐ are dismissed on the motion of the United States.

   It is ordered that the defendant must notify the United States attorney for this district within 30 days of any change of name, residence, or mailing address until all fines, restitution, costs, and special assessments imposed by this judgment are fully paid. If ordered to pay restitution, the defendant must notify the court and United States attorney of material changes in economic circumstances.

8/28/2024
Date of Imposition of Judgment

*Dabney L. Friedrich*
Signature of Judge

Dabney L. Friedrich, United States District Court Judge
Name and Title of Judge

9/17/2024
Date

This page is always included when printing.

A120

AO 245B (Rev. 09/19)    Judgment in a Criminal Case
Sheet 1A

DEFENDANT:  DAN EDWIN WILSON
CASE NUMBER:  24cr238 (DLF)

Judgment—Page __2__ of __8__

## ADDITIONAL COUNTS OF CONVICTION

| Title & Section ? | Nature of Offense | Offense Ended | Count |
|---|---|---|---|
| 26 USC §§ 5841, 5861 (d) and 5871 | Possession of an Unregistered Firearm | 6/3/2022 | 2 |

A121

Include this page when printing?

AO 245B (Rev. 09/19) Judgment in Criminal Case
Sheet 2 — Imprisonment

DEFENDANT:    DAN EDWIN WILSON
CASE NUMBER:    24cr238 (DLF)

## IMPRISONMENT

The defendant is hereby committed to the custody of the Federal Bureau of Prisons to be imprisoned for a total term of:

Sixty (60) months on Counts 1 and 2 (WDKY), to run concurrently with Count 1ss in Case# 23cr427 (DDC).

☑ The court makes the following recommendations to the Bureau of Prisons:

The defendant be placed at a facility close to his residence in Louisville, Kentucky (FCI Ashland) and be evaluated for participation in the RDAP program.

☑ The defendant is remanded to the custody of the United States Marshal.

☐ The defendant shall surrender to the United States Marshal for this district:

  ☐ at _____ ☐ a.m. ☐ p.m.  on  _____ .

  ☐ as notified by the United States Marshal.

☐ The defendant shall surrender for service of sentence at the institution designated by the Bureau of Prisons:

  ☐ before 2 p.m. on _____ .

  ☐ as notified by the United States Marshal.

  ☐ as notified by the Probation or Pretrial Services Office.

## RETURN

I have executed this judgment as follows:

Defendant delivered on _____ to _____

at _____ , with a certified copy of this judgment.

_____
UNITED STATES MARSHAL

By _____
DEPUTY UNITED STATES MARSHAL

A122

AO 245B (Rev. 09/19)  Judgment in a Criminal Case
Sheet 3 — Supervised Release

| | Judgment—Page | 4 | of | 8 |
|---|---|---|---|---|

DEFENDANT:   DAN EDWIN WILSON
CASE NUMBER:   24cr238 (DLF)

## SUPERVISED RELEASE

Upon release from imprisonment, you will be on supervised release for a term of:

Thirty-Six (36) months as to Count 1 and Count 2, to run concurrently with Count 1ss in Case# 23cr00427.

## MANDATORY CONDITIONS

1.   You must not commit another federal, state or local crime.
2.   You must not unlawfully possess a controlled substance.
3.   You must refrain from any unlawful use of a controlled substance. You must submit to one drug test within 15 days of release from imprisonment and at least two periodic drug tests thereafter, as determined by the court.
        ☐ The above drug testing condition is suspended, based on the court's determination that you
            pose a low risk of future substance abuse. *(check if applicable)*
4.   ☑ You must make restitution in accordance with 18 U.S.C. §§ 3663 and 3663A or any other statute authorizing a sentence of
        restitution. *(check if applicable)*
5.   ☑ You must cooperate in the collection of DNA as directed by the probation officer. *(check if applicable)*
6.   ☐ You must comply with the requirements of the Sex Offender Registration and Notification Act (34 U.S.C. § 20901, *et seq.*) as
        directed by the probation officer, the Bureau of Prisons, or any state sex offender registration agency in the location where you
        reside, work, are a student, or were convicted of a qualifying offense. *(check if applicable)*
7.   ☐ You must participate in an approved program for domestic violence. *(check if applicable)*

You must comply with the standard conditions that have been adopted by this court as well as with any other conditions on the attached page.

A123

AO 245B (Rev. 09/19)   Judgment in a Criminal Case
Sheet 3A — Supervised Release

| | | | |
|---|---|---|---|
| Judgment—Page | 5 | of | 8 |

DEFENDANT:  DAN EDWIN WILSON
CASE NUMBER:  24cr238 (DLF)

## STANDARD CONDITIONS OF SUPERVISION

As part of your supervised release, you must comply with the following standard conditions of supervision. These conditions are imposed because they establish the basic expectations for your behavior while on supervision and identify the minimum tools needed by probation officers to keep informed, report to the court about, and bring about improvements in your conduct and condition.

1.  You must report to the probation office in the federal judicial district where you are authorized to reside within 72 hours of your release from imprisonment, unless the probation officer instructs you to report to a different probation office or within a different time frame.
2.  After initially reporting to the probation office, you will receive instructions from the court or the probation officer about how and when you must report to the probation officer, and you must report to the probation officer as instructed.
3.  You must not knowingly leave the federal judicial district where you are authorized to reside without first getting permission from the court or the probation officer.
4.  You must answer truthfully the questions asked by your probation officer.
5.  You must live at a place approved by the probation officer. If you plan to change where you live or anything about your living arrangements (such as the people you live with), you must notify the probation officer at least 10 days before the change. If notifying the probation officer in advance is not possible due to unanticipated circumstances, you must notify the probation officer within 72 hours of becoming aware of a change or expected change.
6.  You must allow the probation officer to visit you at any time at your home or elsewhere, and you must permit the probation officer to take any items prohibited by the conditions of your supervision that he or she observes in plain view.
7.  You must work full time (at least 30 hours per week) at a lawful type of employment, unless the probation officer excuses you from doing so. If you do not have full-time employment you must try to find full-time employment, unless the probation officer excuses you from doing so. If you plan to change where you work or anything about your work (such as your position or your job responsibilities), you must notify the probation officer at least 10 days before the change. If notifying the probation officer at least 10 days in advance is not possible due to unanticipated circumstances, you must notify the probation officer within 72 hours of becoming aware of a change or expected change.
8.  You must not communicate or interact with someone you know is engaged in criminal activity. If you know someone has been convicted of a felony, you must not knowingly communicate or interact with that person without first getting the permission of the probation officer.
9.  If you are arrested or questioned by a law enforcement officer, you must notify the probation officer within 72 hours.
10.  You must not own, possess, or have access to a firearm, ammunition, destructive device, or dangerous weapon (i.e., anything that was designed, or was modified for, the specific purpose of causing bodily injury or death to another person such as nunchakus or tasers).
11.  You must not act or make any agreement with a law enforcement agency to act as a confidential human source or informant without first getting the permission of the court.
12.  If the probation officer determines that you pose a risk to another person (including an organization), the probation officer may require you to notify the person about the risk and you must comply with that instruction. The probation officer may contact the person and confirm that you have notified the person about the risk.
13.  You must follow the instructions of the probation officer related to the conditions of supervision.

## U.S. Probation Office Use Only

A U.S. probation officer has instructed me on the conditions specified by the court and has provided me with a written copy of this judgment containing these conditions. For further information regarding these conditions, see *Overview of Probation and Supervised Release Conditions*, available at: www.uscourts.gov.

Defendant's Signature _____    Date _____

A124

AO 245B (Rev. 09/19)  Judgment in a Criminal Case
Sheet 3D — Supervised Release

Judgment—Page    6    of    8

DEFENDANT: DAN EDWIN WILSON
CASE NUMBER: 24cr238 (DLF)

## SPECIAL CONDITIONS OF SUPERVISION

Substance Abuse Testing - You must submit to substance abuse testing to determine if you have used a prohibited substance. You must not attempt to obstruct or tamper with the testing methods.

Substance Abuse Treatment -You must participate in an inpatient and/or outpatient substance abuse treatment program and follow the rules and regulations of that program. The probation officer will supervise your participation in the program (provider, location, modality, duration, intensity, etc.).

Mental Health Assessment/Treatment -  You must participate in a mental health assessment to determine if mental health treatment is necessary. If determined necessary by the probation officer, you must follow the rules and regulations of that program. The probation officer, in consultation with the treatment provider, will supervise your participation in the program (provider, location, modality, duration, intensity, etc.).

Financial Information Disclosure - You must provide the probation officer access to any requested financial information and authorize the release of any financial information. The probation office may share financial information with the United States Attorney's Office.

Financial Restrictions - You must not incur new credit charges, or open additional lines of credit without the approval of the probation officer.

Location Restriction - You must not knowingly enter the United States Capitol Building or onto surrounding grounds known as Capitol Square and consisting of the square block bounded by Constitution Avenue, NW and NE, to First Street, NE and SE, to Independence Avenue, SE and SW, to First Street, SW and NW, comprising the property under any circumstances, without first obtaining the permission of the probation officer and/or the Court.

Location Restriction - You must not knowingly enter the District of Columbia without first obtaining the permission of the probation officer and/or the Court.

Re-entry Progress Hearing - Within sixty days of release from incarceration or placement on supervision, you will appear before the Court for a re-entry progress hearing. Prior to the hearing, the probation officer will submit a report summarizing your status and compliance with release conditions. If you are supervised by a district outside of the Washington DC metropolitan area, the United States Probation Office in that district will submit a progress report to the court within 60 days of the commencement of supervision; upon receipt of the progress report, the Court will determine if your appearance is required.

The Court shall transfer supervision, but not jurisdiction, to the Western District of Kentucky.

A125

AO 245B (Rev. 09/19)  Judgment in a Criminal Case
Sheet 5 — Criminal Monetary Penalties

Judgment — Page ___7___ of ___8___

DEFENDANT: DAN EDWIN WILSON
CASE NUMBER: 24cr238 (DLF)

## CRIMINAL MONETARY PENALTIES

The defendant must pay the total criminal monetary penalties under the schedule of payments on Sheet 6.

| | **Assessment** | **Restitution** | **Fine** | **AVAA Assessment*** | **JVTA Assessment**** |
|---|---|---|---|---|---|
| **TOTALS** | $ 200.00 | $ | $ | $ | $ |

☐ The determination of restitution is deferred until _____. An *Amended Judgment in a Criminal Case (AO 245C)* will be entered after such determination.

☐ The defendant must make restitution (including community restitution) to the following payees in the amount listed below.

If the defendant makes a partial payment, each payee shall receive an approximately proportioned payment, unless specified otherwise in the priority order or percentage payment column below. However, pursuant to 18 U.S.C. § 3664(i), all nonfederal victims must be paid before the United States is paid.

| **Name of Payee** | **Total Loss*** | **Restitution Ordered** | **Priority or Percentage** |
|---|---|---|---|
| | | | |

| **TOTALS** | $                 0.00 | $                 0.00 | |

☐ Restitution amount ordered pursuant to plea agreement $ _____

☐ The defendant must pay interest on restitution and a fine of more than $2,500, unless the restitution or fine is paid in full before the fifteenth day after the date of the judgment, pursuant to 18 U.S.C. § 3612(f). All of the payment options on Sheet 6 may be subject to penalties for delinquency and default, pursuant to 18 U.S.C. § 3612(g).

☐ The court determined that the defendant does not have the ability to pay interest and it is ordered that:

    ☐ the interest requirement is waived for the    ☐ fine   ☐ restitution.

    ☐ the interest requirement for the    ☐ fine   ☐ restitution is modified as follows:

\* Amy, Vicky, and Andy Child Pornography Victim Assistance Act of 2018, Pub. L. No. 115-299.
\*\* Justice for Victims of Trafficking Act of 2015, Pub. L. No. 114-22.
\*\*\* Findings for the total amount of losses are required under Chapters 109A, 110, 110A, and 113A of Title 18 for offenses committed on or after September 13, 1994, but before April 23, 1996.

Include this page when printing?

A126

AO 245B (Rev. 09/19) Judgment in a Criminal Case
Sheet 6 — Schedule of Payments

DEFENDANT: DAN EDWIN WILSON
CASE NUMBER: 24cr238 (DLF)

Judgment — Page __8__ of __8__

# SCHEDULE OF PAYMENTS

Having assessed the defendant's ability to pay, payment of the total criminal monetary penalties is due as follows:

**A** ☑ Lump sum payment of $ ___200.00___ due immediately, balance due

☐ not later than _____ , or
☑ in accordance with ☐ C, ☐ D, ☐ E, or ☑ F below; or

**B** ☐ Payment to begin immediately (may be combined with ☐ C, ☐ D, or ☐ F below); or

**C** ☐ Payment in equal _____ *(e.g., weekly, monthly, quarterly)* installments of $ _____ over a period of _____ *(e.g., months or years)*, to commence _____ *(e.g., 30 or 60 days)* after the date of this judgment; or

**D** ☐ Payment in equal _____ *(e.g., weekly, monthly, quarterly)* installments of $ _____ over a period of _____ *(e.g., months or years)*, to commence _____ *(e.g., 30 or 60 days)* after release from imprisonment to a term of supervision; or

**E** ☐ Payment during the term of supervised release will commence within _____ *(e.g., 30 or 60 days)* after release from imprisonment. The court will set the payment plan based on an assessment of the defendant's ability to pay at that time; or

**F** ☑ Special instructions regarding the payment of criminal monetary penalties:

The financial obligations are immediately payable to the Clerk of the Court for the U.S. District Court, 333 Constitution Ave NW, Washington, DC 20001. Within 30 days of any change of address, you shall notify the Clerk of the Court of the change until such time as the financial obligation is paid in full.

Unless the court has expressly ordered otherwise, if this judgment imposes imprisonment, payment of criminal monetary penalties is due during the period of imprisonment. All criminal monetary penalties, except those payments made through the Federal Bureau of Prisons' Inmate Financial Responsibility Program, are made to the clerk of the court.

The defendant shall receive credit for all payments previously made toward any criminal monetary penalties imposed.

☐ Joint and Several

| Case Number Defendant and Co-Defendant Names *(including defendant number)* | Total Amount | Joint and Several Amount | Corresponding Payee, if appropriate |
|---|---|---|---|
| | | | |

☐ The defendant shall pay the cost of prosecution.

☐ The defendant shall pay the following court cost(s):

☑ The defendant shall forfeit the defendant's interest in the following property to the United States:
see ECF [12] Consent Final Order of Forfeiture.

Payments shall be applied in the following order: (1) assessment, (2) restitution principal, (3) restitution interest, (4) AVAA assessment, (5) fine principal, (6) fine interest, (7) community restitution, (8) JVTA assessment, (9) penalties, and (10) costs, including cost of prosecution and court costs.

Include this page when printing?

A127

AO 245B (Rev. 09/19)    Judgment in a Criminal Case
Sheet 1

# UNITED STATES DISTRICT COURT

District of Columbia

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | **JUDGMENT IN A CRIMINAL CASE** |
| v. | ) | |
| DAN EDWIN WILSON | ) | Case Number:  23cr427-1 (DLF) |
| | ) | USM Number:  42452-510 |
| | ) | Norman A Pattis |
| | ) | Defendant's Attorney |

## THE DEFENDANT:

☑ pleaded guilty to count(s)    1ss of the Second Superseding Information filed on 5/16/2024

☐ pleaded nolo contendere to count(s)
   which was accepted by the court.

☐ was found guilty on count(s)
   after a plea of not guilty.

The defendant is adjudicated guilty of these offenses:

| Title & Section ? | Nature of Offense | Offense Ended | Count |
|---|---|---|---|
| 18 USC § 372 | Conspiracy to Impede or Injure Officer | 1/6/2021 | 1ss |

The defendant is sentenced as provided in pages 2 through ___7___ of this judgment. The sentence is imposed pursuant to the Sentencing Reform Act of 1984.

☐ The defendant has been found not guilty on count(s)

☐ Count(s) _____ ☐ is ☐ are dismissed on the motion of the United States.

It is ordered that the defendant must notify the United States attorney for this district within 30 days of any change of name, residence, or mailing address until all fines, restitution, costs, and special assessments imposed by this judgment are fully paid. If ordered to pay restitution, the defendant must notify the court and United States attorney of material changes in economic circumstances.

8/28/2024
Date of Imposition of Judgment

*Dabney L. Friedrich*
Signature of Judge

Dabney L. Friedrich, United States District Court Judge
Name and Title of Judge

9/17/2024
Date

This page is always included when printing.

A128

AO 245B (Rev. 09/19) Judgment in Criminal Case
Sheet 2 — Imprisonment

Judgment — Page __2__ of __7__

DEFENDANT:   DAN EDWIN WILSON
CASE NUMBER:   23cr427-1 (DLF)

## IMPRISONMENT

The defendant is hereby committed to the custody of the Federal Bureau of Prisons to be imprisoned for a total term of:

Sixty (60) months on Count 1ss, to run concurrently with Counts 1 and 2 in Case# 24cr238 (WDKY).

☑ The court makes the following recommendations to the Bureau of Prisons:

The defendant be placed at a facility close to his residence in Louisville, Kentucky (FCI Ashland) and be evaluated for participation in the RDAP program.

☑ The defendant is remanded to the custody of the United States Marshal.

☐ The defendant shall surrender to the United States Marshal for this district:

☐ at _____ ☐ a.m.  ☐ p.m.  on _____ .

☐ as notified by the United States Marshal.

☐ The defendant shall surrender for service of sentence at the institution designated by the Bureau of Prisons:

☐ before 2 p.m. on _____ .

☐ as notified by the United States Marshal.

☐ as notified by the Probation or Pretrial Services Office.

## RETURN

I have executed this judgment as follows:

Defendant delivered on _____ to _____

at _____ , with a certified copy of this judgment.

_____
UNITED STATES MARSHAL

By _____
DEPUTY UNITED STATES MARSHAL

Include this page when printing?

A129

AO 245B (Rev. 09/19)   Judgment in a Criminal Case
Sheet 3 — Supervised Release

Judgment—Page ___3___ of ___7___

DEFENDANT:   DAN EDWIN WILSON
CASE NUMBER:   23cr427-1 (DLF)

## SUPERVISED RELEASE

Upon release from imprisonment, you will be on supervised release for a term of:

Thirty-Six (36) months as to Count 1ss, to run concurrently with Counts 1 and 2 in Case# 24cr238.

## MANDATORY CONDITIONS

1. You must not commit another federal, state or local crime.
2. You must not unlawfully possess a controlled substance.
3. You must refrain from any unlawful use of a controlled substance. You must submit to one drug test within 15 days of release from imprisonment and at least two periodic drug tests thereafter, as determined by the court.
   ☐ The above drug testing condition is suspended, based on the court's determination that you
      pose a low risk of future substance abuse. *(check if applicable)*
4. ☑ You must make restitution in accordance with 18 U.S.C. §§ 3663 and 3663A or any other statute authorizing a sentence of restitution. *(check if applicable)*
5. ☑ You must cooperate in the collection of DNA as directed by the probation officer. *(check if applicable)*
6. ☐ You must comply with the requirements of the Sex Offender Registration and Notification Act (34 U.S.C. § 20901, *et seq.*) as directed by the probation officer, the Bureau of Prisons, or any state sex offender registration agency in the location where you reside, work, are a student, or were convicted of a qualifying offense. *(check if applicable)*
7. ☐ You must participate in an approved program for domestic violence. *(check if applicable)*

You must comply with the standard conditions that have been adopted by this court as well as with any other conditions on the attached page.

A130

AO 245B (Rev. 09/19)    Judgment in a Criminal Case
Sheet 3A — Supervised Release

| | Judgment—Page | 4 | of | 7 |

DEFENDANT:  DAN EDWIN WILSON
CASE NUMBER:  23cr427-1 (DLF)

## STANDARD CONDITIONS OF SUPERVISION

As part of your supervised release, you must comply with the following standard conditions of supervision.  These conditions are imposed because they establish the basic expectations for your behavior while on supervision and identify the minimum tools needed by probation officers to keep informed, report to the court about, and bring about improvements in your conduct and condition.

1.   You must report to the probation office in the federal judicial district where you are authorized to reside within 72 hours of your release from imprisonment, unless the probation officer instructs you to report to a different probation office or within a different time frame.
2.   After initially reporting to the probation office, you will receive instructions from the court or the probation officer about how and when you must report to the probation officer, and you must report to the probation officer as instructed.
3.   You must not knowingly leave the federal judicial district where you are authorized to reside without first getting permission from the court or the probation officer.
4.   You must answer truthfully the questions asked by your probation officer.
5.   You must live at a place approved by the probation officer. If you plan to change where you live or anything about your living arrangements (such as the people you live with), you must notify the probation officer at least 10 days before the change. If notifying the probation officer in advance is not possible due to unanticipated circumstances, you must notify the probation officer within 72 hours of becoming aware of a change or expected change.
6.   You must allow the probation officer to visit you at any time at your home or elsewhere, and you must permit the probation officer to take any items prohibited by the conditions of your supervision that he or she observes in plain view.
7.   You must work full time (at least 30 hours per week) at a lawful type of employment, unless the probation officer excuses you from doing so.  If you do not have full-time employment you must try to find full-time employment, unless the probation officer excuses you from doing so. If you plan to change where you work or anything about your work (such as your position or your job responsibilities), you must notify the probation officer at least 10 days before the change. If notifying the probation officer at least 10 days in advance is not possible due to unanticipated circumstances, you must notify the probation officer within 72 hours of becoming aware of a change or expected change.
8.   You must not communicate or interact with someone you know is engaged in criminal activity.  If you know someone has been convicted of a felony, you must not knowingly communicate or interact with that person without first getting the permission of the probation officer.
9.   If you are arrested or questioned by a law enforcement officer, you must notify the probation officer within 72 hours.
10.  You must not own, possess, or have access to a firearm, ammunition, destructive device, or dangerous weapon (i.e., anything that was designed, or was modified for, the specific purpose of causing bodily injury or death to another person such as nunchakus or tasers).
11.  You must not act or make any agreement with a law enforcement agency to act as a confidential human source or informant without first getting the permission of the court.
12.  If the probation officer determines that you pose a risk to another person (including an organization), the probation officer may require you to notify the person about the risk and you must comply with that instruction.  The probation officer may contact the person and confirm that you have notified the person about the risk.
13.  You must follow the instructions of the probation officer related to the conditions of supervision.

### U.S. Probation Office Use Only

A U.S. probation officer has instructed me on the conditions specified by the court and has provided me with a written copy of this judgment containing these conditions. For further information regarding these conditions, see *Overview of Probation and Supervised Release Conditions*, available at: www.uscourts.gov.

Defendant's Signature _____     Date _____

A131

AO 245B (Rev. 09/19)    Judgment in a Criminal Case
Sheet 3D — Supervised Release

| | | | |
|---|---|---|---|
| Judgment—Page | 5 | of | 7 |

DEFENDANT: DAN EDWIN WILSON
CASE NUMBER: 23cr427-1 (DLF)

## SPECIAL CONDITIONS OF SUPERVISION

Substance Abuse Testing - You must submit to substance abuse testing to determine if you have used a prohibited substance. You must not attempt to obstruct or tamper with the testing methods.

Substance Abuse Treatment -You must participate in an inpatient and/or outpatient substance abuse treatment program and follow the rules and regulations of that program. The probation officer will supervise your participation in the program (provider, location, modality, duration, intensity, etc.).

Mental Health Assessment/Treatment -  You must participate in a mental health assessment to determine if mental health treatment is necessary. If determined necessary by the probation officer, you must follow the rules and regulations of that program. The probation officer, in consultation with the treatment provider, will supervise your participation in the program (provider, location, modality, duration, intensity, etc.).

Financial Information Disclosure - You must provide the probation officer access to any requested financial information and authorize the release of any financial information. The probation office may share financial information with the United States Attorney's Office.

Financial Restrictions - You must not incur new credit charges, or open additional lines of credit without the approval of the probation officer.

Location Restriction - You must not knowingly enter the United States Capitol Building or onto surrounding grounds known as Capitol Square and consisting of the square block bounded by Constitution Avenue, NW and NE, to First Street, NE and SE, to Independence Avenue, SE and SW, to First Street, SW and NW, comprising the property under any circumstances, without first obtaining the permission of the probation officer and/or the Court.

Location Restriction - You must not knowingly enter the District of Columbia without first obtaining the permission of the probation officer and/or the Court.

Re-entry Progress Hearing - Within sixty days of release from incarceration or placement on supervision, you will appear before the Court for a re-entry progress hearing. Prior to the hearing, the probation officer will submit a report summarizing your status and compliance with release conditions. If you are supervised by a district outside of the Washington DC metropolitan area, the United States Probation Office in that district will submit a progress report to the court within 60 days of the commencement of supervision; upon receipt of the progress report, the Court will determine if your appearance is required.

The Court shall transfer supervision, but not jurisdiction, to the Western District of Kentucky.

AO 245B (Rev. 09/19)  Judgment in a Criminal Case
Sheet 5 — Criminal Monetary Penalties

Judgment — Page __6__ of __7__

DEFENDANT: DAN EDWIN WILSON
CASE NUMBER: 23cr427-1 (DLF)

## CRIMINAL MONETARY PENALTIES

The defendant must pay the total criminal monetary penalties under the schedule of payments on Sheet 6.

| | **Assessment** | **Restitution** | **Fine** | **AVAA Assessment\*** | **JVTA Assessment\*\*** |
|---|---|---|---|---|---|
| **TOTALS** | $ 100.00 | $ 2,000.00 | $ | $ | $ |

☐ The determination of restitution is deferred until _____ . An *Amended Judgment in a Criminal Case (AO 245C)* will be entered after such determination.

☑ The defendant must make restitution (including community restitution) to the following payees in the amount listed below.

If the defendant makes a partial payment, each payee shall receive an approximately proportioned payment, unless specified otherwise in the priority order or percentage payment column below. However, pursuant to 18 U.S.C. § 3664(i), all nonfederal victims must be paid before the United States is paid.

| **Name of Payee** | **Total Loss\*\*\*** | **Restitution Ordered** | **Priority or Percentage** |
|---|---|---|---|
| Clerk of the Court for the United States District Court, District of Columbia, for disbursement to the following victim: | | | |
| Architect of the Capitol Office of the Chief Financial Officer Ford House Office Building Room H2-205B Washington, DC 20515 | | $2,000.00 | |
| **TOTALS** | $ 0.00 | $ 2,000.00 | |

☑ Restitution amount ordered pursuant to plea agreement $ 2,000.00

☐ The defendant must pay interest on restitution and a fine of more than $2,500, unless the restitution or fine is paid in full before the fifteenth day after the date of the judgment, pursuant to 18 U.S.C. § 3612(f). All of the payment options on Sheet 6 may be subject to penalties for delinquency and default, pursuant to 18 U.S.C. § 3612(g).

☐ The court determined that the defendant does not have the ability to pay interest and it is ordered that:

    ☐ the interest requirement is waived for the  ☐ fine  ☐ restitution.

    ☐ the interest requirement for the  ☐ fine  ☐ restitution is modified as follows:

\* Amy, Vicky, and Andy Child Pornography Victim Assistance Act of 2018, Pub. L. No. 115-299.
\*\* Justice for Victims of Trafficking Act of 2015, Pub. L. No. 114-22.
\*\*\* Findings for the total amount of losses are required under Chapters 109A, 110, 110A, and 113A of Title 18 for offenses committed on or after September 13, 1994, but before April 23, 1996.

A133

AO 245B (Rev. 09/19)  Judgment in a Criminal Case
                      Sheet 6 — Schedule of Payments

DEFENDANT:  DAN EDWIN WILSON
CASE NUMBER:  23cr427-1 (DLF)

Judgment — Page ____7____ of ____7____

## SCHEDULE OF PAYMENTS

Having assessed the defendant's ability to pay, payment of the total criminal monetary penalties is due as follows:

**A** ☑ Lump sum payment of $ __2,100.00__ due immediately, balance due

  ☐ not later than _____ , or
  ☑ in accordance with ☐ C,  ☐ D,  ☐ E, or  ☑ F below; or

**B** ☐ Payment to begin immediately (may be combined with ☐ C,   ☐ D, or  ☐ F below); or

**C** ☐ Payment in equal _____ *(e.g., weekly, monthly, quarterly)* installments of $ _____ over a period of
    _____ *(e.g., months or years)*, to commence _____ *(e.g., 30 or 60 days)* after the date of this judgment; or

**D** ☐ Payment in equal _____ *(e.g., weekly, monthly, quarterly)* installments of $ _____ over a period of
    _____ *(e.g., months or years)*, to commence _____ *(e.g., 30 or 60 days)* after release from imprisonment to a
    term of supervision; or

**E** ☐ Payment during the term of supervised release will commence within _____ *(e.g., 30 or 60 days)* after release from
    imprisonment.  The court will set the payment plan based on an assessment of the defendant's ability to pay at that time; or

**F** ☑ Special instructions regarding the payment of criminal monetary penalties:

    The financial obligations are immediately payable to the Clerk of the Court for the U.S. District Court, 333
    Constitution Ave NW, Washington, DC 20001. Within 30 days of any change of address, you shall notify the Clerk
    of the Court of the change until such time as the financial obligation is paid in full.

Unless the court has expressly ordered otherwise, if this judgment imposes imprisonment, payment of criminal monetary penalties is due during
the period of imprisonment.  All criminal monetary penalties, except those payments made through the Federal Bureau of Prisons' Inmate
Financial Responsibility Program, are made to the clerk of the court.

The defendant shall receive credit for all payments previously made toward any criminal monetary penalties imposed.

☐ Joint and Several

    Case Number
    Defendant and Co-Defendant Names              Joint and Several         Corresponding Payee,
    *(including defendant number)*     Total Amount      Amount              if appropriate

☐ The defendant shall pay the cost of prosecution.

☐ The defendant shall pay the following court cost(s):

☐ The defendant shall forfeit the defendant's interest in the following property to the United States:

Payments shall be applied in the following order: (1) assessment, (2) restitution principal, (3) restitution interest, (4) AVAA assessment,
(5) fine principal, (6) fine interest, (7) community restitution, (8) JVTA assessment, (9) penalties, and (10) costs, including cost of
prosecution and court costs.

Include this page when printing?

A134

```
 1                 BEFORE THE UNITED STATES DISTRICT COURT
                     FOR THE DISTRICT OF COLUMBIA
 2

 3   UNITED STATES OF AMERICA,        .
                                      .  Case Number 23-cr-427-1
 4            Plaintiff,              .  Case Number 24-cr-238
                                      .
 5        vs.                         .
                                      .  Washington, D.C.
 6   DAN EDWIN WILSON,                .  May 17, 2024
                                      .  2:32 p.m.
 7            Defendant.              .
     - - - - - - - - - - - - - - - - -
 8

 9                     TRANSCRIPT OF PLEA HEARING
                 BEFORE THE HONORABLE DABNEY L. FRIEDRICH
10                   UNITED STATES DISTRICT JUDGE

11   APPEARANCES:

12   For the United States:        ANTHONY MARIANO, AUSA
                                   MINDY DERANEK, AUSA
13                                 United States Attorney's Office
                                   601 D Street Northwest
14                                 Washington, D.C. 20579

15   For the Defendant:           NORMAN PATTIS, ESQ.
                                   Pattis & Associates, LLC
16                                 383 Orange Street
                                   First Floor
17                                 New Haven, CT 06511

18

19

20

21   Official Court Reporter:     SARA A. WICK, RPR, CRR
                                   333 Constitution Avenue Northwest
22                                 Room 4704-B
                                   Washington, D.C. 20001
23                                 202-354-3284

24
     Proceedings recorded by stenotype shorthand.
25   Transcript produced by computer-aided transcription.
```

A135

```
 1                    P R O C E E D I N G S

 2          (Call to order of the court.)

 3              COURTROOM DEPUTY:  Your Honor, we are in Criminal

 4     Actions 23-427-1 and 24-238, the United States of America versus

 5     Dan Wilson.

 6          If I can have counsel please approach the podium and state

 7     your names for the record, starting with the United States.

 8              MR. MARIANO:  Good afternoon, Your Honor.  Anthony

 9     Mariano for the United States, joined by my co-counsel, Mindy

10     Deranek.

11              THE COURT:  Good morning to both of you.

12              MR. PATTIS:  Good afternoon, Your Honor.  Norm Pattis

13     for Mr. Wilson.

14              THE COURT:  Good afternoon.  Are we ready to go

15     forward with the plea?

16              THE DEFENDANT:  We are.

17              THE COURT:  Am I correct that a superseding indictment

18     was filed?  Was that today?

19              MR. MARIANO:  Superseding information, Your Honor.

20              THE COURT:  Information, all right.  So Mr. Wilson

21     needs to be arraigned on that.  And what about the Kentucky

22     charging document?  Has he been arraigned?

23              MR. MARIANO:  He was arraigned in the Western District

24     of Kentucky on that.

25              THE COURT:  Okay.  All right.  I just want to make
```

```
1    sure I have everything I need.
2        I have the waiver of trial by jury.  Why do I have two of
3    those?
4            COURTROOM DEPUTY:  Two cases, for the Kentucky matter
5    and for this matter.
6            THE COURT:  All right.  So two waivers of trials by
7    jury and one waiver of indictment, because this is the Kentucky
8    case only?
9            MR. MARIANO:  The superseding information adds a
10   charge that was not subject to the superseding indictment.
11           THE COURT:  I'm confused.
12           MR. MARIANO:  So the waiver of the indictment is
13   because in the case that originated in the District of Columbia,
14   Mr. Wilson is pleading under 18 U.S.C. 372, which was an
15   uncharged count when we returned the superseding indictment a
16   few weeks ago.
17           THE COURT:  Okay.  So he's pleading guilty to a charge
18   in the information?
19           MR. MARIANO:  Correct.  In the information, Count 1 is
20   the new charge that he's going to plead to.  Counts 2 through 7
21   are the charges he had received previously under the superseding
22   indictment.
23           THE COURT:  Okay.  All right.  So he needs to be
24   arraigned on the information?
25           MR. MARIANO:  Yes, Your Honor.
```

1              THE COURT:  All right.  Let's start with that.

2         Mr. Hopkins?

3              MR. PATTIS:  Can we approach the podium, Judge?

4              THE COURT:  Yes, please.

5              COURTROOM DEPUTY:  Mr. Dan Wilson, you're being

6    charged with violating Title 18 of the U.S. Code Section 372,

7    conspiracy to obstruct or impede officers; Section 18 of the

8    U.S. Code Section 1512(k), conspiracy to obstruct an official

9    proceeding; Title 18 of the U.S. Code Sections 1512(c)(2), 2,

10   obstruction of an official proceeding; Title 18 of the U.S. Code

11   Section 1752(a)(1), entering and remaining in a restricted

12   building or grounds; Title 18 of the U.S. Code Section

13   1752(a)(2), disorderly and disruptive conduct in a restricted

14   building or grounds; Title 40 of the U.S. Code Section

15   5104(e)(2)(D), disorderly conduct in a Capitol building; and

16   Title 40 of the U.S. Code Section 5104(e)(2)(G), parading,

17   demonstrating, or picketing in a Capitol building.

18        Counsel, for the purposes of the arraignment, do you waive

19   formal reading of the charges, and if so, how does your client

20   plead?

21             MR. PETTIS:  We do waive and plead not guilty.

22             THE COURT:  All right.  Thank you.

23        If you could also let me know, Mr. Mariano, is the plea

24   agreement the same one that was provided on May 15?

25             MR. MARIANO:  Yes, Your Honor.

A138

1          THE COURT:  Is there a consent order of forfeiture, or
2    is that just incorporated in the plea agreement?
3          MR. MARIANO:  It's incorporated in the plea agreement.
4    We will file one before sentencing.
5          THE COURT:  So none for today?
6          MR. MARIANO:  Correct.
7          THE COURT:  I also have the consent for the Rule 20
8    transfer from Kentucky, the Western District of Kentucky, but
9    the copy I have does not have a signature by the U.S. Attorney
10   for the District of Columbia.
11         MR. MARIANO:  I think on page 2.  We had just signed
12   different versions.
13         THE COURT:  Okay.  I just have page 1.
14         MR. MARIANO:  Your Honor, if I can approach, I have a
15   copy.
16         THE COURT:  Do you have the original?  Does the clerk
17   have the original?
18         MR. MARIANO:  I have what was filed on the docket.
19         THE COURT:  All right.  I just want to make sure you
20   have it, Mr. Hopkins.  It's already on the docket.
21      It's okay.  I don't need a copy, so long as it's on the
22   docket.
23         COURTROOM DEPUTY:  I see a signature, Your Honor.
24         THE COURT:  All right.  If you could, please,
25   Mr. Hopkins, place the defendant under oath.

A139

1          (Defendant sworn.)

2                    THE COURT:  Good afternoon, Mr. Wilson.

3                    THE DEFENDANT:  Good afternoon, ma'am.

4                    THE COURT:  If I can ask you to speak clearly into the

5     microphone so that the court reporter here can transcribe what

6     you're saying.

7                    THE DEFENDANT:  Yes, ma'am.

8                    THE COURT:  You understand, now that you've been

9     placed under oath, you could be prosecuted for perjury or for

10    making a false statement if you were to testify falsely here

11    today?

12                   THE DEFENDANT:  Yes, ma'am.

13                   THE COURT:  All right.  Before we proceed, I want to

14    first make sure that you do consent to transfer of the case from

15    the Western District of Kentucky here to D.C., and I see on the

16    docket at Docket 34 you have signed a copy of a consent of

17    transfer of case for plea and sentence.

18         Can you see your signature on that document?

19                   THE DEFENDANT:  I signed it, ma'am, yes.

20                   THE COURT:  All right.  And that's your signature?

21                   THE DEFENDANT:  Yes, ma'am.

22                   THE COURT:  And you reviewed this with your attorney

23    before signing it?

24                   THE DEFENDANT:  Yes, ma'am.

25                   THE COURT:  And it is your desire to consent to

1    transfer that Western District of Kentucky case involving

2    firearms to this district and for you to plead guilty to three

3    offenses today?

4              THE DEFENDANT:  Yes, ma'am.

5              THE COURT:  And you understand through this plea

6    agreement you're waiving any challenge of venue, including for

7    the Western District of Kentucky case?

8              THE DEFENDANT:  Yes, ma'am.

9              THE COURT:  All right.  So, sir, I'm going to ask you

10   a series of questions to make sure that you understand your

11   rights and that your plea is voluntary.  If at any point you

12   don't understand my question, I want you to ask me to repeat the

13   question.  I'm also willing to give you time to consult with

14   your attorney privately.  It's critical for a valid plea that

15   you understand every question before you answer it.

16             THE DEFENDANT:  Yes, ma'am.

17             THE COURT:  Do you understand that?

18             THE DEFENDANT:  Yes, ma'am.

19             THE COURT:  All right.  Let me ask you, what year were

20   you born?

21             THE DEFENDANT:  1975.

22             THE COURT:  Were you born here in the United States?

23             THE DEFENDANT:  Yes.

24             THE COURT:  And how far did you go in school?

25             THE DEFENDANT:  I have a diploma as a construction

1    electrician.

2                THE COURT:  All right.  Did you complete high school?

3                THE DEFENDANT:  I got a GED.

4                THE COURT:  All right.  So you can read and write the

5    English language fine?

6                THE DEFENDANT:  Yes, ma'am.

7                THE COURT:  All right.  Have you taken any drugs or

8    any medication or anything else in the last 48 hours that might

9    interfere with your ability to follow these proceedings?

10               THE DEFENDANT:  No, ma'am.

11               THE COURT:  Is there any other reason that might make

12   it difficult for you to follow these proceedings?

13               THE DEFENDANT:  No, ma'am.

14               THE COURT:  So have you received a copy of the

15   superseding information that contains the written charges

16   against you in the D.C. case?

17               THE DEFENDANT:  Yes.

18               THE COURT:  And have you also received a copy of the

19   indictment that contains the -- is it an indictment in the

20   Western District of Kentucky?

21               MR. MARIANO:  It is, Your Honor.

22               THE COURT:  That contains the written charges against

23   you in your Western District of Kentucky case?

24               THE DEFENDANT:  Yes, ma'am.

25               THE COURT:  All right.  And you read these documents?

1          THE DEFENDANT:  Yes, ma'am.

2          THE COURT:  You understand them?

3          THE DEFENDANT:  Yes, ma'am.

4          THE COURT:  Does counsel for either side question

5  Mr. Wilson's ability, his competence to enter a plea at this

6  time?

7          MR. PATTIS:  I do not.

8          MR. MARIANO:  No, Your Honor.

9          THE COURT:  All right.  Based on Mr. Wilson's answers

10  to my questions and counsel's representations, I do find he's

11  fully competent and capable of entering an informed plea.

12      So, Mr. Wilson, I understand that instead of going to

13  trial, you wish to plead guilty to the offense of conspiracy to

14  impede or injure officers in violation of Title 18 United States

15  Code Section 372.

16      In addition, pursuant to Rule 20 of the Federal Rules of

17  Criminal Procedure, you wish to plead guilty to Counts 1 and 2

18  of the indictment in the Western District of Kentucky, namely

19  possession of a firearm by a prohibited person in violation of

20  Title 18 United States Code Section 922(g)(1) and 924(a)(2) and

21  possession of an unregistered firearm in violation of Title 26

22  United States Code Sections 5841, 5861(d), and 5871.

23      Is that correct?

24          THE DEFENDANT:  Yes, ma'am.

25          THE COURT:  Before we discuss the terms of the plea

1    agreement, let me ask Mr. Mariano, does this plea agreement

2    reflect the most lenient plea offer made to Mr. Wilson?

3                    MR. MARIANO:  Yes, Your Honor.

4                    THE COURT:  All right.  So, Mr. Wilson, I'm going to

5    hold up a copy of the plea agreement in this case.  It's dated

6    May 6.  It's a 14-page document.  And I'm going to turn to the

7    last page.  Actually -- yeah, the last page.  Page 14 appears to

8    have your signature dated May 15th of this year on it.

9          Is that your signature?

10                   THE DEFENDANT:  Yes, ma'am.

11                   THE COURT:  And did you read this document fully

12   before you signed it?

13                   THE DEFENDANT:  Yes, ma'am.

14                   THE COURT:  And you discussed it with your lawyer?

15                   THE DEFENDANT:  Yes, ma'am.

16                   THE COURT:  And this is the agreement you wish to

17   enter today?

18                   THE DEFENDANT:  Yes, ma'am.

19                   THE COURT:  All right.  Attached to the plea agreement

20   is another document called the statement of offense, and this is

21   a 12-page document I'm going to hold up, and again, I'm going to

22   turn to the 12th page that also appears to have your signature

23   on the document.

24         Can you see that?

25                   THE DEFENDANT:  Yes, ma'am.

```
 1              THE COURT:  Is that your signature?

 2              THE DEFENDANT:  Yes, ma'am.

 3              THE COURT:  And did you read this fully --

 4              THE DEFENDANT:  Yes, ma'am.

 5              THE COURT:  -- before signing it?

 6              THE DEFENDANT:  Yes.

 7              THE COURT:  Do you have any questions about it?

 8              THE DEFENDANT:  No, ma'am.

 9              THE COURT:  I'm not going to review every fact in

10    here, but do you agree that the facts as stated here in the

11    statement of offense are true and actually what occurred in this

12    case?

13              THE DEFENDANT:  Yes, ma'am.

14              THE COURT:  All right.  I'm going to review some of

15    the key facts with you before we proceed.

16         Sir, is it true that as early as November 24th, 2020, you

17    were a member of an encrypted Telegram Messenger chat which was

18    organized by other individuals, including David Scott Kuntz,

19    called the "coalition of the unknown"?

20              THE DEFENDANT:  I believe so.  Honestly, I've been on

21    a lot of chats, and a lot of them got taken down.  So there was

22    a lot of different chats going on.  But I mean, I believe so.

23              THE COURT:  All right.  Well, you've signed this

24    document --

25              THE DEFENDANT:  Yes, ma'am, I believe that I was on
```

1    there.

2            THE COURT:  All right.  I'm referring to paragraph 8

3    in particular, if you want to take a look at it and make sure

4    that you don't disagree with that.

5            THE DEFENDANT:  I don't disagree, ma'am.

6            THE COURT:  You believe the government could prove

7    that?

8            THE DEFENDANT:  Yes, ma'am.

9            THE COURT:  All right.  Is it also true that on or

10   about December 22nd of 2020, after Mr. Kuntz stated on the

11   "coalition of the unknown" Telegram group "January 6 will be the

12   target date for D.C.  This goes to all groups that can help to

13   defend those that cannot defend themselves," is it true in

14   response to that, you stated, "Ooh-rah, curb stomp crew all in"?

15   Is that true?

16           THE DEFENDANT:  Yes, ma'am.

17           THE COURT:  And is it also true that you later wrote,

18   "We are willing to work in coordination with others, but I am a

19   gray ghost ranger," and "gray ghost ranger" refers to your

20   association with a Three Percenter militia known as the "gray

21   ghost malitia"?

22           THE DEFENDANT:  Yes, ma'am.

23           THE COURT:  On December 22nd of 2020, is it true that

24   you and others posted a number of messages that are set forth in

25   paragraphs 10 through 11 of the statement of offense?

1              THE DEFENDANT:  Yes, ma'am.

2              THE COURT:  And among those statements, you said, "I

3    have to admit, I have carried my expandable baton both times

4    I've been there," and "there" was D.C.  "I understand it's

5    against the rules, but I haven't had a problem yet.  Hard

6    knuckle gloves are a must."

7              THE DEFENDANT:  Yes, ma'am.

8              THE COURT:  Is it also true that you said, "It is an

9    easy choice, but it's not an easy choice.  I stand with you all.

10   I will go down swinging"?

11             THE DEFENDANT:  Yes, ma'am.

12             THE COURT:  That same date, you also posted, "They

13   might set up a perimeter as usual.  This line was pushed out

14   even further.  I expect the 6th and the 20th to continue with

15   that trend, but they cannot stop us from walking in.  We've

16   already been there twice.  So we're starting to understand the

17   lay of the land and how to get around and what to expect.  If

18   anybody has any questions, feel free to ask."

19             THE DEFENDANT:  Yes, ma'am.

20             THE COURT:  Is it true that you posted on

21   December 23rd of 2020 a link to an open letter from the website

22   oathkeepers.org entitled "open letter to President Trump.  You

23   must use Insurrection Act to stop the steal and defeat the

24   coup"?

25             THE DEFENDANT:  Yes, ma'am.

1      THE COURT:  On December 24th of 2020, is it true that

2  you discussed in the "united front" Telegram group that you

3  didn't think it was time to gun up for the 6th.  You said, "We

4  have to play this out, but if they seat Biden on the 20th, all

5  bets are off.  It's going to happen.  Even if Trump wins, we

6  have to get this government under control.  It's been crossing

7  my mind.  If we go to a civil war, do we try to take Washington,

8  D.C., first, or do we try to take state capitals first?"

9      THE DEFENDANT:  Yes, ma'am.

10      THE COURT:  Is it true on December 27th of 2020, you

11  responded to some messages, "I'm ready to lay my life on the

12  line.  It's time for good men to do bad things"?

13      THE DEFENDANT:  Yes, ma'am.

14      THE COURT:  On December 27th, did you also write, "I

15  ain't nobody, but when it comes down to it, follow me, and I

16  will show you a symphony of destruction"?

17      THE DEFENDANT:  Yes, ma'am.

18      THE COURT:  Is it true that you agreed with Mr. Kuntz

19  and others to travel to Washington, D.C., for the events on

20  January 6, 2021?

21      THE DEFENDANT:  Yes, ma'am.

22      THE COURT:  And you traveled with him on January 5th

23  to D.C.?

24      THE DEFENDANT:  Yes, ma'am.

25      THE COURT:  And your intent was to corruptly obstruct

1    or impede Congress with respect to the certification of the 2020

2    Electoral College vote?  And I'm in paragraph 20.

3                THE DEFENDANT:  Yes, ma'am.

4                THE COURT:  And is it true that you and Mr. Kuntz, in

5    order to accomplish this goal, agreed to work together and to

6    coordinate your actions?

7                THE DEFENDANT:  Yes, ma'am.

8                THE COURT:  On January 6th at approximately 1:43 p.m.,

9    did you share an audio message over Zello, which is a live voice

10   push-to-talk communication platform, did you share an audio

11   message to a group called "stop the steal J6"?  This is

12   paragraph 23.

13               THE DEFENDANT:  Yes, ma'am.

14               THE COURT:  Did you say, "The people are trying to

15   push through the barricades at the Capitol building.  We're

16   headed that way"?

17               THE DEFENDANT:  Yes, ma'am.

18               THE COURT:  And at approximately 1:45 p.m. that day,

19   did you say, again over Zello, "Hey, whoever's got ears on, even

20   if you ain't in D.C., pass the word.  The people are pushing on

21   the Capitol.  We need all hands on deck"?

22               THE DEFENDANT:  Yes, ma'am.

23               THE COURT:  Did you then ascend to the Upper West

24   Terrace of the Capitol?

25               THE DEFENDANT:  Yes, ma'am.

A149

1          THE COURT:  And at approximately 2:37 p.m. on

2    January 6 of 2021, you entered the Capitol building?

3          THE DEFENDANT:  Yes, ma'am.

4          THE COURT:  Wearing a gas mask?

5          THE DEFENDANT:  Yes, ma'am.

6          THE COURT:  Even so, is it true that on March 9th of

7    2021, you falsely denied having entered the U.S. Capitol

8    building when the FBI interviewed you?

9          THE DEFENDANT:  Yes, ma'am.

10          THE COURT:  And you also said you didn't know anyone

11    who entered the building; is that right?

12          THE DEFENDANT:  Yes, ma'am.

13          THE COURT:  Is it true on June 3rd of 2022, during the

14    execution of a lawfully issued search warrant for your home, law

15    enforcement recovered a number of firearms and ammunition from

16    your home?

17          THE DEFENDANT:  Yes, ma'am.

18          THE COURT:  And are all those firearms and that

19    ammunition listed in paragraph 32?

20          THE DEFENDANT:  Yes, ma'am.

21          THE COURT:  I'm not going to read all of them here,

22    but you've reviewed paragraph 32, and that's true?

23          THE DEFENDANT:  Yes, ma'am.

24          THE COURT:  And is it also true that you knew at that

25    time you had previously been convicted in court of a crime

1    punishable by a term of imprisonment exceeding one year?

2              THE DEFENDANT:  Yes, ma'am.

3              THE COURT:  You had been convicted of burglary in the

4    second degree and unlawful transaction with a minor?  Both of

5    those were felonies?

6              THE DEFENDANT:  Yes, ma'am.

7              THE COURT:  You had also been convicted of theft by

8    unlawful taking?

9              THE DEFENDANT:  Yes, ma'am.

10             THE COURT:  And you had been convicted of escape in

11   the second degree?

12             THE DEFENDANT:  Yes, ma'am.

13             THE COURT:  All of those are felonies?

14             THE DEFENDANT:  Yes, ma'am.

15             THE COURT:  And on June 3rd, you knowingly received

16   and possessed a firearm, specifically an Anderson Manufacturing

17   model AM-15 multi-caliber rifle bearing serial number 19347295

18   with a 28-inch overall length and a 14-inch barrel, that was not

19   registered to you in the National Firearms Registration and

20   Transfer Record?

21             THE DEFENDANT:  Yes, ma'am.

22             THE COURT:  And that was not an antique?

23             THE DEFENDANT:  Yes, ma'am.

24             THE COURT:  And you agree that all those firearms were

25   transported in interstate commerce from one state to another?

1          (Defense counsel and defendant conferred.)

2                  THE DEFENDANT:  Okay.  Yes, ma'am.

3                  THE COURT:  All right.  And finally --

4                  MR. PATTIS:  May we have a moment?

5                  THE COURT:  Of course.

6          (Defense counsel and defendant conferred.)

7                  MR. PATTIS:  It was just a question about whether

8      personal transportation or transported, and that was the --

9                  THE COURT:  I see.

10         So you agree that these firearms had been transported, not

11     necessarily by you, but had been transported in interstate

12     commerce?

13                 THE DEFENDANT:  Yes, ma'am.

14                 THE COURT:  From one state to another?

15                 THE DEFENDANT:  Yes, ma'am.

16                 THE COURT:  All right.  Finally, sir, paragraphs 35

17     through 36 -- 37, you have admitted to all the elements of all

18     three charges, conspiracy to impede or injure an officer; is

19     that right?

20                 THE DEFENDANT:  Yes, ma'am.

21                 THE COURT:  Knowingly and voluntarily possessing a

22     firearm by a prohibited person?

23                 THE DEFENDANT:  Yes, ma'am.

24                 THE COURT:  And you've admitted the elements of

25     possession of an unregistered firearm; correct?

A152

1           THE DEFENDANT:  Yes, ma'am.

2           THE COURT:  All right.  Is there anything else the

3    government would like put on the record?

4           MR. MARIANO:  No, Your Honor.

5           THE COURT:  All right.  Could I have Mr. Mariano state

6    the elements of the crime.

7           MR. PATTIS:  Judge, before you do, we've discussed the

8    elements of the offense at great length and considered

9    submitting some requested changes and, after several

10   discussions, decided that we had no material differences.

11   That's the reason there were pauses from time to time.  This was

12   deliberate and the product of several discussions.

13          THE COURT:  Is it important for me to flag where the

14   critical parts are?

15          MR. PATTIS:  No, it is not.  I think like

16   transportation was one, and so you saw the colloquy there.

17          THE COURT:  All right.  You are not going to object to

18   the elements as the government describes them to me?

19          MR. PATTIS:  We are not, but I wanted you to be aware

20   of the discussion about offense conduct.

21          THE COURT:  I appreciate that.

22      All right.  Mr. Mariano, can you start with conspiracy to

23   impede or injure an officer?

24          MR. MARIANO:  Yes, Your Honor.

25      The defendant willfully and knowingly conspired with one or

1    more other persons to prevent by force, intimidation, or threat

2    any person that is a member of the United States Congress and

3    law enforcement officers from discharging any duty, duties of

4    any office, trust, or place of confidence under the United

5    States, and to induce by force, intimidation, and threat any

6    officer of the United States, that is, members of the United

7    States Congress and law enforcement officers, to leave the place

8    where their duties as officers were required to be performed.

9           And then possession of a firearm by a prohibited person,

10   the defendant knowingly possessed at least three firearms with

11   knowledge that he had previously been convicted in a court of a

12   crime punishable by imprisonment for a term exceeding one year.

13          And finally, for possession of an unregistered firearm,

14   that the defendant knowingly received and possessed a firearm,

15   specifically a rifle with a 28-inch overall length and a 14-inch

16   barrel, not registered to him in the National Firearms

17   Registration and Transfer Record.

18              THE COURT:  Okay.  And is there an interstate commerce

19   element for any of the firearm offenses?

20              MR. MARIANO:  Your Honor, I will note for the record,

21   he has agreed that they moved in interstate commerce.  I do not

22   see interstate commerce elements, but the defendant has

23   factually acknowledged that.

24              THE COURT:  All right.  Regardless of whether it's an

25   element, you don't dispute that these firearms moved in

A154

1    interstate commerce, that you didn't move them; is that right?

2              THE DEFENDANT:  Yes, ma'am.  I mean, I never did.

3              THE COURT:  Sorry?

4              THE DEFENDANT:  I never did, no, ma'am.

5              THE COURT:  Okay.  But you do agree that these

6    firearms all had been transported by somebody --

7              THE DEFENDANT:  Yes, ma'am.

8              THE COURT:  -- in interstate commerce?

9              THE DEFENDANT:  Yes, ma'am.

10             THE COURT:  All right.  Sir, do you understand these

11   three charges against you?

12             THE DEFENDANT:  Yes, ma'am.

13             THE COURT:  All right.  Let me turn to the plea

14   agreement.  You understand, sir, that the government's agreed

15   that the D.C. U.S. Attorney's Office and the U.S. Attorney's

16   Office for the Western District of Kentucky have agreed not to

17   criminally prosecute you further for the conduct that's set

18   forth in the statement of offense?

19             THE DEFENDANT:  Yes, ma'am.

20             THE COURT:  But you understand that both offices have

21   reserved the right to prosecute you for any crime of violence

22   committed prior to or after execution of the plea agreement?

23             THE DEFENDANT:  Yes, ma'am.

24             THE COURT:  And you understand in exchange for your

25   plea today, the government's agreeing to dismiss the remaining

1    counts of the charging documents?

2              THE DEFENDANT:  Yes, ma'am.

3              THE COURT:  All right.  I'm not going to review every

4    single term in the plea agreement, but you need to understand

5    that so long as a term is in this plea agreement, you are bound

6    by it, even if I don't mention it here.

7              THE DEFENDANT:  Yes, ma'am.

8              THE COURT:  All right, sir.  You understand that the

9    conspiracy offense to which you're pleading guilty to, a

10   violation of Title 18 United States Code Section 372, that crime

11   carries a maximum sentence of six years in prison, a fine of

12   $250,000 -- a maximum fine of $250-, a maximum term of

13   supervised release after any period of incarceration of three

14   years, and an obligation to pay any applicable interest or

15   penalties on fines or restitution not timely made?

16             THE DEFENDANT:  Yes, ma'am.

17             THE COURT:  All right.  With respect to the firearm

18   charges, first, the Title 18 United States Code Sections

19   922(g)(1) and 922(a)(4), you understand that that crime carries

20   a maximum sentence of 20 years in prison, a fine of -- a maximum

21   fine of $250,000, a maximum term of supervised release again

22   after any period of incarceration of three years, an obligation

23   to pay any applicable interest or penalties on fines or

24   restitution not timely made?

25        And finally, the violation of Title 26 United States Code

A156

1    Sections 5841, 5861(d), and 5871 carry a maximum sentence of ten

2    years in prison, a maximum fine of $10,000, a maximum term of

3    supervised release after any period of incarceration of three

4    years, and again, an obligation to pay applicable interest on

5    penalties or fines not timely made.

6         Do you understand?

7              THE DEFENDANT:  Yes, ma'am.

8              THE COURT:  You also understand you're agreeing to pay

9    a special assessment to the Clerk of Court of $100 per count?

10             THE DEFENDANT:  Yes, ma'am.

11             THE COURT:  Per conviction here.

12             THE DEFENDANT:  Yes, ma'am.

13             THE COURT:  Do you understand that the Court can

14   impose a fine, if it finds you have the ability to pay a fine,

15   that's sufficient to pay the federal government for any term of

16   imprisonment or supervision?

17             THE DEFENDANT:  Yes, ma'am.

18             THE COURT:  Is there any -- there is restitution as a

19   part of the plea agreement; right?

20             MR. MARIANO:  There is, Your Honor.

21             THE COURT:  You also understand that the Court has the

22   authority to order you to pay restitution to the victim of your

23   offenses for any damage as a result of the crime?

24             THE DEFENDANT:  Yes, ma'am.

25             THE COURT:  Do you also understand that if you have

1    two or more convictions for a crime of violence or a felony drug

2    offense, you could be subject -- certain drug offenses, you

3    could be subject to higher penalties provided for in the career

4    offender statutes and provisions of the sentencing guidelines?

5    Do you understand that?

6                THE DEFENDANT:  Yes, ma'am.

7                THE COURT:  And neither side expects that Mr. Wilson

8    has those prior convictions; is that right?

9                MR. MARIANO:  That's right.

10                MR. PATTIS:  That's correct.

11                THE COURT:  All right.  But you understand, sir, I

12    won't know that until I get the presentence report that outlines

13    your criminal history?

14                THE DEFENDANT:  Yes, ma'am.

15                THE COURT:  All right.  Do you also understand that

16    you could be subject to a period of supervised release after any

17    term of imprisonment?  And what that means is that during that

18    period of supervision, you would be subject to certain

19    conditions and rules with which you must comply, and if you

20    failed to do so, you could be sent back to prison to serve an

21    additional period of time in prison for violating those terms

22    and conditions.

23                THE DEFENDANT:  Yes, ma'am.

24                THE COURT:  Do you understand that parole has been

25    abolished in the federal system, and that means you will serve

A158

1    the sentence the Court imposes less a small reduction for

2    possible good time credit for good behavior in prison, which

3    would be up to approximately 54 days a year?

4              THE DEFENDANT:  Yes, ma'am.

5              THE COURT:  All right.  And as a part of your plea

6    agreement, you've consented to forfeit specific property to the

7    U.S. government, that is, firearms and ammunition.

8          You understand?

9              THE DEFENDANT:  Yes, ma'am.

10             THE COURT:  All right.  Do you understand that because

11   this case involves more than a single conviction, the Court

12   could reject any sentence worked out between the parties and

13   sentence you on each count consecutively?

14             THE DEFENDANT:  Yes, ma'am.

15             THE COURT:  And you understand that this offense --

16   these offenses are all subject to the U.S. Sentencing

17   Guidelines?

18             THE DEFENDANT:  Yes, ma'am.

19             THE COURT:  And I take it you've discussed with your

20   attorney how those guidelines might apply in this case?

21             THE DEFENDANT:  Yes, ma'am.

22             THE COURT:  All right.  The government and your

23   attorney have stated in the plea agreement what they estimate

24   your guideline sentence to be, but you realize that the Court

25   won't know what your guideline range is until after a

```
1                    BEFORE THE UNITED STATES DISTRICT COURT
                          FOR THE DISTRICT OF COLUMBIA
2

3      UNITED STATES OF AMERICA,          .
                                          .  Case Number 23-cr-427-1
4               Plaintiff,                .  Case Number 24-cr-238
                                          .
5          vs.                            .
                                          .  Washington, D.C.
6      DAN EDWIN WILSON,                  .  August 28, 2024
                                          .  10:19 a.m.
7               Defendant.                .
       - - - - - - - - - - - - - - - - -
8

9                        TRANSCRIPT OF SENTENCING HEARING
                     BEFORE THE HONORABLE DABNEY L. FRIEDRICH
10                        UNITED STATES DISTRICT JUDGE

11     APPEARANCES:

12     For the United States:       ANTHONY MARIANO, AUSA
                                    MINDY DERANEK, AUSA
13                                  United States Attorney's Office
                                    601 D Street Northwest
14                                  Washington, D.C. 20579

15     For the Defendant:          NORMAN PATTIS, ESQ.
                                   Pattis & Associates, LLC
16                                 383 Orange Street
                                   First Floor
17                                 New Haven, CT 06511

18

19

20

21     Official Court Reporter:    SARA A. WICK, RPR, CRR
                                   333 Constitution Avenue Northwest
22                                 Room 4704-B
                                   Washington, D.C. 20001
23                                 202-354-3284

24
       Proceedings recorded by stenotype shorthand.
25     Transcript produced by computer-aided transcription.
```

A160

1                    P R O C E E D I N G S

2          (Call to order of the court.)

3              COURTROOM DEPUTY:  We are on the record in Criminal

4     Case 23-427-1 and Criminal Case 24-238, United States of America

5     versus Dan Edwin Wilson.

6          Starting with the government, please approach the podium

7     and state your appearance for the record.

8              MR. MARIANO:  Good morning, Your Honor.  Anthony

9     Mariano for the United States, joined by my co-counsel, Mindy

10    Deranek.

11             MR. PATTIS:  Good morning, Your Honor.  Norm Pattis on

12    behalf of Mr. Wilson.

13             THE COURT:  Good morning, Mr. Pattis, Mr. Wilson.

14             PROBATION OFFICER:  Good morning, Your Honor.  Sherry

15    Baker on behalf of the Probation Office.

16             THE COURT:  Good morning, Ms. Baker.

17         All right.  We are here for sentencing.  I've reviewed the

18    government's exhibits, as well as both parties' sentencing

19    memoranda, including the defendant's reply.  I've reviewed the

20    presentence investigation report and the sentencing

21    recommendations of the probation officer.

22         Let me ask Mr. Pattis, Mr. Pattis, have you had adequate

23    time to review the final presentence report with your client and

24    make any objections?

25             MR. PATTIS:  Yes, Judge, we have.

1          THE COURT:  Have all those been resolved?  It appears
2    that they have been.
3          MR. PATTIS:  Yes, they have.
4          THE COURT:  All right.  Thank you.
5      And, Mr. Wilson, you can stay there.  I just want to make
6    sure that you had adequate time to review the presentence report
7    with your attorney --
8          THE DEFENDANT:  Yes, ma'am.
9          THE COURT:  -- and you had a chance to make any
10   corrections to the report?
11         THE DEFENDANT:  Yes, ma'am.
12         THE COURT:  And it's completely accurate in terms of
13   the facts alleged in the report?
14         THE DEFENDANT:  Yes, ma'am.
15         THE COURT:  All right.  And how about from the
16   government?  I see there were minimal revisions based on your
17   objections.  Any remaining objections from the government?
18         MR. MARIANO:  No remaining objections, Your Honor.
19         THE COURT:  Very well, then.  I will accept the
20   presentence report as my findings of fact for purposes of this
21   sentencing.
22      Let's start with -- actually, I don't think that there -- I
23   know there's a big dispute about whether the Court should vary
24   or depart upwards in this case in light of *Brock* and for other
25   reasons that the government argues.

1          But aside from that, it appears that the parties are both

2     in agreement with the guidelines calculations, except that the

3     government encourages the Court to calculate the guidelines

4     separately for each offense; correct?

5              MR. MARIANO:  Yes, Your Honor.

6          May I approach briefly?

7              THE COURT:  Yes; yes.

8              MR. MARIANO:  The only other item that I spoke briefly

9     with Mr. Pattis about before this hearing is, we had reserved

10    the right in the plea agreement to argue for an aggravated role

11    enhancement.  We ultimately did not seek that.  The defense did

12    not reserve the right to argue for a mitigating role, but they

13    did argue it in their filing.

14         I'm not sure if Mr. Pattis is pressing that or not, but I

15    wanted to raise that as another potential dispute.

16             THE COURT:  I see.  While you're up here, Mr. Mariano,

17    it's interesting to the Court the way in which the government

18    has charged this.

19         So there was the pending case that was pending for some

20    time in the other jurisdiction.  What was that?  Kentucky?

21             MR. MARIANO:  The Western District of Kentucky.

22             THE COURT:  All right.  And if that case had been

23    prosecuted on its own, am I correct that the guideline range for

24    those offenses would be somewhere around 30 to 37 months?

25             MR. MARIANO:  Let me just grab my guidelines book,

1    Your Honor.

2        So it would have been offense level 22 minus 3 for

3    acceptance of responsibility.  You're right.  That would have

4    been 30 to 37 months.

5                THE COURT:  All right.  And that would have put

6    Mr. Wilson in criminal history category II for purposes of this

7    sentencing.

8                MR. MARIANO:  Correct, Your Honor.

9                THE COURT:  So the government's recommendation here is

10   a 60-month sentence.

11               MR. MARIANO:  Yes, Your Honor.

12               THE COURT:  Although the Court could run these two

13   offenses consecutively.

14               MR. MARIANO:  Yes, Your Honor.

15               THE COURT:  Despite the way Probation has done it with

16   the grouping rules, the Court could treat these as consecutive

17   sentences.

18               MR. MARIANO:  Correct.

19               THE COURT:  And if the Court were to do that, are we

20   not potentially in the same -- right at the guideline range the

21   government would be recommending without even an upward variance

22   or departure?

23               MR. MARIANO:  For the Western District of Kentucky

24   counts, I believe as you noted, the guidelines would be 30 to

25   37.

1          For the District of Columbia --

2               THE COURT:  It would be 15 to 21; right?  It would be

3     14?

4               MR. MARIANO:  Yes, exactly.

5               THE COURT:  So high end of both, 37 and 21, that's 58

6     months right there.

7               MR. MARIANO:  Yes, Your Honor.

8               THE COURT:  Without a single variance or departure.

9               MR. MARIANO:  Correct.

10              THE COURT:  All right.  But aside from the issues that

11    you've raised with respect to the parties' arguments under 3553,

12    the parties are in agreement otherwise, as you see it?

13              MR. MARIANO:  Yes, Your Honor.

14              THE COURT:  Do you agree with that, Mr. Pattis?

15              MR. PATTIS:  We do.

16         Do you need me to approach?

17              THE COURT:  No, that's fine.  Just be sure to speak

18    into the microphone for the court reporter.

19              MR. PATTIS:  Yes, we are in agreement, Judge.

20              THE COURT:  All right.  So let me go through the

21    various counts.  For the Section 372 offense, the appropriate

22    guideline is 2J1.2.  The base offense level is a 14.  There is

23    a -- the parties agree there's a two-level enhancement for the

24    scope, planning, or preparation.  That results in a total

25    guideline offense level of 16.

1           For the 922(g)(1) offense, the operative guideline is

2       2K2.1.  The base offense level would be a level 20, and plus 2

3       for three to seven firearms, for a total of 22.

4           Now, with respect to that guideline, does it not include

5       enhancement for the serial numbers being obliterated or missing?

6               MR. MARIANO:  I'm trying to pull it up, Your Honor,

7       but we certainly did not put that into the plea agreement.  It

8       doesn't represent an agreement by the parties.  So I'm not in a

9       position to argue for it.

10              MR. PATTIS:  Judge, I don't believe any of the serial

11      numbers were missing.

12              THE COURT:  I thought -- I mean, the PSR reflects that

13      they are.

14              MR. MARIANO:  That is correct from at least one of the

15      firearms.

16              THE COURT:  Ms. Baker, can you direct me to the

17      appropriate paragraph of the PSR on that?

18              PROBATION OFFICER:  Court's indulgence.

19              THE COURT:  So under 2K2.1(b)(4), if the defendant --

20      "If any firearm had an altered or obliterated serial number."

21      That doesn't require the defendant's knowledge.  That just seems

22      a strict liability enhancement there.  "Or the defendant knew

23      that any firearm involved in the offense was not otherwise

24      marked with a serial number or was willfully blind or

25      consciously avoided knowledge of such fact, increase by four

A166

1    levels."

2                PROBATION OFFICER:  Your Honor, paragraph 63, page 14.

3                THE COURT:  So I see two firearms.  The M4-style

4    rifles had no visible serial numbers.

5                MR. MARIANO:  And for the record, Your Honor, that is

6    in the Statement of Offense as well at paragraph 32.

7                THE COURT:  Okay.  So the question is -- regardless of

8    what the plea agreement says, the Court's obligation is to

9    properly calculate the guidelines.

10        So the question I have for you all is, is that -- I don't

11   know that that's the same as an altered or obliterated serial

12   number.  And is there any evidence of knowledge or willful

13   blindness that the firearm was not otherwise marked with a

14   serial number?

15               MR. MARIANO:  Yes, Your Honor.

16               THE COURT:  It's a preponderance here.

17               MR. MARIANO:  This is a guideline that I have less

18   frequent exposure with, candidly.  But I take "altered or

19   obliterated" to reflect some affirmative act, not necessarily on

20   the part of the defendant.  Whereas here, the information that I

21   have just says "no visible serial number."

22               THE COURT:  Right.  But that's still covered by

23   (b)(4)(ii) potentially.  "The defendant knew that any firearm

24   involved in the offense was not otherwise marked with a serial

25   number or was willfully blind or consciously avoided knowledge

A167

1    of such fact.  If so, the Court should increase four levels."

2            What's the government's position with respect to that?

3                MR. MARIANO:  I take Your Honor's point on that.  I

4    will defer to the Court.

5                THE COURT:  Come on.  The government has to have a

6    position one way or the other.  Do you think that the facts that

7    you've presented, the evidence before the Court, what's stated

8    in paragraph 63, that the firearms had no visible serial number,

9    is adequate to impose that enhancement?

10               MR. MARIANO:  They had no visible serial number.  He

11   certainly knowingly possessed them.  He had them in his

12   backpacks or cabinets and concealed within clothing.  So I think

13   it is a reasonable conclusion that there was at least willful

14   blindness to that fact.

15               THE COURT:  All right.  Mr. Pattis, what's your

16   position?

17               MR. PATTIS:  I think willful blindness requires some

18   sort of obligation or affirmative duty to know or do something,

19   or it needs to depart from what a reasonable person would do

20   under the circumstances.

21          I've been around a lot of firearm offenses.  And people

22   don't typically, if they acquire them, check to see the serial

23   number.  So I don't think there is sufficient evidence to show

24   willful blindness or knowledge.

25               THE COURT:  All right.  Well, I think this is a close

1    call.  I'm not going to impose the four-level enhancement, but I

2    do note that it is -- the lack of a serial number is an

3    aggravating fact identified in the guidelines, and it is

4    something that the Court can certainly consider as it decides

5    where to sentence Mr. Wilson under 3553(a), even though it's not

6    perhaps -- at least based on the way in which the Statement of

7    Facts is written, the knowledge and willful blindness element is

8    perhaps not certain here.

9         So the Court will not apply it.

10        All right.  So back to the PSR and the guideline offenses.

11   So level 22, total offense level 22, you all agree, for the

12   Section 922(g)(1) offense?

13              MR. MARIANO:  Yes, Your Honor.

14              MR. PATTIS:  Yes, Judge.

15              THE COURT:  And for the Section 5861(d) offense, also

16   goes to the same guideline, 20, base offense level remains 20.

17   So that is -- applying the grouping rules under 3D1.4, that

18   results in an additional point being added?  The parties are in

19   agreement?

20        The driving offense here is the 922(g) offense at a 22.  So

21   we're adding one point under the grouping rules for a total

22   offense level of 23.

23        And then acceptance of responsibility is something also I

24   want to talk about.  In the Court's view, Mr. Wilson is

25   certainly entitled to a reduction for acceptance of

1    responsibility under 3D1.1 for entering a plea to these

2    offenses.  However, the evidence before the Court suggests that

3    he may not be entitled to full acceptance of responsibility.

4        But I will hear both -- I know the government's precluded

5    from affirmatively arguing against the three-level reduction,

6    but I do want you to answer my questions.

7        And that is, why are all these statements since January 6

8    and even in very recent times not relevant to the Court in

9    determining whether he's clearly demonstrated acceptance of

10   responsibility?

11       I'm going to give him the two levels.  But with respect to

12   the third -- I mean, there's no question that the government

13   didn't have to prepare; the Court didn't have to prepare.  So I

14   guess it's not necessarily the third point I'm talking about.

15       I'm just -- I'm asking both parties why the Court should

16   conclude that Mr. Wilson has clearly demonstrated acceptance of

17   responsibility for his offenses.

18           MR. MARIANO:  Your Honor, we typically give this third

19   point for defendants who, like Mr. Wilson, have entered a plea

20   well in advance of trial, as he certainly did here.  But I agree

21   with Your Honor that there are significant -- as to the candor

22   of that acceptance of responsibility and remorse, and I think

23   that's a significant factor that the Court should weigh with

24   respect to the 3553(a) factors.

25       But as a structural matter, we think the third point is an

1    appropriate here.

2              THE COURT:  All right.  Mr. Pattis?

3              MR. PATTIS:  I think the third point is appropriate as

4    well.  The post-arrest and comments thereafter come perilously

5    close to being protected speech.  There is a strong partisan

6    divide in this country, and it remains, and it's my view that

7    many of these January 6 prosecutions come perilously close to

8    prosecuting or seeking enhancements on the basis of protected

9    speech.

10        This may be something you want to argue at a different

11   point in the proceedings under 3355, but I would agree with the

12   government that he is entitled to the third point.  We didn't

13   linger in this case.  We didn't seek protracted hearings on

14   collateral issues.  What caused such delay as there was was the

15   complicating factor of the Western District case.

16        And so I would ask the Court to give the third point.

17             THE COURT:  All right.  Well, I will -- consistent

18   with the plea agreement and consistent with the PSR, I will give

19   the defendant a three-level reduction in acceptance of

20   responsibility, but again, this is another factor that I think

21   is worthy of consideration when we get to 3553(a).

22        In light of all of that, the total offense level for

23   guideline purposes is a level 20.  With a criminal history

24   category I, the guideline range is 33 to 41 months.

25        Both parties are in agreement with that; correct?

1          MR. MARIANO:  Yes, Your Honor.

2          MR. PATTIS:  Yes, Judge.

3          THE COURT:  All right.  So I will now give each side

4    an opportunity to allocute, and after I've heard from both

5    sides, if Mr. Wilson would like to address the Court, I will

6    give him that opportunity as well.

7      So I will ask both sides to not repeat everything in your

8    briefs.  Assume that I've read them.  It's fair enough to

9    emphasize the key points, but I don't need -- you need to

10   presume familiarity with your filings.

11         MR. MARIANO:  Yes, Your Honor.  And I will assume that

12   Your Honor is well familiar with our brief regarding the upward

13   departure provisions.  So I will focus on the 3553(a) factors.

14         THE COURT:  So let me just ask you one question about

15   the upward departure provision.  And I will just say at the

16   outset, I'm not going to give the terrorism note 4 departure

17   which is in --

18         MR. MARIANO:  This is 3A1.4.

19         THE COURT:  -- 3A1.4.  I did not give that in *Reffitt*

20   and other cases, and I'm not going to give it here.  I recognize

21   that Judge Mehta gave some of the Oath Keeper defendants an

22   additional point, I think, under that departure.

23     I think in the facts -- based on the facts and

24   circumstances of this case, I think that there are better fits

25   than that departure.

1       And with respect to the 2K2.7, that departure provision,

2   which the government has argued, that is appropriate, I think,

3   in this case, particularly when the Court is looking at the

4   impact on the government, right, and particularly in light of

5   *Brock*?

6       MR. MARIANO:  Yes, Your Honor.

7       THE COURT:  So I'm wondering for purposes of that,

8   that departure, whether the government would suggest that the

9   Court fashion any departure under 2K2.7 to be consistent with

10  the enhancement in 2J1.2 that the D.C. Circuit has held does not

11  apply in the guideline calculations for proceedings that involve

12  Congress as opposed to the courts, or at least the government

13  agrees on the facts of this case.

14      MR. MARIANO:  That's exactly right, Your Honor.

15      THE COURT:  All right.  So that would be a three-level

16  enhancement for that departure?

17      MR. MARIANO:  There's a three-level for substantial

18  interference, and there's a plus 8 for -- let me look up the

19  exact provision, but it's for --

20      THE COURT:  For the -- yeah.

21      MR. MARIANO:  -- physical injury or property damage or

22  threatening injury to those things.

23      THE COURT:  Okay.  But given that the departure

24  provision itself refers to disruption of a government

25  function -- the departure reads, "If the defendant's conduct

1    resulted in significant disruption of a governmental function,"

2    which I think we all, I hope, can agree it did, "the Court may

3    increase the sentence above the authorized guideline range to

4    reflect the nature and extent of the disruption and the

5    importance of the governmental function affected."

6        In the Court's view, the nature and extent was great, and

7    the importance of the government function was critical.

8        "A departure from the guidelines ordinarily would not be

9    justified when the offense of conviction is an offense such as

10   bribery or obstruction of justice."

11       This does involve 2J1.2, which is an obstruction-related

12   offense.  Nonetheless, this is by no means the mine run

13   obstruction case.  So I, despite that language in the departure,

14   do find that this is not the ordinary obstruction case.

15       And the departure further provides that "in such cases,

16   interference with the government function is an inherent

17   offense."

18       Again, for the reasons we've discussed, I don't find here,

19   and so I view the circumstances here as unusual.

20       But based on that language alone, it's the government's

21   view that the departure should take into account not only -- not

22   only 2J1.2(b)(2), which says, "If the offense resulted in

23   substantial interference with the administration of justice,

24   increase by three levels."

25       The D.C. Circuit said in *Brock* that doesn't apply to this

1    case -- or the government agrees here it does not apply.

2              MR. MARIANO:  Correct.

3              THE COURT:  So increase by three levels.  That makes

4    sense to the Court.

5         You're also saying consider the eight-level enhancement

6    that 2J1.2(b)(1)(B) provides, which states, "If the offense

7    involved causing or threatening to cause physical injury to a

8    person or property damage in order to obstruct the

9    administration of justice, increase by eight."

10        You're saying both of these involve interference and

11   obstruction of the administration of justice, and therefore --

12             MR. MARIANO:  Yes, Your Honor.

13             THE COURT:  -- the departure can include not only the

14   plus 3 -- often, we use guideline provisions as sort of

15   benchmarks to determine how far to depart because the departure

16   provision doesn't address that.

17        You're saying not only three levels but eight levels is

18   appropriate?

19             MR. MARIANO:  Correct, Your Honor.  In a pre-*Brock*

20   posture, we would have sought both enhancements in this case.

21   So we think 5K2.7 takes into account --

22             THE COURT:  I know you would have sought both

23   enhancements in this case, and the Court has applied them

24   pre-*Brock* in similar cases.  In those cases, *Reffitt* being the

25   one that comes to mind immediately, the Court made clear -- this

1    Court made clear that the Court would have applied them under

2    3553(a) regardless.

3        We're not at the 3553(a) argument right now, but it seems

4    to me this is an independent basis, which is the departure

5    provision of 2K2.7 coupled with 5K2.0, which says when the

6    guidelines do not take into account a fact that ordinarily would

7    be relevant, that the Court may depart upwards or downwards.

8        And in this case, I think the combination of 5K2.0 and

9    5K2.7 do warrant an increase in the guideline levels.  But I

10   just hadn't thought about it as for the eight-level as well as

11   the three-level.

12       But you're leaning on the administration of justice impact

13   there in both?

14            MR. MARIANO:  Correct.

15            THE COURT:  So the interference is substantial in the

16   (b)(2), and the interference involves causing or threatening to

17   cause physical injury to a person or property damage in

18   (b)(1) -- say 2J1.1(b)(1)(B); is that fair?

19            MR. MARIANO:  Yes, Your Honor.

20            THE COURT:  All right.  So Mr. Pattis, I'm interested

21   in hearing your perspective on that as well, but since we

22   already have Mr. Mariano, let's just go ahead and proceed, but I

23   want to remember to talk to you about that as well.

24            MR. MARIANO:  So then, Your Honor, let me start with

25   the big picture in this case.

1          Today's August 28, 2024.  We are 131 days away from

2     January 6, 2025.  As Your Honor knows, we have charged hundreds

3     of defendants in this broad January 6 prosecution effort.

4               THE COURT:  Another way of saying that is we're almost

5     four years away.

6               MR. MARIANO:  We're almost four years away?

7               THE COURT:  From January 6, 2021.

8               MR. MARIANO:  Correct.

9          But in every case when we charge it and when Your Honor has

10    to make a determination of guilt, we are laser focused, as we

11    have to be, on what happened on that day and the planning in

12    advance of it.

13         But in imposing a sentence, the Court has to consider not

14    only the conduct on that day but the need to reflect the

15    seriousness, to send a message to the public, and to deter for

16    future events.  So the Court needs to consider not just

17    January 6, 2021, but 2025, 2029, and so on.

18         And what this defendant did is incredibly serious -- so I

19    will start with the nature and circumstances of the offense --

20    because Mr. Wilson is not the typical January 6 defendant.  He's

21    not a defendant who came for a protest and completely

22    unexpectedly found himself at a riot after hearing a speech.

23         He's in the rare class of those defendants who are

24    convicted of conspiracy offenses related to January 6.  And you

25    saw in the weeks following the election and in advance of

A177

1    January 6 just how serious and how violent his aims were.

2                    THE COURT:  Let me interrupt you there for a moment.

3         Why is this case not charged with Koontz as a conspiracy?

4              MR. MARIANO:  It was charged with Koontz as a

5    conspiracy.  So, originally, we had -- in the superseding

6    indictment, we charged them together with the 1512(k).  And this

7    was pre-*Fischer*.  We negotiated the 372 plea agreement, which we

8    had also offered to Mr. Koontz.  So they were charged --

9                    THE COURT:  Okay.  All right.

10             MR. MARIANO:  So you see how violent and serious his

11   aims were.  He talks about being the tip of the spear, being

12   willing to sacrifice himself, whether it means prison or death.

13        He talked about organizing with militias to walk in armed

14   so that law enforcement could not stop them.  He talked about

15   organizing militias to come into Washington, D.C., together and

16   to be prepared not to come out.

17        He talked about bringing weapons.  He talked about going

18   down swinging.

19        "We have to be willing to not go home and take over."  He

20   asked, "Do we try to take Washington, D.C., first, or do we try

21   to take state capitals first?"  He said that if people followed

22   him, he would show them a symphony of destruction.

23        Now, I expect, as they did in their filing, that the

24   defense will point to the leaders of the Oath Keepers and Proud

25   Boys conspiracies as more serious cases.  And there is no

1    argument from me there.  Those defendants were charged with

2    seditious conspiracy, and Mr. Wilson was not.

3        But what principally distinguishes Mr. Wilson's case, when

4    you look at his rhetoric in advance and what he was planning,

5    was that the Proud Boys and Oath Keepers were just more

6    sophisticated organizers than he was.  They are more effective.

7        And thank goodness for that.  Thank goodness Mr. Wilson

8    wasn't the tactician or organizer he aspired to be in terms of

9    getting people to Washington, D.C., to try to take over and

10   never leave.

11       But he transformed his words into action by coming to this

12   city and storming the Capitol on January 6, and the Court needs

13   to take that seriously.  The Court should impose a sentence that

14   reflects the seriousness of his aims and what he did.  The

15   sentence shouldn't rely on the defendant's continued

16   ineffectiveness.

17       I also want to respond to the defendant's argument in his

18   filings that he was here just to protest.  That is certainly

19   completely inconsistent with the messages that you've seen in

20   this case.

21            THE COURT:  And his conduct.

22            MR. MARIANO:  And his conduct, yes.

23            THE COURT:  So you don't need to spend a lot of time

24   on that argument.

25            MR. MARIANO:  And the defendant, whether he was less

1    effective or not, did try to organize with others to storm the

2    Capitol.  Your Honor has seen throughout our filings several

3    messages that he sent not only in Telegram to organize the

4    Coalition of the Unknown, but over Zello, where he was

5    coordinating with the Oath Keepers.

6         This is just one of those messages.

7         (Audio played.)

8            MR. MARIANO:  "The people are pushing on the Capitol.

9    We need all hands on deck."

10        So I expect the defense will argue to you that Mr. Wilson

11   isn't charged with assaulting anyone or personally destroying

12   property, and that's true.  But what were his aims?  Mr. Wilson

13   may have arrived after the barricades had already been breached

14   and police lines were overrun.  When he went through the Upper

15   West Terrace door and entered the Capitol building, rioters were

16   already inside.

17        So the fact that he wasn't personally presented with

18   violence may be an instance of moral luck on his part, but it

19   certainly doesn't speak to his aims.

20        When you listen to this message, the other Zello messages,

21   and when you see all the Telegram messages, you can see plainly

22   how violent and revolutionary his aims were.

23        And you saw it when he got to the Capitol.  When he was

24   overlooking the riotous crowd, you saw how he was cheering and

25   celebrating, because he thought that the revolution he had been

A180

1    seeking for so long was finally here.  This was the riot the

2    defendant wanted.  It wasn't a mistake.  It wasn't a surprise to

3    him.

4        You saw how he entered the Capitol wearing a gas mask,

5    prepared for resistance and violence.  And while I personally

6    believe that the January 6 conduct is the most serious offense

7    that the Court needs to sentence for today, as Your Honor knows,

8    it's not the only offense that we're here for, because

9    Mr. Wilson is also in the rare class of January 6 defendants who

10   are here for completely unrelated firearms offenses.

11       And the defense, I know, has argued that Mr. Wilson has

12   turned his life around after an incredibly extensive criminal

13   history when he was younger.

14           THE COURT:  Again, I'm just curious, why not -- I

15   mean, that case was pending in Western District of Kentucky for

16   a while.  Why wasn't that just prosecuted --

17           MR. MARIANO:  That would be a --

18           THE COURT:  -- before you brought the case here?

19           MR. MARIANO:  I believe that the defense in that case,

20   the local defense was continuing the case to try to see if it

21   could get resolved here first.  So they were sort of in a

22   posture of deferring to our district, and we were trying to get

23   a plea resolved.

24           THE COURT:  Okay.

25           MR. MARIANO:  So we've talked about the firearms, how

1    they were concealed in clothing, firearms in a backpack, in a

2    cabinet, firearms, as Your Honor noted, without serial numbers,

3    firearms that were loaded.  This wasn't a collection for hunting

4    purposes or anything else.  These were firearms that were

5    prepared for ready use.

6       So when the defense talks about how he's turned his life

7    around, consider the ongoing lawlessness that this type of

8    conduct reflects.  He knew that he was a convicted felon, and he

9    was hoarding these weapons, hiding them within clothing.

10       THE COURT:  With 4,000 rounds of ammunition?

11       MR. MARIANO:  Correct, Your Honor.

12       So then let me turn to deterrence, which, as Your Honor

13    knows, is critically important in every January 6 case.  And

14    here, given the defendant's extensive criminal history, the

15    multiple separate felony offenses, the need for specific

16    deterrence is particularly acute as well.

17       And the Court should consider, as you've already noted, the

18    defendant's complete lack of remorse for his conduct.  As Your

19    Honor pointed out, there is a distinction between a formal

20    acknowledgment of guilt, an acknowledgment of the government's

21    evidence, and that we would be able to prove guilt beyond a

22    reasonable doubt at trial, and true acceptance of responsibility

23    that should give the Court confidence that he won't do it again,

24    true acceptance of responsibility and regret, and we have seen

25    none of that from this defendant.

1    So unless the Court has any questions, let me end -- sorry.

2    Did Your Honor have a question?

3          THE COURT:  No, go ahead.

4          MR. MARIANO:  Let me end with how the defendant closed

5    out his day on Capitol grounds, as far as we know.

6    He had stormed the Capitol with others.  He had breached

7    the building itself, gone through the Rotunda Statuary Hall, and

8    then he exited onto the east side of the building through the

9    East Rotunda Doors.  And having taken in this scene and seeing

10   the mob outside on the east front, the defendant cheered that

11   they were on national news, and he proclaimed it 1776.2.  And

12   that makes the defendant's revolutionary aims clear.

13   But the defendant's understanding of 1776 is wrong.  The

14   spirit of 1776 is about fidelity to the will of the people above

15   all else.  It's a decision to design a system where we can

16   govern ourselves through a constitutional republic if we can

17   keep it.

18   Nothing about what the defendant did on January 6 or in

19   advance of it was at all in keeping with the spirit of 1776.  It

20   was all an affront to it.

21   So we're asking the Court to impose a sentence that

22   reflects the seriousness of these offenses and the need for

23   deterrence.  We ask the Court to impose a sentence of 60 months'

24   imprisonment.

25          Thank you.

1               THE COURT:  Thank you.

2        All right.  Mr. Pattis?

3               MR. PATTIS:  That sounds ominous.  All right.

4               THE COURT:  Let's start with the departure.  I think

5    the government has a strong argument that these enhancements,

6    regardless of whether the Court takes them into account under

7    Section 3553(a), that it is appropriate for the Court to

8    consider them under the departure provision 2K2.7.

9               MR. PATTIS:  Is it 5K2.7, Judge?

10              THE COURT:  Did I say 2?  I meant 5.

11              MR. PATTIS:  Well, I don't think it's appropriate.

12   First, you've read the memoranda.  So I don't want to belabor

13   the point.  The more serious charges here are the firearms

14   charges.  It is correct, I was not involved in the Western

15   District case, I've been involved in this case, and there was an

16   effort, a prolonged effort to move these cases together.

17        I don't know -- the Court has asked why the Western

18   District didn't proceed.  I can't answer better than that.

19              THE COURT:  No, that's a question for the government.

20              MR. PATTIS:  Okay.  I asked my client.

21              THE COURT:  It seems like a short-sided resolution to

22   lump these together and then have to argue for the upward

23   adjustment or departure in order to get the sentence they think

24   is appropriate.

25              MR. PATTIS:  I think what struck me in the

1    government's sentencing memoranda is just how similar it was to

2    the Proud Boys sentencing memoranda where the charges were

3    seditious conspiracy, to wit, use of authority against the

4    authority of the United States government.

5         THE COURT:  It's very similar to -- I don't know if

6    you're familiar with Mr. Reffitt.  There are other people who

7    are these sort of want-to-be's, not very effective organizers

8    and leaders who were associated with the Three Percenters and

9    other groups.  So I don't -- I know you're intimately familiar

10   with the Proud Boys.  And based on the verdicts in those cases,

11   those do seem to be among the most serious of the January 6

12   defendants.

13        That doesn't mean that Mr. Wilson is a mere protestor or

14   not somebody who wasn't trying very hard to organize and recruit

15   and lead people on January 6.

16        MR. PATTIS:  The offense of conviction was conspiring,

17   and the crime is conspiring to use force against a police

18   officer, against a law enforcement officer.  I don't know that

19   that is reflective of an intent to interfere with the

20   administration of justice.

21        THE COURT:  But the Court, you know, can consider

22   relevant conduct at sentencing.

23        MR. PATTIS:  Understood.  But to that extent, so much

24   of the government's sentencing memo seems to want to sentence

25   him for being a member of a crowd.  I see the Court shaking its

1    head no, but I don't know how else to read it.

2              THE COURT:  Every single January 6 defendant who is

3    prosecuted in this court, the government is making the argument

4    that being a member of a large violent crowd, regardless of

5    whether the individual defendant committed property damage or

6    violence, that that was -- that they were a part of a violent

7    mob and that each person added to the risk.

8              MR. PATTIS:  I understand.  And I'm smirking not to

9    show disrespect to the Court, but I'm reminded of extensive

10   arguments in the Proud Boys case of Tools Theory.

11             THE COURT:  Of what?

12             MR. PATTIS:  Of Tools Theory, how the Proud Boys

13   conspired to use other people in the group as tools and they,

14   therefore, ought to be responsible for what other people did.

15      He's responsible for what he did.

16             THE COURT:  Well, when you're a part of a conspiracy,

17   you can absolutely be held legally responsible for what people

18   you conspired with did.

19             MR. PATTIS:  But there are many that he didn't

20   conspire with.

21             THE COURT:  He was there with Mr. Koontz.  Do you --

22             MR. PATTIS:  Mere presence is a defense to conspiracy.

23             THE COURT:  He pled to conspiracy, did he not?

24             MR. PATTIS:  With Mr. Koontz and others, yes, but not

25   with 1,200 or 1,300 or 1,400 other co-defendants.

1          THE COURT:  Let's talk about their small conspiracy,

2    and let's talk Mr. Koontz's goals and Mr. Wilson's goals

3    together.  We can get away from the large crowd.

4          MR. PATTIS:  Fair enough.

5          THE COURT:  Let's just talk about their statements and

6    their actions, and let's see if they don't reflect more than

7    just mere participation.

8          MR. PATTIS:  He pled to the conspiracy.  He's not

9    arguing that he was making mere abstract calls for violence.  He

10   pled to the conspiracy.  And there was an overt act.  And he

11   knowingly pled to that, and it was a voluntary plea.  It was

12   canvassed in this court, and I know he understands that.

13      The hope was that the electoral count would be stopped,

14   yes.

15         THE COURT:  His hope was that.

16         MR. PATTIS:  Yeah.

17         THE COURT:  And he played a part in that.

18         MR. PATTIS:  Does that amount to interference with the

19   administration of justice?

20         THE COURT:  Absolutely.

21         MR. PATTIS:  What justice was being administered that

22   day?

23         THE COURT:  We can agree to disagree, Mr. Pattis.

24         MR. PATTIS:  Well, it's a fair question.  I took the

25   cert petition for Mr. Lange on the 1512 case.  It was granted,

1    but the argument wasn't heard on our case.  It was heard on

2    Mr. Fischer's case.  And the claim there was 1512 doesn't cover

3    everything.  It's an evidence tampering offense, and I think

4    administration of justice doesn't cover everything.  It covers

5    the administration of justice.  Not every act that the

6    government conducts is conducting the administration of justice.

7        Now, I will grant that this is not -- outside the heartland

8    of what was contemplated by the guidelines, and I don't think

9    anybody said gee, maybe we should -- or Congress ever said let's

10   have an offense in case somebody storms the Capitol counting

11   electoral votes.  I don't think that was foreseeable.

12       But I don't think it's a direct hit.  I think the Court has

13   to decide --

14           THE COURT:  But the direct hit is he conspired, and

15   he's admitted that.  And in considering the scope of the

16   conspiracy and the nature of the conspiracy, the Court can

17   consider the purposes, can look at what the official proceeding

18   was, and look at the --

19           MR. PATTIS:  No, it's not an official proceeding here.

20   This is not 1512.  It's administration of justice, and these are

21   terms of art that matter, at least to higher courts.

22           THE COURT:  Whatever we want to call it.

23           MR. PATTIS:  You can't sentence that way.

24           THE COURT:  Whatever we want to call that event,

25   whether we call it an official proceeding, whether we call it

A188

1    just one of the most significant constitutional duties Congress

2    performs in order to effect the peaceful transfer of power in

3    this country, it's an important event that he willfully tried to

4    interfere with.

5            MR. PATTIS:  With all due respect to the Court, and I

6    mean this, and I don't want to sound like a --

7            THE COURT:  We always know every time we say "with all

8    due respect" that something's coming.  Go ahead.

9            MR. PATTIS:  A guy comes down from New England and

10   acts like a wiseacre; I'm not trying to be that man.  It can't

11   be whatever we want to call it and have fair notice --

12           THE COURT:  I want to call it the electoral count

13   vote.  Let's call it that.

14           MR. PATTIS:  No, no, we were talking about obstruction

15   of an official proceeding versus obstruction of administration

16   of justice.  I think these terms matter.

17           THE COURT:  I want to call it obstruction of a really

18   important congressional vote.

19           MR. PATTIS:  For which there is no statute.  And then

20   the Court has to go down and consider relevant offense conduct.

21   And now we're using, as the government wants, an enhancement on

22   the base of the more serious offense, the firearms offense.

23       My contention would be that if the Court were to consider

24   that argument, it should use 16 as the base rather than 20,

25   because now we're bootstrapping using the grouping rules.

1          THE COURT:  You agree that I can consecutively

2    sentence him on these two offenses?  And a stat max on the

3    firearms is, what, ten?

4          MR. MARIANO:  It's ten on each count.

5          MR. PATTIS:  I think that probably would bring a

6    habeas corpus action to the Court.  I don't think Western

7    District of Kentucky counsel, when it sought a Rule 20

8    consolidation for purposes of this, warned my client that

9    notwithstanding that, the Court can say never mind, I'm going to

10   sentence you consecutively.

11         THE COURT:  These are two entirely different offenses.

12   You don't claim that -- he didn't use one of these firearms to

13   commit this offense.  I assume you would contest that, despite

14   the fact that he talked about bringing firearms.

15         MR. PATTIS:  The search was justified because of

16   looking for evidence related to this offense, and now the Court

17   is considering relevant offense conduct.

18         THE COURT:  That justified the search, but these are

19   two stand-alone offenses.

20         MR. PATTIS:  Which were brought together for purposes

21   of plea in contemplation of how the plea agreement would --

22         THE COURT:  Understood.  But the Court has the

23   authority, does it not, to sentence him consecutively on these

24   two offenses?

25         MR. PATTIS:  I think the Court has the authority.  I

1  think the Court would be inviting a habeas corpus petition.  I

2  don't think I ever advised him that the Court might use its

3  discretion to impose consecutive sentences.  I know Kentucky

4  counsel didn't.  So you have that right, and he has his

5  appellate rights and his collateral attack rights.

6        THE COURT:  Fair enough; fair enough.  But again, if

7  the Court were to take that approach, we would be looking at a

8  guideline range of 30 to 37 and on top of that 15 to 21.  So

9  that would be the range.

10        MR. PATTIS:  I understand.  And that's within what the

11  government is arguing.

12     I don't know if we're going to transition to the 3353 at

13  some point.

14        THE COURT:  Yes, please.

15        MR. PATTIS:  I would ask the Court to take into

16  consideration, and this is going to sound unusual after the

17  government's argument, rehabilitation.  Mr. Wilson has overcome

18  obstacles that are unimaginable to most people.

19        THE COURT:  I agree.

20        MR. PATTIS:  A father figure requiring him to play

21  Russian roulette, in and out of institutions, homes, and prisons

22  for the better part of his young -- adolescence and young

23  adulthood.  And notwithstanding that, he's become a master

24  electrician and for many years has earned a criminal history I

25  with conduct that complies with the requirements of the law.

1     And so I would ask the Court not to impose too harsh a

2     penalty.  He knows he's going to prison.  He's packed.  He's

3     ready to go.  He knows he's being sentenced today and today

4     begins his sentence.  But he's going to resume his life in the

5     community.

6          THE COURT:  Is he voluntarily surrendering now?

7          MR. PATTIS:  Yes.  Well, we agreed as a part of the

8     plea that he would go in today, and the government --

9          THE COURT:  That he does go in today?

10         MR. MARIANO:  Yes, Your Honor.

11         THE COURT:  All right.

12         MR. PATTIS:  So we're --

13         THE COURT:  I agree 100 percent, no child should be

14    subjected to what Mr. Wilson was, and it is a testament to his

15    strength and resilience and determination that he in recent

16    years, after -- I guess he had a period of time in which he was

17    in and out of prison, and for the ten years before January 6 of

18    2021, he appeared to be on a solid track.  We don't know when

19    the firearms offenses happened, but putting that aside, and so

20    yes, I do credit that.

21         I'm concerned, however, with his shift January 6 on and his

22    state of mind in as recent as a few weeks ago.  I look forward

23    to hearing from him today if he wants to address the Court.  But

24    that is deeply concerning, and it's concerning to the Court that

25    he seems to be minimizing his need for any kind of treatment,

1    whether it be alcohol or mental health or otherwise.

2            MR. PATTIS:  Well, the alcohol thing is interesting.

3    I read the PSR and saw the amount that he was drinking.  I don't

4    know what was on his mind or how much he was actually drinking

5    when these events went on, but it's my view that that's enough

6    that RDAP should be recommended by the Court.

7            THE COURT:  And it will be, yeah.  Although I don't

8    know that he's going to be eligible for a reduction in sentence,

9    unfortunately, because of the firearms offenses.

10           MR. PATTIS:  I think we've heard that, but

11   nonetheless --

12           THE COURT:  But I encourage him, and I look forward to

13   seeing him upon his release and hearing about the programming he

14   did in prison, which I hope will include RDAP, because

15   100 percent he needs that.

16           MR. PATTIS:  Judge, bear with me for just about two

17   minutes here.

18       The last five years of my law career has been really

19   eye-opening, because I began to represent people that people

20   would consider to be on the far right, down in Texas and

21   throughout the country.

22       Before I became a lawyer, I taught political philosophy at

23   various places, at Columbia included.  And my preoccupation was

24   legitimacy.  What gives strangers the power to tell us what to

25   do.  In the United States, we say it's by consent.

1        And my preoccupation in the last five years is what's gone

2   on in this country, you know.  Because I believe it's a

3   full-scale crisis of legitimacy and confidence in our public

4   institutions.

5        And I credit my colleagues with their desire to prosecute

6   and send a message.  But I would urge the Court to consider the

7   people you're sentencing, because this is a man who for whatever

8   reasons believed that an election had been stolen.  I don't

9   think he believes it any longer.  But there are many people out

10  there who continue to harbor these beliefs.

11       Candidly, as an officer of your court, our court, I worry

12  about 2025 and beyond because of the anger I see from one end of

13  the country to the next.  And a lot of that anger is about the

14  sentencings in the January 6 cases.  There is a sense in which

15  the government appears to have gone further than justice

16  requires.  It's not just sending a message to punish those who

17  engaged in bad conduct on the 6th, but it's now trying to reach

18  into the future and warn people.

19       And if you look -- I hope you will read some day the D.C.

20  Circuit Court of Appeals decision that I hope will overturn the

21  Proud Boys convictions.  Because on the day of closing argument,

22  the government abandoned its argument that there was a plan and

23  said that the conspiracy could have been formed instantaneously

24  the moment the barricades were stormed.  But yet, it spent weeks

25  introducing incendiary speech that would have been protected in

A194

1    any other context.

2         And I think the fear in the J6 community, because it has

3    become one, is that we're now at a point where the line between

4    protected speech and criminal speech is blurred, and dissent is

5    going to --

6              THE COURT:  Is what?

7              MR. PATTIS:  Has become blurred.  I'm not arguing that

8    in Mr. Wilson's case.  He pled guilty to conspiracy, and he is

9    guilty of conspiracy.  But he still is outspoken in his speech,

10   and he is still among those who question in some respects the

11   legitimacy of our institutions, and that's a serious problem.

12   That's a serious problem.

13             THE COURT:  And that cuts both ways.

14             MR. PATTIS:  I'm not playing for you.  It does cut

15   both ways.

16             THE COURT:  It cuts both ways.  I agree with you.  We

17   do need to be concerned about the stability of our institutions,

18   and people like Mr. Wilson and others are undermining that by

19   suggesting that this is a -- I watched that 45-minute video that

20   he made talking about "I gotta get the truth out."

21        What is a court to make of that when it's sentencing

22   someone who appears to genuinely believe, after all of the

23   evidence has come out about January 6, after looking at what he

24   was involved in, that someone has that perspective, that this is

25   a political prosecution, that this is all overstated, all of the

1    injuries, all of the property damage, this is really overstated

2    and not that important.

3              MR. PATTIS:  I think you can say that it was

4    important, but it is overstated, and much more has been made of

5    it.  January 6 could have been a tragic footnote in our nation's

6    history.  It's become a chapter.  And it's taken on a life of

7    its own.  More people were arrested in Seattle last week, and

8    there will be yet more prosecutions, presumably until the

9    statute runs.

10       I don't want to play political science professor here, but

11   we're a country founded on dissent.  And many people -- I'm not

12   offended by somebody saying 1776.2.  Many people may be --

13             THE COURT:  It's not what he -- it's not these words

14   that he said.  It's the words coupled -- the words are

15   reflective of his intent, and they form the intent for his

16   actions, his criminal actions on January 6.

17             MR. PATTIS:  So the criminal actions is what he's

18   being punished for, not his political views, but the problem, I

19   think, in many of these prosecutions is the line has become

20   blurred.  It's no crime to say today "I need a 1776.3."  Our

21   institutions are out of touch, are out of control.

22             THE COURT:  It especially becomes blurred at

23   sentencings like this when courts are facing January 6

24   defendants who say they're remorseful and they accept full

25   responsibility, but just hours earlier or days, they've said the

1    opposite.

2         And it's hard at any sentencing to know, when a defendant

3    is facing the Court, whether they feel true remorse and are

4    truly accepting responsibility.  And when there's all this

5    evidence suggesting that they're just saying what they need to

6    say in that moment to get the most lenient --

7         MR. PATTIS:  No, I understand that, but I just don't

8    want the Court to be blind to the fact that Mr. Wilson isn't a

9    guy who sat around conspiring to rob a bank along with Moe and

10   Louie and they got caught and they're sorry they got caught and

11   will never do it again and they're making other plans to rob a

12   bank.

13        He swims in currents that reflect a crisis in this country,

14   and these court's sentencings, when they become at the extreme

15   level, encourage that divisiveness, because it makes it look as

16   though he's being punished for more than those actions that day.

17        I don't think general deterrence is a factor anymore in

18   these cases.  If there's a person in the United States who

19   believes that come January 6, 2025, it's okay to run into the

20   Capitol, they're not watching the news.  The government's made

21   its point.  So I think --

22        THE COURT:  Regardless of the impact, general or

23   specific deterrence, there are other purposes of punishment.

24   One is rehabilitation.  Another is punishment.

25        MR. PATTIS:  In my view, two years is significant

```
 1    punishment.  I tell clients going in, anybody can do --

 2              THE COURT:  For these two separate offenses?

 3              MR. PATTIS:  Yeah.

 4              THE COURT:  The firearms, the 4,000 rounds and the

 5    military-style rifles and other weapons.

 6              MR. PATTIS:  Do you know how many of those weapons

 7    there are out there right now?

 8              THE COURT:  There are plenty, but the fact is, he was

 9    forbidden under the law to possess them, and he knew that, and

10    he possessed them.

11              MR. PATTIS:  He did.

12              THE COURT:  So folks have to respect the laws in our

13    country.

14              MR. PATTIS:  He's going to prison.  The question is,

15    for how long?  And it's our view that something on the shorter

16    end rather than the longer end serves the purposes of

17    sentencing, because I don't know that rehabilitation will be

18    served.  He's going to come out a little bit older, and I don't

19    know whether he'll be able to retain -- and I should know; sorry

20    that I didn't check this -- his master electrician's license

21    when he comes out.

22         The thing that I like best about Mr. Wilson in getting to

23    know him, when I read the PSR, I was overwhelmed.  He hadn't

24    discuss any of this with me, and we talked briefly, and I said

25    boy, I thought I had it tough as a kid, my heart really goes out
```

1    to you.  He says, I'm not going to let anybody get me down, I'm

2    a winner, I'm not going to get beaten.

3        Sometimes he leads with his chin, and I suspect some of the

4    rhetoric that you've seen in recent communications is that.  But

5    some of it reflects the broader crisis going on in the

6    community.

7        And I long -- I long to see the J6 prosecutions end.  I was

8    at my computer --

9              THE COURT:  You and me both.

10             MR. PATTIS:  I bet, for you more so than me.  I don't

11   have to take any more of these cases, but I think the wheel

12   determines your fate.

13       But the day January 6 occurred, I was at home writing a

14   brief, and somebody called and said there's a coup at the

15   Capitol, turn the TV on.  I said did they take communications,

16   have they seized the institutions, did they have an alternative

17   regime?  I said no, it's a riot, leave me alone.  I didn't

18   bother to turn the TV on.

19       But now we have the government coming up here talking about

20   taking over the government and a threat to our democratic

21   institutions.  The institutions held firm.  The people were

22   erratic that day, and it happens in a democracy.  Passions

23   govern.

24       And let's not forget, the leader of the free world stood a

25   couple blocks from here telling people the election was stolen.

1    It's not a crime to believe your president, even if the

2    president at that time, at that time was a fool.

3         I had a sentencing before Judge Moss where I made this

4    argument, and he cut me off, Counsel, you're not helping your

5    client.  No lawyer wants to hear that.  But that was my client's

6    state of mind at the time, and it's many still, and it is deeply

7    disturbing.

8         So I would ask the Court to consider something less than

9    what the government asks for in this case, because I think

10   everyone -- a lot of people watch these sentences, and a lot of

11   people want to believe that justice is done in the courts and

12   that justice is measured and it's not simply an angry reaction

13   to a horrible day.

14            THE COURT:  I hear what you're saying, Mr. Pattis.  I

15   understand the sentiments you're expressing.  What's lacking

16   here is a -- there is a lack of self-accountability.  There will

17   be consequences; there have been consequences to Mr. Wilson.

18   And they are of his own making.  And that piece is absent from

19   the discussion, that piece.

20            MR. PATTIS:  I can't supply that for you.  That has to

21   come from Mr. Wilson.  And I think his plea -- Mr. Koontz, who

22   is similarly situated, without the firearms charge, is

23   apparently on his way to trial.

24        I'm co-counsel in a case that I don't think I will

25   participate in the trial with of with a young man who has --

A200

1    Jake Lange.  I took his cert petition to the Supreme Court.
2    He's online talking about a need for a revolution even now.
3    Those are -- that's in a different class all together than
4    Mr. Wilson.
5            THE COURT:  Mr. Wilson is in a unique class of his own
6    because of this significant firearms offense that was pending in
7    the Western District of Kentucky, and he's managed to get a
8    pretty good resolution here.
9            MR. PATTIS:  That's what he bargained for and what he
10   asked us to accomplish for him, and we tried.
11           THE COURT:  But it is -- we can't lose sight of the
12   fact that he's different from Mr. Koontz for that reason alone.
13           MR. PATTIS:  Fair enough.
14           THE COURT:  All right.  Anything more you want to say
15   with regard to the other --
16           MR. PATTIS:  Simply to stress the following, Judge,
17   that if, in fact, the Court upwardly departs, we think the base
18   should be -- for January 6 conduct, the base offense level
19   should be 16 rather than 20, because we think it's
20   double-dipping to add on top of the firearms offense, on top of
21   the 20 those points.
22           THE COURT:  But why?
23           MR. PATTIS:  Because the controlling offense is the
24   firearm offense, and Congress said in the guidelines that that's
25   more serious.  Now, relevant offense conduct is -- for the

1    lesser offense is now being added to the greater offense, in

2    effect accelerating --

3         THE COURT:  Another way to look at it is the Court has

4    these different buckets.  One is the firearm offense, two

5    offenses, and then the January 6-related offense.

6         MR. PATTIS:  I understand.

7         THE COURT:  And when I'm looking at the

8    January 6-related offense, I'm seeing that the guidelines vastly

9    understate the seriousness of the offense.

10        MR. PATTIS:  But it's still that offense with an

11   offense level of 16.  So you would be --

12        THE COURT:  Right.  But I'm going up, potentially --

13   the government wants me to go up, and I've suggested in other

14   cases like *Reffitt* that I would go up 11 levels.

15        MR. PATTIS:  If the Court were to go up, it should add

16   it to the 16 rather than the 20.  We don't think it should do

17   either.  But if they are separate offenses, it's bootstrapping

18   to take the 20 as the base and the relevant offense conduct for

19   the lesser and add the 11 to the 20.

20        THE COURT:  And then do the grouping rules?

21        MR. PATTIS:  Hmm?

22        THE COURT:  And then consider the grouping rules, and

23   the difference that would make is what?  It wouldn't reach the

24   government's recommendation of --

25        MR. PATTIS:  No, it wouldn't.  It's an academic point

A202

1    perhaps.

2            THE COURT:  That's what I was getting at.  Does this

3    make a difference?

4            MR. PATTIS:  If you're getting into the 30s range, no.

5            THE COURT:  Because the offense level for the J6 is --

6    total offense level is 14, and if the Court were to add 11 --

7            MR. MARIANO:  Excuse me.  16, Your Honor, for the

8    extensive scope enhancement plus 2.

9            MR. PATTIS:  I thought the Court was going to get to

10   that when I saw your hand moving on that pad there.

11           THE COURT:  You're saying if the Court were to

12   benchmark any variance and/or departure according to the

13   guideline enhancements for administration of justice, that would

14   be 16 plus 11.  That would be 27.

15       And then on top of that, the firearms offense is --

16           MR. MARIANO:  Plus 1.

17           THE COURT:  Plus 1 on top of that; right?  So we're

18   then at 28; right?

19           MR. MARIANO:  Correct.

20           THE COURT:  And this already takes into account

21   acceptance of responsibility.  So again, we're well above --

22           MR. MARIANO:  Sorry, Your Honor.  Can I just clarify?

23   I think the 28 would be prior to acceptance.  So it would end up

24   at 25, 57 to 71 months.

25           THE COURT:  All right.  I just wanted to make sure

1    that was an academic point, because I see your point, that the

2    departure and the variance that the Court is considering, at

3    least for this purpose, would be more directed at the January 6

4    conduct, but it does not --

5            MR. PATTIS:  In the spirit of candor, I didn't find a

6    case one way or the other on this.

7            THE COURT:  But I will also say, the Court is

8    contemplating, and I'm interested in your thoughts here, on, you

9    know, as we've discussed, the -- I guess you would say with

10   respect to the adjustment or 3553(a) aggravator being the lack

11   of remorse, acceptance, et cetera, you would say I'm just

12   punishing him for his speech and he's allowed to say crazy

13   things?

14           MR. PATTIS:  I said that in the Proud Boys case given

15   the argument the government made.  But we pled here, and I've

16   explicitly said in the sentencing memo we've waived that

17   argument.

18       But I think he is entitled to say crazy things thereafter

19   because the legitimacy crisis that drove people to the Capitol

20   that day exists still.

21           THE COURT:  Fair enough.  But the Court, in assessing

22   and considering a sufficient but not greater than necessary

23   sentence, you agree the Court can take into account his frame of

24   mind, the degree to which he's fully accepted responsibility,

25   learned his lesson, and is genuinely remorseful and not inclined

1    to do something similar in the future?  You agree that the Court

2    can consider those factors?

3                MR. PATTIS:  Maybe.  And you're saying, how could he

4    say maybe to the obvious?  And it's for -- in the context of

5    political speech, there's a problem.

6        I had another case, I don't recall the judge, Owen Shroyer,

7    who was an acolyte of Alex Jones, pled.  Oh, it was Judge Kelly

8    as well, I think.  And at sentence -- it was a trespass offense.

9    He was on the Capitol steps and no more.  And at sentencing, the

10   government used his post-arrest speech as an argument that the

11   Court should consider under 3353 as an aggravating factor, and I

12   argued that that was unlawful, that -- because the speech that

13   was argued post-conviction was protected.  It was mere abstract

14   calls for violence on some future date and political advocacy,

15   which is a core First Amendment value.

16       Judge Kelly disagreed.  I took an appeal and just submitted

17   the brief right away with a request for an appeal bond because

18   the sentence -- and argued that that was a substantive error

19   that wasn't waived with the right of appellate -- his appellate

20   rights in general because the sentence was below the guideline

21   range.

22       The D.C. Circuit chose to hold us to the plea agreement and

23   dismissed.  We took a certiori petition, which was denied.

24       It would be my position --

25                THE COURT:  So what did the Circuit do?

A205

1          MR. PATTIS:  It dismissed because the sentence

2    ultimately imposed was less than the sentence -- we waived up to

3    a certain point, and the sentence was below the waiver point.

4          THE COURT:  Oh, I see.

5          MR. PATTIS:  And so the merits of the issue were never

6    raised.

7      But I think it remains a lively issue.  I mean, if you look

8    at the cases in the '60s, I can't recall the precise case, but

9    there was a case where someone said to an industrialist "come

10    the revolution, you're the first person I'm going to line up

11    against the wall and shoot you."  And the person was arrested,

12    and the Supreme Court overturned that and said even

13    revolutionary speech, even speech that urges violence, is

14    protected speech.  Mere abstract calls for violence are

15    protected speech.

16      And so I would say, given the context of the political

17    times in which we live and the activities that the J6 defendants

18    are in post-arrest, I think they can still engage in 1776.3, .4,

19    .5.  That's a long and proud heritage.

20          THE COURT:  Just to push your argument a little bit,

21    let's say hypothetically -- and I know this isn't going to

22    happen because Mr. Wilson is smarter than that.  But say he got

23    up and started going off during his allocution about how unfair

24    this political prosecution is and how this is all a big lie and

25    none of this happened and this is 1776.2 and I'm a prisoner of

1    political persecution and this is all a big lie.  Those are --

2    that's speech.

3         And the Court can't consider that in deciding where to

4    sentence him?

5              MR. PATTIS:  In a post-plea case, I think the Court

6    certainly can, yes.

7              THE COURT:  But what -- you said post-conviction case.

8    So what do you mean?  Kelly's case was post-conviction; right?

9              MR. PATTIS:  Yes, post a plea.

10             THE COURT:  What's the difference between post-plea

11   and post-trial?

12             MR. PATTIS:  At a trial, you've never made any

13   concessions.  At a plea, you've conceded that you broke the law.

14   And so Mr. Wilson has conceded that he broke the law by

15   conspiring.

16             THE COURT:  All right.  But a jury has found those

17   people broke the law.

18        I guess just standing at the podium at sentencing --

19   Section 3553 says that -- 3661 says courts can consider anything

20   except for, you know, impermissible constitutional factors like

21   race and --

22             MR. PATTIS:  And I would say political speech is an

23   impermissible constitutional factor.

24        Judge, I'm an outlier on this.  I'm not suggesting that

25   I've got a pocket load of cases.  I'm hoping to make those

1    cases, and I haven't yet.

2         But my view is that whatever the contours of the First

3    Amendment are, and it's certainly evolved a lot in our

4    lifetimes, in the last century, political speech has always been

5    at the heart of it.  And that's something that I believe the

6    Court has a tremendous responsibility to protect.

7         And when the Court suggests that post-conviction political

8    speech can be a factor, you know, this country is rotten, the

9    Justice Department is corrupt, these prosecutions stink, it

10   doesn't mean that he's disavowing his plea.  It may mean that he

11   disagrees with the need to prosecute thousands of Americans for

12   five years over a riot that took place a couple hours one day in

13   January of 2021.

14        This has become a -- it's become a chapter in American

15   history now, not a footnote, and that's the government's choice.

16        So I think Mr. Wilson reserves the right to speak out --

17             THE COURT:  Well, let's not lose sight of the fact why

18   we're here.  The government had nothing to do with people

19   showing up and storming the Capitol.  The government is

20   responding.

21             MR. PATTIS:  The government has everything to do with

22   why we're here.  They chose to prosecute Mr. Wilson, and now

23   they are asking for draconian consequences, and we are asking

24   you to consider something less.

25             THE COURT:  We can agree to disagree on whether these

1    are political prosecutions or not.

2              MR. PATTIS:  My point is, I think any defendant has a

3    right to assert that, but that doesn't mean they're disavowing

4    the plea.

5        Mr. Wilson regrets the conduct he engaged in.  He thinks he

6    was sold a bill of goods by the president.  But he still

7    believes there's something rotten in the United States, and he

8    has the right to speak out about it.

9              THE COURT:  Okay.  Does he want to address the Court?

10             MR. PATTIS:  We talked about that beforehand.  I said

11   let's see what frame of mind the judge is in.

12             THE COURT:  I'm happy to take a break and you can talk

13   to him.

14             MR. PATTIS:  May I have a moment, Judge?

15             THE COURT:  Take as long as you need.

16             MR. PATTIS:  Thank you.

17        (Defense counsel and defendant conferred.)

18             MR. PATTIS:  May we take a brief recess, Judge?

19             THE COURT:  Sure.  I will be in the jury room.

20        (Recess taken from 11:29 a.m. to 11:35 a.m.)

21             THE COURT:  All right.  Mr. Pattis?

22             MR. PATTIS:  With your permission, Mr. Wilson would

23   like to address the Court.

24             THE COURT:  Very well.  Let me just before -- I just

25   had a couple of questions I meant to ask you about.

1          For conditions of supervision, is he receptive to mental

2     health treatment and drug abuse treatment?  I'm going to at a

3     minimum order an assessment, because I think the facts

4     support --

5               MR. PATTIS:  I think ordering the assessment makes

6     sense.

7               THE COURT:  If he doesn't want to participate, those

8     resources can go to someone who does want to participate.

9               MR. PATTIS:  I think that's fair.

10              THE COURT:  And the consent order of forfeiture, you

11     all have agreed to.

12              MR. PATTIS:  Yes.  We're prepared to sign it today.

13     My understanding is a copy was brought in.  I don't know if we

14     need to sign it.

15              THE COURT:  I don't think you need to sign, but we all

16     agree that these firearms and ammunition are forfeited?

17              MR. PATTIS:  Yes, Judge.

18              THE COURT:  And that's what this consent order relates

19     to; correct?

20              MR. PATTIS:  Yes.

21              THE COURT:  And similarly, the plea agreement also

22     provides restitution?

23              MR. PATTIS:  Of 2,000 -- I will be making that through

24     his mother at some point, if you could give us 60 days to get

25     that done.

A210

1          THE COURT:  All right.  But you agree that's

2     appropriate in light of the statutes here?

3          MR. PATTIS:  We agreed to it as a part of the plea

4     agreement, Judge.

5          THE COURT:  Okay.  Nonresponsive.

6          MR. PATTIS:  Well, I mean, a riot that was going to

7     destroy democracy yielding $2.9 million in damage in total for

8     thousands of people doing decades' worth of time?

9          THE COURT:  I'm just saying, you don't contest that

10    he, as one of the many people who were there that day, can be

11    held responsible under the relevant statutes for a portion of

12    that damage, even though he himself did not personally destroy

13    anything?

14         MR. PATTIS:  I'll make it easy for you.  Yes.

15         THE COURT:  Okay.  All right.  Thank you.

16      So I'm going to sign the consent order of forfeiture before

17    I forget.

18      All right.  Mr. Wilson?  Good morning, sir.  You've heard a

19    lot of talk about you by us, and I know it's difficult to sit

20    there, and I'm sure there's lots you would like to say in

21    response, and I understand you would like to make a brief

22    statement.  So I'm happy to hear what you would like to say.

23         THE DEFENDANT:  Yes, ma'am.  I would like to keep it

24    brief.

25      As far as the guns go, I mean, honestly, I'm from Kentucky.

A211

1    We shoot.  I understand.  I accept my responsibility.  I knew I

2    wasn't supposed to have the guns.

3        My only defense, and it's just my Kentucky talk, because

4    I'm going to be like so honest, I'm not trying to put on a fake

5    here.  We all just like guns in Kentucky.  We shoot.  I know I

6    wasn't supposed to have them.  Honestly, I've had most of them

7    for years.

8        I don't commit crime with them.  I'm not out there

9    accosting the streets, selling drugs, anything of that nature.

10   So that's all I really have to say about the firearms.  I accept

11   it.  If the Court would just consider that I haven't used those

12   firearms in an ill-mannered way.

13       January 6, it started way before, and I don't want to get

14   into a lot, but our country was in turmoil.  I believe it still

15   is.  I didn't realize my talk would go that far, you know.  You

16   get two-thumbing it sometimes with a couple of beers in you, you

17   know.

18       I care.  At the end of the day, no matter what, left,

19   right, middle, I got involved with good intentions.  I made

20   mistakes along the way.  I shouldn't have went in that door that

21   day.  I wish I hadn't.

22       That's all I can really say.

23            THE COURT:  All right.  Thank you, Mr. Wilson.

24            THE DEFENDANT:  Yes, ma'am.

25            MR. PATTIS:  Thank you, Judge.

1          THE COURT:  All right.  Anything more either side

2    would like to say before I summarize my reasons for sentence?

3          MR. MARIANO:  No, Your Honor.

4          MR. PATTIS:  No, Judge.

5          THE COURT:  All right.  We've covered a lot of ground

6    here.  Just to review some of the points that we discussed

7    earlier, the Court does believe -- turning first to 3553(a), the

8    Court does believe, as it explained in *Reffitt* -- and I

9    recognize that that was dealing with the 1512 offense.  So I

10   know we're in a different situation here with this conspiracy

11   offense.  But nonetheless, I think the logic still applies.

12       We are going to 2J1.2, and at least with regard to the

13   conspiracy that Mr. Wilson has admitted to, I do believe that

14   the guidelines for 2J1.2 do understate the seriousness of the

15   conspiracy.

16       And although these enhancements, the eight-level

17   enhancement in 2(b)(1)(B) -- sorry, in 2J1.2(b)(1)(B), as well

18   as the three-level enhancement in (B)1.2, although they do not

19   apply, as the Circuit has made clear in *Brock*, I do think that

20   they can form a basis of a significant upward variance.  And so

21   the Court is going to vary.

22       The Court also notes, as we've discussed, that another

23   basis for the increase in offense level is based on the

24   departure provision in 5K2.7, coupled with Section 5K2.0.

25   Again, the Court recognizes that 2K2.7 ordinarily doesn't apply

1    to obstruction offenses, but I do find this is a rare case and

2    worthy of significant departure for all the reasons we've

3    discussed earlier.

4        I do believe that the extensive planning, preplanning

5    Mr. Wilson was involved in, the steps he took to organize and

6    rally others in the weeks before January 6 to join him in taking

7    the Capitol by storm, knowing the intent of the riot, and the

8    additional steps he took on that very day to rally people as he

9    watched the police lines fall in response to violent rioters who

10   overran police lines and broke through Capitol windows and doors

11   to enter, I do believe that those -- his actions, again taken

12   with the clear intent to impede Congress from performing a

13   significant constitutional duty that helps ensure the peaceful

14   transfer of power in this country, I do believe that that

15   justifies a significant variance and departure.  So these are

16   independent grounds for the Court increasing the offense level.

17       The Court takes Mr. Pattis's point about the enhancement of

18   the offense being tied to the January 6-related offense.  We've

19   discussed how those guidelines would be calculated if the Court

20   did indeed depart or vary upward 11 levels, and ultimately, that

21   would, with the grouping rules, result in a total offense level

22   of 25 after credit for acceptance of responsibility, and that

23   would be a guideline range of 57 to 71 months.

24       And again, consistent with my earlier ruling in *Reffitt*,

25   the Court is not, however, applying the terrorism adjustment in

1    Section 3A1.4 of the guidelines, Note 4.

2        The government has also argued that Mr. Wilson's criminal

3    history overstates -- or understates the seriousness of his

4    criminal history and, I think, makes basically two arguments in

5    support of that.  One is that this firearms charge could have

6    easily been prosecuted separate from this, in which case

7    Mr. Wilson would be in a criminal history category of II as the

8    Court looked to sentence him on the conspiracy charge.

9        And separate from that, Mr. Wilson has a lengthy criminal

10   history background that includes three separate felonies.

11   Granted, most of that criminal history is dated.

12       Nonetheless, I think that the -- it is understated, but on

13   the other hand, when the Court takes into account the valid

14   grounds for downward variance in this case -- and I do think

15   that Mr. Wilson's childhood was extremely, extremely difficult,

16   and as I've stated, it's admirable and really a reflection of

17   his determination and resilience that he is where he is in terms

18   of his career as an electrician.

19       And so I'm not -- I think that the criminal history

20   understatement is countered by Mr. Wilson's very tragic

21   upbringing.

22       So I think I've covered -- correct me if I'm wrong,

23   Mr. Mariano.  Have I covered all the bases for the government's

24   variances?

25           MR. MARIANO:  Yes, Your Honor.

1          THE COURT:  And what about you, Mr. Pattis?  Did I

2     address -- it was the childhood upbringing?

3          MR. PATTIS:  Yes, Judge.

4          THE COURT:  Moving on to Section 3553(a), the Court is

5     required -- in addition to considering the guidelines, which

6     we've already discussed, the Court is required to consider all

7     of the factors under 3553(a), and the Court has done so.

8          Just in summary, I will say with respect to the nature of

9     the offense, Mr. Wilson was indeed a part of a large violent mob

10    that aggressively stormed the Capitol on January 6, 2021.

11    Regardless of whether he himself was individually responsible

12    for any of the injuries that occurred that day or the damage to

13    the property, he knowingly and intentionally joined, encouraged,

14    and celebrated the mob that both threatened and did in fact

15    injure officers and destroy Capitol property.

16         And there's no question at all that he had the intent to

17    interfere with Congress's vote that day.  And Mr. Wilson

18    explained in his own words that were shared with other rioters

19    and would be rioters on encrypted online and radio platforms

20    that that was the very purpose of his actions on January 6 and

21    his actions leading up to that day.

22         I want to be real clear.  Mr. Wilson is entitled to hold

23    whatever belief about the 2020 presidential election he believes

24    to be true.  He's entitled to express his political views and

25    any other views publicly.

A216

1    But what he did leading up to and on January 6 was not

2    simply engage in First Amendment-protected vitriolic speech and

3    social media chatter.  He assisted, at least with Mr. Koontz and

4    certainly others who were on the same platforms, Mr. Wilson

5    assisted in planning, organizing, and recruiting for a violent,

6    large-scale riot.

7    Far from simply showing up outside the Capitol grounds

8    seeking redress for his grievances, as others did that day

9    outside restricted grounds and still others did on restricted

10   grounds but not inside Capitol building, Mr. Wilson was all in.

11   He trespassed on Capitol grounds, knowing he had no legal right

12   to be there.  He went past signs, bike racks, and barricades,

13   most of which were down but obvious to anyone walking by.

14   After rioters overran a police line, he raised his arms in

15   victory, celebrating.  And minutes after a large crowd violently

16   overcame officers guarding the Capitol building, he entered the

17   building, alarms blaring, and went in wearing a gas mask and

18   carrying what appears to have been a canister of bear spray.

19   Once inside, he traipsed across the Capitol, taking selfies

20   in the Rotunda and Statuary Hall, repeatedly making the Three

21   Percenters sign with his hands.  12 or so minutes later, he

22   exited the Capitol, and once he exited, he celebrated even more,

23   exclaiming 1776.2.

24   Again, to be clear, he's not being punished for what he

25   said that day.  His comments that day are reflective of his

A217

1    intent and the reason why he committed the many violations of
2    law he committed that day.
3        The government has no evidence that Mr. Wilson brought any
4    of his firearms to the Capitol that day.  There's no question he
5    considered it.  His posts, comments online make clear that he
6    was considering firearms but, I think, ultimately made the
7    decision not to bring them.  I think he was going to save those
8    for a later date.  He considered bringing an expandable baton
9    and admitting to bringing one of those on December 12th when he
10   was here for an earlier riot.  He wore hard-knuckled gloves.
11       Bottom line is, he actively participated and planned for a
12   full-fledged riot with full knowledge of what was intended.  It
13   was a riot that put every officer and government worker in and
14   around the Capitol that day at great risk.  The fact that
15   Mr. Wilson did not use bear spray, assault an officer, damage
16   property does not mean that he's just a mere protestor that day.
17   And the fact that he's not charged in any larger-scale
18   conspiracy like some of the Oath Keepers and Proud Boys were
19   does not mean -- as he's admitted, he's engaged in a conspiracy.
20       His messages before January 6 with Koontz and others show
21   active coordination.  That day, Mr. Wilson provided a
22   play-by-play over secured communications platforms.  He said he
23   needed all hands on deck.  He passed updates on to other Oath
24   Keepers groups.  He made pleas for help.
25       And far from showing any remorse after this event,

1    Mr. Wilson, when approached by the FBI, lied to the FBI.  This

2    is -- after he had a chance to hear about the injuries and

3    deaths that occurred, other destruction that happened at the

4    Capitol that day, he lied about being in the Capitol, he lied

5    about knowing anyone else that had entered the Capitol.

6        Since then, following the convictions of many, including

7    those charged with conspiracies and other serious felonies, he's

8    doubled down.  In recent weeks, he's said he will soon be going

9    to prison for standing up for the people.  He's consistently

10   claimed that he's a victim of political prosecution.  He calls

11   himself a patriot January 6 defendant and views himself as a

12   hero for his actions.  He stated that he's being prosecuted for

13   doing the job of the government and law enforcement.

14       As recently as December 2023, he was interviewed on a show

15   in which he suggested that what happened on January 6 is

16   overstated.  He refers repeatedly in the remarks that I watched,

17   some 45 minutes of them, to "they."  By "they," it's unclear

18   whether he's referring to the government, the courts, or others

19   who have kept the truth from the public.  And he views his role

20   as getting the truth out about what happened on January 6.  It's

21   as though nothing significant happened that day.

22       And he continues to express these sentiments nearly four

23   years after January 6.

24       The Court is considering, in addition to the nature of the

25   offense, considering the personal characteristics of Mr. Wilson.

1    We've talked about his job.  He also has a GED.  We've talked

2    about his tragic childhood, which was in and out of numerous

3    foster homes.  He was physically and emotionally abused by his

4    parents, who -- his father in particular.

5        He was on a good track, it seemed, the ten years prior to

6    January 6, aside from the firearms, which he admits that he's

7    held.  The fact is, he so far, as the record reflects, committed

8    no offense for a ten-year period prior to January 6.

9        I do appreciate what Mr. Pattis has said about individuals

10   like Mr. Wilson being very frustrated with the way in which

11   democracy is operating.  And I appreciate that a lot of this

12   frustration about the direction he views our country is going in

13   is wrong motivated his actions on January 6.

14       It concerns the Court that there's a perspective held by,

15   if not Mr. Wilson himself, others that he's being punished for

16   his speech as opposed to his actions.  That is not the case.

17       And I hope that when Mr. Wilson goes to prison, that he can

18   appreciate and take responsibility for what he did on January 6

19   and that he might use his talents, use his grit, use his

20   determination, to be a voice for change.  So far, he's used his

21   talents to be a voice for attacking the institutions of the

22   government.

23       And, Mr. Wilson, you have the power to reach people like

24   yourself in prison and when you get out of prison who are

25   disgruntled about the path this country is on.  And I challenge

1    and I look forward to hearing from you -- because there will be

2    a re-entry hearing when you get out of prison.  I challenge you

3    to use this frustration and this energy and direct it in another

4    way that's not attacking the institutions of democracy.

5         And if you really want to make a difference, perhaps that

6    would -- you would be able to have more of an impact in creating

7    the kind of country that you would like to see by using your

8    voice to reach folks like yourself who are disgruntled with the

9    way democracy is operating.

10        We've talked about how Mr. Wilson is differently situated

11   than other January 6 defendants because of the firearms offense,

12   and the Court has noted how that case could have been prosecuted

13   separately and how the Court could sentence Mr. Wilson

14   consecutively on these various offenses.

15        The Court is not going to do that, but the Court revisits

16   the issue because it does illustrate, in the Court's view, what

17   a fair recommendation the government's sentence of 60 months is

18   in this case, when you take into account the fact that the

19   firearms offenses alone would result in a guideline range of 30

20   to 37 months.  And when you couple that with the guideline range

21   that would exist if Mr. Wilson had been prosecuted for that and

22   then later this offense, he'd be looking -- correct me if I'm

23   wrong, but we'd be looking at a guideline range, in criminal

24   history category II, of 18 to 24 months.  So adding those

25   respective cases together is a guideline range that's over, well

63

1       over 60 months.

2              So I again provide this as an illustration to Mr. Wilson

3       and to others that this is a fair sentence, despite the fact

4       that the Court is varying upwards and departing upwards, has

5       independent bases for increasing the sentence to a level of 60

6       months.

7              The Court will follow the recommendation of the government

8       and sentence Mr. Wilson to 60 months.  The Court does believe

9       that it's sufficient but not greater than necessary to achieve

10      the purposes of punishment.  Putting aside, you know, general

11      and specific deterrence, which the Court does believe it

12      furthers, there is a need for punishment in this case, and that

13      is a big part of the driver of the case.

14             So the Court will now formally impose the sentence,

15      announce the sentence, and then give both sides a chance to

16      object.

17             Pursuant to the Sentencing Reform Act of 1984 and in

18      consideration of the provisions of Title 18 United States Code

19      Section 3553, as well as the advisory sentencing guidelines, it

20      is the judgment of the Court that you, Dan Edwin Wilson, are

21      hereby committed to the custody of the Bureau of Prisons for

22      concurrent terms of 60 months on Counts 1 and 2 in Case

23      24-cr-238 and Count 1 in Case 23-cr-427.

24             You're further sentenced to serve concurrent terms, three

25      years, 36 months, of supervised release as to Counts 1 and 2 in

1    both of these cases.

2         In addition, you're ordered to pay a special assessment of

3    $100 on each count, for a total of $300.

4         While on supervision, you shall abide by the following

5    mandatory conditions, as well as the discretionary conditions

6    recommended by the Probation Office in Part D of the sentencing

7    options of the presentence report.

8         Which I trust, Mr. Pattis, you've reviewed as a part of the

9    presentence report with Mr. Wilson, and there's no need for the

10   Court to repeat them here?

11            MR. PATTIS:  Correct.

12            THE COURT:  All right.  The mandatory conditions

13   include not committing another federal, state, or local crime,

14   not unlawfully possessing a controlled substance, refraining

15   from any unlawful use of a controlled substance, cooperating in

16   the collection of DNA as directed by the probation officer.

17        You must also make restitution in the amount of $2,000 to

18   the Architect of the Capitol, consistent with the plea

19   agreement.  The Court will give Mr. Wilson 60 days, as counsel

20   has asked, for those payments to be made.

21        You shall also comply with the following special

22   conditions:  You shall submit to substance abuse testing to

23   determine if you've used a prohibited substance.  You must not

24   tamper with the testing methods.  You must also participate in

25   inpatient or outpatient substance abuse treatment program and

1    follow the rules and regulations of that program.  The Probation

2    Office will supervise you.

3        You must also cooperate in a mental health assessment and

4    treatment, if necessary, including cognitive behavioral

5    treatment, if recommended.  You must follow the rules and

6    regulations of that program.  The Probation Office will

7    supervise you.

8        You must provide the Probation Office access to any

9    requested financial information and authorize the release of

10   financial information.  That can be shared with the U.S.

11   Attorney's Office.

12       You must not include new credit charges or open additional

13   lines of credit without approval of the probation officer.

14       I will not impose a fine.  I don't find that you have the

15   ability to pay a fine in this case.

16       You must not, knowingly -- you must not flat-out enter the

17   U.S. Capitol building or the surrounding grounds known as

18   Capitol Square and consisting of the square block bounded by

19   Constitution Avenue Northwest and Northeast to First Street

20   Northeast and Southeast, Independence Avenue Southeast and

21   Southwest of First Street Southwest and Northwest without first

22   obtaining the permission of the Probation Office or the Court.

23       Within -- the same holds true for the District of Columbia.

24   You also need permission from the probation officer or the Court

25   to enter the District of Columbia during your supervision.

1    Within 60 days of release from imprisonment, you will

2    appear before the Court for a re-entry progress hearing, and

3    that can be done via video conference if you're being supervised

4    in your home district.

5    And the Court will transfer supervision to the home

6    district.  It will not transfer jurisdiction.

7    Mr. Pattis, it doesn't seem that you're in need of a

8    financial payment schedule?

9       MR. PATTIS:  Correct.

10       THE COURT:  So I will not impose that.

11    Mr. Wilson, you do have the right to appeal your conviction

12    to the U.S. Court of Appeals for the D.C. Circuit if you believe

13    your guilty plea was somehow unlawful or involuntary or if

14    there's some other fundamental defect in the proceedings that

15    was not waived in your plea agreement.

16    Under some circumstances, the defendant also has the right

17    to appeal the sentence to the D.C. Circuit.  The defendant may

18    waive that right as a part of the plea agreement.  However, you

19    have entered into a plea agreement which waives some of your

20    rights to appeal the sentence yourself.  Such waivers are

21    generally enforceable.  But if you believe the waiver itself is

22    not valid, you can present that theory to the appellate court.

23    And under 28 U.S.C. Section 2255, you also have the right

24    to challenge the conviction entered or the sentence imposed to

25    the extent permitted by that statute or your plea agreement.

1    Any notice of appeal must be filed within 14 days of the
2    entry of judgment.
3        If you're unable to afford the cost of the appeal, you may
4    request permission from the Court to file an appeal without cost
5    to you.  On appeal, you may also apply for court-appointed
6    counsel.
7        I can't recall whether I also talked about ensuring that
8    this sentence does not result in unwarranted sentencing
9    disparities.  I have carefully considered the sentences imposed
10   in analogous cases, a couple of which were mentioned in the
11   government's sentencing memoranda that were fairly close,
12   distinguished in certain ways in both aggravating and mitigating
13   ways than Mr. Wilson.
14       But I've considered those, as well as the more serious
15   cases that involve the Oath Keepers and Proud Boys that were
16   sentenced much more severely.  And I've considered this Court's
17   own sentences in cases like *Reffitt*.  And I note that I imposed
18   an 84-month sentence in Mr. Reffitt's case, and here, imposing a
19   60-month sentence, I do think that's proportional, given the
20   various aggravators and mitigators in that case relative to this
21   case.
22       So is there any objection to the sentence as announced
23   before I consider any motions and recommendations?
24            MR. MARIANO:  No, Your Honor.
25            THE COURT:  Any objection?

A226

1           MR. PATTIS:  Without waiving argument previously, no.

2           THE COURT:  Okay.  All right.  I will order that that

3    sentence as announced be imposed.

4      Is there a recommendation as to a facility?

5           MR. PATTIS:  Lexington, Kentucky, please, Judge, given

6    his Kentucky home.

7           THE COURT:  All right.  I will make that

8    recommendation.

9      Mr. Wilson, understand the Court doesn't have the power to

10   order that.  Generally, the Bureau of Prisons does try to

11   accommodate recommendations for institutions that are close to

12   your home, which I'm sure that is.

13     Is there a motion to dismiss any remaining counts?

14          MR. MARIANO:  Yes, Your Honor.

15          THE COURT:  I can't recall if there are any -- if

16   there's a complaint or anything else pending on the docket.  But

17   to the extent there is, that motion is granted.

18          MR. MARIANO:  Yes.

19          THE COURT:  Anything else we need to address?

20          MR. PATTIS:  May we have one moment, Judge?

21          THE COURT:  Of course.

22     (Defense counsel and defendant conferred.)

23          MR. PATTIS:  Nothing further, Judge.

24          THE COURT:  Sorry to interrupt, but looking at the

25   Consent Order of Forfeiture, it says "Consent Preliminary

A227

1    Order."

2          Is there any reason why I can't mark this as a final order?

3                MR. MARIANO:  It can be marked as final, Your Honor.

4                THE COURT:  Do you agree, Mr. Pattis?

5                MR. PATTIS:  I do, Judge.

6                THE COURT:  All right.  Mr. Pattis?

7                MR. PATTIS:  Nothing further.

8                MR. MARIANO:  Excuse me, Your Honor.  We had moved

9    pursuant to the plea agreement to have the defendant detained at

10   the time of sentencing.

11               THE COURT:  All right.  Without objection, that's

12   granted.

13               MR. PATTIS:  Well, now that we've kind of gone outside

14   the plea agreement with respect to the consideration of

15   consecutive sentences, if the Court wants to exercise its

16   discretion and give him a chance to voluntarily surrender --

17               THE COURT:  I didn't impose consecutive sentences.  If

18   the record is at all unclear, I've imposed concurrent sentences.

19               MR. PATTIS:  My client made the request.  So I tend to

20   agree.  We did agree in the plea agreement.

21               THE COURT:  I think you're bound by the plea

22   agreement, and the Court sees no reason to disrupt the agreement

23   of the parties.  So Mr. Wilson is ordered to surrender.

24         Is there anything else from Probation?

25               PROBATION OFFICER:  No, Your Honor.

1          THE COURT:  Okay.  We'll take just a moment.  I think

2    the marshals are being contacted.

3          MR. PATTIS:  May I have one moment, Judge?

4          THE COURT:  Yes.

5       (Defense counsel and Probation conferred.)

6          THE COURT:  All right.  The marshals are on their way.

7    If there's a need for me to come back, you can let me know, but

8    I have another matter at noon.

9       Thank you.

10       (Proceedings adjourned at 12:08 p.m.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    CERTIFICATE OF OFFICIAL COURT REPORTER

2

3              I, Sara A. Wick, certify that the foregoing is a

4       correct transcript from the record of proceedings in the

5       above-entitled matter.

6

7

8       /s/ Sara A. Wick                    October 23, 2024

9       SIGNATURE OF COURT REPORTER         DATE

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

A230

UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | 1:23-cr-00427-DLF-1 |
|     Plaintiff | : | |
| V. | : | |
| | : | |
| | : | |
| DAN EDWIN WILSON | : | SEPTEMBER 26, 2025 |
|     Defendant | | |

**MOTION FOR STAY OF ANY ORDER PERTAING TO**
**RELEASE FROM COSTODY**

Mr. Wilson was among the approximately 1,400 people granted presidential

pardons on January 20, 2025 by President Donald J. Trump.  He was

subsequently released by the Bureau of Prisons.  Upon information and belief, the

Bureau of Prisons seeks to have Mr. Wilson return to prison. Mr. Wilson requests

a stay of any order that he return to custody.

In support hereof, the undersigned represents as follows:

1.  Mr. Wilson pleaded guilty and was sentenced to a period of 60 montns

    incarceration by the Court for two sets of charges: firearms convictions

    arising out of the Western District of Kentucky, and charges arising from

    his participation in the riot at the Capitol on January 6, 2021.

2.  Each set of charges ran concurrently to one another.

3.  On or about January 20, 2025, pursuant to an Executive Order of the

    President of the United States, Mr. Wilson was pardoned.

4.  Mr. Wilson was promptly released from the Beckley Federal

    Correctional Institution in West Virginia.

5.  Mr. Wilson was not placed on supervised release.

A231

6. Although the firearms charges arose from evidence seized in a search of Mr. Wilson's home, that search warrant was issued to seek evidence of his participation in the Capitol riot. It pre-dated his arrest on riot-related charges.

7. At this moment, Mr. Wilson has been released without conditions or supervised released.

8. Whether he was, in fact, pardoned of both sets of offenses has yet to be litigated.

9. Mr. Wilson requests an order staying any effort to take him back into custody while this issue is litigated.

WHEREFORE, the undersigned requests an order barring any efforts either to take him into custody or requiring him to turn himself in to the Bureau of Prisons until such time as the scope of the President's order is clarified.

THE DEFENDANT
By /s/ Norman Pattis /s/
NORMAN PATTIS
Pattis & Paz ,LLC
383 Orange Street New
Haven, CT 06511 Tel: 203-
393-3017
Fax: 203-393-9745
npattis@pattislaw.com

## CERTIFICATE OF SERVICE

I hereby certify that on the foregoing date, a copy of the foregoing Motion was filed electronically and served by mail on anyone unable to accept electronic filing.

2

A232

Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing.  Parties may access this filing through the Court's CM/ECF system.

_____/s/ NORMAN PATTIS_____

3

A233

4

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **UNITED STATES OF AMERICA** | |
| **v.** | **Case No. 23-CR-427** |
| **DANIEL EDWIN WILSON,** | |
| **Defendant.** | |

**UNITED STATES' RESPONSE TO COURT'S MINUTE ORDER DATED**
**FEBRUARY 3, 2025**

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this response to the Court's order dated February 3, 2025. Wilson originally had two criminal cases in two different jurisdictions: one indictment in the Western District of Kentucky relating to his unlawful possession of firearms as a prohibited possessor, and one in the District of Columbia related to his activities at the U.S. Capitol on January 6, 2021. Wilson was indicted by a on January 18, 2023 in the Western District of Kentucky on 18 U.S.C. § 922(g)(1), 18 U.S.C. §§ 924(a)(2) & (d), 26 U.S.C. § 5841, 26 U.S.C. § 5861(d), 26 U.S.C. § 5871, 26 U.S.C. § 5872, and 28 U.S.C. § 2461, arising from his possession of firearms on or about June 3, 2022 (ECF 59). Wilson was originally charged in the District of Columbia by complaint on May 17, 2023, with 18 U.S.C. § 1512(c)(2), 18 U.S.C. § 1752(a)(1) & (a)(2), and 40 U.S.C. § 5104 (e)(2)(D) and (e)(2)(G). On December 6, 2023, he was indicted by the District of Columbia on those same charges. On April 17, 2024, he and his co-defendant in the January 6 case – David Kuntz – were indicted in a superseding indictment which charged Wilson with 18 U.S.C. § 1512(k) in addition to the previous charges.

On May 17, 2024, jurisdiction on the Kentucky case was transferred to the District of Columbia pursuant to Rule 20 and Wilson pled guilty to 18 U.S.C. § 372 in 23-CR-427 and 18

1

A235

U.S.C. § 922(g) & 924(a)(2) (possession of a firearm by a prohibited person) and 18 U.S.C. § 5841, 5861(d), and 5871 (possession of an unregistered firearm) in 24-CR-238. (ECF 56). He was sentenced concurrently on both cases to sixty months' imprisonment, and was remanded immediately on August 28, 2024.

On January 20, 2025, an Executive Order issued Granting Pardons and Commutation of Sentences for Certain Offenses Relating to the Events at Or Near the United States Capitol on January 6, 2021. Wilson was erroneously released from the custody of the Bureau of Prisons on or about that date. Wilson was ordered to return to the custody of the Bureau of Prisons. Defense counsel filed a motion to stay his return, which the government did not oppose.

The government has reviewed the Certificate of Pardon, which was provided to the defendant by the Office of the Pardon Attorney on or about January 29, 2025. The Certificate makes clear that the pardon only applies to "convictions for offenses related to events that occurred at or near the United States Capitol on January 6, 2021." The convictions for 18 U.S.C. § 922(g) & 924(a)(2) (possession of a firearm by a prohibited person) and 18 U.S.C. § 5841, 5861(d), and 5871 (possession of an unregistered firearm) in 24-CR-238 did not occur at the United States Capitol on January 6, 2021, and thus, by the plain language of the certificate, the pardon does not extend to these convictions.

2

A236

The defendant should be returned to the custody of the Bureau of Prisons.

Respectfully submitted,

EDWARD R. MARTIN, JR.
United States Attorney
D.C. Bar No. 481866

_____/S/_____

JENNIFER LEIGH BLACKWELL
Assistant United States Attorney
D.C. Bar No. 481097
601 D Street, NW
Washington, D.C. 20530
Jennifer.blackwell3@usdoj.gov
(202) 252-7068

3

A237

# UNITED STATES DISTRICT COURT

## DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| _____ | ) |  |
| UNITED STATES OF AMERICA | ) | 23-CR-00427-DLF |
| PLAINTIFF | ) |  |
|  | ) |  |
| VS. | ) |  |
|  | ) |  |
| DAN EDWIN WILSON | ) |  |
| DEFENDANT | ) | FEBRUARY 7, 2025 |
| _____ | ) |  |

### MR. WILSON'S REPLY TO GOVERNMENT'S MEMORANDUM REGARDING SCOPE OF PRESIDENTIAL PARDON

By way of a minute order docketed on February 3, 2025, the Court ordered briefing on the following topic: "[W]hy the Court should not order the defendant to self-report to the Bureau of Prisons to serve the remainder of his sentence on firearms offenses, which are unrelated to the defendant's criminal conduct on January 6, 2021."[1]  Mr. Wilson's answer is simple: The Court should

---

[1] Herewith the minute order:

| 02/03/2025 | MINUTE ORDER as to DAN EDWIN WILSON (1). On May 17, 2024, Mr. Wilson pled guilty to Counts 1 and 2 of the Indictment in No. 3:23-cr-3 (W.D. Ky.), which charged him with Possession of a Firearm by a Prohibited Person, in violation of 18 U.S.C. §§ 922(g)(1) & 924(a)(2), and Possession of an Unregistered Firearm, in violation of 26 U.S.C. §§ 5841, 5861(d), & 5871. *See* 56 Plea Agreement. Mr. Wilson also pled guilty to Count 1 of |

not issue such an order because it has neither personal  jurisdiction over Mr.

Wilson nor subject matter jurisdiction over the issue at hand.  Simply put, the

Court has no authority to act.

The legal landscape in which this issue arises is at once novel and bizarre.

Mr. Wilson is among some 1500 persons pardoned by President Donald Trump

on his first day in office. The pardon extended to all but 14 individuals convicted

---

the 54 Second Superseding Information, which charged him with Conspiracy to Impede or Injure an Officer, in violation of 18 U.S.C. § 372. *See* 56 Plea Agreement. On August 28, 2024, the Court sentenced Mr. Wilson to a term of imprisonment of 5 years (60 months) on Count 1 of the Second Superseding Information, to run concurrently with Counts 1 and 2 of the Indictment in No. 3-23-cr-3 (W.D. Ky.). *See* 79 Judgment.

Subsequently, on January 20, 2025, the President issued "a full, complete and unconditional pardon to... individuals convicted of offenses related to events that occurred at or near the United States Capitol on January 6, 2021." *See* Granting Pardons And Commutation Of Sentences For Certain Offenses Relating To The Events At Or Near The United States Capitol On January 6, 2021 (Jan. 20, 2025), https://www.whitehouse.gov/presidential-actions/2025/01/granting-pardons-and-commutation-of-sentences-for-certain-offenses-relating-to-the-events-at-ornear-the-united-states-capitol-on-january-6-2021/ (last visited Feb. 3, 2025). Thereafter, Mr. Wilson was released from custody by the Bureau of Prisons.

On or before February 6, 2025, the government shall file a brief, with supporting legal authority, that sets forth its position as to why the Court should not order the defendant to self-report to the Federal Bureau of Prisons to serve the remainder of his sentence on the firearms offenses, which are unrelated to the defendant's criminal conduct on January 6, 2021. The defendant shall file any response on or before February 10, 2025. So Ordered by Judge Dabney L. Friedrich on February 3, 2025. (lcdlf2)

(Entered: 02/03/2025)

or charged in connection with their participation in the riot at the Capitol on January 6, 2021. Of the fourteen commuttees, whose sentences were commuted to time served, one individual, Jeremy Bertino, was not even sentenced. Neither is there rhyme nor reason for the distinction between those pardoned and those receiving a commutation: Most of those recurring commutations were convicted of seditious conspiracy, but one, Enrique Tarrio, president of the Proud Boys, enjoyed a full pardon. Some but not all of those receiving commutations were convicted of 18 U.S.C. Section 111, assault on a peace officer. However, many individuals pardoned were convicted of assault. No discernable principled basis exists for who was pardoned and who was not. Consistency of principle is not required in application of the president's pardon power.

The treatment of those pardoned by the Executive Branch admits of some principled distinctions. The Department of Justice apparently is moving to dismiss every pending appeal by a January 6 defendant, seeking to have the cases of those with pending appeals remanded to the District Court so that the convictions can be vacated, as was Mr. Tarrio's this very day. Those pardonees without a pending appeal are not entitled to a dismissal of their charges. This is apparently because the lack of a case pending before the judicial branch

3

deprives the Court of jurisdiction to act on their cases. The Justice Department gives the benefit of an eventual dismissal to all appellants, regardless of the merits of their appeal. Those pardoned without appeals pending are not offered the benefit of a pending appeal and cannot obtain a dismissal because the Courts lack authority over them.

Mr. Wilson falls into the class of those pardoned without an appeal pending. As a result, his pardon is limited by the discretion of the Executive Branch. President Trump pardoned Mr. Wilson. The warden of his facility, a member of the Executive Branch, released Mr. Wilson from prison on authority of that pardon; thereafter, the warden apparently concluded he erred. Efforts by the undersigned to reach the warden, or the FBI, or anyone who can speak for the warden, have thus far been unavailing. The undersigned filed a request for an order staying any potential order requiring Mr. Wilson to return as a means of preventing Mr. Wilson from being taken into custody unlawfully.

As of this moment, there is no case or controversy pending before the Court, thus depriving it of subject matter jurisdiction. Counsel's motion for a stay of any order to require him to report was not a waiver of personal jurisdiction, and, if so, is expressly NOT waived. The executive branch has

4

A241

pardoned him and set him free. Just how they go about regaining lawful custody of him is an issue the likes of which the undersigned has not yet confronted. He has found no reported decisions on point.

One wishes President Trump would see the virtue of consistency in the clemency process, and issue orders that treated similarly situated persons similarly. That would require extending pardons to those who received commutations and seeking a means of eliminating the tortured anomaly presented by Mr. Wilson's case.

For present purposes, Mr. Wilson, who is no longer a defendant and who has no case pending before this Court, urges the Court to refrain from further action.

DEFENDANT, DAN EDWIN WILSON

**By   /s/   Norman A. Pattis, Esq.**
Norman A. Pattis, Esq.
Pattis & Paz, LLC
383 Orange St., 1st Floor
New Haven, CT  06511
Phone:      (203) 393-3017
Fax:          (203) 393-9745
Email:       npattis@pattispazlaw.com

5

**C**ERTIFICATE **O**F **S**ERVICE

I hereby certify that on February 7, 2025, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system, which will send a notice of electronic filing to all counsel of record.

_____/s/____Norman A. Pattis, Esq._____

A243

| | | |
|---|---|---|
| 02/07/2025 | MINUTE ORDER as to DAN EDWIN WILSON (1). Upon consideration of the government's 103 Response to the Court's Minute Order Dated February 3, 2025 and the defendant's 104 Reply, the Court finds that the plain language of the President's January 20, 2025 pardon does not extend to the defendant's Western District of Kentucky firearm convictions: Possession of a Firearm by a Prohibited Person, in violation of 18 U.S.C. 922(g)(1) & 924(a)(2), and Possession of an Unregistered Firearm, in violation of 26 U.S.C. 5841, 5861(d), & 5871. See Judgment at 2, Dkt. 79. The defendant does not appear to contest the scope of the pardon; rather, he argues, without citing to any legal authority, that the Court cannot take further action in this case because it lacks subject matter jurisdiction or personal jurisdiction over Mr. Wilson. See Def. Reply at 2, Dkt. 104. Given that the Court's judgment remains operative with regards to the defendant's firearms convictions, and the defendant has remaining time left to serve on his five-year (60 month) sentence, the Court cannot discern any reason that it would be deprived of jurisdiction over the defendant nor why his erroneous release would bar the government from reincarcerating him, as it apparently intends to do, see Gov't Response at 3, Dkt. 105. See, e.g., Vega v. United States, 493 F.3d 310, 316 (3d Cir. 2007) ("[A] mistaken release does not prevent a government from reincarcerating a prisoner who has time to serve."). At the time of his plea, the defendant waived trial in the Western District of Kentucky on the firearms offenses and consented to a transfer to this Court under Rule 20 of the Federal Rules of Criminal Procedure. See Plea at 10, Dkt. 56. Far from being a "tortured anomaly," as the defendant argues, see Def. Reply at 5, among January 6 defendants, he stands in a class of his own: he was convicted of three separate felony offenses--a conspiracy to impede or injure an officer at the U.S. Capitol on January 6, 2021 and two unrelated Western District of Kentucky firearm offenses. See Judgment at 2; Gov't Response at 2. Accordingly, it is ORDERED that the Court's Minute Order of January 27, 2025 is VACATED. It is further ORDERED that the defendant shall self-surrender to the Bureau of Prisons, as directed by the United States Probation Office, to serve the remainder of the five-year (60 month) concurrent sentence the Court imposed for his Western District of Kentucky firearm convictions, see Judgment at 2. So Ordered by Judge Dabney L. Friedrich on February 7, 2025. (lcdlf2) (Entered: 02/07/2025) |

**THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | |
| | ) | |
| **v.** | ) | **Case No. 23-cr-427 (DLF)** |
| | ) | **24-cr-238 (DLF)** |
| **DAN EDWIN WILSON,** | ) | |
| **Defendant** | ) | |
| _____/ | | |

**<u>DEFENDANT WILSON'S UNOPPOSED MOTION TO VACATE, SET
ASIDE, OR CORRECT SENTENCE PURSUANT TO 28 U.S.C. § 2255</u>**

The Movant, **DAN EDWIN WILSON**, seeks relief pursuant to 28 U.S.C.
Section 2255. The government does not oppose this motion.

In support hereof, the undersigned represents as follows:

1. On May 20, 2024, Wilson pleaded guilty to charges related to the events of
January 6, 2021, at the U.S. Capitol. Count One of the Second Superseding
Information filed herein (ECF 54), charged a conspiracy to obstruct or impede
officers "between on or about December 22, 2020 and January 6, 2021, within the
District of Columbia and elsewhere," and Count One and Two of an Indictment
returned in the Western District of Kentucky (24cr238), which alleged offenses
concerning firearms which were discovered pursuant to a search warrant seeking
evidence pertaining to January 6, 2021.

A245

2.  The Indictment from the Western District of Kentucky was transferred pursuant to Rule 20, Federal Rules of Criminal Procedure, and both cases were consolidated for disposition in this District before this Court.

3.  On August 28, 2024, this Court imposed a sentence of sixty (60) months for the January 6 conviction and sixty (60) months imprisonment for the firearms convictions, both sentences to run concurrently.   Judgment was entered on September 17, 2024. (ECF 79).

4.  On January 20, 2025, the Defendant, DAN WILSON, was pardoned by President Donald J. Trump for ***any convictions arising from or related to*** the events at the Capitol on January 6, 2021.  This includes the Indictment from the Western District of Kentucky that arose from the January 6 search warrant.

5.  The search warrant which led to his arrest for firearms possession was issued with probable cause to believe agents would find evidence linking him to January 6.

6.  But for the events of January 6, the agents would never have obtained legal justification or excuse to enter his home.

7.  The Bureau of Prisons rightfully released Mr. Wilson from prison pursuant to the pardon on or about January 21, 2025.

8.  The prison has since sought the Defendant's return to custody and this Court

has ordered the Defendant to comply with any order requiring him to surrender to prison to serve the sentence on the firearms conviction.

9.   The Government now takes the position, as they have with other January 6 defendants similarly situated, that Mr. Wilson, has been pardoned for the firearms offenses because those offenses indeed are covered by the presidential pardon.

10.   In *United States v. Daniel Ball*, Case No: 24-cr-00097-TPB (Middle District of Florida), the United States moved to dismiss with prejudice the Indictment of a January 6 defendant where a firearm and ammunition were discovered in his home which was searched pursuant to a warrant based upon probable cause regarding the Defendant's involvement in the events of January 6.  (ECF 41).  The Court dismissed the Indictment.  The facts of Mr. Wilson's case are virtually identical to this case.

11. The continued incarceration of a pardoned defendant is a violation of his right to substantive and procedural due process as guaranteed by the Fifth Amendment to the United States Constitution.  Considering the President's "blanket" pardon, this Court lacks jurisdiction to impose and/or enforce any sentence previously imposed upon this pardoned defendant.  The issuance of a pardon is akin to newly discovered evidence which would warrant the vacatur of the instant judgment and sentence in that it was not possible to know at the time of sentencing that a presidential pardon

would be issued covering the defendant's conduct. The continued judgment and sentence of the Defendant under these circumstances constitutes fundamental error.

WHERFORE, the Movant, requests that the judgment and sentence imposed herein be vacated and/or set aside.

Respectfully submitted,

GEORGE T. PALLAS, P.A
Counsel for Dan Edwin Wilson
Bar No:  FL0108
2420 SW 22nd Street
Miami, FL 33145
305-856-8580
305-860-4828 FAX
george@pallaslaw.com
By:/s/ *George T. Pallas*
GEORGE T. PALLAS, ESQ.

NORMAN A. PATTIS, P.A.
Bar No.: CT0013
383 Orange Street, 1st Floor
New Haven, CT 06511
203-393-3017
203-393-9745 FAX
info@pattislaw.com
By:/s/ *Norman Pattis, Esq.*
NORMAN A. PATTIS, ESQ.

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that a true and correct copy of the foregoing has been electronically filed with the Clerk of Court using CM/ECF system which will send notification of such filing.

A248

By:/s/ _George T. Pallas_____

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
OCALA DIVISION

UNITED STATES OF AMERICA

      v.                          CASE NO. 5:24-cr-97-TPB-PRL

DANIEL CHARLES BALL

## UNITED STATES' MOTION TO DISMISS THE INDICTMENT WITH PREJUDICE PURSUANT TO FEDERAL RULE OF CRIMINAL PROCEDURE 48(a)

The United States of America, by and through the undersigned Assistant United States Attorney, respectfully submits this motion to dismiss the indictment in the above-referenced case.

Pursuant to Federal Rule of Criminal Procedure 48(a), the United States hereby moves to dismiss the indictment pending against the defendant, Daniel Charles Ball, with prejudice. The United States cites to the Executive Order dated February 20, 2025, Granting Pardons and Commutation of Sentences for Certain Offenses Relating to the Events at or Near the United States Capitol on January 6, 2021, as the reason for this dismissal.

A250

Therefore, the United States respectfully requests that the Court enter an order dismissing the above-referenced indictment with prejudice.

Respectfully submitted,

SARA C. SWEENEY
Acting United States Attorney

By:  /s/ William S. Hamilton
     WILLIAM S. HAMILTON
     Assistant United States Attorney
     Florida Bar No. 95045
     35 SE 1st Avenue, Suite 300
     Ocala, Florida 34471
     Telephone:   (352) 547-3600
     Facsimile:    (352) 547-3623
     E-mail: William.S.Hamilton@usdoj.gov

A251

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **UNITED STATES OF AMERICA** | |
| **v.** | **Case No. 23-CR-427** |
| **DANIEL EDWIN WILSON,** | |
|    **Defendant.** | |

**UNITED STATES' RESPONSE TO COURT'S FEBRUARY 24, 2025**
**ORDER REGARDING DEFENDANT'S MOTION FOR RELIEF**
**PURSUANT TO 28 U.S.C. § 2255**

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this motion in response to the Court's Minute Order dated February 24, 2025.

As set forth in the Defendant's Emergency Motion (ECF No. 107), the defendant was released on January 21, 2025, following the issuance of the Executive Order dated January 20, 2025, Granting Pardons and Commutation of Sentences for Certain Offenses Relating to the Events at Or Near the United States Capitol on January 6, 2021 ("Presidential Pardon"). When the Bureau of Prisons ordered the defendant to return to custody, his attorney filed a motion to stay, to which the government did not object. The Court then ordered the government to file a response by February 6, 2025, as to whether the Presidential Pardon covered the defendant's firearm convictions, which had been transferred to the District of

A252

Columbia through Rule 20 as part of the plea agreement, in addition to the conviction regarding the defendant's conduct on January 6, 2021.

In its filing dated February 6, 2025, the government indicated that the language of the pardon did not cover the firearm convictions, 18 U.S.C. §§ 922(g) & 924(a)(2) (possession of a firearm by a prohibited person) and 18 U.S.C. §§ 5841, 5861(d), and 5871 (possession of an unregistered firearm). (ECF No. 103). The basis of these convictions were firearms recovered pursuant to a search warrant executed at the defendant's residence in Kentucky, based on his conduct on January 6, 2021, at the United States Capitol. In the intervening period since the government filed its response, the government has received further clarity on the intent of the Presidential Pardon. Under these circumstances, the Presidential Pardon includes a pardon for the firearm convictions to which the defendant pled, similar to other defendants in which the government has made comparable motions.

For example, the government recently moved to dismiss an indictment pending in the Middle District of Florida, where the defendant had been charged with felony possession of a firearm, for a firearm obtained during a search warrant related to the investigation of the defendant's conduct on January 6, 2021. *United States v. Ball*, 5:24-CR-97, ECF 41 (Middle District of Florida, filed February 20, 2025). Similarly, the government filed a Notice of Filing of Certificate of Pardon

A253

in *United States v. Jeremy Brown*, to clarify that "[b]ased on consultation with Department leadership, it is the position of the United States that the offenses in this case are intended to be covered by this Pardon." *United States v. Jeremy Brown*, 8:21-CR-00348, ECF 372 (Middle District of Florida, filed February 25, 2025). In that case, the defendant had been convicted in the Middle District of Florida for possession of firearms and other weapons at a jury trial in December 2022; contraband which had been located at his residence pursuant to a search warrant related to his actions on January 6, 2021. In addition, the government recently concurred in the dismissal of an appeal in the Fourth Circuit, in the case of a defendant who was convicted of offenses related to January 6, 2021, and possession of contraband which was located pursuant to a search warrant executed at his residence for evidence related to his January 6, 2021 conduct. In that matter, the U.S. Attorney for the District of Maryland noted that "[a]fter consulting with the Department of Justice's leadership, the United States has concluded that the President pardoned Mr. Costianes of the offenses in the indictment. This determination by the Executive is 'conclusive and persuasive.' *Trump [v. United States]*, 603 U.S. [593], 608 (2024)." *United States v. Costianes*, USCA4 Appeal 24-4543, Doc 20-1 (filed February 19, 2025). As noted by the Supreme Court, a "pardon is an act of grace by which an offender is released from the consequences of his offense." *Knote v. United States*, 95 U.S. 149, 153 (1877).

3

A254

For the reasons set forth above, the government does not oppose the defendant's motion for relief. It is the position of the United States that the offenses of conviction in this case are intended to be covered by the Presidential Pardon.

Respectfully submitted,

EDWARD ROBERT MARTIN, JR.
United States Attorney
D.C. Bar No. 481866

_____/S/_____
JENNIFER LEIGH BLACKWELL
Assistant United States Attorney
D.C. Bar No. 481097
601 D Street, NW
Washington, D.C. 20530
Jennifer.blackwell3@usdoj.gov
(202) 252-7068

4

A255

| | |
|---|---|
| 02/26/2025 | MINUTE ORDER as to DAN EDWIN WILSON (1). As the Court stated during today's hearing on the defendants 107 Emergency Motion to Vacate, the government shall clarify or modify, on or before 5:00 pm on February 26, 2025, the representations counsel made during the hearing regarding the meaning of the Pardon that the President issued on January 20, 2025. Further, the Courts February 7, 2025 order directing the defendant to surrender to the Bureau of Prisons on February 27, 2025, is STAYED pending any future order of the Court. So Ordered by Judge Dabney L. Friedrich on February 26, 2025. (lcdlf2) (Entered: 02/26/2025) |

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **UNITED STATES OF AMERICA** | |
| **v.** | **Case No. 23-CR-427** |
| **DANIEL EDWIN WILSON,** | |
| **Defendant.** | |

**RESPONSE TO COURT'S MINUTE ORDER REGARDING**
**INTERPRETATION OF THE PRESIDENTIAL PARDON**

During the February 26, 2025, hearing on the matter of the defendant's motion under 28 U.S.C. § 2255, which the government did not oppose, the Court inquired about the interpretation of the pardon issued by President Trump for "individuals convicted of offenses related to events that occurred at or near the United States Capitol on January 6, 2021[.]" Executive Order dated January 20, 2025, Granting Pardons and Commutation of Sentences for Certain Offenses Relating to the Events at Or Near the United States Capitol on January 6, 2021 *available at* *https://www.whitehouse.gov/presidential-actions/2025/01/granting-pardons-and-commutation-of-sentences-for-certain-offenses-relating-to-the-events-at-or-near-the-united-states-capitol-on-january-6-2021/*. As stated during the hearing, it is the Executive Branch's position that the pardon covers the defendant's conviction in this case.

A257

This is not the only case in which the Department of Justice has taken the position that President Trump's pardon applies to offenses that were charged as a result of search warrants conducted as part of the January 6, 2021, investigation, for which the government did not have pre-existing evidence related to similar offenses. The government noted examples of other such cases in its February 25, 2025 filing. *See* ECF 108.

The Department's interpretation of the scope of President Trump's pardon should be accorded deference. Through the Office of the Pardon Attorney, the Department of Justice administers the President's pardon power. *See Andrews v. Warden*, 958 F.3d 1072, 1078 (11th Cir. 2020). "The Supreme Court has ruled that deference should be accorded to an executive agency's interpretation of an executive order it is charged with administering." *Id.* (citing *Udall v. Tallman*, 380 U.S. 1, 4, 16-18 (1965)). If the agency's interpretation is not unreasonable, and "the language of the order[ ] bears [its] construction," courts must "respect" it. *Udall*, 380 U.S. at 4, 18. The Supreme Court has further noted that "pardon and commutation decisions have not traditionally been the business of courts . . . [and] are rarely, if ever, appropriate subjects for judicial review." *Ohio Adult Parole Auth. v. Woodard*, 523 U.S. 272, 276 (1998) (internal quotation marks and citations omitted); *see United States v. Libby*, 495 F. Supp. 2d 49, 56 (D.D.C. 2007) (Walton, J.) (citing same). Although the analysis of a pardon begins with the

A258

plain language of the pardon, a "full pardon" must be read in context with other indicia of Presidential intent. *See Robertson v. Gibson*, 759 F.3d 1351, 1357-58 (Fed. Cir. 2014) ("Accordingly, we cannot read the pardon in a vacuum, as [the defendant] suggests. We must also look to the nature and purpose of the pardon, namely, President Ford's clemency program." (citation omitted)).

The language of the Executive Order at issue here stated that a pardon was granted to "individuals convicted of offenses *related to events* that occurred at or near the United States Capitol on January 6, 2021." Proclamation 10887, 90 Fed. Reg. 8331 (January 20, 2025) (emphasis added). In these circumstances, it is a reasonable interpretation of this language to include cases such as the defendant's, where the firearms that formed the basis of his convictions were found as a result of a search warrant for evidence of the defendant's conduct on January 6, 2021 (and for which he was not previously being investigated). As such, deference should be accorded to the Executive's reasonable interpretation of the pardon language, to include a pardon for the firearms convictions in these circumstances.

.

A259

Respectfully submitted,

EDWARD ROBERT MARTIN, JR.
United States Attorney
D.C. Bar No. 481866

_____/S/_____
JENNIFER LEIGH BLACKWELL
Assistant United States Attorney
D.C. Bar No. 481097
601 D Street, NW
Washington, D.C. 20530
Jennifer.blackwell3@usdoj.gov
(202) 252-7068

4

A260

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

---

UNITED STATES OF AMERICA,

v.

DANIEL EDWIN WILSON,

*Defendant.*

No. 25-cv-545 (DLF)
No. 23-cr-427-1 (DLF)

**<u>ORDER</u>**

For the reasons stated in the accompanying Memorandum Opinion, it is

**ORDERED** that the defendant's Motion to Vacate, Set Aside, or Correct Sentence Pursuant to 28 U.S.C. § 2255, Dkt. 107, is **DENIED**.  It is further

**ORDERED** that the Court's Minute Order of February 26, 2025, staying its February 7, 2025 order directing the defendant to surrender to the Bureau of Prisons, is **VACATED**.  It is further

**ORDERED** that the defendant shall self-surrender to the Bureau of Prisons, as directed by the United States Probation Office, to serve the remainder of the five-year (60 month) concurrent sentence the Court imposed for his Western District of Kentucky firearm convictions, *see* Judgment at 2, Dkt. 79.  It is further

**ORDERED** that a Certificate of Appealability is hereby **ISSUED** as to the issue of whether the continued incarceration of the defendant would violate his Fifth Amendment due process rights in light of President Trump's January 20, 2025 pardon, Proclamation No. 10887, 90 Fed. Reg. 8331 (Jan. 29, 2025).

A261

**SO ORDERED.**

_Dabney L. Friedrich_
DABNEY L. FRIEDRICH
United States District Judge

March 13, 2025

A262

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

UNITED STATES OF AMERICA,

v.

DANIEL EDWIN WILSON,

*Defendant.*

No. 25-cv-545 (DLF)
No. 23-cr-427-1 (DLF)

<u>**MEMORANDUM OPINION**</u>

Before the Court is the defendant's unopposed Motion to Vacate, Set Aside, or Correct Sentence under 28 U.S.C. § 2255. Dkt. 107. For the reasons that follow, the Court will deny the motion.

**I.        BACKGROUND**

Dan Edwin Wilson was charged with multiple offenses related to his conduct at the United States Capitol on January 6, 2021. Second Super. Info., Dkt. 54. On May 17, 2024, Wilson pled guilty to conspiracy to impede or injure federal law enforcement officers, in violation of 18 U.S.C. § 372 (the "January 6 conspiracy offense"). Plea Agreement, Dkt. 56. At the same time, he also pled guilty to two separate and unrelated charges originating in the Western District of Kentucky in 2022—possession of an unregistered firearm, 26 U.S.C. §§5841, 5861(d), & 5871, and felon-in-possession, 18 U.S.C. §§ 922(g)(1) & 924(a)(2) (the "Kentucky firearm offenses") —that were transferred to this district. *Id.*

During his plea, Wilson, a three-time convicted felon, admitted that he had illegally possessed six firearms and 4,800 rounds of ammunition on June 3, 2022, in the Western District of Kentucky. *See* Statement of Offense ¶ 32, Dkt. 59. Federal agents discovered the firearms and ammunition when they searched Wilson's home pursuant to their investigation of Wilson's actions

A263

at the U.S. Capitol on January 6.  Two of the six firearms were found loaded.  *Id*.  Three were military-style (M-4) rifles, two without visible serial numbers.  *Id*.

At sentencing, the Court imposed three concurrent terms of 60 months' imprisonment for each of the three offenses to which Wilson pled—the January 6 conspiracy offense and the two Kentucky firearm offenses.  *See* Judgment, Dkt. 79.  Wilson did not file a notice of appeal, and the Court's judgment became final on October 2, 2024.  *See* Fed. R. App. P. 4(b)(1); *United States v. Booker*, 613 F. Supp. 2d 32, 35 (D.D.C. 2009).

On January 20, 2025, the President issued "a full, complete and unconditional pardon to . . . individuals convicted of offenses related to events that occurred at or near the United States Capitol on January 6, 2021."  Proclamation No. 10887, 90 Fed. Reg. 8331 (Jan. 29, 2025) ("Presidential Pardon" or "pardon").  Shortly thereafter, Wilson was erroneously released from custody by the Bureau of Prisons.  *See* Gov't Resp. at 2, Dkt. 103.  Wilson then moved the Court to stay any order from the Bureau of Prisons to re-incarcerate him until the Court could determine whether the Presidential Pardon covered the Kentucky firearm offenses.  Dkt. 100 at 2.  The Court granted Wilson's motion.  *See* Minute Order of January 28, 2025.

Shortly thereafter, on February 6, 2025, the government took the position that Wilson should return to prison because the "plain language" of the pardon does not apply to the Kentucky firearm offenses.  Gov't Resp. at 3, Dkt. 103 ("The defendant should be returned to the custody of the Bureau of Prisons" because the pardon only applies to "convictions for offenses related to events that occurred at or near the United States Capitol on January 6, 2021.").  Because Wilson's firearms offenses did not occur at the United States Capitol on January 6, 2021, the government asserted that the pardon does not extend to those offenses.  *Id.* at 2.

A264

The government's position at that time was consistent with the position it had taken in other January 6 cases. From January 20 through February 18, the Department repeatedly and unequivocally stated in courtrooms across the country that the "plain" and "unambiguous" language of the pardon does not apply to criminal offenses that did not occur at or near the Capitol on January 6. *See, e.g.*, Gov't Resp. at 2, Dkt. 103 (Mr. Wilson's "[firearm] convictions . . . did not occur at the United States Capitol on January 6, 2021, and thus, *by the plain language of the certificate*, the pardon does not extend to these convictions." (emphasis added)); United States' Resp. to Def.'s Mot. to Vacate Jury Conviction and Dismiss Indictment at 3, *United States v. Kelley*, No. 3:22-cr-118-TAV-JEM-1 (E.D. Tenn. Feb. 18, 2025) (opposing defendant's motion to dismiss based on the "unambiguous language of the pardon" because "[t]he crimes for which an East Tennessee jury convicted the defendant did not occur at or near the United States Capitol on January 6, 2021. They occurred entirely within the Eastern District of Tennessee nearly two years later."); United States' Resp. in Opp'n to Appeal Pursuant to Rule 9(b) at 15–19, *United States v. Martin*, No. 24-7203 (9th Cir. Feb. 14, 2025) (contending that there is no "fairly debatable question" that "Martin's pardon for January 6, 2021 offenses he committed in Washington, D.C., does not reach his separate firearms offense he committed in California at a different time."); United States' Opp'n to Def.'s Mot. to Dismiss at 4, *United States v. Taranto*, No. 23-cr-229 (CJN) (D.D.C. Feb. 11, 2025) ("Taranto's actions in June 2023 in Washington, D.C., were not offenses occurring at the U.S. Capitol on January 6, 2021 . . . [and] are wholly unrelated to the pardon for and dismissal of charges related to January 6, 2021 at the United States Capitol.").

This Court agreed with the government's reading of the pardon. On February 7, 2025, it held that the plain language of the pardon does not cover the defendant's Kentucky firearm offenses. Minute Order of February 7, 2025. The Court therefore ordered Wilson to report as

A265

directed to the Bureau of Prisons to serve the remainder of his 60-month sentence for his firearms convictions. *Id.*

Less than two weeks later, however, the Department began to change its position. *See* United States' Resp. to Appellant's Emergency Mot. for Relief at 3, *United States v. Costianes*, No. 24-4543 (4th Cir. Feb. 19, 2025). To date, there has been limited judicial review of the Department's reversal in position because the government has either moved to dismiss cases under Rule 48 of the Federal Rules of Criminal Procedure, *see, e.g.*, *United States v. Ball*, No. 5:24-cr-97 (M.D. Fla. Feb. 25, 2025) (granting motion to dismiss), or urged remand of pending appeals in order to seek Rule 48 dismissals before district courts, *see e.g.* United States' Time-Sensitive, Unopposed Mot. to Remand for Dismissal, *United States v. Brown*, No. 23-11146 (11th Cir. Feb. 26, 2025); Joint Mot. to Vacate Conviction and Remand for Dismissal, *United States v. Costianes*, No. 24-4543 (4th Cir. Mar. 12, 2025). *See also infra* pp. 13–15 and note 6. *But see United States v. Kelley*, No. 3:22-cr-118-TAV-JEM-1, 2025 WL 757583, at *8–9 (E.D. Tenn. Mar. 10, 2025) (denying defendant's *opposed* motion to dismiss case as covered by pardon).

On February 20, 2025, the defendant filed an unopposed motion to delay his surrender date in order to "reach a resolution" with the government, which had "agreed to take another look at the defendant's legal situation." *See* Def.'s Mot. for Ext. of Time, Dkt. 106. The Court denied the defendant's motion. Minute Order of February 20, 2025.

On February 24, 2025, the defendant filed the instant 28 U.S.C. § 2255 motion seeking vacatur of the Court's judgment on the ground that the Presidential Pardon covers his firearms offenses. *See* Def.'s § 2255 Mot. at 2–4. One day later, the government filed its response, asserting for the first time in this case that the pardon covers Wilson's Kentucky firearm offenses—a 180 degree turn from its earlier position. Gov't Resp. at 2, Dkt. 108. The Department of Justice stated

A266

that the government's position has changed because it "received further clarity on the intent of the Presidential Pardon" after consulting with Department leadership. *Id.*

The Court held a hearing on the defendant's motion on February 26, 2025. At that time, the prosecutor defending the government's position reiterated that the Department's about face was based on "further clarity about the presidential intent of the pardons." Rough Hr'g Tr. at 2:19-20. Initially, the prosecutor did not provide a cogent articulation of the pardon's meaning and resisted providing any interpretation that would apply beyond the instant case. Rough Hr'g Tr. at 18:21-22 ("I just want to be careful that I'm not speaking to other cases."); *id.* at 50:6-9 ("I am speaking as to this case and we've discussed how it applies to these circumstances and other circumstances. And I was very careful in our pleadings to say that under these circumstances the pardon applies."). When pressed, the Department eventually defined the pardon as covering "offenses that were charged as a result of search warrants conducted as part of the January 6, 2021 investigation, for which the government did not have pre-existing evidence related to similar offenses." Gov't Suppl. at 2, Dkt. 111; *see also* Rough Hr'g Tr. at 35. At the conclusion of the hearing, the Court stayed its surrender order pending resolution of the instant motion. *See* Minute Order of February 26, 2025. Because the government reversed its position and now agrees with the defendant's reading of the pardon, the Court proceeds without the benefit of adversarial briefing.

## II.     LEGAL STANDARDS

Under 28 U.S.C. § 2255, a prisoner in custody under sentence of a federal court may move the sentencing court to vacate the sentence on the ground that "the sentence was imposed in

violation of the Constitution."[1] 28 U.S.C. § 2255(a).  As relevant here, continued incarceration of a prisoner who has been pardoned would infringe upon his Fifth Amendment rights and warrant this Court setting aside its judgment.  *See, e.g.*, *Barnes v. District of Columbia*, 793 F. Supp. 2d 260, 274–75 (D.D.C. 2011) (holding that detention of a prisoner without an adequate reason for detention would violate the prisoner's due process rights).

Article II of the Constitution grants the Executive the "Power to grant Reprieves and Pardons for Offences against the United States."  U.S. Const. art. II § 2, cl. 1.  "The Framers vested this power in the President because it is part and parcel with the power to execute the laws and operates as a check on the other two branches."  *Andrews v. Warden*, 958 F. 3d 1072, 1076 (11th Cir. 2020).  The President's pardon power is broad and can be exercised "[s]o long as the President does not use the power to pardon to violate another provision of the Constitution."  *Id.* at 1076 (first citing *Schick v. Reed*, 419 U.S. 256, 264, 266–67 (1927); and then citing *Ohio Adult Parole Auth. v. Woodard*, 523 U.S. 272, 276 (1998)).  The President's pardon power is also exclusive— it may not be exercised or altered by either Congress, *see Schick*, 419 U.S. at 266, or the Judiciary, *Ohio Adult Parole Auth.*, 523 U.S. at 276; *see also Dennis v. Terris*, 927 F. 3d 955, 959 (6th Cir. 2019) ("Courts may not alter a President's commutation, except perhaps if the commutation itself violates the Constitution.").

Courts have long exercised their authority to interpret and apply Presidential pardons.  *See, e.g.*, *In re Greathouse*, 10 F. Cas. 1057, 1061 (C.C.N.D. Cal. 1864) (No. 5,741); *Carlisle v. United States*, 83 U.S. 147, 153–56 (1872); *Andrews*, 958 F.3d at 1078.  When exercising this authority, a court's duty is to determine the pardon's effect without expanding or reducing its scope.  *United*

---

[1] Though Wilson is not presently incarcerated, he is "in custody" for the purposes of 28 U.S.C. § 2255. *See Maleng v. Cook*, 490 U.S. 488, 491 (1989).

*States v. Rhodes*, No. 22-cr-15 (APM), 2025 WL 309111, at *4 (D.D.C. Jan. 27, 2025); *see Andrews*, 958 F.3d at 1078.  A court lacks the authority to correct or reinterpret the terms of a pardon.  *See Stetler's Case*, 22 F. Cas. 1314, 1316 (C.C.E.D. Pa. 1852) (No. 13,380) ("We cannot, by judicial construction, expand the pardon of one felony into a pardon of two.").

Because the text of the pardon "governs [a court's] review," courts use ordinary tools of statutory interpretation to determine the meaning of a pardon.  *Andrews*, 958 F.3d at 1078 (Pryor, J.); *see also Rhodes*, 2025 WL 309111, at *3; *Ex parte Weimer*, 29 F. Cas. 597, 598 (C.C.E.D. Wis. 1878) (No. 17,362).  It is "sensible" for a court to defer to an agency's interpretation of a pardon so long as the agency's "interpretation is not unreasonable" and "the language of the order bears its construction."  *Andrews*, 958 F.3d at 1078 (Pryor, J.) (quoting *Udall v. Tallman*, 380 U.S. 1, 4 (1965)) (cleaned up); *see also Rhodes*, 2025 WL 309111, at *3.

## III.    ANALYSIS

By its terms, the plain and unambiguous language of President Trump's pardon applies to offenses that occurred at or near the U.S. Capitol on January 6, 2021.  Nonetheless, the parties argue that the pardon applies to Wilson's Kentucky firearm offenses, which occurred on a different date—June 3, 2022—and in another place—the Western District of Kentucky.  This interpretation, which the government strongly disavowed just weeks ago, contradicts the terms of the pardon and is not entitled to deference.

### A.    The Plain Language of the Pardon

When the language of a document with the force of law is plain, "the sole function of the courts is to enforce it according to its terms."  *United States v. Ron Pair Enters., Inc.*, 489 U.S. 235, 241 (1989) (cleaned up).  A court may not take liberties with unequivocal language nor "manufacture ambiguity where none exists."  *United States v. Batchelder*, 442 U.S. 114, 121–22

(1979).  And "if the law gives an answer—if there is only one reasonable construction of a regulation—then a court has no business deferring to any other reading, no matter how much the agency insists it would make more sense."  *Kisor v. Wilkie*, 588 U.S. 558, 574 (2019); *see Christensen v. Harris Cnty.*, 529 U.S. 576, 588 (2000).  This principle also holds true for Presidential pardons.  So long as the language of a pardon is clear and unambiguous, courts interpret the pardon according to its plain and ordinary meaning.  *See In re Greathouse*, 10 F. Cas. at 1061 (citing *United States v. Wilson*, 32 U.S. 150, 160–61 (1833) (Marshall, C.J.)); *Stetler's Case*, 22 F. Cas. at 1316.

The terms of the Presidential Pardon are clear and unambiguous: it "grant[s] a full, complete and unconditional pardon to . . . individuals convicted of offenses related to events that occurred at or near the United States Capitol on January 6, 2021."  90 Fed. Reg. at 8331.  For an offense to fall within its scope, it must be tethered to a specific time—January 6, 2021—and place—at or near the U.S. Capitol.  Because Wilson did not use the firearms he possessed in Kentucky when he conspired to impede and injure officers at the Capitol on January 6, 2021, his firearm convictions are not covered by the Presidential Pardon.

Despite its earlier contrary position, the Department now argues that the pardon applies to "offenses that were charged as a result of search warrants conducted as part of the January 6, 2021 investigation, for which the government did not have pre-existing evidence related to similar offenses."  Gov't Suppl. at 2.  Wilson takes a similar approach, arguing that the pardon covers his 2022 Kentucky firearm offenses because the "convictions" for those offenses "arose from" or were "related to" the events at the Capitol on January 6.  *See* Def.'s § 2255 Mot. at 2.  Wilson asserts that because the search warrant which led to his arrest was based on probable cause that the search would yield evidence linking him to the January 6 events, "but for the events of January 6," law

enforcement agents never would have entered his Kentucky home in 2022 and discovered the firearms he unlawfully possessed. *Id.*

The parties ground their overly broad interpretations of the pardon in its "related to" phrase. *See* Gov't Suppl. at 3; Rough Hr'g Tr. at 8; Def's § 2255 Mot. at 2. While "related to" has a capacious meaning, it cannot be "taken to extend to the furthest stretch of its indeterminacy . . . for really, universally, relations stop nowhere." *N.Y. State Conf. of Blue Cross & Blue Shield Plans v. Travelers Ins. Co.*, 514 U.S. 645, 655 (1995). Rather, the phrase must be understood in context. *See Mellouli v. Lynch*, 575 U.S. 798, 812 (2015).

The Presidential Pardon only applies to "certain" offenses—those "related to events that occurred at or near the United States Capitol on January 6, 2021." 90 Fed. Reg. at 8331. An "offense" is a violation of the law—a crime. Offense, Black's Law Dictionary (12th ed. 2024). In this context, the meaning of "related to" is well-settled: it restricts the scope of the generic term "offenses" to those "committed in certain factual circumstances." *Friedman v. Sebelius*, 686 F.3d 813, 818–23 (D.C. Cir. 2012) (interpreting statutory provision that applies to "[a]ny individual or entity that has been convicted of a criminal offense consisting of a misdemeanor relating to fraud"); *see also Nijhawan v. Holder*, 557 U.S. 29, 33–36 (2009). And those factual circumstances are tethered to a specific place and time—the events that occurred at or near the U.S. Capitol on January 6, 2021. *Accord Kelley*, 2025 WL 757583, at *3 (holding "that the pardon is primarily constrained by temporal and spatial parameters as defined by the date and location of 'events.'").

The surrounding text of the pardon makes clear that "related to" denotes a specific factual relationship between the conduct underlying a given offense and what took place at the U.S. Capitol on January 6, 2021. For instance, the title of the Presidential Pardon—"Granting Pardons and Commutation of Sentences for *Certain Offenses* Relating to the *Events* at or Near the United

9

A271

States Capitol on January 6, 2021," 90 Fed. Reg. at 8331 (emphasis added)—strongly suggests that it is the offense itself that must be related to the events of January 6. *Cf. Yates v. United States*, 574 U.S. 528, 539–40 (2015) (looking to the heading of a statutory provision for evidence of the provision's meaning). Relatedly, the pardon directs "the Attorney General to pursue dismissal with prejudice to the government of all pending indictments against individuals for their *conduct* related to the events at or near the United States Capitol on January 6, 2021." 90 Fed. Reg. at 8331 (emphasis added). That the pardon instructs the Attorney General to exercise its prosecutorial discretion by looking to the *conduct* underlying an indictment—and not the *investigation* which produced that indictment—indicates that the pardon is likewise meant to apply only to defendants convicted of January 6-related offenses—those occurring at or near the Capitol on January 6, 2021.

The structure of the Presidential Pardon lends further support to the conclusion that it was meant to apply to offenses factually tethered to the events of January 6, 2021, rather than to incidental offshoots of the January 6 investigations. At the time the pardon was issued, President Trump drew clear distinctions between certain classes of January 6 defendants. He commuted the sentences of fourteen January 6 defendants, while issuing a full and unconditional pardon for all other January 6 defendants. 90 Fed. Reg. at 8331. The President made no attempt to distinguish between those January 6 defendants who were charged with additional criminal offenses—including threats of physical violence and possession of child pornography, classified information, explosives, and firearms, *see infra* pp. 13–15—as a result of the January 6 search warrants and those who were not.

To be sure, the "related to" language in the pardon leaves open the possibility that certain criminal actions may be close enough in time and place to the events of January 6 so as to fall within the pardon. But the phrase cannot extend so far as to cover *any* criminal offense—no matter

10

how physically or temporally remote to the January 6 Capitol events—solely because some evidence supporting the offense was recovered during a January 6 investigation. Contrary to the pardon's plain language and structure, the parties' reading of the pardon conflates offenses discovered during the January 6 investigations with offenses that occurred at or near the Capitol on January 6. *See Kelley*, 2025 WL 757583, at *7 (noting that the text of the pardon does not include offenses related solely "to the investigation of conduct occurring on January 6, 2021"). Because Wilson's Kentucky firearm offenses bear no relationship to the events that occurred at the Capitol on January 6, 2021, they are not covered by the plain language of the Presidential Pardon.

### B.    Deference is Unwarranted

The Court need not defer to the Department's reinterpretation of the Presidential Pardon because the pardon's text is clear and unambiguous. *See Christensen*, 529 U.S. at 588. But even if the language of the pardon were ambiguous, the Court would not accord deference to the Department's most recent interpretation because it is unreasonable and does not reflect its fair and considered judgment. *See Christopher v. SmithKline Beecham Corp.*, 567 U.S. 142, 153 (2012).

The Department's latest reinterpretation of the pardon is unreasonable because it is unsupported by the pardon's text. *See Norfolk S. Ry. Co v. Shanklin*, 529 U.S. 344, 356 (2000). The pardon says nothing at all about evidence recovered during an investigation, much less evidence recovered "as a result of search warrants." *Compare* Gov't Suppl. at 2 *with* 90 Fed. Reg. at 8331. Nor does the pardon carve out offenses in which the government had pre-existing evidence related to "similar offenses." *Compare* Gov't Suppl. at 2 *with* 90 Fed. Reg. at 8331. The multiple qualifying clauses the Department asks the Court to add to the pardon stretch its meaning

A273

well beyond what its language can bear.  *Andrews*, 958 F.3d at 1078; *see also Stetler's Case*, 22 F. Cas. at 1316.[2]

Moreover, the Department's prosecution decisions defy its broad interpretation of the pardon's scope.  *See Friedman*, 686 F.3d at 820.  On the one hand, the Department argues that "related to" has a maximally capacious meaning and covers offenses charged as a result of evidence gathered during a January 6 investigation.  Rough Hr'g Tr. at 8.  On the other, however, it applies the pardon to cover only those offenses that were charged "as a result of evidence seized in a search warrant," as opposed to the January 6 investigation as a whole.  *See* Rough Hr'g Tr. at 30–31.  The Department further restricts the pardon's scope by excluding offenses for which the government had "pre-existing evidence," even if that evidence related to a distinct (though similar) offense.  *See* Rough Hr'g Tr. at 21–23, 35 (explaining that pardon does not cover a child pornography offense because government had preexisting evidence of a child exploitation, but not child pornography, offense); Gov't Suppl. at 2.  These selective applications of the pardon undermine the reasonableness of the Department's position.

Apart from being unreasonable, the Department's current interpretation diverges sharply from its previous position, is being inconsistently applied, and appears to be a post hoc rationalization advanced to support its ongoing litigating positions.  A change in interpretation that is not based on a well-grounded explanation does not reflect a "fair and considered judgment on the matter in question."  *Christopher*, 567 U.S. at 155.  In such circumstances, deference is

---

[2] To the extent that the government adopts Wilson's formulation, *see* Rough Hr'g Tr. at 13, it likewise adds words—"convictions" and "arising from"—that do not exist within the pardon's text.  *Compare* Def.'s § 2255 Mot. at 2 *with* 90 Fed. Reg. at 8331; *see 62 Cases, More or Less, Each Containing Six Jars of Jam v. United States*, 340 U.S. 593, 596 (1951) (a court is "neither to add nor to subtract, neither to delete nor to distort" the words of a document with the force of law).

unwarranted.  *See Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 212–13 (1988); *cf. Auer v. Robbins*, 519 U.S. 452, 462 (1997).

From January 20, when the President issued the pardon, through February 18, the Department stated repeatedly and unequivocally in courts across the country that the pardon does not cover offenses that were charged based on evidence gathered as a result of a January 6-related search warrant.  *See supra* p. 3.  But on February 25, the government abruptly reversed its position in this case, with virtually no explanation, and reinterpreted the pardon to mean the opposite.  Gov't Resp. at 2, Dkt. 108.  The Department insists that its current interpretation is entitled to deference because "indicia of Presidential intent" support its position, Gov't Suppl. at 2–3 (citing *Robertson v. Gibson*, 759 F.3d 1351, 1357–58 (Fed. Cir. 2014)).[3]  But those "indicia" appear to stem from decisions the *Department* has made to dismiss certain cases, rather than from any clear expression of the *President's* intent.  Gov't Resp. at 2, Dkt. 108.; Rough Hr'g Tr. at 13.

In cases across the country, the Department appears to be shifting positions, making decisions about the scope of the pardon, as it sees fit.  Although the government now asserts that the pardon is intended to cover offenses charged as a result of evidence obtained during a January 6-related search, Rough Hr'g Tr. at 23–24, its prosecution decisions show otherwise.  Firearm, explosive, and classified information offenses are being dropped as a result of the Presidential

---

[3] Contrary to the position the Department took at the hearing, *see* Rough Hr'g Tr. at 46, *Robertson* does not stand for the proposition that the meaning of a "full pardon" cannot be resolved on the basis of the pardon's plain language alone.  In *Robertson*, the Federal Circuit looked beyond the plain language of the pardon at issue because the language of the pardon itself required that inquiry.  *See Robertson*, 759 F.3d at 1357–58.  The Court noted that the phrase "full pardon" was subject to two limiting phrases that "strongly suggest[ed] that Mr. Robertson's 'full pardon' must be read in the context of the clemency program described by Presidential Proclamation 4313."  *Id.*  Here, however, no language in the Presidential Pardon at issue suggests that the Court must look outside of the pardon's text to ascertain its meaning.

13

A275

Pardon, *see, e.g.*, *United States v. Brown*, No. 23-11146 (11th Cir.), while otherwise similar child pornography offenses are not, *see*, *e.g.*, *United States v. Daniel*, No. 3:24-cr-209 (W.D.N.C.); *United States v. Colton*, No. 2:24-cr-29-DAD (E.D. Cal.).

The Department's proffered justifications for the varying positions it has taken in cases across the country are not borne out by the record. As noted, the government defended its continued prosecution of a child pornography case in one district on the ground that some of the evidence in support of that prosecution came from a preexisting child exploitation (but not child pornography) investigation. Rough Hr'g Tr. at 21–23; *see United States v. Daniel*, No. 3:24-cr-209 (W.D.N.C.). At the same time, however, court records show that the government continues to prosecute a child pornography case in another district, even though the evidence in support of those child pornography charges allegedly arose *solely* from evidence seized as a result of a January 6 search warrant. *See* United States' Opp'n to Colton's Mot. to Suppress at 1–7, *United States v. Colton*, No. 2:24-cr-29-DAD (E.D. Cal. Oct. 11, 2024). And in another January 6 case, the government has argued that a defendant's convictions for various unrelated felonies, including possession of classified information, are covered by the pardon, *see* Rough Hr'g Tr. at 33–34, even though the government was aware of information related to the classified information offense *before* it conducted the January 6 search of the defendant's home, *see* United States' Sentencing Mem. at 5–6, *United States v. Brown*, No. 8:21-cr-348 (M.D. Fla. Mar. 24, 2023) (describing Air Force Office of Special Investigations' previous investigation of the defendant regarding the same classified information).

During the hearing in this case, the government justified its continued prosecution of another January 6 defendant charged with a plot to murder January 6 investigators on the ground that the defendant's "conduct was completely different from the events of January 6th of 2021"

14

A276

and was "the product[] of the defendant's independent volitional acts."  Rough Hr'g Tr. at 30:15-16; United States' Suppl. Resp. to Def.'s Mot. to Vacate Jury Conviction and Dismiss Indictment at 1, *United States v. Kelley*, No. 3:22-cr-118-TAV-JEM-1 (E.D. Tenn. Feb. 26, 2025).  But that is true of all of the above defendants, as well as Wilson.  A defendant cannot be guilty of unlawfully possessing explosives, classified information, child pornography, firearms, or other contraband without having engaged in intentional and "independent volitional acts."

In addition to applying the pardon inconsistently, the government appears to be intent on preserving its ability to take a different position in the future.  *See* Rough Hr'g Tr. at 30.  During the motions hearing, the prosecutor was reluctant to take any position before this Court that would affect future cases, including ones actively being litigated.  *Id.* at 30:6-11, 18:21-22, 50:6-9.  But the meaning of a pardon cannot change after the pardon issues.  *Cf. United States v. Santos*, 553 U.S. 507, 522 (2008) ("[T]he meaning of words in a statute cannot change with the statute's application.  To hold otherwise would render every statute a chameleon . . . ." (cleaned up)). Determinations about the scope of a pardon are made before, not after, its issuance.

Historically, as here, Presidents have issued broad pardons to cover large groups of similarly situated defendants.[4]  But such broadly-worded pardons clearly define the class of

---

[4] *See, e.g.*, James Madison, Proclamation No. 19 (Feb. 6, 1815), *in* 1 A Compilation of the Messages and Papers of the Presidents 1789–1897, at 558–60 (James D. Richardson ed., 1897) (pardoning all inhabitants of New Orleans and the island of Barratria for "all offences committed in violation of any [act of Congress] touching the revenue, trade, and navigation thereof or touching the intercourse and commerce of the United States with foreign nations at any time before" January 8, 1815); Abraham Lincoln, Proclamation No. 108, 13 Stat. 737 (Dec. 6, 1863) (granting a full pardon "to all persons who have, directly or by implication, participated in the existing rebellion, except as hereinafter excepted"); Harry S. Truman, Proclamation No. 2676, 10 Fed. Reg. 15409 (Dec. 24, 1945) (pardoning certain World War II veterans "convicted of violation of any law of the United States or the Territory of Alaska, other than the laws for the government of the Army and Navy" prior to their enrollment in the armed services); Jimmy Carter, Proclamation No. 4483, 42 Fed. Reg. 4391 (Jan. 24, 1977) (pardoning "all persons who

A277

individuals and the types of offenses covered by the pardon. *See* Amnesty—Power of the President, 20 Op. Att'y Gen. 330, 331–32 (1892) (Taft, William H.) (concluding that the President may issue a broad pardon to a class of defendants "without naming them, but describing them as persons committing, or participating in, the same kind of offenses" so long as the pardon is "sufficiently definite with respect to the beneficiaries by a description other than by name"). And in those rare circumstances in which a pardon has been genuinely susceptible to multiple readings, Presidents have issued clarifying proclamations. *See, e.g.*, Abraham Lincoln, Proclamation No. 111 (Mar. 26, 1864), *in* 6 A Compilation of the Messages and Papers of the Presidents 1789–1897, at 217–18 (clarifying that Proclamation No. 108 does not apply to prisoners but only to those "at large and free from any arrest, confinement, or duress"). The President did not do so here.

Instead, he issued a broad proclamation that divides the class of January 6 defendants into two groups—a large group that was fully pardoned for "offenses related to events at or near the United States Capitol on January 6, 2021," 90 Fed. Reg. at 8331, and a smaller set of fourteen named individuals whose sentences were merely commuted. The pardon does not separately identify January 6 defendants who were charged with additional unrelated offenses that merely "arose out" of the January 6 investigations, Def.'s § 2255 Mot. at 2. And, despite questions raised by numerous courts,[5] the President has not issued a clarifying proclamation that states that the pardon is intended to cover some (or all) of those "offenses that were charged as a result of search warrants conducted as part of the January 6, 2021 investigation," Gov't Suppl. at 2. Nor has the

---

may have committed any offense between August 4, 1964 and March 28, 1973 in violation of the Military Selective Service Act").

[5] *See, e.g.*, Rough Hr'g Tr. at 6–7; Oral Argument at 23:00, *United States v. Brown*, No. 23-11146 (11th Cir. Mar. 6, 2025), https://www.ca11.uscourts.gov/system/files_force/ oral_argument_recordings/23-11146_03062025.mp3; Order, *United States v. Costianes*, No. 24-4543 (4th Cir. Feb. 27, 2025).

A278

President, or anyone else connected with the pardon drafting process, provided a declaration or other clear expression of his intent.  Individual prosecutors' representations in court regarding unspecified "recent clarity," Gov't Suppl. at 2, are not an adequate substitute.  *Cf., e.g.*, *United States v. Navarro*, 651 F. Supp. 3d 212, 224 (D.D.C. 2023) (defendant could not make out a claim that the President privately invoked executive privilege when such claim was unsupported by any sworn affidavit or testimony and rested entirely on counsel's representations).

  To interpret the Presidential Pardon to apply to *any* type of offense—no matter when or where that offense was committed—simply because evidence of that offense was uncovered incident to a January 6-related search warrant would "def[y] rationality."  *United States v. Cook*, 594 F.3d 883, 891 (D.C. Cir. 2010).  That might explain why the Department has incorporated a myriad of qualifying clauses into the pardon's text to ensure that certain cases—like those involving child pornography and murder plots, *see supra* pp. 13–15—are not covered by the President's grant of clemency.  In any case, the Department's inconsistent litigating positions and its unwillingness[6] (and perhaps inability) to express a clear and stable interpretation of the pardon leads the Court to conclude that its current position is a "*post hoc* justification adopted in response to litigation."  *See City & Cnty. of San Francisco v. Trump*, 897 F.3d 1225, 1242 (9th Cir. 2018) (quoting *Decker v. Nw. Envtl. Def. Ctr.*, 568 U.S. 597, 614 (2013)); *cf. C.I.R. v. Schleier*, 515 U.S. 323, 334 n.7 (1995) ("In view of the Commissioner's differing interpretations of her own

---

[6] The recent proceedings in *United States v. Costianes*, No. 24-4543 (4th Cir.), are illustrative. There, the Fourth Circuit ordered supplemental briefing on the applicability of the pardon to the defendant's firearm conviction, *see* Order, *United States v. Costianes*, No. 24-4543 (4th Cir. Feb. 27, 2025), after the Department sought vacatur of the conviction based on the pardon, *see* United States' Resp. to Appellant's Emergency Mot. for Relief, *supra* p. 4, at 1–5.  Despite the Fourth Circuit's order, the government declined to answer the court's questions because it "determined that the more efficient and prudent course—and the one most consistent with President Trump's instructions—is to move to vacate Mr. Costianes's conviction and dismiss the indictment under Rule 48(a)," *see* Joint Mot. to Vacate Conviction and Remand for Dismissal, *supra* p. 4, at 2.

A279

regulation, we do not accord her present litigating position any special deference."); *Bowen*, 488 U.S. at 211–12.  Because the Department's latest interpretation of the Presidential Pardon lacks a reasoned basis and is not a fair and considered judgment of the pardon's scope, *see Christopher*, 567 U.S. at 153, the Court accords no deference to the Department's current litigating position.

\* \* \*

The Constitution grants the President the exclusive and broad authority to pardon an individual for any and all criminal offenses.  This case is not about the reach of that power—President Trump unquestionably has the authority to pardon Wilson for all of his convictions.  That authority is clear and virtually unreviewable.

The issue before this Court is whether the language of the Presidential Pardon related to the January 6, 2021 Capitol events covers Wilson's 2022 Kentucky firearm offenses.  It does not.  By moving to expand the Presidential Pardon beyond any reasonable interpretation, the parties ask this Court to exceed its constitutional authority.  President Trump alone has the constitutional authority to pardon Wilson for all of his crimes.  He still may do so.  But this Court cannot—it is duty bound to enforce the Presidential Pardon *as written*.

18

**CONCLUSION**

For the reasons stated, the defendant's Motion to Vacate, Set Aside, or Correct Sentence under 28 U.S.C. § 2255, Dkt. 107, is denied. A separate order consistent with this decision accompanies this memorandum opinion.

_____
DABNEY L. FRIEDRICH
United States District Judge

March 13, 2025

A281

```
 1                  IN THE UNITED STATES DISTRICT COURT
                      FOR THE DISTRICT OF COLUMBIA
 2

 3    UNITED STATES OF AMERICA,      ) CRIMINAL ACTION NO.:
                                     ) 23-0427-DLF
 4             Plaintiff,            )
            vs.                      )
 5                                   )
      DAN EDWIN WILSON,              )
 6                                   ) Washington, D.C.
               Defendant.           ) February 26th, 2025
 7    _____ ) 11:35 a.m.

 8

 9                     Transcript of Motions Hearing
                  Before the Honorable Dabney L. Friedrich
10                     United States District Judge

11

12    APPEARANCES:

13    For the Government: Jennifer L. Blackwell, Esquire
                          U.S. Attorney's Office
14                        555 4th Street, N.W.
                          Washington, DC 20530
15

16

17    For the Defendant:  George T. Pallas, Esquire
                           George T. Pallas, P.A.
18                         2420 Coral Way
                           Miami, FL 33145
19

20

21    Reported by:        Christine T. Asif, RPR, FCRR
                           Official Court Reporter
22                         United States District Court
                           for the District of Columbia
23                         333 Contitution Avenue, NW
                           Washington, D.C., 20001
24                         (202) 354-3247

25    Proceedings recorded by machine shorthand; transcript produced
      by computer-aided transcription
```

A282

```
1                    P R O C E E D I N G S
2              THE CLERK:  We are on the record in criminal case
3     23-427-1, United States of America versus Dan Edwin Wilson.
4              Starting with the government, please approach the
5     podium and state your appearance for the record.
6              MS. BLACKWELL:  May it please the Court, Jennifer
7     Blackwell, appearing on behalf of the United States.
8              THE COURT:  Good morning, Ms. Blackwell.
9              MS. BLACKWELL:  Good morning.
10              MR. PALLAS:  Good morning, Your Honor.  George
11     Pallas on behalf of Dan Edwin Wilson, who is also present.
12              THE COURT:  All right.  Good morning to both of you.
13     Just bear with me one moment while I get the realtime going.
14              (Pause in the proceedings.)
15              THE COURT:  All right.  Counsel, this is a hearing
16     on the defendant's emergency motion to vacate the order
17     requiring the defendant to report to the Bureau of Prisons
18     tomorrow.  Although it's the defendant's motion, I'd like to
19     hear first from the Department of Justice because the
20     department has not opposed the defendant's motion, and the
21     Court scheduled this hearing because it needs some clarity on
22     what the government's current position is.
23              MS. BLACKWELL:  Thank you, Your Honor.  And I
24     understand.  As Your Honor is aware from the procedural
25     history, we did file a motion and response to the Court's
```

Christine T. Asif, RPR, FCRR, Federal Official Court Reporter

1    order, I believe that was approximately three weeks ago now,

2    indicating that under the plain language of the pardon

3    certificate, the government did not believe that the pardon

4    covered the firearms offenses to which this defendant pled

5    guilty in this court and then was sentenced in August of last

6    year.

7              However, as we indicated in our filing papers

8    yesterday, and the reason that we did not oppose the

9    defendant's motion, is because there has been further clarity

10   about the presidential intent of the pardons.  Specifically,

11   as noted in our papers, there are similarly situated cases

12   which have either been vacated or dismissed, and they are

13   similarly postured to Mr. Wilson's example here, in that those

14   were cases in which there was a search warrant for evidence

15   related to January 6th of 2021, and in that search warrant,

16   the law enforcement located contraband, whether that be

17   firearms or drugs.  And it is now the position of the

18   department that in those cases and under these circumstances,

19   if there was contraband such as firearms that were found

20   pursuant to a search warrant that was executed from

21   January 6th of 2021, that the pardon does cover those offenses

22   as well.  So in order to be consistent with the posture the

23   department has taken with respect to those other defendants --

24              THE COURT:  But to be clear, the position the

25   department has taken with those other defendants is also very

1    recent.

2              MS. BLACKWELL:  That is correct, Your Honor.

3              THE COURT:  Okay.

4              MS. BLACKWELL:  It has been in the intervening three

5    weeks.  And in fact, one I filed was as recently as yesterday

6    morning.

7              THE COURT:  And today in this case.

8              MS. BLACKWELL:  Yes, that's correct, Your Honor.

9              THE COURT:  Okay.  So earlier in this case, and I

10   presume in others, the government stated that the pardon only

11   applies to convictions for offenses related to events that

12   occurred at or near the Capitol on January 6th.  And in this

13   case, with respect to these firearms offenses, which are

14   possession of firearms in the Western District of Kentucky, on

15   a date in 2023, those firearms, although Mr. Wilson certainly

16   discussed before January 6th bringing firearms to the Capitol,

17   the government never took the position, and presented the

18   Court with no evidence, that Mr. Wilson actually had the

19   firearms with him on January 6th.

20             So the government said, I think it was, I don't

21   know, around February 6th, that you took the position here

22   that those charges, those convictions for the firearms

23   offenses, were complete -- they were unrelated and that the

24   plain language of the pardon excluded them, plain language.

25             So I'm wondering now, is it the government's

1    position that the plain language does not exclude those

2    convictions, that you had it wrong a couple of weeks ago?  Is

3    that what you're saying now?

4              MS. BLACKWELL:  That is correct.  And I think just

5    to add to that, we've had more of an understanding of the

6    presidential intent.  So it is the presidential intent that

7    governs what is covered by the pardon.  And I think in light

8    of these other cases and guidance from the department, we have

9    more of an understanding of what that intent does cover.

10             THE COURT:  All right.  Well, I want to put aside

11   the other cases, because I think that they've all -- the

12   government's flipped in all of them.

13             MS. BLACKWELL:  In candor, Your Honor, I do believe

14   this was the only case in which we were called upon to sort of

15   have one position and then when our understanding of the

16   intent further developed, then take what seemed to be a

17   contrary position --

18             THE COURT:  I don't know that that's true.  I think

19   in another -- at least one other case I thought you set forth,

20   quite clearly, the sort of time and location restriction on

21   the pardon language.  I could be wrong.

22             But regardless, it doesn't matter.  What I'm trying

23   to understand is from your filing, it wasn't clear to me

24   exactly what the definition of the pardon is.  And if I'm

25   understanding what you're saying today, it is the government's

1    position that the plain language of the pardon means that any

2    convictions which stemmed from evidence that was seized as a

3    result of a January 6th investigation search warrant, those

4    convictions are covered by the plain language of the pardon,

5    even though they were separated from the events of the Capitol

6    in both time and place.

7            MS. BLACKWELL:  So I want to be careful in

8    responding to Your Honor's question, because I am aware that

9    there are other cases in which the events are separated by

10   time and place from the January 6th that are not covered by

11   the pardon.

12           THE COURT:  So tell me what those are, because it

13   seems to me, and correct me if I'm wrong, but it seems to me

14   that the meaning of the pardon was established on

15   January 20th, when it was entered, not after the fact, right?

16   I mean, that's when we discern the meaning of the pardon.

17           MS. BLACKWELL:  Understood.

18           THE COURT:  It doesn't evolve over time.  It's not a

19   blank -- fill-in-the blanks pardon with some loose language.

20   It is a document that has legal meaning, and that meaning is

21   set at the time the pardon is issued.  Do you agree with that?

22           MS. BLACKWELL:  I understand, Your Honor.  I

23   think --

24           THE COURT:  Do you agree with that?

25           MS. BLACKWELL:  I do agree with it, but I think in

1    terms of the department's understanding of the president's

2    intent, I think that has become clearer over time.

3              THE COURT:  Okay.  But I understand the president's

4    intent has become clear over time, but even just focusing on

5    the president's intent and not the language, you would agree

6    the president's intent has to be formed on January 20th, when

7    he issues the pardon.  He can't change his intent and

8    essentially issue a new pardon as time lapsed.  The proper

9    procedure is for the president to exercise his constitutional

10   authority to issue a new or different pardon if his intent,

11   or, I would argue, the language changes over time, right?  I

12   mean, the pardon is set when it issues.

13             MS. BLACKWELL:  I would -- I see Your Honor's point,

14   but I will definitely caveat my answer to say that I'm not an

15   expert on the pardon power.

16             THE COURT:  Right.  But I'm looking to the

17   department --

18             MS. BLACKWELL:  Correct.

19             THE COURT:  -- to guide the Court on how the Court

20   interprets the pardon and what degree of deference the Court

21   gives to the president's intent.  And so I'm -- you know, I'm

22   looking for the department's view at this time on how a court

23   should interpret a pardon.

24             I'm sensing that you are suggesting perhaps -- I

25   don't want to put words in your mouth, but you're suggesting

```
1    that the president's intent can -- excuse the pun -- but trump

2    the plain language of the pardon.  Is that what you're

3    arguing?

4              MS. BLACKWELL:  So actually, I would say I'm not

5    arguing that.

6              THE COURT:  Okay.

7              MS. BLACKWELL:  Because if you look at the pardon

8    from January 20th, it is very broad.  So --

9              THE COURT:  Well, it -- I mean, yes and no.  It has

10   some pretty clear text.  The pardon applies to convictions for

11   offenses related to events that occurred at or near the

12   U.S. Capitol on January 6th, 2021.  So the pardon does not say

13   convictions related to offenses -- it doesn't say convictions

14   related to events that occurred at the Capitol.  What it says

15   is convictions for offenses related to events.  So it's the

16   offense that needs to be related, not the conviction.

17            The offense here, again, is possession of firearms

18   on a date in 2023, in the Western District of Kentucky.  I

19   believed, at the time I ordered the government to give its

20   view on what the pardon meant, I believe that the plain

21   language did not include these possession of firearms in the

22   Western District of Kentucky.  The government affirmed the

23   Court's view that the plain language does not include those

24   offenses.

25            I'm just trying to get clarity now on what the
```

```
 1    government's position is.  Is it that the government was wrong
 2    at that time in saying the plain language did not include
 3    these firearms offenses?  Or is it saying the government still
 4    believes the plain language does not cover these offenses, but
 5    the president's intent was different, and therefore, the Court
 6    should defer to the president's intent rather than the plain
 7    language of the pardon?
 8              MS. BLACKWELL:  I think both could be true.  I think
 9    the "related to" is a pretty expansive word.
10              THE COURT:  Convictions related to events.
11              MS. BLACKWELL:  Correct.
12              THE COURT:  Not investigations, events that occurred
13    at the Capitol.
14              MS. BLACKWELL:  And then we would have to go to part
15    two, which is the presidential intent, and the intent of that
16    phrase was to capture the convictions that may have been sort
17    of a but for, if you will --
18              THE COURT:  But why isn't the solution here for a
19    clarifying pardon to issue that says what was intended on that
20    date, as opposed to a reinterpretation of language that was
21    clear to the department and clear to the Court a matter of
22    days ago?
23              MS. BLACKWELL:  I can understand the Court's
24    position on that, but I will say given the amount of pardons
25    that this affected, you know, it invariably took some time to
```

```
1    determine what the presidential intent was as to each of
2    these special cases.
3              THE COURT:  But that's my concern, is that the
4    intent cannot evolve over time as new cases are brought to his
5    intention by defense attorneys or others.
6              MS. BLACKWELL:  And with respect --
7              THE COURT:  It -- I mean, I'm looking for you to
8    push back on this.  I feel strongly that the meaning of the
9    pardon was set on January 20th of 2025.  Do you disagree with
10   that?
11             MS. BLACKWELL:  I don't disagree, but I do think it
12   is fair to say that an understanding -- that the presidential
13   intent governs --
14             THE COURT:  Governs over the plain text of the
15   pardon.  That's your position.
16             MS. BLACKWELL:  But I think you have to --
17             THE COURT:  Yes or no?
18             MS. BLACKWELL:  You have to read them together.
19             THE COURT:  No, no, I'm -- there's two arguments
20   here.  You can make them both, but I want to make sure I
21   understand what the government's position is now.
22             The government's position is, it sounds like, even
23   if the plain language excludes these convictions from the
24   pardon, the president's intent trumps the plain language.
25   That's the secondary argument.  Am I correct you're making
```

```
 1    that argument?
 2              MS. BLACKWELL:  I would go back to my default of the
 3    presidential intent governs, but it's through a reading of the
 4    plain language that it could be said to include these --
 5              THE COURT:  But that's suggesting that you're saying
 6    the plain language is ambiguous.  You didn't say that days
 7    ago, but you're saying now the plain language is ambiguous; is
 8    that right?
 9              MS. BLACKWELL:  I think the plain language is broad.
10    I think there is an argument that the actual pardon
11    certificate may be more detailed than the pardon itself.  So
12    if we go back to the pardon itself, I think that is more
13    expansive in its reading than the actual pardon certificate.
14              THE COURT:  So what governs, in the government's
15    view, the pardon or the certificate?  Can the certificate
16    reinterpret the pardon to mean something other than the plain
17    language of the pardon?
18              MS. BLACKWELL:  I don't think so.  I think --
19              THE COURT:  Okay.  So you're saying the certificate
20    informs, in real time, the meaning of the text of the
21    pardon.
22              MS. BLACKWELL:  I think that's right.
23              THE COURT:  And that certificate was issued the same
24    day.  And the certificate in this case, remind me, it says
25    what?
```

Christine T. Asif, RPR, FCRR, Federal Official Court Reporter

A292

```
 1              MS. BLACKWELL:  I believe the defense attorney filed
 2      it.  It's sitting right there.
 3              THE COURT:  Is it attached to the --
 4              MS. BLACKWELL:  He just filed it this morning.
 5              THE COURT:  You filed it this morning?
 6              MR. PALLAS:  Yes, Your Honor, I filed this morning.
 7      I noticed it wasn't even in the record, so I filed it to make
 8      sure --
 9              THE COURT:  Let me -- I missed that.  Let me pull it
10      up.
11              MR. PALLAS:  It's actually more narrow than the
12      executive order on January 20th.
13              THE COURT:  Okay.  So the certificate says that
14      Daniel Edwin Wilson was pardoned by the presidential
15      proclamation of January 20th, 2025.  The pardon applies only
16      to convictions for offenses related to events that occurred at
17      or near the Capitol on January 6th.
18              Is this not identical to the language of the pardon?
19      Or it's the language I've been referencing.
20              Mr. Pallas, what's different between --
21              MR. PALLAS:  I read it kind of quickly, and I
22      thought it was a little bit narrower because it didn't say
23      related.
24              THE COURT:  It does say related to.
25              MR. PALLAS:  Okay.  Well, then I take that back,
```

```
1   Judge.  But I can clear this up very quickly, Judge.
2              THE COURT:  Well, no, no, I want to -- I'll hear
3   from you in a moment, but I want to stick with Ms. Blackwell.
4              MR. PALLAS:  Okay.
5              MS. BLACKWELL:  I think to be fair, Your Honor, the
6   pardon says "all other individuals convicted of."  The pardon
7   certificate says "convictions for."  So there is an argument
8   that "individuals convicted of" is perhaps broader than just
9   the word "convictions for offenses."
10             THE COURT:  Okay.  Wait.
11             Can I get you to print this out because I can't read
12  it sideways.
13             THE CLERK:  Yes.
14             THE COURT:  Thank you.
15             All right.  So, Ms. Blackwell, you are saying the --
16  it says the pardon applies only to convictions for offenses
17  related, as opposed to -- what did the pardon say?
18             MS. BLACKWELL:  The pardon says "all other
19  individuals convicted of."
20             THE COURT:  Convicted of.  So you're saying
21  convicted of offenses related to events is different than
22  convictions for offenses related to events.  I don't
23  understand the distinction.  Can you walk me through what they
24  mean?
25             MS. BLACKWELL:  I think the former, then.  I think
```

```
1   the pardon itself would allow an interpretation that in cases

2   such as this, where you have a search warrant based on the

3   January 6th activities, that then, because these were

4   individuals convicted of, that that would extend to those

5   cases in which it was a relationship between the search

6   warrant for the January 6th and the contraband that was --

7           THE COURT:  Okay.  So the -- you're actually saying

8   the opposite of what Mr. Pallas was arguing in terms of the

9   certificate versus the pardon itself.  You're saying the

10  pardon itself has broader language because it uses the word

11  "convicted of offenses related to events"?

12          MS. BLACKWELL:  Correct.

13          THE COURT:  And because you're convicted of offenses

14  related to events, but again, the qualifier is "events that

15  occurred at or near the Capitol."

16          So how is being convicted of a gun possession

17  offense in Kentucky in 2023 related to events that occurred at

18  or near the Capitol?  You're saying it's related to the

19  investigation.

20          MS. BLACKWELL:  I think Mr. Pallas would -- and I

21  don't want to borrow from his argument, but it's sort of a

22  but-for analysis, that but for what the defendant did on

23  January 6th, that law enforcement would not have uncovered the

24  firearms in this case, which led to a --

25          THE COURT:  No, I understand.  So you embrace -- you
```

Christine T. Asif, RPR, FCRR, Federal Official Court Reporter

A295

1    didn't oppose that motion.  You embrace the defense's

2    interpretation.

3              MS. BLACKWELL:  That is correct.

4              THE COURT:  That is the government's position now.

5              MS. BLACKWELL:  Yes.

6              THE COURT:  All right.  And so just to -- just to --

7    I'm going to pull up the defense's filing here.  I just want

8    to make sure that we're all on the same page.

9              So we're talking about Mr. Wilson's unopposed motion

10   to vacate, set aside, or correct the sentence?

11             MS. BLACKWELL:  Correct.

12             THE COURT:  All right.  And another thing, he adds

13   language that's not in the pardon.  He's got, in bold, "any

14   convictions arising from or related to."  That's not what the

15   pardon says.

16             MS. BLACKWELL:  Correct.

17             THE COURT:  All right.  So I don't know that even in

18   this motion that there is a clearly articulated definition, so

19   I'd ask you, Ms. Blackwell, to articulate the definition of

20   the pardon.  I understand what you're saying.  It includes any

21   contraband seized as a result of a January 6th-related search

22   warrant.

23             But I just want a clear definition of the pardon

24   because what you've said in your filing is it includes these

25   two offenses.  But from what you're saying, it includes other

Christine T. Asif, RPR, FCRR, Federal Official Court Reporter

A296

1    offenses as well, not just these two firearm offenses.

2            So I'm looking for the definition that was formed on

3    January 20th of 2025.  Unless you tell me that the definition

4    can change over time, I can't imagine what authority you could

5    present that would convince the Court that that is true.  But,

6    you know, correct me if I'm wrong.

7            MS. BLACKWELL:  So with respect, Your Honor, I can

8    speak to this case, and in this case, as with the other

9    examples that we cited, the pardon covers situations like

10   this, where there was a search warrant for evidence related to

11   January 6th of 2021, which the pardon clearly covers, and they

12   then uncover additional evidence that leads to additional

13   charges or convictions.

14           THE COURT:  I understood your speaking about this

15   case.  However, if the government's taking a position in this

16   case that's different than -- and saying the pardon means

17   something else in another case, that's a problem.  You'd

18   agree?

19           MS. BLACKWELL:  I would agree.

20           THE COURT:  Okay.  So I need to know what's the

21   high-level definition of the pardon from which you made the

22   determination that these offenses were covered by the pardon.

23   There has to be somewhere, if not in writing in the pardon,

24   somewhere a definition for what this pardon means, however

25   inartfully it was drafted.

Christine T. Asif, RPR, FCRR, Federal Official Court Reporter

A297

1          MS. BLACKWELL:  In consultation with department

2    leader Schiff, as in the other cases, we understand that the

3    presidential intent is to cover this case and the other cases

4    that were cited.  I do not want to go beyond and hypothesize

5    as to other cases where the pardon may not apply.

6          THE COURT:  But the pardon has to have a meaning, a

7    fixed meaning that was formed on January 20th.

8          MS. BLACKWELL:  And the fixed meaning of the pardon

9    is it applies to cases like this.

10          THE COURT:  It's not an ad hoc dribble out, like

11    what about this one?  There is an intention.  There is

12    language, I would argue, that governs.  You argue that the

13    president's intention governs, perhaps more than the plain

14    language, and I'm looking -- I will be looking for authority

15    to support that argument.

16          But it's not -- it can't be the case that a pardon

17    can be issued in vague terms and, you know, months later the

18    president can make a determination that this is what it means.

19    There has to be some overarching meaning to this pardon from

20    which the department does its proper role of applying the

21    pardon to cases.  But it has to have meaning.  And the only

22    meaning I see is what the plain language provides.

23          So if there's some alternative meaning, other than

24    the plain language, I need to know what that is.  Because I do

25    have a role here, right?  I mean, the pardon doesn't itself --

1    it's not a mechanical exercise where the pardon hits the

2    Court's docket and a defendant is released.  There is a role

3    for the judge to execute the order releasing a defendant or

4    not ordering a defendant to report.  There is a judicial role

5    here to interpret the pardon.  You agree with that?

6            MS. BLACKWELL:  Not necessarily, because it's only

7    in a few cases that we needed to rely on judicial

8    interpretation because really, this is an executive function.

9    It is an executive order.

10           THE COURT:  Understood it's an executive function,

11   but it's not an executive function that results in release of

12   people from prison without a court order.  And the Court's

13   role is to apply the pardon to the facts.  But if the pardon

14   said Mr. Wilson is pardoned for a list of January 6th

15   offenses, and he's before me on a murder conviction, I have a

16   role in saying this pardon doesn't cover the murder

17   conviction.  Agreed?

18           MS. BLACKWELL:  So, no, Your Honor, respectfully, I

19   would say that that would be up to the executive, and the

20   executive in that case would be saying, no, the pardon doesn't

21   cover this.

22           THE COURT:  Even though the pardon that I'm

23   describing here says Mr. Wilson is pardoned for an assault, a

24   conspiracy to assault federal officers on January 6th of 2021,

25   that's the plain language of the pardon, let's put this aside.

1    It's a clear pardon, one offense on one date.  And before me

2    is another case involving a murder from five years ago.

3           You're saying that that pardon, if you said it,

4    covered that?  That conviction, you came to court and said,

5    Your Honor, despite what the plain language of this pardon

6    says, President Trump says it covers his murder conviction,

7    that I would be bound to release him for the murder

8    conviction, without a pardon saying -- I mean, the pardon

9    could say I pardon Dan Edwin Wilson for all crimes.  Fair

10   enough.  The president has the exclusive authority to make

11   that determination.  He can pardon Dan Edwin Wilson for any

12   crime he's ever committed.  But that's not what happened here.

13   And so the language of a pardon has to matter.

14           MS. BLACKWELL:  But in that case, I would think Your

15   Honor would at least -- and again, then we go back to

16   presidential intent and what is covered by the language of the

17   pardon, and it's the department's interpretation that this is

18   covered by the language of the pardon.

19           THE COURT:  Okay.  So your step -- your first answer

20   to my question about the plain language is the department got

21   it wrong, the plain language does, in fact, cover these gun

22   offenses.  That's your first-line argument.

23           MS. BLACKWELL:  Correct.

24           THE COURT:  Your second-line argument is even if the

25   Court disagrees and thinks the plain language does not cover

Christine T. Asif, RPR, FCRR, Federal Official Court Reporter

A300

1    the Kentucky firearm offenses, the Court has to accept the

2    government's proffer here about the president's intent.

3                MS. BLACKWELL:  Under these circumstances, yes, Your

4    Honor.

5                THE COURT:  Under what circumstances?

6                MS. BLACKWELL:  I -- I can't -- I just want to be

7    careful that I'm not speaking to other cases.  So I understand

8    under these circumstances, that I think I've sort of confined,

9    I think the Court would have to accept the government's

10   interpretation of how that's applied.

11               THE COURT:  Okay.  But if there was a pardon that

12   applied to a large number of people like this, you know,

13   January 6th defendants, and it said the president pardons, you

14   know, January 6th defendants for offenses to be determined,

15   can the president do that?

16               MS. BLACKWELL:  I don't know, Your Honor.

17               THE COURT:  You don't know.

18               MS. BLACKWELL:  No.  Like, I -- again, I'm going to

19   go back to my default of I'm not an expert on pardon law.

20               THE COURT:  But I need an expert in pardon law.

21   This is -- I have no analysis in the department's filings.

22   Like you are the department.  You are tasked with applying

23   pardons, interpreting pardons, drafting pardons.  You are the

24   experts.

25               MS. BLACKWELL:  That is --

```
1              THE COURT:  The executive branch is the experts in

2      pardons.  So if you can't answer the questions, I need you to

3      get a colleague from the department that can answer these

4      questions.

5              MS. BLACKWELL:  And I think the recourse here, Your

6      Honor, is I'm going back to the as applied, and we have

7      presented circumstances to show how the "as applied" language

8      is working in very similar cases to Mr. Wilson.

9              THE COURT:  Okay.  But is the overarching -- I'm

10     going to try to help you craft a definition that you're

11     comfortable with, because I don't think that you can just have

12     an open pardon without any meaning.  I don't -- I think it

13     can't be completely divorced from the text.  And to the extent

14     intent informs the text, the intent has to be expressed.  It

15     can't be we know it when we see it.  Fair enough?

16             MS. BLACKWELL:  In this case, the language is broad

17     enough that -- and again, we've shown how this can be covered

18     by the broad language.

19             THE COURT:  Okay.  But you're telling me that the

20     broad language doesn't mean what you told me it meant a couple

21     weeks ago, and that is that it's tied to the events that

22     occurred at or near the Capitol on January 6th.  And in this

23     case, these offenses were separated both time and geography.

24     And there was no evidence that Mr. Wilson brought any of these

25     firearms, the six firearms he had in his place, including the
```

A302

1    automatic weapons and missing serial numbers, that you had no

2    evidence that he took any of those to January 6th.

3         So it sounds like the meaning is offenses related to

4    events means -- it includes offenses that were charged as a

5    result of either the January 6th investigation or search

6    warrants in the January 6th investigation?  Which is it?

7         MS. BLACKWELL:  I would limit it to as a result of

8    search warrants that were --

9         THE COURT:  Search warrants conducted as part of the

10   January 6th investigation?

11        MS. BLACKWELL:  Correct.

12        THE COURT:  Okay.  So basically, any items that were

13   seized in a search related to a January 6th search warrant.

14   Is that -- is that fair?

15        MS. BLACKWELL:  I think that is fair.  I will say

16   that there is one case I am aware of in North Carolina, and

17   forgive me, Your Honor, I do not have the case caption, but

18   it's my understanding that there was CSAM located in

19   that residence and --

20        THE COURT:  There was what?

21        MS. BLACKWELL:  CSAM.

22        THE COURT:  What do you mean?

23        MS. BLACKWELL:  Child pornography.

24        THE COURT:  Okay.  So it doesn't cover child

25   pornography.

Christine T. Asif, RPR, FCRR, Federal Official Court Reporter

A303

1           MS. BLACKWELL:  But only because it's my

2    understanding that there was an already -- an existing

3    investigation into that matter.

4           THE COURT:  Okay.  So let's modify this.  So it

5    includes offenses that were charged as a result of search

6    warrants conducted as part of the January 6th investigation

7    for which the government did not have pre-existing evidence?

8           MS. BLACKWELL:  I think that's fair, Your Honor.

9           THE COURT:  Did not have pre-existing evidence.  So

10   you're saying you are proceeding with the prosecution of a

11   child pornographer based on child pornography that was seized

12   during a January 6th search warrant, but you're only

13   proceeding with respect to that prosecution because you knew

14   something about the child pornography before the search or

15   just child exploitation before the search.

16          MS. BLACKWELL:  And, Your Honor, that --

17   unfortunately, my visibility into that investigation is fairly

18   limited.  I was only informed that there was at least a

19   pre-existing investigation into either CSAM or child

20   exploitation before the search warrant for the January 6th

21   material.

22          THE COURT:  Because my understanding, and my

23   understanding is probably less like -- less informed than

24   yours, but my understanding was that there was an

25   investigation about -- related to the exploitation of

```
1    children, physically, but I'm -- was unaware of any child
2    pornography.
3              So those are -- it's not quite right, then, to say
4    an investigation for which the government did not have
5    pre-existing evidence relating to similar offenses.  I mean,
6    it's not even pre -- is that fair?
7              MS. BLACKWELL:  That's fair.
8              MR. PALLAS:  Judge, I know a little bit more about
9    that case, if you're interested.
10             THE COURT:  Sure.
11             MR. PALLAS:  My understanding is that it was a
12   situation where an adult male, January 6th defendant, was
13   having communications with an underage female and texting back
14   and forth, and an exchange of sexually explicit materials that
15   the government was aware of, or authorities were aware of, and
16   then --
17             THE COURT:  So already was aware of child
18   pornography?
19             MR. PALLAS:  Well, I think it was -- it was child
20   pornography that was related to that particular victim that
21   the defendant was exchanging --
22             THE COURT:  No, but my understanding was the
23   defendant was -- there was an investigation of child
24   exploitation of that victim.
25             MR. PALLAS:  Correct.
```

A305

1           THE COURT:  But when they did the search related to

2    January 6th, they found child pornography related to that

3    victim.

4           MR. PALLAS:  Correct, that's my understanding

5    also.

6           THE COURT:  Okay.  So again, I think we have to add

7    this qualifier, which is, this includes offenses that were

8    charged as a result of search warrants conducted as part of

9    the January 6th investigation for which the government did not

10   have pre-existing evidence relating to similar offenses,

11   because in that case -- I mean, I invite you, Ms. Blackwell,

12   to supplement the record after -- immediately after this

13   hearing if the government had pre-existing evidence about the

14   child pornography, as opposed to related sexual exploitation

15   offenses.

16          All right.  So that's an interesting line to draw,

17   because potentially, Mr. -- President Trump has pardoned --

18   you know, hypothetically, if someone -- if part of this

19   January 6th-gathered evidence includes evidence linking a

20   January 6th defendant to a murder, that's covered.  Is that

21   the government's position?

22          MS. BLACKWELL:  I would not want to take that

23   position, Your Honor, not knowing about these hypothetical

24   cases.

25          THE COURT:  Okay.  But this is my struggle,

Christine T. Asif, RPR, FCRR, Federal Official Court Reporter

A306

1    Ms. Blackwell.

2            MS. BLACKWELL:  I understand.

3            THE COURT:  We can't just have a pardon out there

4    that's just subject to reinterpretation every day depending

5    upon the egregious facts of any particular case.  It has to

6    have a fixed meaning.

7            MS. BLACKWELL:  But I think we're only speaking to

8    the charged cases of which we are currently aware, and these

9    are the charged cases that we are currently aware.  And we are

10   sort of highlighting the ones that are in a unique posture.

11           THE COURT:  Okay.  So we have to add another phrase

12   to this.  So, you know, after all of these qualifiers, then we

13   say but only those offenses of which the government is

14   aware.

15           MS. BLACKWELL:  Or which are currently charged,

16   because that would include this case, and the others that

17   were --

18           THE COURT:  But what if the murder case hasn't been

19   charged yet?

20           MS. BLACKWELL:  And again, I would leave that to

21   another prosecutor to argue that, that I don't think the

22   department's position would be the same.

23           THE COURT:  But the meaning of the pardon can't be

24   shifting from day to day.

25           MS. BLACKWELL:  Correct.  And I don't think -- I

A307

1    mean, again, I'll go back to the we don't know what we don't

2    know, so that's why I can't speak to cases that haven't been

3    charged or brought to the department's attention.

4          THE COURT:  Okay.  Back to the child porn case.  My

5    understanding is the laptops were seized as part of the

6    January 6th investigation.

7          MS. BLACKWELL:  I think that's correct, Your

8    Honor.

9          THE COURT:  But my understanding was also that the

10   agents had some knowledge of exploitation of a minor whose

11   photographs were found on the laptops.

12         MS. BLACKWELL:  I think that's correct.

13         THE COURT:  Okay.

14         MS. BLACKWELL:  And I'll also -- this language that

15   Your Honor has crafted, I will also note, does not apply to

16   the other case that I'm aware of, Mr. Edward Kelly, and that's

17   in Tennessee, and that was for actions that were separate and

18   apart from January 6th.

19         THE COURT:  Okay.  We'll get there.  But to be

20   clear, it's not my job to craft the pardon language, that's

21   the executive's, right?

22         MS. BLACKWELL:  I agree.

23         THE COURT:  I'm just trying to assist you because it

24   seems that you're telling me there is a fixed meaning.  If

25   you're telling me there's not a fixed meaning, then I need to

A308

1    know that because I think that's a problem.

2            MS. BLACKWELL:  I'm going to go back to it's the

3    intent, as demonstrated by the language, and this language is

4    very broad.  So I'm having difficulty in cabining it to -- I

5    mean, it is not Your Honor's duty to draft language.  It is

6    also -- I mean, the language is what it is, and it is my job,

7    as an advocate for the government, to show how the language

8    fits this case.

9            THE COURT:  All right.  But you've earlier said that

10   the Court really doesn't have an interpretive role here.

11           MS. BLACKWELL:  That is my understanding, Your

12   Honor, because this is a presidential pardon.

13           THE COURT:  Well, what about the 11th Circuit case

14   in which Judge Pryor talked about how one goes about

15   interpreting a pardon?  Are you familiar with that case?

16           MS. BLACKWELL:  I am not familiar with that, Your

17   Honor.

18           THE COURT:  Okay.  Well, let me discuss that with

19   you.

20           Okay.  I'm going to come up with the name in just a

21   minute.

22           MS. BLACKWELL:  Thank you.

23           THE COURT:  But in that case, Judge Pryor analogized

24   an agency's interpretation of a pardon to an agency's

25   interpretation of an executive order, and cited *Towman*.  But

Christine T. Asif, RPR, FCRR, Federal Official Court Reporter

A309

1   in that case, Judge Pryor was considering -- it's *Andrews*, by

2   the way.  I'll give you a case cite in a moment.  But

3   Judge Pryor was considering the deference owed to the Bureau

4   of Prisons when it was recalculating a sentence in the regular

5   course of business on behalf of the president.

6         Here, we've got a different situation because

7   we're -- this was in the context of a pardon.  Here, we're

8   interpreting the president's pardon, not BOP's regulation.

9   But -- I mean, the -- Judge Pryor did suggest that the Courts

10  do use ordinary tools of statutory interpretation.  And --

11  it's *Andrews v. Warden*, 958 F.3d 1072.

12        So, you know, again, I'm wondering -- I'm looking

13  for the department's view, I mean, putting aside this case,

14  how does a Court go about doing its job with respect to a

15  pardon and interpreting a pardon?  Does it give *Auer-Kisor*

16  deference to the government's interpretation?  If so, then the

17  agency's interpretation has to be reasonable.

18        MS. BLACKWELL:  I would agree.  And I will go back

19  to the default.  And again, I hate to keep repeating myself,

20  but I do believe the pardon is an executive branch function

21  and thus subject to executive branch interpretation.  It is a

22  power that is entrusted, and there's very little room, if any,

23  for judicial interpretation.

24        THE COURT:  But that's not -- I mean, the

25  11th Circuit case, granted, it's a different scenario, but

1    it's certainly viewed -- and Judge Mehta cited this recently

2    in a case in which he was looking at how to interpret the

3    pardon and whether it includes -- I don't remember the

4    specifics of that case, but whether it includes supervised

5    release, and he deferred to the government's interpretation of

6    the pardon because he deemed it reasonable.

7            So there's two instances -- that's *Rhodes*, 2025

8    Westlaw 309111.  So there are two instances there in which

9    this Court is aware of other Courts using, you know,

10    traditional statutory interpretive tools before giving

11    deference.  But certainly deferring but not to the exclusion

12    of reasonableness.  So --

13            MS. BLACKWELL:  And I think I would posture that

14    this is certainly within the realm of reasonableness, you

15    know, notwithstanding that we are inherently contradicting

16    ourselves, and for that I apologize for the imposition on Your

17    Honor's time, but, you know, I think, again --

18            THE COURT:  No, I'm not -- look, that -- I'm not

19    faulting you for that.

20            MS. BLACKWELL:  No, no, I understand.

21            THE COURT:  I just need a position.  So the

22    government is saying that -- it sounds like you're saying that

23    this is ambiguous and subject to multiple interpretations, and

24    the interpretation that you're giving it is reasonable.

25            MS. BLACKWELL:  That is correct, Your Honor.

Christine T. Asif, RPR, FCRR, Federal Official Court Reporter

A311

1          THE COURT:  You're not saying that it was a

2     interpretation that was fixed on January 20th, you're saying

3     it's evolved over time.

4          MS. BLACKWELL:  I don't think I would say that.  I

5     think our -- I think it's fair to say our understanding of the

6     intent has evolved over time.  I think given the "as applied,"

7     because certainly, when there was the pardon on that date, and

8     it applied to over a thousand individuals, so I think it would

9     be reasonable to understand that it would take some time for

10    the department to understand the intent of the executive in

11    this pardon authority.

12         THE COURT:  But now you have an understanding of

13    it.

14         MS. BLACKWELL:  That is correct.

15         THE COURT:  And your understanding of what President

16    Trump's intent was on January 20th was that the pardon would

17    include offenses that were charged as a result of search

18    warrants conducted as part of the January 6th investigation

19    for which the government did not have pre-existing evidence

20    relating to similar offenses, but only those the department

21    was aware of.

22         MS. BLACKWELL:  That is correct, Your Honor.

23         THE COURT:  Okay.

24         MS. BLACKWELL:  And I only add the last caveat

25    because --

Christine T. Asif, RPR, FCRR, Federal Official Court Reporter

A312

1          THE COURT:  The hypothetical that I raised.

2          MS. BLACKWELL:  Correct.

3          THE COURT:  Okay.  But that's your understanding of

4    President Trump's intent on January 20th.

5          MS. BLACKWELL:  That is correct.

6          THE COURT:  And you don't expect that to change in

7    another court.

8          MS. BLACKWELL:  I do not, not under these similar

9    fact patterns.  I think -- my hesitation is because I am aware

10   of these cases, this one in North Carolina that we've talked

11   about, Mr. Kelly in Tennessee, that the defense counsel may

12   attempt to argue that the pardon applies in those instances,

13   and I believe the department is taking the position that it

14   does not.  Because we've talked about the extenuating

15   circumstances.

16         THE COURT:  And tell me the distinction you can draw

17   in that case from this case.

18         MS. BLACKWELL:  So Mr. Kelly's conduct was

19   completely different from the events of January 6th of 2021.

20         THE COURT:  In what way?

21         MS. BLACKWELL:  He actually -- it was a separate

22   plot and conspiracy, if you will, to assassinate the agents.

23         THE COURT:  That did arise out of the January 6th

24   investigation.

25         MS. BLACKWELL:  But it did not, because his

1    conspiracy to then assassinate them was a separate crime that

2    went to a jury trial.

3            THE COURT:  Okay.  But -- I mean, so was

4    Mr. Wilson's possession of firearms in Kentucky, is a separate

5    crime.

6            MS. BLACKWELL:  But that was not -- but again, we

7    only became aware of that contraband because of the search

8    warrant for evidence related to January 6th.  Mr. Kelly's

9    conduct was separate and apart from that.

10          THE COURT:  But if you apply kind of a but for test

11    that the defense sort of suggests in its filing, you know, but

12    for the January 6th investigation, there never would have been

13    a need to threaten an agent.

14          MS. BLACKWELL:  But again -- but he did, he did

15    threaten those agents and the FBI headquarters there in

16    Tennessee and, you know, that was unrelated, if you will, to

17    what happened on January 6th.

18          THE COURT:  Because it didn't stem from a search

19    warrant.

20          MS. BLACKWELL:  Correct.

21          THE COURT:  But it certainly stemmed from the

22    January 6th investigation, but not the search warrant.  So

23    this just covers contraband items seized in a search warrant

24    that leads to charges.

25          MS. BLACKWELL:  Correct.

A314

1          THE COURT:  And in terms of the level of deference

2     that this Court should accord to the president's

3     interpretation of the pardon, do you think that the Court's

4     correct to apply *Auer-Kisor* deference, give it deference so

5     long as the Court deems it reasonable?

6          MS. BLACKWELL:  That is correct, Your Honor.

7          MR. PALLAS:  Sorry, I didn't hear that last part,

8     Judge, the deference?

9          THE COURT:  I was asking whether the level of

10    deference, if this Court should accord to the president's

11    interpretation, is in line with *Auer* and *Kisor* deference; in

12    other words, if it's reasonable the Court can give deference,

13    but first the Court has to determine that the plain language

14    of the text is not clear.

15          Okay.  So again, the defense has argued that there's

16    definitely a tie to search warrants, right, as opposed to

17    broader events like the example you just provided.

18          MS. BLACKWELL:  Correct.  Tied to search warrants

19    for which there was no pre-existing investigation into related

20    conduct.

21          THE COURT:  Okay.  So the cases that you cited in

22    your filing included the case out of the Middle District of

23    Florida, Mr. Ball, and that defendant's charges were

24    dismissed, as I understand.

25          MR. PALLAS:  It was my case, judge.

Christine T. Asif, RPR, FCRR, Federal Official Court Reporter

A315

```
1              THE COURT:  Sorry?

2              MR. PALLAS:  That was my case.

3              THE COURT:  That was yours, okay.

4              As I understand it, the charges were dismissed

5    against Mr. Ball -- these were firearm-related charges --

6    because, like Mr. Wilson, these firearms were seized during a

7    search warrant in connection with January 6th, search warrant,

8    right.  Okay.

9              The government also cited U.S. v. Jeremy Brown,

10   another Middle District of Florida case, in which a defendant

11   had been convicted of possession of a firearm, but I think

12   that there was other -- and other weapons, I think.

13             MS. BLACKWELL:  I believe it may have been other

14   weapons, Your Honor, and that was actually convicted at a jury

15   trial.

16             THE COURT:  Okay.

17             MR. PALLAS:  Grenade.

18             THE COURT:  So that included a grenade.

19             MS. BLACKWELL:  Yes.

20             THE COURT:  So people who were prosecuted for having

21   grenades that were discovered as a result of a January 6th

22   case, those are pardoned as well.

23             MS. BLACKWELL:  That's correct.

24             MR. PALLAS:  Judge, he was a -- he's a -- a military

25   officer or former -- former Green Beret, actually, and the
```

A316

```
1    search warrant in that case was only for two misdemeanors.
2            THE COURT:  Okay.  But I think he also -- correct me
3    if I'm wrong, did he not have a conviction for possession of
4    classified information?
5            MR. PALLAS:  Documents, yes.
6            MS. BLACKWELL:  Yes.
7            THE COURT:  So he was pardoned for that as well.
8            MS. BLACKWELL:  That's correct.
9            THE COURT:  The possession of classified
10   information, possession of a grenade, and firearms.
11           MS. BLACKWELL:  Yes.
12           THE COURT:  That's covered.
13           And then the Kelly case is the case that you talked
14   about involving the threat to an agent; is that right?
15           MS. BLACKWELL:  Correct.
16           THE COURT:  Okay.
17           MR. PALLAS:  There was one other cited, Your Honor,
18   Costianes.
19           THE COURT:  Yeah, that's the 4th Circuit case?
20           MR. PALLAS:  Yes.
21           THE COURT:  Remind me the facts of that case.
22           MR. PALLAS:  That was a search warrant that
23   discovered a weapon -- a firearm and drugs.
24           THE COURT:  Drugs.
25           MR. PALLAS:  And he was --
```

Christine T. Asif, RPR, FCRR, Federal Official Court Reporter

A317

```
1              THE COURT:  Okay.

2              MR. PALLAS:  It was something -- it was drugs --

3     prescription drugs without a prescription and a firearm, and

4     he was charged under the same statute that Hunter Biden was, a

5     prohibited person, being a drug possessor.

6              THE COURT:  Okay.  So it sounds like a search that

7     uncovers anything, firearms, explosives, national security

8     information, drugs, child pornography, but only if the

9     government doesn't already know about related child

10    exploitation offenses, all of those will be covered by this

11    pardon.  There's really no limit to what's covered by this

12    pardon in terms of evidence discovered in someone's home as a

13    result of a January 6th search.

14             MS. BLACKWELL:  I believe that's the department's

15    position --

16             THE COURT:  I mean, that's just extraordinary.  It's

17    kind of a blanket pardon for offenses that can come out of

18    investigations that stemmed from items seized in one

19    investigation.

20             MR. PALLAS:  I'm sorry, Judge, may I say something,

21    you know, pardons themselves are extraordinary, you know, the

22    former president pardoned -- I think it was 37 people on death

23    row, or commuted --

24             THE COURT:  No, absolutely, pardon is an

25    extraordinary -- it's an extraordinary pow- -- it's
```

```
 1   extraordinary authority, Mr. Pallas, I agree.  The president
 2   could pardon again, you know, Dan Edwin Wilson for anything
 3   he's ever done.  It's an extraordinary power.  The question is
 4   what did he do on January 20th of 2025.  What is the meaning
 5   of this pardon?  It's not that he doesn't have the power to
 6   exercise his pardon in extraordinary ways, he certainly does.
 7   It's --
 8            MR. PALLAS:  On January 20th, 2025, he pardoned
 9   Dan Edwin Wilson for this January 6th case and for the
10   Kentucky case.  That's clear.
11            THE COURT:  Well, that's not what the -- what I
12   determine the plain language of the pardon said or the
13   department determined that's what the plain language of the
14   pardon said.
15            MR. PALLAS:  But you don't have the authority to
16   determine that.  The pardon power is plenary.  You don't --
17   unlike --
18            THE COURT:  The decision to issue a pardon is
19   plenary.  I think the Court does have a role in interpreting a
20   pardon.
21            MR. PALLAS:  You don't, Judge.  You have to accept
22   it.  It's not like an act of Congress, where you have judicial
23   review and you can strike it down as unconstitutional.
24            THE COURT:  What do you say about Judge Pryor's
25   11th Circuit opinion?  What's your response to that or
```

```
 1    Judge Mehta's opinion?  They're wrong?
 2              MR. PALLAS:  I'll tell you exactly -- I'm going to
 3    get to Judge Pryor's decision in a second, because the second
 4    part of my argument is that because you have no ability to
 5    modify or review or strike down a pardon, the fact is you
 6    don't even have a right to interpret it, and I'll tell you
 7    why, because President Trump pardoned this man for the
 8    offense, and how do we know that?  Because he issued a pardon
 9    and he's the executive, and the pardon can only come from the
10    president.  And the woman that's in the courtroom as an
11    Assistant U.S. Attorney is part of the executive branch, and
12    she's telling you what the judge -- what the president means
13    by this pardon.
14              In other words, we're in a situation which is very
15    unique.  We have pardons that are issued on day one of an
16    administration where the president, who does the pardoning, is
17    still the president.  For example, prior to President Biden
18    leaving office, he issued pardons.  He pardoned his son,
19    Hunter Biden.  If the Department of Justice wanted to charge
20    Hunter Biden, you know, you, as the judge, would have to
21    determine the scope or the application of that pardon.  That's
22    fine.  Why?  Because President Biden is no longer the
23    executive.
24              Here, President Trump is the executive.  A
25    representative of President Trump is in your courtroom telling
```

```
1    you what President Trump intended with this pardon.  She's

2    telling you that President Trump intended to pardon this man

3    for the January 6th case and the Kentucky case.

4             THE COURT:  Okay.  So I want to make --

5             MR. PALLAS:  It's not subject to interpretation,

6    Judge.

7             THE COURT:  I want to make sure I'm understanding

8    your argument.  You're saying that if an issue arose in a case

9    involving a defendant who was pardoned by President Biden, I,

10   as a Court, would have the ability to interpret that pardon

11   because he's no longer president.  But if he were president, I

12   would have no authority to interpret a pardon issued by

13   President Biden.

14            MR. PALLAS:  No, by President Trump.

15            THE COURT:  No, but you said a moment ago if -- I

16   thought you said, and maybe I misunderstood what you were

17   saying, but I thought you said if -- you could interpret a

18   pardon by President Biden because he's no longer president.

19   But that I can't --

20            MR. PALLAS:  Correct.

21            THE COURT:  So you're saying that if I had an issue

22   arise in one of my cases relating to a defendant who had been

23   pardoned in some respect, I could interpret President Biden's

24   pardon, but only because he's no longer president.

25            MR. PALLAS:  Correct.  And that's why *Andrews*
```

Christine T. Asif, RPR, FCRR, Federal Official Court Reporter

A321

```
 1    doesn't apply, because Andrews was a pardon by President Obama
 2    in 2003, and reviewed in 2020.
 3                 THE COURT:  Okay.  So --
 4                 MR. PALLAS:  A Court, an Article III Court has the
 5    right to review the scope of the pardon with the applicability
 6    of the pardon.  But here, the applicability is not of your
 7    concern, Your Honor, because the executive is speaking to
 8    you --
 9                 THE COURT:  Okay.
10                 MR. PALLAS:  -- today, telling you --
11                 THE COURT:  I didn't note -- I didn't appreciate --
12    did Judge Pryor draw that distinction in his opinion, that he
13    could interpret it simply because President Obama was no
14    longer president?
15                 MR. PALLAS:  No, because it's not an issue, but the
16    pardon -- I'm reading it -- it was from 2003.
17                 THE COURT:  No, I understand, but Judge Pryor didn't
18    draw that distinction.
19                 MR. PALLAS:  I don't know if he did or she did or
20    not.
21                 THE COURT:  He.
22                 MR. PALLAS:  No, actually, it's she.  There's two
23    Judge Pryors, there's Jill Prior and William Pryor.  Jill
24    Pryor wrote the opinion and William Pryor concurred, I think.
25    It's an unusual situation.  I'm in the 11th Circuit, Judge, so
```

Christine T. Asif, RPR, FCRR, Federal Official Court Reporter

A322

```
1   I know a little bit about it.  But in any event, it's a 2003
2   pardon, of course the court -- there's no issue of whether a
3   Court can --
4            THE COURT:  Okay.  In the case before Judge Mehta --
5   and by the way, I think it is Judge Bill Pryor's opinion, but
6   check that out.  I think it is.  He wrote it, I think.  But in
7   the case before Judge Mehta, and I think this involved -- I
8   gave you the cite earlier, but I think it involved maybe --
9            MR. PALLAS:  Is that the one about the supervised
10  release?
11           THE COURT:  Right.  What was that defendant's name?
12           MR. PALLAS:  I don't remember.
13           THE COURT:  So in that case, I think a defense
14  attorney asked Judge Mehta to interpret this pardon in a
15  certain way, and he heard from the executive and he credited
16  the interpretation because he found it reasonable, but he
17  certainly was interpreting the language of President Trump's
18  pardon even though President Trump is not out of office.  So
19  was that erroneous for Judge Mehta to opine on the meaning of
20  President Trump's pardon?
21           MR. PALLAS:  No, it was erroneous for Judge Mehta to
22  require commuted -- it was commuted defendants.  They were not
23  Proud Boys but the Oath Keepers.  And he -- even though they
24  were commuted, Judge Mehta's thinking was that they still had
25  to comply with supervised release --
```

A323

1          THE COURT:  No, but he reversed himself on that and

2   in doing so --

3          MR. PALLAS:  He reversed himself, correct.

4          THE COURT:  In doing so, he interpreted the pardon,

5   and he went through the analysis and determined that the

6   executive's interpretation of the pardon was reasonable, and

7   therefore, he accorded deference to it.  He undertook -- you

8   know, it seemed he applied traditional tools of statutory

9   interpretation.

10          MR. PALLAS:  But that's where the mistake is, Judge.

11  You're -- an Article III judge has no authority to interpret,

12  to modify, or to explain a pardon, especially a pardon that is

13  by an executive who is still the executive and a

14  representative of that executive is in your courtroom telling

15  you what the intent of the pardon was by the --

16          THE COURT:  I agree, the Court has no authority to

17  modify the pardon, that is true.  Does the executive have the

18  power to modify the pardon going forward?  Do you think that's

19  true, or does the executive have to issue a new pardon if the

20  executive wants to modify a pardon?

21          MR. PALLAS:  Judge, he's not modifying it.  He's --

22  he is telling his surrogate, who is in your courtroom, that

23  it's to be -- it's to be interpreted in the most expansive and

24  broad way that it is, and that's what's happening.

25          THE COURT:  Okay.  What if --

 1              MR. PALLAS:  There's no need for a new pardon.

 2              THE COURT:  What if the language of the pardon had

 3    said, you know, Daniel Edwin Wilson is pardoned for conspiracy

 4    to assault officers at the Capitol on January 6th, period,

 5    full stop, that's all it said.

 6              MR. PALLAS:  Actually, the indictment or the

 7    information to which Mr. Wilson pled in this case gave a date

 8    of, I think it was December 20th to January 6th, so right

 9    there, even your interpretation --

10              THE COURT:  All right.

11              MR. PALLAS:  You can make an argument that it

12    doesn't apply to the January 6th conduct.

13              THE COURT:  Okay.  Now, all right, the --

14              MR. PALLAS:  No, seriously.

15              THE COURT:  You get the point.  If the pardon

16    applied to a specific conviction, if the president had said, I

17    pardon Mr. Wilson for this conviction, Count 1 of the

18    indictment, superseding information, whatever it was, period,

19    that's it, and if -- that's all the pardon said, are you

20    saying that if Ms. Blackwell came in here and said, no,

21    actually, that pardon includes the Kentucky possession of

22    firearm offenses from 2023, the Court accepts at face value

23    what she's saying because that was the president's intent,

24    despite the clear language of that pardon, to pardon him for

25    Count 1?  You're saying because she says so, like, then I have

1       to --

2               MR. PALLAS:  Basically -- basically, the language

3       isn't that narrow, but basically yes.  She is sitting there as

4       part of the executive.  The executive is still the executive.

5       He is telling -- he's directing his Department of Justice that

6       this is how I intended the pardon to be applied.  Did I know

7       every detail of every 1500 or 1600 defendants' cases, no, of

8       course he didn't.  But this is -- it was written, and there

9       were these loose ends which people are like we're scratching

10      our heads like how do we figure this out, and the way they

11      figure it out is clear, it's clear because the defendant

12      had -- the defendant has -- I'm sorry, the president has

13      plenary power to pardon people for whatever extraordinary

14      offense, it could be the most minimal misdemeanor, it could be

15      a horrible mass murder, he has the right to do that, and he

16      does it and this Court, nor any Court can review it.  They

17      don't review --

18              THE COURT:  Okay.  Let me ask you, Mr. Pallas, one

19      more question.  So if the pardon said, I pardon Mr. Wilson for

20      the conspiracy charge in Count 1, I do not pardon him for the

21      gun possession charges in Kentucky, period, and then

22      Ms. Blackwell came to this courtroom and said, actually, the

23      pardon doesn't say that, what he really meant was he meant to

24      say I pardoned him for both of these offenses.  Can the Court

25      take what she says at face value and say, despite the plain

A326

1    language of the pardon, I'm told here that President Trump

2    intended something differently, so I'm going to correct the

3    pardon for him, or does he have to issue a new pardon?

4        MR. PALLAS:  Judge, it's -- we can stay here all day

5    thinking of different hypotheticals.

6        THE COURT:  But I'm just trying to see what the

7    outer limit to your argument is.

8        MR. PALLAS:  The outer limit is as follows:  The

9    pardon is broad enough for a reasonable person to look at it

10    and say, you know what, hey, I think that's related.  At least

11    it's related.

12        THE COURT:  Okay.

13        MR. PALLAS:  It's not -- it didn't happen on that

14    day.  It didn't -- you know, there are defendants -- there are

15    defendants that have been pardoned that weren't even on

16    Capitol Hill on January 6th.  Enrique Tarrio, he was in

17    Baltimore on January 6th and he's pardoned.  Jeremy Bertino

18    got injured and was in Baltimore, and he wasn't on

19    January 6th --

20        THE COURT:  I'm not questioning that the president

21    has extraordinary authority to pardon people.  I'm just

22    questioning whether he did -- whether he issued the pardon you

23    say he did.  And when you say it's a reasonable

24    interpretation, it sounds to me like you're backtracking and

25    saying yes, you do have some interpretive role here.

A327

1            MR. PALLAS:  No, I'm just saying that because you're

2    making hypotheticals that are just completely contrary to what

3    it says, where I can -- I pardon Mr. Wilson for this count,

4    but I don't for that count, and then the president's surrogate

5    would come to court and tell you --

6            THE COURT:  But I'm pushing --

7            MR. PALLAS:  That would never happen, Judge.  That

8    would never happen.

9            THE COURT:  I'm pushing back because you're making

10   the extraordinary statement that the Court has no interpretive

11   role.  And so I'm challenging that.  Because I don't think

12   there's any authority for that proposition.

13           MR. PALLAS:  Well, the proposition is that the

14   pardon was issued, and the president intended to pardon this

15   defendant for both instances, both conducts, and the reason we

16   know that, the reason we know that for sure, is because -- you

17   know, Ms. Blackwell is not a rogue prosecutor.  She's not

18   coming in here and telling you something that hasn't gone up

19   the chain all the way to the White House.  The White House's

20   position is that the pardon covers both conduct, and you

21   can't -- and you cannot, you, Judge, I'm sorry, you cannot say

22   no to that.  You cannot deny the defendant -- the president's

23   pardon power.  He's the only one that can do it and he's done

24   it.  And he's telling you he did it.  He's telling you he did

25   it because his surrogate is there telling you that.  That's

Christine T. Asif, RPR, FCRR, Federal Official Court Reporter

A328

```
1    how you know.

2            THE COURT:  All right.  Mr. Pallas, can you give me

3    any authority to support your position that the Court has no

4    interpretive role whatsoever?

5            MS. BLACKWELL:  Can I offer two case cites?

6            MR. PALLAS:  Ex parte Garland.

7            THE COURT:  Sorry?

8            MR. PALLAS:  Ex parte Garland is the Supreme Court

9    case.

10           THE COURT:  And what does Ex parte Garland say

11   exactly?

12           MR. PALLAS:  Saying that the defendants -- that the

13   president's pardon power is unlimited.

14           THE COURT:  I agree with that.

15           MR. PALLAS:  Okay.  Well --

16           THE COURT:  The fact that the president -- the fact

17   that the president, you know, has, again, extraordinary

18   authority does not necessarily mean the Court has no

19   interpretive authority.

20           MR. PALLAS:  Judge, let's see, I had a case up

21   here --

22           THE COURT:  All right.  Well, let me turn to

23   Ms. Blackwell, because she has a case she wants to offer.

24           MS. BLACKWELL:  If I may, Your Honor, my colleague

25   was able to send me Judge Pryor's decision, and I think
```

Christine T. Asif, RPR, FCRR, Federal Official Court Reporter

A329

1    there's specifically a note in there that the Supreme Court

2    has ruled that deference should be accorded to the executive

3    agency's interpretation of an executive order it is charged

4    with administering.  So in this case, I would say that, you

5    know, we are being accorded that deference in interpreting the

6    pardon.  And then also *Robertson v. Gibson*, 759 F.3d 1351,

7    "Accordingly, we cannot read the pardon in a vacuum, as

8    Mr. Robertson suggests.  We must look to the nature and the

9    purpose of the pardon; namely, President Ford's clemency

10   program."

11           THE COURT:  All right.  But do either of those cases

12   suggest that the text doesn't control?

13           MS. BLACKWELL:  I think it's a reasonable

14   interpretation of the text.  And in this case, as Mr. Pallas

15   notes, you have representative of the executive agency

16   offering the interpretation that the president meant.

17           THE COURT:  All right.  And I've not decided this.

18   I decided it once, but I'm being asked to reconsider the

19   decision that I rendered, which was that the plain of the

20   pardon was clear, does not apply to these offenses.  The

21   government agreed with me at the time, but the government is

22   asking me to reconsider because the government no longer

23   thinks that the plain text of the pardon answers this

24   question.

25           And so there -- the government's saying there's some

Christine T. Asif, RPR, FCRR, Federal Official Court Reporter

A330

```
 1    ambiguity to the language.  Despite the position it took
 2    earlier, it believes the language is ambiguous.  And the
 3    government's saying it is reasonable to interpret it in a way
 4    that applies to offenses that were charged as a result of
 5    search warrants conducted as part of the January 6th
 6    investigation for which the evidence -- for which the
 7    government did not have pre-existing evidence relating to
 8    similar offenses.
 9              MS. BLACKWELL:  That is correct, Your Honor.
10              THE COURT:  Okay.  Anything more you can -- other
11    than those two cases you can provide to me with regard to the
12    amount of deference?  It sounds like you're not agreeing with
13    Mr. Pallas that there's no role for the Court, but you're
14    saying the Court -- and I agree, the Court does have to accord
15    deference.  The question is how much deference.
16              MS. BLACKWELL:  And I would think almost exclusive
17    deference when you were presented with an interpretation that
18    is reasonable such as this one by the current executive
19    branch.
20              THE COURT:  Exclusive deference, but that's not --
21    is that what the Pryor case says?
22              MS. BLACKWELL:  Because it's -- because this is a
23    reasonable interpretation.  I mean, the Pryor case was
24    definitely very differently postured from this.  So I would
25    think that, again, you know, this is the current executive
```

A331

 1    informing the Court as of the interpretation of this pardon.

 2              THE COURT:  Okay.  What I would like from the

 3    government, because we've done this informally, I'd like the

 4    government in the next, you know, hour after this hearing, to

 5    file with the Court the government's interpretation of the

 6    pardon.  I want you to confirm whether you and I have stated

 7    it correctly.

 8              MS. BLACKWELL:  I would ask Your Honor for more time

 9    than just an hour to --

10              THE COURT:  No.  No.  We had -- we've had these

11    motions, you know, filed for some time now.  There is a

12    meaning that existed on January 20th.  It's not out there in

13    the clouds somewhere.  There was a meaning at the time.  And

14    here we are, six weeks later, and we're needing more time to

15    tell me what the meaning of that pardon is.

16              MS. BLACKWELL:  And I think we have said that.  I

17    don't think -- I'm not going to get or be able to get

18    additional plain language that says the pardon covers "X."  We

19    are saying the pardon covers "X."  It covers "X" here, it

20    covers the Jeremy Brown case, it covers the Daniel --

21              THE COURT:  Okay.

22              MS. BLACKWELL:  -- case.

23              THE COURT:  But the -- again, the pardon isn't a

24    document that has, I pardon the January 6th defendants for all

25    the things that happened on January 6th at the Capitol, and

Christine T. Asif, RPR, FCRR, Federal Official Court Reporter

A332

```
1   any other offenses for which I decide in the future it applies
2   to.  You agree, can't do that
3            MS. BLACKWELL:  And we're not doing that.  This is
4   the --
5            THE COURT:  Okay.  So there is -- there is a
6   meaning.
7            MS. BLACKWELL:  It is --
8            THE COURT:  -- that you're applying right now to
9   make these determinations.  And it is a -- it had to be formed
10  on January 20th.
11           MS. BLACKWELL:  It is the interpretation of that
12  pardon, and that's what we are doing here.
13           MR. PALLAS:  Judge, I think the --
14           THE COURT:  Just a minute, Mr. Pallas.  Just a
15  minute.
16           MR. PALLAS:  Okay.  I'm sorry.
17           THE COURT:  Say that again.
18           MS. BLACKWELL:  It is the interpretation.  I'm going
19  back to the Andrews v. Warden, that this is the interpretation
20  of that executive order, and that is what we have been
21  discussing.
22           THE COURT:  Okay.  So you want me -- what you're
23  saying is don't give you extra time to tweak this definition.
24  You want me to accept the definition.  You're speaking for the
25  executive branch here, and this is the meaning of the
```

Christine T. Asif, RPR, FCRR, Federal Official Court Reporter

A333

1    January 20th, 2025 pardon.  I would have thought -- I would

2    have thought you wanted additional time.  I will accept this,

3    but I'm surprised that you don't want time to refine this.

4         MS. BLACKWELL:  But I am speaking as to this case,

5    and we've discussed how it applies to these circumstances and

6    other circumstances.  And I was very careful in our pleadings

7    to say that under these circumstances, the pardon applies.

8         THE COURT:  I know, but the -- there has to be -- I

9    think what you're saying, then, is that I have to just go to

10   the text of the pardon.

11        MS. BLACKWELL:  But as --

12        THE COURT:  And if I interpret the text, and I do --

13   my best reading of the text --

14        MS. BLACKWELL:  But that is where we get back to the

15   judicial role versus the executive role, and the judicial role

16   is to give deference to the executive.

17        THE COURT:  If it's reasonable.

18        MS. BLACKWELL:  And we are giving a reasonable

19   interpretation.

20        THE COURT:  But the reasonable interpret- -- I can't

21   just -- just itemizing two offenses in this offense, in this

22   case, two possession offenses in this case is not enough for

23   the Court to assess the reasonableness of the executive's

24   interpretation.

25        MS. BLACKWELL:  But in context of the other examples

Christine T. Asif, RPR, FCRR, Federal Official Court Reporter

A334

1    we have given you.

2              THE COURT:  Okay.  So we've strung together how we

3    can make all these examples work together.  And again, like,

4    I'm not going to order it, but I will give you, you know, this

5    afternoon to file a revision to this.  You and I have pieced

6    together these different cases, and we've come up with a

7    interpretation that fits -- makes all of them work together,

8    because clearly, there's got to be -- in order for the

9    interpretation to be reasonable, it has to make sense in how

10   the government's applying it.  You agree with that.

11             MS. BLACKWELL:  So, Your Honor -- but Your Honor is

12   only looking at this case.

13             THE COURT:  No, I'm looking at the other cases

14   too.

15             MS. BLACKWELL:  But, Your Honor, you can't issue an

16   interpretation as to other cases.  It is only this case that

17   is in front of you.  So I guess I will push back on that.

18             THE COURT:  Okay.  So, agreed, but in assessing the

19   reasonableness of the interpretation you're providing the

20   Court here, if I know next door you're taking the opposite

21   interpretation, are you saying that that different litigating

22   position in another case is not something the Court can

23   consider in deciding whether to give deference to your

24   interpretation?  Surely, I can.

25             MS. BLACKWELL:  Yes, but I don't think there is

1    another courtroom next door where we're taking a different

2    position.  We are being consistent in these positions.

3              THE COURT:  But -- and the way you're being

4    consistent is to interpret the pardon in the way you and I

5    have discussed here.  That's how it all makes sense.  That's

6    how it all strings together.  When you take these five cases

7    and you say, well, we're proceeding on the child pornography

8    case, you're proceeding on the child pornography case because

9    you say you had pre-existing knowledge of related sexual

10   offenses that makes that case different.  So you're not

11   proceeding on the others.  You're not proceeding on the

12   grenade and the national security information or any of those

13   because you didn't know about them ahead of time.

14             MS. BLACKWELL:  Know about them being the

15   contraband, not that we didn't know about those cases; that's

16   correct, Your Honor.

17             THE COURT:  Yeah.

18             MS. BLACKWELL:  I guess, you know, again, I struggle

19   because we are at an "as applied" instance here.  There are

20   very few cases where any judges are considering the

21   interpretation of this pardon.  This is uniquely postured

22   because, actually, the defense attorney filed a motion to have

23   this Court consider.  Otherwise, this may not have ever been

24   presented, and this might have been like a Jeremy Brown

25   case --

Christine T. Asif, RPR, FCRR, Federal Official Court Reporter

A336

1                    THE COURT:  Well, I did ask you.

2                    MS. BLACKWELL:  That is correct.

3                    THE COURT:  Because BOP, as you said at the time,

4     erroneously released Mr. Wilson from prison when he had nearly

5     five years to serve on gun charges in Kentucky.

6                    MS. BLACKWELL:  That is correct.  And again --

7                    THE COURT:  And he was incorrectly released,

8     erroneously, and so I asked you for your position why

9     shouldn't he go back to prison.  And you said we agree, he

10    should go back to prison.  So it's not -- the government has

11    created this issue itself.

12                   MS. BLACKWELL:  Understood.

13                   THE COURT:  And so, I mean, the Court does have to

14    assess the reasonableness of your position, and is that not

15    informed by all these different positions that you're

16    taking.

17                   MS. BLACKWELL:  Well, I would go back again to the

18    other examples, the enormity of the pardon that was granted in

19    these cases, and again, it is an extraordinary power, and

20    there were a lot of defendants that this power applied to.

21    And so, you know, again, understanding, from the department's

22    perspective, the presidential intent has taken some time when

23    it comes to specific cases.  And again, our apologies for the

24    interpretation from I think it was three weeks ago now, but

25    again, given these other cases which are very similarly timed

                Christine T. Asif, RPR, FCRR, Federal Official Court Reporter

A337

```
1    to Mr. Wilson's example now, I think we can give clarity to

2    what the presidential intent was and is.

3              THE COURT:  All right.  Well, you agree that the

4    president can't issue a pardon that violates the

5    Constitution.

6              MS. BLACKWELL:  I would agree with that.  It is an

7    extraordinary power, but it can't usurp the Constitution, that

8    is correct.

9              THE COURT:  Okay.  And who would decide whether the

10   pardon violated the Constitution?  Would that be the president

11   or the Court?

12             MR. PALLAS:  Nobody, Judge.  You wouldn't -- you

13   don't have the right to review the pardon for

14   constitutionality.  This is not Marbury v. Madison.

15             THE COURT:  Okay.  Well --

16             MR. PALLAS:  You can review acts of Congress.  You

17   cannot review the president's plenary power of pardoning

18   convictions.  You can --

19             THE COURT:  Okay.

20             MR. PALLAS:  -- go back and look at all of Hunter

21   Biden -- I mean, President Biden's prospective pardons for

22   14 years ago and they're too broad, nobody can do that.  It's

23   done, you have to accept it.  Our --

24             THE COURT:  I'm accepting the pardon.  I'm accepting

25   the language of the pardon.  The question is how far afield
```

A338

```
1      from the language can -- can it go.
2                  MR. PALLAS:  The pardon --
3                  THE COURT:  So --
4                  MR. PALLAS:  -- says related.  And can you say --
5      can you say that the seizure of firearms in Mr. Wilson's home
6      on a day that a search with probable cause for the January 6th
7      and searching for evidence of January 6th were discovered when
8      that search warrant was served, can you say that those aren't
9      related?  Can you say those firearms are not related to
10     January 6th in any way?  I mean, just use the word "related"
11     in the most broadest term.  I mean, the relationship can go
12     from 1 percent to 99 percent.  It's related, though.  It is
13     related.  There would not have been a firearm case because
14     there would not have been a search of his residence absent or
15     but for the J6th search warrant.  It's related.  That's the
16     end of the inquiry.
17                 THE COURT:  All right.  Ms. Blackwell, I'm informed
18     that in Brown, the classified information was known to an
19     Air Force Office of Special Investigations back in 2017.  But
20     that's covered by the pardon.
21                 MS. BLACKWELL:  (Nodding.)
22                 THE COURT:  So --
23                 MR. PALLAS:  It's even broader.  It's broader than
24     Your Honor thought at the beginning --
25                 THE COURT:  That's why I'm asking for some
```

Christine T. Asif, RPR, FCRR, Federal Official Court Reporter

A339

1    additional thoughts on this.  I'll give you till the end of

2    the day today, close of business.  If the government doesn't

3    want to, by 5:00 p.m., supplement its position here, that's

4    fine.  I'll go with what we discussed here.

5           Okay.  Anything else, Ms. Blackwell?  You're in a

6    very difficult position.

7           MS. BLACKWELL:  Not from the government.

8           THE COURT:  Appreciate your attempts to answer the

9    Court's questions.

10          MS. BLACKWELL:  Thank you, Your Honor.

11          THE COURT:  All right.

12          MR. PALLAS:  Can we address Mr. Wilson's surrender

13    date.

14          THE COURT:  Yes.  Yes, just one moment.

15          Let me just ask you, Ms. Blackwell, do you agree

16    with the defense that the 2255, alleging the due process

17    violation, is appropriate vehicle by which the defense should

18    raise this argument?  I know he's not in custody, but I think

19    there are cases suggesting that the 2255 is appropriate where

20    a sentence has been imposed.  You agree?

21          MS. BLACKWELL:  Yes, Your Honor, we agree --

22          THE COURT:  You agree it's a due process violation?

23          MS. BLACKWELL:  It's the correct procedural vehicle

24    for this matter.

25          THE COURT:  There would be a due process violation

A340

```
 1    to order him to return to prison if the pardon does, in fact,

 2    cover this offense.

 3              MS. BLACKWELL:  Correct.

 4              THE COURT:  All right.

 5              Yes, so Mr. Wilson is at this point subject to an

 6    order to report tomorrow to the Bureau of Prisons.  The Court

 7    is going to take this under advisement.  The Court expects to

 8    issue an opinion shortly.

 9              If the Court were to deny the defendant's motion, I

10    take it Mr. Pallas or the government would appeal the Court,

11    in which case the Court would be inclined to stay any order

12    for Mr. Wilson to report, at least long enough for you to seek

13    a stay in the circuit.

14              So all of that means -- and I haven't decided yet

15    what I'm going to rule.  But in the worst-case scenario for

16    Mr. Wilson, that means, in all likelihood, he doesn't have to

17    report tomorrow, because I would stay the order just long

18    enough for you to appeal, which I expect you would; is that

19    right, Mr. Pallas?

20              MR. PALLAS:  Yes, Your Honor.  We would probably

21    file a notice of appeal immediately and then, I guess, a stay

22    along with -- you know, as long as the notice of appeal was

23    filed, you would stay it pending the decision --

24              THE COURT:  Well, I would give you short time.

25    You'd have to file a motion for stay before the Court of
```

```
 1    Appeals.
 2            MR. PALLAS:  I mean, well, so you wouldn't -- you
 3    would not --
 4            THE COURT:  Yeah, I --
 5            MR. PALLAS:  Well, if we file a notice of appeal,
 6    aren't you going to --
 7            THE COURT:  I'm just not sure how -- I don't know,
 8    you know, the length of time for an administrative stay that's
 9    appropriate.
10            MR. PALLAS:  30 days, I mean, at least -- we're not
11    going to --
12            THE COURT:  I don't know that -- I'm not certain I
13    have that amount of -- that authority to stay for that period
14    of time.
15            MR. PALLAS:  Judge, I mean, I think it's pretty
16    obvious it's a good-faith issue here.
17            THE COURT:  No, I mean, for sure you can seek a
18    stay.  I'm just not sure if I'm the one who should decide it
19    or the Court of Appeals.
20            MR. PALLAS:  Well, I don't think any party is going
21    to object to the stay.
22            THE COURT:  All right.  What's the government's
23    position?
24            MS. BLACKWELL:  We would not object to a stay, Your
25    Honor.
```

Christine T. Asif, RPR, FCRR, Federal Official Court Reporter

A342

62

```
1              THE COURT:  Okay.  All right.  Well, that's good to
2       know.
3              All right.  I'll order the government to supplement
4       the record, if it desires, on or before 5:00 p.m. today.
5              MS. BLACKWELL:  Yes, Your Honor.
6              THE COURT:  Okay.
7              MS. BLACKWELL:  Okay.
8              THE COURT:  All right.  Thank you, all.
9              MS. BLACKWELL:  Thank you.
10             MR. PALLAS:  Thank you, Your Honor.
11             (The proceedings were concluded at 1:05 p.m.)
12
13             I, Christine Asif, RPR, FCRR, do hereby certify that
       the foregoing is a correct transcript from the stenographic
       record of proceedings in the above-entitled matter.
14
                        _____/s/_____
15                        Christine T. Asif
                          Official Court Reporter
16
17
18
19
20
21
22
23
24
25
```

Christine T. Asif, RPR, FCRR, Federal Official Court Reporter

A343

# U.S. District Court
## District of Columbia (Washington, DC)
## CRIMINAL DOCKET FOR CASE #: 1:24–cr–00238–DLF–1

Case title: USA v. WILSON                     Date Filed: 05/16/2024

Assigned to: Judge Dabney L. Friedrich

**Defendant (1)**

**DAN EDWIN WILSON**          represented by   **Norman A Pattis**
PATTIS & PAZ, LLC
383 Orange Street
1st Floor
New Haven, CT 06511
203–393–3017
Fax: 203–393–9745
Email: npattis@pattispazlaw.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Designation: Retained*

| **Pending Counts** | **Disposition** |
| --- | --- |
| 18:922(g)(1) and 924(a)(2); UNLAWFUL TRANSPORT OF FIREARMS, ETC.; Possession of a Firearm by a Prohibited Person (1) | Sixty (60) months incarceration to run concurrent to Count 2 and Count 1ss in 23cr427. Three (3) years Supervised Release to run concurrent to Count 2 and Count 1ss in 23cr427. $100 Special Assessment. |
| 26: 5841, 5861(d), and 5871; REGISTRATION OF FIREARMS; Possession of an Unregistered Firearm (2) | Sixty (60) months incarceration to run concurrent to Count 1 and Count 1ss in 23cr427. Three (3) years Supervised Release to run concurrent to Count 1 and Count 1ss in 23cr427. $100 Special Assessment. |

**Highest Offense Level (Opening)**

Felony

| **Terminated Counts** | **Disposition** |
| --- | --- |
| None | |

**Highest Offense Level (Terminated)**

None

| **Complaints** | **Disposition** |
| --- | --- |
| None | |

**Plaintiff**

**USA**          represented by   **Anthony William Mariano**
U.S. ATTORNEY'S OFFICE FOR THE DISTRICT OF COLUMBIA
601 D Street, NW
Washington, DC 20530

A344

(202) 476–0319
Email: anthony.mariano2@usdoj.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Designation: Assistant U.S. Attorney*

| Date Filed | # | Docket Text |
|---|---|---|
| 05/16/2024 | 1 | CONSENT TO TRANSFER CASE for Plea and Sentence under Rule 20 from United States District Court for the Western District of Kentucky by DAN EDWIN WILSON. (NOTICE OF FORFEITURE) (zstd) (Entered: 05/16/2024) |
| 05/16/2024 | 2 | RULE 20 Transfer Notice by USA as to DAN EDWIN WILSON from United States District Court for the Western District of Kentucky, CR No. 23–cr–00003. Certified copies of docket sheet and indictment/information received. (Attachments: # 1 Indictment, # 2 Related Case Form– Criminal, # 3 Docket Sheet)(zstd) (Entered: 05/16/2024) |
| 05/17/2024 | | Minute Entry for Plea Agreement Hearing as to DAN EDWIN WILSON held on 5/17/2024 before Judge Dabney L. Friedrich. Guilty Plea entered by DAN EDWIN WILSON as to Counts 1,2. REFERRAL TO PROBATION OFFICE for Presentence Investigation. Responses to Sentencing due by 8/15/2024. Sentencing Memorandum due by 8/9/2024. Sentencing set for 8/22/2024 at 11:00 AM in Courtroom 14– In Person before Judge Dabney L. Friedrich. Bond Status of Defendant: Personal Recognizance; Court Reporter: Sara Wick; Defense Attorney: Norman Pattis; US Attorney: Anthony Mariano and Mindy Deranek. (zjch, ) (Entered: 05/20/2024) |
| 05/20/2024 | 4 | PLEA AGREEMENT as to DAN EDWIN WILSON (zjch, ) (Entered: 05/20/2024) |
| 05/20/2024 | 5 | WAIVER of Trial by Jury as to DAN EDWIN WILSON. Approved by Judge Dabney L. Friedrich on 5/17/2024. (zjch, ) (Entered: 05/20/2024) |
| 05/20/2024 | 6 | STATEMENT OF OFFENSE by DAN EDWIN WILSON (zjch, ) (Entered: 05/20/2024) |
| 08/09/2024 | 8 | SENTENCING MEMORANDUM by USA as to DAN EDWIN WILSON (Attachments: # 1 Exhibit 1–21)(Mariano, Anthony) (Entered: 08/09/2024) |
| 08/09/2024 | 9 | NOTICE *of Proposed Consent Order of Forfeiture* by USA as to DAN EDWIN WILSON (Mariano, Anthony) (Entered: 08/09/2024) |
| 08/28/2024 | | Minute Entry for Sentencing held on 8/28/2024 before Judge Dabney L. Friedrich as to DAN EDWIN WILSON: It is the judgment of the Court, the defendant is hereby committed to the custody of the Bureau of Prisons for (60) months as to Count 1, Count 2 and Count 1ss in 23cr427, with all such terms to run concurrently. The Defendant is further sentenced to serve a Three (3) year term of Supervised Release as to Count 1, Count 2 and Count 1ss in 23cr427, with all such terms to run concurrently. It is further ordered that the Defendant pay a $200 special assessment ($100 per count). Oral Government Motion for remand (pursuant to the plea agreement) heard and GRANTED. Bond Status of Defendant: Remanded/Commitment Issued. US Attorneys: Anthony Mariano and Mindy Deranek. Defense Attorney: Norman Pattis. Probation Officer: Sherry Baker. Court Reporter: Sara Wick. (smc) (Entered: 08/28/2024) |
| 08/28/2024 | 12 | CONSENT FINAL ORDER OF FORFEITURE as to DAN EDWIN WILSON.. Signed by Judge Dabney L. Friedrich on 8/28/2024. (smc) (Entered: 08/28/2024) |
| 09/17/2024 | 13 | JUDGMENT as to DAN EDWIN WILSON. Statement of Reasons Not Included. Signed by Judge Dabney L. Friedrich on 09/17/2024. (zljn) (Entered: 09/18/2024) |
| 09/17/2024 | 14 | STATEMENT OF REASONS as to DAN EDWIN WILSON re 13 Judgment Access to the PDF Document is restricted per Judicial Conference Policy. Access is limited to Counsel of Record and the Court. Signed by Judge Dabney L. Friedrich on 09/17/2024. (zljn) (Entered: 09/18/2024) |

A345